UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE UNITED STATES OF AMERICA,

                  Plaintiff,                        **Case No. 25-cv-06226**

        v.

THE CITY OF ROCHESTER; MALIK D.
EVANS, Mayor of Rochester, in his Official
Capacity; ROCHESTER CITY COUNCIL;
MIGUEL A. MELENDEZ, JR., President of the
Rochester City Council, in his Official Capacity,

                  Defendants.

_____

**MEMORANDUM OF LAW IN SUPPORT OF CITY DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

## <u>TABLE OF CONTENTS</u>

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

Preliminary Statement ...................................................................................................1

Statement of Facts ..........................................................................................................2

Standard of Review for Judgment on the Pleadings .......................................................6

Argument     .....................................................................................................................7

    I.     The Rochester Policies are Not Preempted by Federal Law....................................7

          a.  Rochester's Policies Are Presumed Valid .........................................................8

          b.  Further Deference is Due to the Rochester Policies Because They Further a Larger Statutory Scheme................................................................................10

          c.  Rochester's Policies Do Not Conflict with Federal Law................................12

               i.    Sections 1373 and 1644 are Not Valid Preemptive Provisions ...........13

              ii.    Plaintiff's Express Preemptive Claim Fails .........................................14

             iii.    Plaintiff's Conflict Preemption Claim Fails .......................................18

    II.    The Unsigned Complaint Violates Rule 11 ........................................................23

    III.    Plaintiff's Intergovernmental Immunity Claims Must Fail ..................................24

          a.  The Rochester Policies Do Not Discriminate Against the Federal Government..................................................................................................24

          b.  The Rochester Policies Do Not Regulate the Federal Government.................25

Conclusion .....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Arizona v United States*, 567 U.S. 387 (2012) ..................................................................... passim

*Ashcroft v Iqbal*, 556 U.S. 662 (2009) ............................................................................ 6

*Auto Workers v Wisconsin Bd.*, 351 US 266 (1956) ......................................................... 9

*Chamber of Commerce v Whiting*, 563 U.S. 582 (2011) ............................................... 19

*City & Cty. of San Francisco v Sessions*, 349 F. Supp 3d 924 (N.D. Cal. 2018) ................ 14, 17

*City of Chicago v Sessions*, 888 F.2d 272 (7th Cir. 2018) ........................................... 11

*City of El Cenzio v Texas*, 890 F.3d 164 (5th Cir. 2018) ............................................. 21

*City of New York v United States*, 179 F.3d 29 (2d Cir. 1999) .................................... 11, 14

*City of Philadelphia v Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) .................... 11, 17

*Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034 (D. Colo. 2020) ...................... 14

*County of Ocean v Grewal,* 475 F. Supp. 3d 355 (D.N.J. 2020) ............................................ 17, 22

*DeCanas v Bica*, 424 U.S. 351 (1976) .......................................................................... 9

*Gerbasi v NU Era Towing and Service, Inc.*, 443 F.Supp.3d 411 (W.D.N.Y. 2020) ................... 6

*Hernandez v United States*, 939 F.3d 191 (2d Cir. 2019) ............................................ 19

*Hillsborough County v Automated Medical Laboratories, Inc.*, 471 US 707 (1985) .................... 9

*Kansas v Garcia*, 589 U.S. 191 (2020) ................................................................. 19, 20, 21

*Koog v United States*, 79 F.3d 452 (5th Cir. 1996) ...................................................... 10

*L-7 Designs, Inc. v Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011) ................................. 6

*Marsh v Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) ..................................................... 20

*McHenry Cnty. v Raoul*, 44 F.4th 581 (7th Cir. 2022) ............................................... 25

*Medtronic, Inc. v Lohr*, 518 U.S. 470 (1996) ............................................................. 8

*Metropolitan Life Ins. Co. v Massachusetts*, 471 US 724 (1985)..................................................... 9

*Murphy v National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ..................................... passim

*New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135 (2d Cir. 2024) ..................... 9, 19

*North Dakota v United States*, 495 U.S. 423 (1990) ..................................................... 24

*Ocean Cnty. Bd. Of Comms. v Attorney Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021)

.................................................................................................................................. 14

*Oregon v Trump*, 406 F. Supp. 3d 940 (D. Or. 2019)................................................... 14

*Plyler v Doe*, 457 U.S. 202 (1982).......................................................................... 9

*Printz v United States*, 521 U.S. 898 (1997)........................................................... 8, 21

*Sira v Morton*, 380 F.3d 57 [2d Cir. 2004] ............................................................ 6

*State of New York v Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020)......................... 22, 23

*Steel Institute of New York v City of New York*, 716 F.3d 31 (2d Cir. 2013)................. 8

*Steinle v City and County of San Francisco*, 919 F.3d 1154 (9th Cir. 2019) .............. 17

*U.S. v Morrison*, 529 US 598 (2000) ................................................................... 9, 22

*United States v California*, 921 F.3d 865 (9th Cir. 2019)............................ 16, 17, 21, 25

*Washington v United States*, 460 U.S 536 (1983) ...................................................... 24

## Statutes

8 C.F.R. 287.7 ........................................................................................................ 19

8 U.S.C. § 1182 ..................................................................................................... 19

8 U.S.C. § 1225 ..................................................................................................... 19

8 U.S.C. § 1226 ..................................................................................................... 19

8 U.S.C. § 1227 ..................................................................................................... 19

8 U.S.C. § 1228 ..................................................................................................... 19

8 U.S.C. § 1231 ............................................................................................................... 19

8 U.S.C. § 1357 ............................................................................................................... 21

8 U.S.C. § 1357(g)(10)(A)-(B)) ..................................................................................... 21

8 U.S.C. § 1357(g)(9) ..................................................................................................... 21

8 U.S.C. § 1360(a) ........................................................................................................... 17

8 U.S.C. § 1367(a)(2) ....................................................................................................... 17

8 U.S.C. § 1373 ......................................................................................................... passim

8 U.S.C. §1360(b) ............................................................................................................. 17

8 U.S.C. §1644 .......................................................................................................... passim

Fed. R. Civ. P. 11 ............................................................................................................. 23

The City of Rochester Code Chapter 63 ................................................................... 10, 11

## PRELIMINARY STATEMENT

On February 21, 2017, Rochester City Council ("the Council") reaffirmed the long-standing policy of the City of Rochester ("the City") to welcome immigrants and refugees into our community by passage of Council Resolution No. 2017-5 ("the Resolution").

The Resolution is part of an overarching statutory scheme as well as the City's "long tradition of support for the vulnerable and dispossessed, as exemplified by Rochester citizens' strong acceptance of Frederick Douglass, whose statue stands in Highland Park, and the Rev. Thomas James, whose bust is in the Hall of Justice, and by Rochester citizens' well-known participation in the underground railroad one hundred years ago, at considerable risk of fines and jail sentences." ECF. No. 6-1 at p. 3.

The Resolution does not conflict with any federal laws, including 8 U.S.C. § 1373 (a), which purports to prohibit local governments from restricting their own officials from communicating an individual's immigration status information to immigration authorities. *See* ECF No. 1-2 at p. 3. However, by its plain terms, the Resolution "does not prohibit City employees from communications with federal immigration agencies regarding citizenship or immigration status." *Id.* The Resolution simply recognizes that the law does not require local governments to collect immigration status information or to engage in immigration enforcement – consequently City officials are instructed not to participate in immigration enforcement. *Id.*

Now, some eight years after the Resolution went into effect, the United States seeks to invade the City's sovereignty by attempting to invalidate the Resolution. The Resolution was plainly an exercise of powers not delegated to the federal government and therefore secured to the City by the Tenth Amendment to the United States Constitution. It is a public safety measure that ensures anyone can call 911 without fear of adverse immigration consequences.

By filing this action, the United States has not only failed to uphold its duty to respect the City's local sovereignty, the United States has also threatened public safety by chilling the willingness of City residents to report crimes to police or other officials.  That is unacceptable.

The City, the Council, Mayor Malik D. Evans ("Mayor Evans"), and Rochester City Council President Miguel A. Melendez, Jr. ("President Melendez"; collectively, "City Defendants") submit this motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) because the Rochester's policies are not preempted by federal law.  Rochester's policies do not obstruct federal enforcement of federal immigration law.  Likewise, the policies do not regulate or discriminate against the federal government. The Resolution and its implementing policies are valid exercises of local sovereignty not in conflict with federal law. This Court should dismiss the complaint in its entirety.

## STATEMENT OF FACTS

Since 1986, the City of Rochester has been a "City of Sanctuaries."  On May 15, 1986, by Council Resolution 86-29, the Council established Rochester as a "City of Sanctuaries."  ECF 6-1 at p. 3 ("the 1986 Resolution").  The 1986 "City of Sanctuaries" Resolution recognized that the regulation of immigration is a matter of federal jurisdiction and it is the responsibility of federal officials to implement federal immigration and refugee policy.  *Id.*  The 1986 Resolution further resolved that the City administration should "direct [City] employees to exclude refugee status as a consideration in their daily activities and routine dealings with the public, with the provisio [sic] that this directive should not be construed as approval to violate any law or encourage interference in law enforcement efforts[.]"  *Id.*

In the wake of the 2016 Presidential election and President Trump's January 25, 2017 executive order directing the Attorney General of the United States to scrutinize the actions of

2

cities with sanctuary policies, the Council reaffirmed Rochester as a Sanctuary City, by enacting Resolution No. 2017-5 a policy which assured immigrants and refugees that they are free to contact RPD or any other City agency without fear of adverse immigration consequences.  ECF No. 1-2 at p. 2.  That measure enhanced public safety and neighborhood conditions for all City residents, not just immigrants and refugees.  *Id.*

Subject to federal law and the Constitution of the United States of America, the Resolution requires that:  (1) RPD "shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual," except where necessary to investigate criminal activity; (2) "City personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits," except where required by law; and (3) City funds and personnel shall not be used to "enforce or to assist in the enforcement of Federal immigration policies."  *Id.*

On March 23, 2017, then-Chief of the RPD Michael L. Ciminelli issued General Order 502 ("the General Order").  ECF No. 1-3 at p. 2.  The General Order implemented the Resolution into RPD policy, recognizing that immigration enforcement is the responsibility of the federal government and that the law does not require local law enforcement to inquire about an individual's immigration status.  ECF No. 1-3 at p. 3-4.  The General Order sets forth that RPD officers "shall not perform the functions of a federal immigration officer or otherwise engage in the enforcement of federal immigration law," while recognizing that RPD officers are subject to the Constitution of the United States of America and federal law.  ECF No. 1-3 at p. 5.  The General Order requires that RPD officers "will not inquire about the immigration status of an individual" unless necessary to investigate criminal activity.  *Id.*

In specific situations, RPD officers are permitted to review "immigration documents" if voluntarily provided for the specific purpose of proving identity and, in those narrow circumstances, may contact immigration authorities regarding the person who provided those documents after notice to and authorization from a supervisor.  ECF No. 1-3 at p. 5-6.

On March 23, 2017, RPD issued Training Bulletin P-75-17 ("the Bulletin") which summarized the Resolution and the General Order for RPD officers.  *See generally* ECF No. 1-4. The Bulletin, like the Resolution and the General Order, acknowledged that RPD officers must comply with federal law but that the law does not require local law enforcement to inquire about individual's immigration status.  ECF No. 1-4 at p. 2.  The Bulletin set forth that "RPD does not get involved in immigration enforcement."  *Id.*  The Bulletin highlights the General Order's instruction that RPD may respond to "officer in trouble" calls for back up from immigration authorities.  ECF No. 1-4 at p. 3.  The Bulletin instructs RPD officers to "not inquire about the immigration status of an individual" unless necessary to investigate criminal activity.  *Id.*  And the Bulletin notes that RPD officers will not request "immigration documents," but that they may accept them "if voluntarily offered by a person in response to a request for proof of identity."  *Id.* The Bulletin requires that "contact and activities" with immigration enforcement agencies be documented.  *Id.*

The General Order and Bulletin implement the Resolution which, as noted above, specifically contemplates that City officials may contact immigration authorities with "information regarding the immigration status, lawful or unlawful, of any individual" as authorized by 8 U.S.C. § 1373.

On March 24, 2025, RPD officers responded to a call for assistance from federal law enforcement officers.  *See* ECF No. 1 at ¶1 (Complaint).  As alleged in the answer and

demonstrated in body camera video, this call would turn out to be a sham.  Nonetheless, the

RPD's emergency response was, indeed, "law enforcement at its finest."  *Id.*  Indeed, the

Complaint fails to allege that immigration officials we actually facing an emergency, or that they

were executing a judicial warrant, as RPD officers quickly ascertained.  *See generally* ECF No.

1.  RPD officers complied with the Resolution, General Order, and Bulletin (collectively, "the

Rochester Policies") when they "responded to federal officers' calls for assistance" because they

believed that immigration officials were in an emergency situation, thereafter immigration

officials improperly conscripted RPD officers to execute immigration enforcement tasks in

violation of the Rochester Policies.  *See* ECF No. 1 at ¶¶1, 44, 46-47; *accord* ECF No. 6 at ¶1.

ECF No. 1 at ¶44.  Body-worn camera ("BWC") footage depicts the March 24, 2025 RPD

response to federal immigration authorities' call for help.  *See* ECF No. 1 at ¶48[1] .  Mayor Evans

clarified the Rochester Policies during a press conference held on March 26, 2025.  *See* ECF No.

1 at ¶45[2] .  Mayor Evans indicated that any RPD officers who violated the Rochester Policies

would "receive more training on General Order 502."  *Id.* (again referring to the press conference

footage included by reference in the Complaint).

     This lawsuit is the federal government's attack on the City's long-standing valid policy

decision—a policy decision entirely consistent with federal law—to leave federal immigration

enforcement solely to federal authorities.  That policy has been in force in the City for almost 40

and Rochester's acknowledged history as a place where the vulnerable and dispossessed have

---

[1] This paragraph includes by reference a media article which asserts that the BWC depicts "RPD officers taking part in handcuffing people from the vehicle, which city officials said was a violation of the sanctuary city policy."

[2] This paragraph includes by reference a link to footage of the press conference during which Mayor Evans declared "City police officers do not help or participate in federal immigration activities."

sought safe harbor extends back some 200 years or more.  Now, eight years after Council

enacted the Resolution, plaintiff points to a purported "*National Emergency at the Southern*

*Border of the United States*" in alleging that its immigration enforcement efforts are being

hindered by cities such as Rochester ECF No. 1 at ¶2 (emphasis in original).  Along with that

geographically distant crisis, Plaintiff's attack on the Rochester Policies was prompted by the

events of March 24, 2025 in which RPD dutifully responded to immigration authorities request

for assistance with a purported emergency – it was indeed "law enforcement at its finest."  ECF

No. 1 at ¶1.

### STANDARD OF REVIEW FOR JUDGMENT ON THE PLEADINGS

The standard for deciding a Rule 12(c) motion is the same as that applicable to dismissals

pursuant to Rule 12(b)(6), as such courts "will accept all factual allegations in the [c]omplaint as

true and draw all reasonable inferences in [the Plaintiff's] favor."  *L-7 Designs, Inc. v Old Navy,*

*LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  To survive a 12(c) motion, the complaint must contain

sufficient factual allegations which state a facially plausible claim for relief.  *Ashcroft v Iqbal*,

556 U.S. 662, 678 (2009).  A claim is "plausible on its face" when it is supported by enough

"factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.*  Courts need not credit conclusory statements or legal

conclusions offered by a plaintiff.  *Id.*  "On a Rule 12(c) motion, courts consider the complaint,

the answer, any written documents attached to them, and any matter of which the court can take

judicial notice for the factual background of the case," including materials incorporated by

reference and documents that, although not incorporated by reference, are "integral" to the

complaint  *Gerbasi v NU Era Towing and Service, Inc.*, 443 F.Supp.3d 411, 412 (W.D.N.Y.

2020) (quoting *Sira v Morton*, 380 F.3d 57, 67 [2d Cir. 2004]).

## ARGUMENT

### I.  THE ROCHESTER POLICIES ARE NOT PREEMPTED BY FEDERAL LAW

Plaintiff alleges broadly that "Federal law contemplates" coordination between local authorities and immigration authorities to execute federal immigration authorities' duties, and that the Rochester Policies conflict with that "framework" by "limiting information sharing, cooperation, access, and the types of warrants honored."  ECF No. 1 at ¶¶50-51, 62.  Plaintiff misconstrues federal law as thoroughly as it misconstrues the Rochester policies.  Federal law does not require – and plaintiff does not plausibly allege that federal law requires – the City to participate in federal immigration enforcement.  The Rochester Policies are not in conflict with federal law, nor does the Complaint plausibly allege as much.  Plaintiff's preemption claims are entirely defective and this Court should dismiss them accordingly.

"Federalism, central to the constitutional design, adopts the principal that both the National and State Governments have elements of sovereignty the other is *bound* to respect." *Arizona v United States*, 567 U.S. 387, 398-399 (2012) (emphasis added).  The existence of two sovereigns risks possible conflict between the laws of each, and the Supremacy Clause "provides a rule of decision" whereby the conflicted state law is preempted in favor of federal law. *Murphy v National Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

Preemption may be either express or implied, but either type "work[s] in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with federal law; and therefore the federal law takes precedence and the state law is preempted."  *Murphy*, 584 U.S. at 477.  Another fundamental structural decision incorporated into the Constitution – that Congress should *not* have the power to issue orders directly to the states – is expressed in the doctrine of anti-

commandeering which simply recognizes that Congress may regulate private actors but Congress may not issue orders to the governments of the States. *See Murphy*, 584 U.S. at 470-472.

By Constitutional design, local governments "retained 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470 [quoting The Federalist No. 39, p. 245 (J. Madison)]. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v United States*, 521 U.S. 898, 935 (1997). This rule is one of the Constitution's "structural protections of liberty" which promotes a healthy balance of power between the states and the federal government thereby reducing the risk of tyranny and abuse from either front. *Murphy*, 584 U.S. at 473 (citations omitted).

Plaintiff broadly alleges that the Rochester Policies reflect the City's "intentional effort to obstruct the Federal Government's enforcement of federal immigration law" and to impede communication between RPD officers and immigration authorities. ECF No. 1 at ¶4. Plaintiff claims that the Rochester Policies are preempted by federal law under express and conflict theories. ECF No. 1 at ¶¶61-62. Plaintiff's claims are entirely without merit.

### a. Rochester's Policies Are Presumed Valid

"There is a strong presumption against preemption when states and localities 'exercise their police powers to protect the health and safety of their citizens.'" *Steel Institute of New York v City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) (quoting *Medtronic, Inc. v Lohr*, 518 U.S. 470, 475 (1996) (cleaned up)). The Rochester Policies at issue are public safety and crime prevention policies, as well as policies of equal access. And the Supreme Court has observed that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, *than the suppression of violent crime and vindication of*

*its victims.*"  *U.S. v Morrison*, 529 US 598, 618 (2000) (emphasis added).  The presumption

against preemption of the Rochester Policies may only be overcome if Congress's intent to

preempt is "clear and manifest."  *New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135,

148 (2d Cir. 2024) (citations omitted).

Congress has, of course, preempted state laws regarding immigration enforcement, *see*

*e.g. Arizona*, 567 U.S. at 400-403, but states and local governments retain broad powers to enact

and enforce generally applicable laws addressing "essentially local problems."  *DeCanas v Bica*,

424 U.S. 351, 357 (1976); *see Hillsborough County v Automated Medical Laboratories, Inc.*,

471 US 707, 719 (1985) ("the regulation of health and safety matters is primarily, and

historically, a matter of local concern").  Moreover, the City is permitted to pass laws for all

persons within its borders, including immigrants and refugees.  *See DeCanas*, 424 U.S. at 355-

356; *Plyler v Doe*, 457 U.S. 202, 215 (1982).

Here, the Resolution enacts the City's policy to encourage anyone within its limits to call

RPD so that RPD officers are empowered to suppress crime, and the victims of crime can receive

justice.  *See generally* ECF No. 1-2 (pointing to the "public safety" purpose of the Resolution).

Public safety is plainly an area of traditional police powers because States and localities are "the

natural guardians of the public against violence . . . [and courts] should not interpret an act of

Congress to leave them powerless to avert such emergencies without compelling directions to

that effect."  *Auto Workers v Wisconsin Bd.*, 351 US 266, 274-275 (1956); *see Metropolitan Life*

*Ins. Co. v Massachusetts*, 471 US 724, 756 (1985) (police powers traditionally include

legislation as to "the protection of the lives, limbs, health, comfort, and quiet of all persons").

Likewise, the General Order and Bulletin "regulate [the City's] internal law enforcement

activities" and that also "is a quintessential police power" exercise.  *Morrison*, 529 US at 618.

The clear statement of the Council establishing the Resolution's public safety purpose is not defeated by plaintiff's conclusory and unsupported assertions that the City seeks to frustrate immigration enforcement. *Compare* ECF No. 1 at ¶3 (alleging without basis and contrary to the facts as pleaded by plaintiff that the Rochester Policies are "designed" to interfere with federal immigration enforcement); *with* ECF No. 1-2 at p. 4 (clear statement of the Resolution's public safety purpose).

Nor are the plain terms of the General Order and Bulletin complicated by plaintiff's conclusory and unsupported assertions that their provisions are anything other than lawful regulation of internal law enforcement affairs. *Compare* ECF No. 1 at ¶52 (alleging total prohibition on communication with immigration authorities) *with* ECF No.1-3 at p. 5-6 (General Order provisions at issue do not implicate 8 U.S.C. § 1373 because they do not restrict sharing of "information regarding the immigration status, lawful or unlawful, of any individual"). By requiring RPD officers to document their interactions with immigration authorities and the like, the City has merely directed the internal affairs of the RPD. *See Koog v United States*, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies"). The Rochester Policies are entitled to the strongest possible presumption against preemption.

### b. Further Deference is Due to the Rochester Policies Because They Further a Larger Statutory Scheme

Further demonstrating that the Rochester Policies are integral exercise of local authority, those policies operate in conjunction with the earlier 1986 Resolution and The City of Rochester Code ("Code") Chapter 63. Code Chapter 63 enshrines the City's long tradition of tolerance and openness as a community. Code Chapter 63 prohibits human rights violations, including

10

discrimination on the basis of national origin.  Code § 63-1.  In enacting Code Chapter 63, the

Council determined that the City was responsible to ensure equal access to City services because

failure to do so not only threatens the rights and privileges of City inhabitants, "but menaces the

institutions and foundation of a free democratic state and threatens the peace, order, health,

safety, and general welfare of the City and its inhabitants."  *Id.*

Code Chapter 63 defines national origin protections to include "persons not citizens."

Code § 63-2.  Code Chapter 63 prohibits discrimination in the provision of any City programs or

services, including public safety and law enforcement services by the Rochester Police

Department ("RPD").  Code § 63-7.  The overall goal of these enactments is to ensure equal

access to City services by all persons within the City limits.  Moreover, the Resolution clarified

that equal access to emergency services promotes the general welfare and overall public safety

because, if anyone is discouraged from calling 911, then crime is likely to go unreported and

crime victims are less likely to receive the redress they deserve.

The Second Circuit has observed that "[t]he obtaining of pertinent information, which is

essential to the performance of a wide variety of state and local government functions, may in

some cases be difficult or impossible if some expectation of confidentiality is not preserved."

*City of New York v United States*, 179 F.3d 29, 36 (2d Cir. 1999).  Likewise, other courts have

recognized that fear among immigrants that contact of any kind with government officials "will

bring the scrutiny of federal immigration authorities to their home" might deter them from

reporting crime.  *City of Chicago v Sessions*, 888 F.2d 272, 280 (7th Cir. 2018); *see City of

Philadelphia v Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018) (same).  The City policy

is to ensure equal access to its crime reporting and law enforcement services so that public safety

is safeguarded, crime is suppressed, and victims receive redress.

Moreover, plaintiff's scant factual allegations show how frivolous its preemption argument is because – rather than pointing even to a single concrete instance where the City frustrated immigration enforcement – plaintiff points only to an occasion on which City personnel *responded* to a request for assistance from immigration authorities. *See* ECF No. 1 at ¶1. Indeed, as is explored more fully below, that compliance was no fluke. The Rochester Policies require RPD to provide aid to immigration authorities who report themselves to be in an emergency situation. In the event immigration authorities are ever in an emergency situation in the City – even if the emergency arose because they were enforcing federal immigration regulations – RPD will respond to secure the scene and ensure the safety of those federal immigration authorities.

There is no basis whatsoever – and Plaintiff alleges none – to support the implication that the City is "assisting removable aliens' evasion of federal law enforcement." ECF No. 1 at ¶54; *see* ECF No. 1 at ¶26. To the contrary, the City has a historical tradition and an existing statutory scheme which explicitly seeks to promote public safety within the City of Rochester while welcoming immigrants and refugees. The Rochester Policies are an integral component of that scheme.

### c. Rochester's Policies Do Not Conflict With Federal Law

Despite the strong presumption against preemption enjoyed by the Rochester Policies, plaintiff claims that the Rochester Policies "are expressly preempted by the requirements 8 U.S.C. §§ 1373 and 1644." ECF No. 1 at ¶61. And Plaintiff claims that the Rochester Policies are conflict preempted because they "limit[] information sharing, cooperation, access, and the types of warrants honored." ECF No. 1 at ¶62. Plaintiff's contentions in Count I of the Complaint are entirely without merit

### i. Sections 1373 and 1644 are Not Valid Preemption Provisions

As a threshold matter, plaintiff's preemption claims fail because the only two federal statutes relied upon in Count I impermissibly regulate states and their political subdivisions rather than private actors. The Supreme Court clearly stated that – whatever theory of preemption is advanced – it must be based on "federal law that regulates the conduct of private actors, not the States." *See Murphy* 584 U.S. at 479. Any federal law that purports to issue a "direct command to the States" violates the anti-commandeering rule and cannot be used to preempt state laws. *Id.* at 474, 477, 480.

Plaintiff itself admits that 8 U.S.C. §§ 1373 and 1644 do not apply to private actors. Rather plaintiff alleges that these statutes operate against "state and local government officials." ECF No. 1 at ¶24. Moreover, a plain reading of these provisions confirms plaintiff's allegations in this narrow regard. Section 1373(a) constrains any "State, or local government entity or official" from prohibiting or restricting another government entity or official from sending "information regarding the immigration status, lawful or unlawful, of any individual" to immigration authorities. *See* ECF No. 1 at ¶24 (describing §§ 1373(b) and § 1644 as "similar" in that they operate against State and local governments).

Plaintiff clearly construes §§ 1373 and 1644 as broad prohibitions against any local government rules whatsoever regarding their officials' communications with immigration authorities. *See* ECF No. 1 at ¶¶ 22-26, 50, 53, 56, 61-62. However, such a broad construction of these sections violates the 10th Amendment's anti-commandeering principles and no principle of preemption overrides that prohibition. *See Murphy*, 584 U.S at 477 (the Supremacy Clause is not an independent grant of power to Congress).

As to §§ 1373 and 1644, "there is no way in which [either] provision can be understood as a regulation of private actors." *Murphy*, 584 U.S. at 479-480. Congress "may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution." *City of New York v United States*, 179 F3d 29, 35 (2d Cir. 1999). Post-*Murphy*, there can be no doubt that §§ 1373 and 1644 impermissibly commandeer state and local legislatures by telling them what they "may or may not do" in violation of the 10th Amendment, and courts have consistently concluded as much when presented with exactly that question. *Murphy*, 584 U.S. at 474; *see Ocean Cnty. Bd. Of Comms. v Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-182 (3d Cir. 2021); *Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034, 1059 (D. Colo. 2020); *Oregon v Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *City & Cty. of San Francisco v Sessions*, 349 F. Supp 3d 924, 950 (N.D. Cal. 2018). Plaintiff fails to plausibly allege—because it cannot be alleged—that §§ 1373 and 1644 are valid preemption provisions.

The plain text of §§ 1373 and 1644 forecloses plaintiff's preemption claim. While plaintiff references a number of other federal statutes in the Complaint, none of those statutes – apart from §§ 1373 and 1644 – are alleged to be express or conflict preempted except in the most impermissibly broad terms. Consequently Count I should be dismissed without further consideration of the Rochester Policies themselves.

### ii. Plaintiff's Express Preemption Claim Fails

Plaintiff's attempt to bring the Rochester Policies within the reach of § 1373 must fail. To begin with, the Resolution itself incorporates and accommodates § 1373 – the Resolution neither "expressly violate[s]" federal law nor creates an obstacle to a "clear and manifest" congressional objective. *Arizona*, 567 U.S. at 400. Moreover, the rule against anti-

14

commandeering forecloses any interpretation of § 1373 that requires information sharing over and above what the Resolution permits.  The General Order and Bulletin incorporate the Resolution's savings clause language recognizing the limitations of federal law and § 1373 but, regardless, neither the General Order nor the Bulletin prohibit or restrict the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" as contemplated by § 1373.  *See generally* ECF No. 1-3 at pp. 5-6; ECF No. 1-4 at pp. 2-3.

The General Order does not implicate "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373 (a), rather it prohibits RPD officers from "requesting immigration documents" while allowing them to "accept and review them if voluntarily offered by a person in response to a request for proof of identity." ECF No. 1-3 at p. 3.  Even then, such requests for proof of identity may only be made in the context of "an arrest, traffic stop, or investigative detention," or "for purposes of issuing an appearance ticket for setting pre-arraignment bail."  ECF No. 1-3 at p. 4.

Thereafter, if an RPD officer was provided an "immigration document" that was "voluntarily offered by a person" in connection with an enumerated circumstance, that RPD officer is required to seek supervisory approval before contacting immigration authorities regarding the person who provided the "immigration document."  *Id.*  Moreover, RPD officers must seek command approval before they make "requests for assistance" to immigration authorities.  *See* ECF No. 1-3 at p. 6.  The General Order creates no bar to an RPD officer contacting immigration authorities with "information regarding the immigration status, lawful or unlawful, of any individual" as authorized by 8 U.S.C. § 1373.  Section 1373 is not implicated by

the General Order which does not address reporting of an individual's immigration status
information to federal authorities

      Plainly, the information implicated by the General Order is distinct from "information
regarding the citizenship or immigration status, lawful or unlawful, of any individual" under §
1373. Plaintiff's simple replication of the General Order language alongside that of § 1373
confirms as much. *See* ECF No. 1 at ¶36. An "immigration document" is not co-extensive with
confirmation whether a person's immigration status is "lawful or unlawful." Plaintiff's strained
reading appears to assume that review of a document relating to immigration necessarily leads to
a conclusion regarding the subject person's immigration status – this Court should reject that
reading. In an unrestricted, categorical sense, "immigration documents" may not be irrelevant to
a determination of a person's "immigration status," but this conceptual relationship is far too
broad to justify preemption. *See Arizona*, 567 U.S. at 399-400. Plaintiff's construction of these
provisions defies their plain meaning, Plaintiff's view of the General Order cannot be squared
with the text of § 1373. And Courts have rejected similar attempts to enhance the narrow
application of § 1373 for preemption purposes.

      The Ninth Circuit has determined that "'information regarding the citizenship or
immigration status, lawful or unlawful, of any individual' is naturally understood as a reference
to a person's *legal classification under federal law*." *United States v California*, 921 F.3d 865,
891 (9th Cir. 2019) (emphasis added). Such a narrow construction is necessary because "the
range of facts that might have some connection to the federal removability or detention decisions
is extraordinarily broad." *California*, 921 F.3d at 891-892 n.17. Plaintiff advances a theory of
preemption which is so broad that it "would never run its course" and would hazard the
preemption of many state and local statutes governing information which would otherwise be

considered private or confidential.  Plaintiff asks this Court to open the proverbial Pandora's Box, and this Court this reject the invitation.

The relative breadth of other federal immigration statutes further supports the conclusion that the appropriate scope of § 1373 is narrow.  *California* at 892 (citing 8 U.S.C. §§ 1360(a) (mandating "such other relevant information as the Attorney General shall require as an aid"), 1360(b) ("information . . . as to the identity and location" of noncitizens); *see also* 8 U.S.C. § 1367(a)(2) (prohibiting disclosure of "any information which relates to" a noncitizen).  If Congress intended the reach of § 1373 to be similarly broad, it would have drafted it as such.

Similarly, in *County of Ocean v Grewal*, the court held that "a plain reading of sections 1373(a) and 1644 reflects that the *only* information that state and local governments are required to share is the legal status—i.e. the citizenship of immigration status—of an individual."  475 F. Supp. 3d 355, 375 (D.N.J. 2020), *aff'd on other grounds* 8 F.4th 176 (3d Cir. 2021).  Other courts have likewise interpreted "information regarding . . . immigration status" in § 1373 as narrowly covering only a person's legal classification under federal law.  *See Steinle v City and County of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019); *City of Philadelphia v Sessions*, 309 F. Supp. 3d 289, 332 (E.D. Pa. 2018), *aff'd in part and vacated in part on unrelated grounds*, 916 F.3d 276 (3d Cir. 2019); *City & Cty. of San Francisco*, 349 F. at 967, *aff'd in part and vacated in part on unrelated grounds*, 965 F.3d 753 (9th Cir. 2020).  This Court should join in rejecting plaintiff's overbroad interpretation of § 1373.

Prudential concerns further support the Rochester Policies.  The Complaint does not allege that RPD officers are qualified to determine "an individual's immigration or citizenship status, *i.e.*, whether the individual is a U.S. citizen, green card holder, or holds some other legal or unlawful status in the United States," *County of Ocean*, 475 F. Supp. 3d at 376, to the contrary

17

the Complaint alleges that immigration status is governed by an "'extensive and complex' statutory scheme" which it is the federal government's responsibility to enforce. ECF No. 1 at ¶20. The City has a local sovereign interest to ensure that – if an RPD officer reviews a document that has some immigration relevance – that he or she not form or report to federal authorities an incorrect conclusion as to its import. And the City has an interest to ensure that City resources are not spent on calls to immigration authorities reporting assumptions that RPD officers are not qualified to make. The requirement that RPD officers seek supervisory input in the special cases where an immigration document was provided to them serves the federal government's interests as well – federal immigration authorities do not have an interest in receiving potentially incorrect immigration status information.

Sections 1373 and 1644 pertain to a narrow category of information and do not conflict with General Order's procedures relating to instances when an RPD officer review's any immigration document. No allegation in the Complaint can plausibly be construed to establish that the City maintains "immigration status" information. Quite the contrary, as plaintiff alleges, the Rochester Policies strictly forbid it or any of its officers from inquiring into or maintaining such information. Nor does the Complaint plausibly allege that the City or any of its personnel have ever actually withheld such information, a necessary factual allegation if plaintiff's complaint is to withstand dismissal. Plaintiff's express preemption claims advance a strained reading of the Rochester Policies and an interpretation of § 1373 that has been routinely rejected by other courts. This Court should follow suit and dismiss Count I with prejudice.

### iii.  Plaintiff's Conflict Preemption Claim Fails

The burden of establishing conflict preemption "is heavy:  the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting

preemption, particularly when the state law involves the exercise of traditional police power." *James*, 101 F.4th at 155. Conflict preemption arises when "a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." *Arizona*, 567 U.S. at 399. But the basis for preemption must always be "either the Constitution itself or a valid statute enacted by congress" and not "some brooding federal interest." *Kansas v Garcia*, 589 U.S. 191, 202 (2020). Because "it is Congress rather than the courts that pre-empts state law," preemption analysis is not a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce v Whiting*, 563 U.S. 582, 607 (2011). Where, as here, "historic police powers" are exercised, preemption can only occur if "that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400.

Plaintiff's overweening focus is on information sharing provisions, but it also challenges the General Order's provision that RPD will not honor civil immigration detainers issued pursuant to 8 C.F.R. 287.7. ECF No. 1-3 at pp. 2, 7; *see* ECF No. 1 at ¶ 62 (implying that the Rochester Policies conflict with 8 C.F.R. 287.7); *see also* ECF No. 1 at ¶20, 50 (pointing to 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, and 1231 without alleging – even in a conclusory fashion – how the Rochester Policies conflict with same). But 8 C.F.R. 287.7 does not require state or local compliance with civil immigration detainers as the plain text of that provision makes clear. It describes detainers as "requests" rather than mandates. 8 C.F.R. 287.7; *see Hernandez v United States*, 939 F.3d 191, 200 n.11 (2d Cir. 2019) (noting that courts have concluded it is not mandatory to honor civil immigration detainers).

There is no federal law requiring the City to perform the actions plaintiff would prefer of the City – complying with civil immigration detainers, assisting in the execution of same, "cooperating" as it broadly alleges the City should. This vagueness is self-defeating. Plaintiff's

conflict preemption claim fails because it does not specify a "valid statute" for preemption. *Kansas*, 589 U.S. at 202; *see* ECF No. 1 at ¶62 (alleging "obstacle to federal immigration laws" in general terms).  Moreover, plaintiff's conclusory allegations violate the requirement that "the conflict between state law and federal law must be a sharp one" where, as here, the local authority has exercised its traditional police powers.  *Marsh v Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007); *see Kansas*, 589 U.S. at 808 (Thomas, J., concurring) (preemption must rest on statutory text rather than "generalized notions of congressional purposes).

Plaintiff cannot seriously contend that the Resolution poses an obstacle to the accomplishment of federal immigration policy priorities; indeed the Resolution conspicuously accommodates federal law and § 1373 specifically.  *See* ECF No. 1-2 at p. 3 (noting that City employees are not prohibited from communications with federal immigration agencies regarding citizenship or immigration status information).  Rather, plaintiff focuses on the General Order provisions – which are referenced in the Bulletin – requiring RPD officers presented with immigration documents for the purposes of identification to refrain from calling immigration authorities in relation to the person providing those documents without command approval.  *See generally* ECF No. 1-3 at pp 5-6.

As noted above, these provisions do not prevent the communication of immigration status information as authorized by §§ 1373 and 1644.  But assuming *arguendo* that the General Order and Bulletin are even in tension with federal law – which they are not – plaintiff has not and cannot identify any "valid statute enacted by Congress" reflecting a "clear and manifest purpose"

to conscript the City into assisting with federal immigration enforcement.  *Kansas*, 589 U.S. at

202; *Arizona*, 567 U.S. at 400.[3]

The State of New York and its political subdivisions, like the City, "remain independent

and autonomous within their proper sphere of authority."  *Printz*, 521 U.S. at 928.  City officials

therefore cannot be "dragooned . . . into administering federal law."  *Id.*  As other courts have

recognized, federal immigration laws generally "do not suggest the intent—let alone a clear and

manifest one—to prevent states from regulating *whether* their localities cooperate in immigration

enforcement."  *City of El Cenzio v Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (emphasis in

original).  For example 8 U.S.C. § 1357 permits local cooperation with immigration authorities,

but it does not at all require cooperation.  *See* 8 U.S.C. § 1357(g)(9).

And, while § 1357(g) allows for states or their political subdivisions to enter into

agreements with immigration authorities whereby they will cooperate with federal immigration

enforcement, the savings clause in that section "also expressly allows cooperation in immigration

enforcement outside those agreements."  *City of El Cenzio*, 890 F.3d at 177 (citing 8 U.S.C. §

1357(g)(10)(A)-(B)).  The natural conclusion of this federal statutory framework is that it

"indicates that some state and local regulation of cooperation is permissible."  *City of El Cenzio*,

890 F.3d at 178 (citing 8 U.S.C. § 1357(g)(10)(A)-(B)).  The City's determination not to

participate in federal immigration enforcement "may well frustrate the federal government's

immigration enforcement efforts" but "that frustration is permissible" where, as here, the City

has the right pursuant to the anti-commandeering rule to refrain from assisting with federal

efforts.  *United States v California*, 921 F.3d 865, 890-891 (9th Cir. 2019).

---

[3] Of course, if any such law did conscript local law enforcement into doing the federal
government's work, that statute would likely fall as violative of the Tenth Amendment.

Within the federal immigration statutory framework, the §§ 1373 and 1644 grants of authority to local officials to communicate with federal immigration authorities clearly establishes that local government may make regulations either taking advantage of that authority *or* affirmatively declining to take advantage of that authority.  *See* ECF No. 1 at ¶25 (asserting § 1373 gives state and local officials "authority" to communicate with federal immigration authorities); 8 U.S.C. § 1373(b) ("additional authority of governmental entities); *Arizona*, 567 U.S. at 412-413; *see also County of Ocean v Grewal*, 475 F. Supp. 3d 355, 371-372 & n.13 (D.N.J. 2020) (holding that §§ 1373 and 1644 have no meaningful differences and analyzing them together).  The City has declined to exercise that authority but, crucially, has not gone the extra step of "*prohibiting* information sharing" as contemplated by §§ 1373 and 1644.  *State of New York v Dep't of Justice*, 951 F.3d 84, 114 (2d Cir. 2020) (performing anti-commandeering analysis and explicitly not reaching preemption issue).

The Second Circuit has acknowledged that the broadly preeminent federal power to regulate immigration "does not mean that States [or localities] can never enact laws pertaining to aliens."  *See State of New York*, 951 F.3d at 112-114 (discussing *City of New York* in the wake of *Murphy* and *Arizona*) (quotations omitted).  Rather, this Court must "carefully identify the powers reserved to the States in this area of extensive and complex federal legislation and the effect of their exercise on federal immigration laws and policies."  *Id.*

Here, plaintiff seeks to intrude on the City's exercise of "quintessential" police powers – to safeguard the public and to regulate the internal affairs of law enforcement – on the basis of wholly conclusory and unsupported allegations that the City's exercise of local sovereignty has somehow impacted federal immigration enforcement efforts.  *Morrison*, 529 US at 618; *see* ECF No. 1 at ¶¶49-57 (restating preemption allegations without even alleging a negative practical

effect of the Rochester Policies on federal immigration enforcement).  Rather than adopting a policy "*contrary*" to federal immigration policy, the City has merely established internal organizing principles for the RPD.  *State of New York*, 951 F.3d at 114 (emphasis in original).

These procedures are of no consequence to federal immigration enforcement.  Indeed, the only factual allegations offered by plaintiff – that RPD officers sped to the aid of immigration authorities – flatly belie the notion that the Rochester Policies have any negative effect on immigration enforcement whatever.  *Id.* at ¶1.  Nothing alleged in the Complaint can plausibly be construed to establish that the City or any of its officers – nor the Rochester Policies – pose any obstacle whatsoever to federal immigration enforcement.  Quite the contrary, plaintiff's allegations portray the City as rendering assistance when and where appropriate, while holding RPD officers accountable to the City's valid policy choice not to engage in immigration enforcement.

No federal law preempts the Rochester Policies, and the 10th Amendment rule against commandeering provides an absolute shield against federal interference with that exercise of the City's sovereignty.  This Court should dismiss Count I with prejudice.

**II.  THE UNSIGNED COMPLAINT VIOLATES RULE 11**

"Every pleading," plaintiff's Complaint included, "must be signed."  Fed. R. Civ. P. 11.  Moreover, courts are expected to "strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention."  Rule 11.  The Complaint is unsigned, either by hand or electronically.  *See* ECF No. at p. 17.  Plaintiff has been on notice that the Complaint is not signed – and by rule should be stricken – for the last two weeks because the City, as its tenth affirmative defense, asserted as much.  *See* ECF No. 6 at ¶52.  Plaintiff's slipshod Complaint, if it is not dismissed on the merits, should be stricken pursuant to Rule 11.

### III. PLAINTIFF'S INTERGOVERNMENTAL IMMUNITY CLAIMS MUST FAIL

A state or local law is invalid "if it regulates the United States directly or discriminates against the Federal Government," *North Dakota v United States*, 495 U.S. 423, 435 (1990), but the Rochester Policies regulate City of Rochester officers – not federal officers – and the Rochester Policies express the City's 10th Amendment-protected choice not to participate in immigration enforcement, nothing more. Plaintiff's claim that the Rochester Policies violate principles of governmental immunity fail and Counts II and III of the Complaint must be dismissed.

#### a. The Rochester Policies Do Not Discriminate Against the Federal Government

Count II of the Complaint alleges that the Rochester Policies "single out federal immigration officials, expressly or impliedly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated." ECF No. 1 at ¶67.

As the Supreme Court has explained, the federal government is only discriminated against when a state or local law "treats someone else better than it treats [the federal government]." *Washington v United States*, 460 U.S 536, 544-545 (1983). An assessment whether a state or local regulation does so requires that the "entire regulatory system should be analyzed to determine whether it is discriminatory with regard to the [] burdens that result." *North Dakota*, 495 U.S. at 435. Here, there is clearly no such discriminatory treatment anywhere in the Rochester Policies, or the larger statutory scheme of which they are a part.

Moreover, there is no authority to justify plaintiff's attempt to invalidate – on intragovernmental immunity grounds – the City's voluntary and constitutionally sound decision not to participate in federal immigration enforcement. *See Murphy*, 584 U.S. at 471. Were that effort to succeed, then many State exercises of those 10th Amendment prerogatives would be

vulnerable to attack on intragovernmental immunity grounds. Courts have rejected that theory and this Court should do the same. *See California*, 921 F.3d at 891 (rejecting similar intragovernmental immunity claim by plaintiff because of obvious inconsistency with anti-commandeering rule).

The same principle applies here. To the limited extent plaintiff argues that the Rochester Policies can be read to treat federal immigration authorities differently from anyone else, it is wholly the result of a decision not to participate in immigration enforcement that the City was constitutionally entitled to make. Count II must be dismissed.

### b. The Rochester Policies Do Not Regulate the Federal Government

Both Counts II and III are essentially a re-packaging of plaintiff's underlying preemption argument, and both should similarly fail. The plain text of the Rochester Policies fatally undermines plaintiff's unlawful regulation claim because the Rochester Policies bind the Council, the Mayor, and City personnel including officers of the RPD, and no one else.

By their plain terms, these enactments direct City officials in the conduct of their City duties and do not govern any federal actors or entities. *See McHenry Cnty. v Raoul*, 44 F.4th 581, 593 (7th Cir. 2022). As is set forth in detail above, the Resolution regulates all officers and personnel of the City of Rochester, and determines the purposes for which its resources can be used. And the General Order and Bulletin narrowly govern RPD officers. No part of the Rochester Policies regulates the federal government. Count III must be dismissed.

### <u>CONCLUSION</u>

As the Supreme Court has observed, "[i]mmigration policy shapes the destiny of the Nation." *Arizona*, 567 U.S. at 415. It is within the City's "residuary and inviolable sovereignty" to decide not to cooperate in federal immigration regulation. *Murphy*, 584 U.S. at 470 (quoting

The Federalist No. 39, p. 245 (J. Madison).  The Tenth Amendment to United States Constitution shields the City against plaintiff's attempt to rope the City into undertaking federal immigration enforcement.

For the foregoing reasons, City Defendants respectfully request entry of a judgment dismissing all of Plaintiff's claims against them, as a matter of law, and providing for such other and further relief as the Court deems proper.

Dated:  June 4, 2025     PATRICK BEATH
Rochester, New York    Corporation Counsel

         By:  s/ *James "Hal" Kieburtz*    
             James "Hal" Kieburtz, Esq., Of Counsel
             *Attorneys for City Defendants*
             30 Church Street, Room 400A
             Rochester, NY 14614
             Tel.:  (585) 428-6758

To:  Attorneys of Record, via ECF