UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

    v.

THE CITY OF ROCHESTER; MALIK D.
EVANS, Mayor of Rochester, in his Official
Capacity; ROCHESTER CITY COUNCIL;
MIGUEL A. MELENDEZ, JR., President of
the Rochester City Council, in his Official
Capacity,

          Defendants.

---

No. 6:25-cv-06226-FPG-MJP


**OPPOSITION TO MOTION FOR
PERMISSIVE INTERVENTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.     Constitutional and Statutory Framework ...................................................... 2

    II.    The Challenged Sanctuary Law and Policies ............................................... 5

          A.     Resolution 2017-5, "Resolution Affirming that Rochester is
a Sanctuary City"............................................................................ 5

          B.     Policies Implementing the Sanctuary City Resolution ..................... 6

               1.     General Order 502 ................................................................ 6

               2.     Training Bulletin No. P-75-17 ............................................. 8

    III.   Procedural History ..................................................................................... 9

LEGAL STANDARD ................................................................................................ 12

ARGUMENT ............................................................................................................. 13

    I.     Intervention Should Be Denied Because There are
Limited Common Questions of Law between the Defendants and
the Proposed Intervenors, Whose Interests are Already
Adequately Represented by the Defendants................................................ 13

    II.    Intervention Should Be Denied Because the Proposed Intervenors
Seek to Expand the Scope of the Litigation with Collateral Interests
and Issues.................................................................................................... 16

    III.   Intervention Should Be Denied Because the Proposed Intervenors
Will Unduly Delay the Litigation ............................................................... 19

CONCLUSION.......................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa Steamship Co.*,
  No. 04 Civ. 4309, 2005 U.S. Dist. LEXIS 2735 (S.D.N.Y. Feb. 22, 2005)..............................17

*Arizona v. United States*,
  567 U.S. 387 (2012) ...........................................................................................................2

*Bano v. Union Carbide Corp.*,
  2005 U.S. Dist. LEXIS 32595 (S.D.N.Y. Aug. 12, 2005) .......................................................19

*Catanzano v. Wing*,
  103 F.3d 223 (2d Cir. 1996) ...............................................................................................13

*Citizens Against Casino Gambling in Erie Cnty. v. Hogen*,
  704 F. Supp. 2d 269, 286 (W.D.N.Y. 2010) .........................................................................15

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) ...................................................................................3, 4, 5, 17

*City of Syracuse v. Bureau of Alcohol*,
  No. 1:20-cv-06885-GHW, 2021 U.S. Dist. LEXIS 102 (S.D.N.Y. Jan. 2, 2021) ...............13, 17

*Erie Cnty. v. Hogen*,
  704 F. Supp. 2d 269 (W.D.N.Y. 2010) .................................................................................16

*Floyd v. City of New York*,
  770 F.3d 1051 (2d Cir. 2014) .........................................................................................12, 13

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)............................................................................................................2

*High Farms v. King*,
  No. 16-cv-736, 2021 U.S. Dist. LEXIS 56730 (E.D.N.Y March 25, 2021) .......................13, 19

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)..............................................................................................................4

*Kearns v. Cuomo*,
  1:19-cv-902-EAW, 2019 U.S. Dist. LEXIS 175384, at *1-3 (W.D.N.Y. Oct. 9, 2019) 14, 15, 19

*Nat. Res. Def. Council, Inc. v. New York State Dep't of Env't Conservation,*
   834 F.2d 60 (2d Cir. 1987) ..............................................................................15

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
   612 F.3d 97 (2d Cir. 2010) ..............................................................................4

*New York v. U.S. Dep't of Justice,*
   951 F.3d 84 (2d Cir. 2020) ..........................................................................3, 4

*North Dakota v. United States,*
   495 U.S. 423 (1990) ..........................................................................................2

*S.E.C. v. Bear, Stearns & Co. Inc.*
   03 CIV.2937 WHP, 2003 U.S. Dist. LEXIS 14611, at *8-9 (S.D.N.Y. Aug. 25, 2003) ..........20

*SEC v. Everest Mgmt. Corp.,*
   475 F.2d 1236 (2d Cir. 1972) ..........................................................................17

*South Carolina v. Baker,*
   485 U.S. 505 (1988) ..........................................................................................4

*United States Postal Service v. Brennan,*
   579 F.2d 188 (2d Cir. 1978) ............................................................................12

*United States v. City of N.Y.,*
   179 F.R.D. 373 (E.D.N.Y. 1998) ....................................................................13

*Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,*
   922 F.2d 92 (2d Cir. 1990) ..............................................................................15

Statutes

6 U.S.C. § 482(b) ................................................................................................3
6 U.S.C. § 482(b)(2) ...........................................................................................2
8 U.S.C. § 1101 ..................................................................................................2
8 U.S.C. § 1226(d)(1)(A) ...................................................................................3
8 U.S.C. § 1357(g) ......................................................................................6, 7, 8
8 U.S.C. § 1373 ..................................................................................................9
8 U.S.C. § 1373(a) .............................................................................................3
8 U.S.C. § 1373(c) .............................................................................................3
8 U.S.C. § 1182 ..................................................................................................2

Rules

Fed. R. Civ. P. 24(b) ........................................................................................13
Fed. R. Civ. P. 24(b)(1)(B) ..............................................................................12
Fed. R. Civ. P. 24(b)(3) ..........................................................................1, 12, 19

Fed. R. Civ. P. 24(c)....................................................................................... 1, 11, 13, 18

Other Authorities

Rochester First, "Full Press Conference: City policy broken by officers during ICE response"
    (March 26, 2025), *available at* https://www.rochesterfirst.com/video/full-press-conference-
    city-policy-broken-by-officers-during-ice-response/10573550.................................................7

**INTRODUCTION**

This case challenges the City of Rochester's Sanctuary City laws and policies as invalid under the Constitution and federal immigration laws. The United States opposes the Proposed Intervenors' request to permissively intervene, where they argue that their interests, including how they allocate funding, structure programs, and provide assistance to aliens, stem from Rochester's Sanctuary City laws and policies and thus should be protected in this litigation. The Proposed Intervenors also claim an interest in upholding Rochester's Sanctuary City laws and policies, ignoring that the City of Rochester is already adequately protecting that interest, which makes their intervention unnecessary. The Proposed Intervenors' true interests, however, are in their disagreement with the enforcement of U.S. immigration laws and their opportunity for a platform to disparage federal immigration officers and federal agencies' immigration enforcement efforts, which is all the more apparent from the Proposed Intervenors' intentional decision to forego submission of the proposed pleading required by Fed. R. Civ. P. 24(c).

Undue delay further forecloses permissive intervention here. Fed. R. Civ. P. 24(b)(3). Undue delay is a paramount concern when proposed intervenors in a case seek to expand the litigation through claims and defenses only tangentially related to the underlying legal issues. That is precisely what will occur here— allowing intervention will cause undue delay because the Proposed Intervenors seek to expand the scope of the claims, defenses and potential discovery. It may also encourage other non-party organizations with tangential interests to seek intervention and assert broad claims for relief. For these reasons, the Court should deny the Proposed Intervenors' motion.

# BACKGROUND

## I.    Constitutional and Statutory Framework

The United States Constitution entrusts the power to "establish an uniform Rule of Naturalization," to Congress, thereby providing the Federal Government with exclusive power over immigration policy. U.S. Const., art. I § 8, cl. 4; *see Arizona v. United States*, 567 U.S. 387, 394 (2012) (discussing the Federal Government's "broad, undoubted power over the subject of immigration and the status of aliens"). Congress has executed this mandate through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)). *See Arizona*, 567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so."). This body of law confers upon the Federal Government the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (the United States has the "exclusive[]" control over "any policy toward aliens"). This authority stems from the Federal Government's "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395. Based on these enumerated constitutional and sovereign powers, the Federal Government has broad authority to establish immigration laws, the execution of which States cannot obstruct or take discriminatory actions against. *See id.* at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

While "[t]he federal power to determine immigration policy is well settled," "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 395, 411. "Absent any cooperation at all from local officials," the

immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Congress, through the INA, contemplated this framework of cooperation. For example, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). And state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

To this end, Congress acknowledged the critical value of information-sharing across and within governments when it enacted Sections 1373 and 1644 of the United States Code. *See New York v. U.S. Dep't of Justice*, 951 F.3d 84, 97 (2d Cir. 2020). Through these provisions, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *Id.* (citations omitted). Section 1373 thus requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction." 8 U.S.C. § 1373(c); *see also* 6 U.S.C. § 482(b) (requiring information-sharing among federal agencies). Moreover, Section 1373 provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

8 U.S.C. § 1373(a); *see id.* § 1373(b). Similarly, Section 1644 provides that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [Federal Government] information regarding the immigration status, lawful or unlawful, of an alien in the United States."

The United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, the Tenth Amendment "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York*, 951 F.3d at 112; *see City of New York*, 179 F.3d at 35 (rejecting a facial commandeering challenge to 8 U.S.C. § 1373). "A commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *Id.* at 113.

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). A state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

In sum, through this litigation, the United States seeks to uphold a well-settled concept underpinning our system of government: that state and local governments do not have "an

untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York,* 179 F.3d at 35.

## II.    The Challenged Sanctuary Law and Policies

### A.    Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City"

In February 2017, the City passed Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City," (hereinafter the "Resolution"). *See* ECF No. 1-2. The Resolution was unanimously adopted by the City Council and remains in force today. *See id.* p. 4.

The Resolution prohibits City officials, including law enforcement officers, from participating in federal civil immigration enforcement and limits cooperation with federal immigration enforcement. *See generally id.* Specifically, the Resolution expressly prohibits the use of city funds or personnel "to enforce <u>or to assist in the enforcement of</u> Federal immigration policies" "except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." *Id.* ¶ 5 (emphasis in original).

Moreover, the Resolution prohibits the police department from "engag[ing] in certain activities solely for the purpose of enforcing federal immigration laws." *Id.* ¶ 3. In particular, the Resolution bars Rochester police from "inquiring about the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance." *Id.* Rochester police likewise "shall not stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status." *Id.*

The Resolution similarly prohibits city personnel from inquiring about or requesting proof of immigration status when providing services or benefits, unless the services or benefits "are contingent upon one's immigration or citizenship status," or if "inquiries are otherwise lawfully required" or the "information is needed for a criminal investigation." *Id.* ¶ 4. The Resolution also

directs the Mayor and city officials to "implement policies that further the City's role as a Sanctuary City to ensure compliance with" the Resolution's "objectives." *Id.* ¶ 2.

**B.    Policies Implementing the Sanctuary City Resolution**

On March 23, 2017, the Rochester Police Department issued General Order 502 ("the Order") and Training Bulletin No. P-75-17 ("the Bulletin"). *See* ECF Nos. 1-3, 1-4. Upon information and belief, the General Order and Training Bulletin remain in force today.

**1.    General Order 502**

General Order 502 (hereinafter "the Order") prohibits local cooperation with federal immigration enforcement. It provides that "Members shall not perform the functions of a federal immigration officer or otherwise engage in the enforcement of federal immigration law under 8 U.S.C. § 1357(g) or any other law, regulation, or policy." General Order 502 sec. (III)(C). It singles out CBP and ICE, stating that "Members will not be assigned to a CBP or ICE task force." *Id.* The Order suggests elsewhere that officers may be assigned to other federal law enforcement task forces. *Id.* sec. (V).

Section V of the Order, entitled "Sanctuary City Procedures," prohibits the "engage[ment] in police activities solely for the purpose of enforcing federal immigration laws or policies." *Id.* sec. (V)(A). This section explains that "[i]f provided immigration documents for identification purposes, [officers] will not contact CBP, ICE, or other federal immigration authorities regarding the person unless necessary to investigate criminal activity." *Id.* sec. (V)(E)(2). Thus, the enactment of the Resolution and its implementation through the Order explicitly limits officers' ability to cooperate with, or provide information to federal immigration authorities regarding citizenship or immigration status.

6

The Order addresses requests for assistance from CBP or ICE to the Rochester Police Department, and contact with or requests for assistance from the Rochester Police Department to CBP or ICE. *See Id.* sec. 502 (V)(F). Specifically, the Order requires that all such contact or requests from Rochester Police Department "must be authorized by [a] Captain or above during business hours, or the Staff Duty Officer (SDO) during non-business hours" and either "require a specific and articulable need for a criminal investigation" or must fall within the scenarios identified in Section (V)(G). *Id.* sec. (V)(G) of the Order allows Rochester police to cooperate with CBP or ICE when an individual is named in a judicial warrant or federal criminal arrest warrant, or there is probable cause to believe the person committed a federal crime. *Id.* sec. (V)(G)(1)(a)-(c). By requiring authorization to respond to a request from CBP or ICE, the City is restricting, and potentially prohibiting, government officials from sending information to CBP and ICE regarding the citizenship or immigration status of individuals. While the Order contains an exception to the requirement that officers obtain authorization to respond to a request from ICE or CBP in "situations involving an imminent threat to life or safety (e.g., a call for back-up assistance, 'officer in trouble,' response to a crime in progress, etc.)", *Id.* sec. 502(V)(F), as became clear in the aftermath of the March 24, 2025, incident, even the scope and applicability of that exception has been called into question by the Mayor and City Council. [1]

The Order expressly prohibits cooperation in federal civil immigration enforcement activities, stating that "Members will **not** detain or turn over to CBP or ICE a person named in a civil immigration detainer, and will **not** assist CBP or ICE in taking such persons into custody." *Id.* sec. (G)(2) (emphases in original). The Order also explains that Rochester Police will only

---

[1] *See* Rochester First, "Full Press Conference: City policy broken by officers during ICE response" (March 26, 2025), https://www.rochesterfirst.com/video/full-press-conference-city-policy-broken-by-officers-during-ice-response/10573550.

provide access to a person in custody or allow the use of Rochester Police facilities to question or interview a person if that person is "named in a judicial warrant or federal criminal arrest warrant; or when there is probable cause to believe the person has committed a federal crime." *Id.* sec. (G)(1)(c).

The Order requires officers to report any violations of the Order to their immediate supervisor, and supervisors are instructed to discipline officers who violate the Order. *Id.* sec. (VII)(A)-(B).

### 2. Training Bulletin No. P-75-17

In conjunction with the Order, the Rochester Police Department issued Training Bulletin No. P-75-17 (hereinafter "the Bulletin"). The Bulletin explained that the Resolution "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." Training Bulletin No. P-75-17 at 1.

The Bulletin explained that "[i]n order to implement the Sanctuary City Resolution and ensure compliance, we are renaming and reissuing G.O. 502 with substantial updates." *Id.* at 1. It further explained that updates were made to other General Orders and Training Bulletins. *Id.* The Bulletin provided an overview of the Order, reiterating the information contained therein. *Id.* at 2-3. By way of example, the Bulletin provided that "Members will *not* detain or turn over to CBP or ICE a person named in a ***civil immigration detainer***, and ***will not assist*** CBP or ICE in taking such persons into custody." *Id.* at 2 (emphasis original).

The Bulletin also provided information about the modifications to other General Orders. For example, in General Order 520, the Prisoner Data Form was modified to remove the field inquiring whether the prisoner was a citizen. *Id.* at 3.

8

### III.    Procedural History

On April 24, 2025, the United States filed this action against the City of Rochester, the Rochester City Council, the Mayor of Rochester, Malik D. Evans, and City Council President Miguel A. Melendez ("Defendants"), in their official capacities. *See* Compl., ECF No. 1. The Complaint alleges three claims for relief on federal preemption grounds: express and conflict preemption (Count One), unlawful discrimination against the Federal Government (Count Two), and unlawful regulation of the Federal Government (Count Three). *Id.* ¶¶ 58-72. The United States seeks a judgment declaring that the City of Rochester's Sanctuary City law and policies violate 8 U.S.C. §§ 1373 and 1644 and are preempted by those and other federal immigration laws, injunctive relief prohibiting Defendants from enforcing the Sanctuary City law and policies, costs and fees, and other relief this Court deems just and proper. *See id.*, Prayer for Relief ¶¶ A-E.

Defendants answered the Complaint on May 21, 2025, ECF No. 6, and filed a Motion for Judgment on the Pleadings on June 4, 2025, ECF No. 8. On June 4, 2025, Third Presbyterian Church, Ibero-American Action League, Inc., New Hope Free Methodist Church, and Western New York Coalition of Farmworker Serving Agencies ("Proposed Intervenors") filed a Motion to Intervene which attached, in lieu of Rule 24(c)'s requisite "pleading," a "Proposed Motion to Dismiss." ECF Nos. 9-12. Proposed Intervenors contend that they seek permissive intervention because they rely on the City of Rochester's Sanctuary City laws and policies to further their mission of assisting immigrants in the community "integrate fully into the fabric of the City" where those laws and policies foster trust among the immigrant community and law enforcement agencies and protect religious liberty. ECF No. 10 at 1.

***Ibero-American Action League ("Ibero").*** Ibero states that it is an advocacy organization that serves the Latino and underserved communities, offering a variety of community services

including language access, relocation services, and educational programs. *See id.* at 4; ECF No. 11-1, Declaration of Angelica Perez-Delgado, ¶¶ 9-10. Ibero claims to foster relationships between Rochester's immigrant community and the Rochester police department, and claims to have improved the police department's "cultural competency," which has led to improvements in public safety. ECF No. 11-1 ¶ 13. Moreover, the organization claims that their work with the Rochester police department, in conjunction with the sanctuary policies, have reduced crime in the city. *Id.* ¶¶ 16-17. Should the sanctuary policies be enjoined, Ibero claims that the organization "would have to curtail or end many of its events, programs, and partnerships with RPD," would experience increased demand for its services, and would have to divert funding and staffing to ensure its mission is met without the need for Rochester police. *Id.* ¶¶ 31-34.

> **Western New York Coalition of Farmworker Serving Agencies ("WNY Coalition").** WNY Coalition is a non-profit advocacy organization primarily serving migrants and farmworkers. ECF No. 10 at 5. WNY Coalition provides resources to immigrants, including case management services to farmworkers, trafficking survivors, and migrant families, and hosts community events. *See* ECF No. 11-2, Declaration of Irene Sanchez, ¶¶ 8-9. The organization claims to rely on Rochester's Sanctuary City policies to maintain their relationship with the Rochester police department and other city agencies in order to serve the immigrant community and build their trust. *Id.* ¶¶ 13, 19. WNY Coalition contends that the absence of the sanctuary policies will impede their mission to connect their clients with the police department in order to investigate trafficking, and may decrease the likelihood that crimes against immigrants in Rochester will be reported, thus requiring WNY Coalition to help investigate trafficking instead of police. *Id.* ¶¶ 23-24, 26.

*Third Presbyterian Church ("Third Presbyterian").* Third Presbyterian is a Rochester-based church that claims to welcome all parishioners regardless of citizenship or immigration status. ECF No. 10 at 6. Third Presbyterian serves the immigrant community through refugee resettlement efforts, educational programs, housing, community services, and dining room and food cupboard ministries. *See* ECF No. 11-3, Declaration of Rebecca Segers, ¶¶ 20-25. According to Third Presbyterian's Pastor and Head of Staff Reverend Rebecca Segers, Rochester's sanctuary policies enable their members to freely participate in their church without fear of immigration enforcement. *Id.* ¶ 32. Without those policies, she contends, the church will lose participants in their worship and community services. *Id.* ¶ 39. Reverend Segers also claims that in the absence of the policies, she would fear calling Rochester police to protect the congregation, and claims the church would be required to expend more resources to reach its members. *Id.* ¶¶ 41-44.

*New Hope Free Methodist Church ("New Hope").* New Hope is a Rochester-based church that, like Third Presbyterian, accepts all parishioners regardless or immigration status. ECF No. 10 at 7. New Hope serves Rochester's immigrant community by providing access to health services, community events, and a pet care clinic. *See* ECF No. 11-4, Declaration of Marissa Mattox Heffernan, ¶¶ 20-27. New Hope contends that the end of Rochester's sanctuary city laws will amplify the fear of immigration enforcement in the city and will reduce attendance at church services such that members of the community cannot freely practice their faith. *Id.* ¶ 40.

Proposed Intervenors did not include a "pleading [setting] out the claim[s] or defense[s] for which intervention is sought" pursuant to Fed. R. Civ. P. 24(c). Instead, Proposed Intervenors filed a Proposed Motion to Dismiss pursuant to Rule 12(b)(6), which claims that each count of Plaintiff's Complaint fails as a matter of law. *See generally* ECF No. 11-6. Specifically, the Motion to Dismiss argues that Rochester's Sanctuary City laws and policies are presumptively valid and

are not preempted by, but are consistent with, the INA, and they do not unlawfully discriminate against or regulate the Federal Government. *See id.* at 6-21, 22-25. Proposed Intervenors also contend that Plaintiff's position represents an unconstitutional effort by the United States to unlawfully commandeer the City to enforce the immigration laws in violation of the Tenth Amendment. *Id.* at 13-17, 21-22, 24.

## LEGAL STANDARD

Federal Rule of Civil Procedure 24 governs intervention. The relevant threshold requirement for permissive intervention is that the proposed intervenor has "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

In exercising its discretion to grant or deny a motion for permissive intervention, the district court also "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see also United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978) (undue delay is a "principal consideration" for permissive intervention). Additional factors the court considers in exercising its discretion over permissive intervention are: the nature and extent of the intervenors' interests, whether those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to the full development of the factual issues in the suit and the just and equitable adjudication of the legal questions presented. *Brennan*, 579 F.2d at 191-92.

In assessing whether to permit intervention, the court should consider two competing policies: "efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand[.]" *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014). Permissive intervention may be denied where the proposed claims, though generally related, go

beyond the limited issues of the lawsuit. *See, e.g.*, *City of Syracuse v. Bureau of Alcohol,* No. 1:20-cv-06885-GHW, 2021 U.S. Dist. LEXIS 102, at *14-15 (S.D.N.Y. Jan. 2, 2021) (denying permissive intervention where proposed intervenors sought to raise Second Amendment challenge beyond the scope of the original litigation); *United States v. City of N.Y.*, 179 F.R.D. 373, 381 (E.D.N.Y. 1998) (denying permissive intervention where the claimed interests, "although broadly related to the subject matter of this action, [were] extraneous to the issues before the court")), *aff'd*, 198 F.3d 360 (2d Cir. 1999).

A proposed intervenor must also include "a pleading that sets out the claim or defense for which intervention is sought" to permit the court to assess the scope of the proposed intervention. Fed. R. Civ. P. 24(c); *see High Farms v. King*, No. 16-cv-736, 2021 U.S. Dist. LEXIS 56730 at *28-29 (E.D.N.Y March 25, 2021) (denying intervention where lack of pleading hindered court's ability to assess scope of claims).

The court's discretion under Fed. R. Civ. P. 24(b) is broad. Indeed, the Second Circuit has noted that "[a] denial of permissive intervention has virtually never been reversed." *See Floyd*, 770 F.3d at 1062 n.38 (quoting *Catanzano v. Wing*, 103 F.3d 223, 234 (2d Cir. 1996)).

## ARGUMENT

## I.    Intervention Should Be Denied Because There are Limited Common Questions of Law between the Defendants and the Proposed Intervenors, Whose Interests are Already Adequately Represented by the Defendants.

At the threshold, this Court should deny Proposed Intervenors' request in light of the nature of this lawsuit.[2] The United States has raised a facial challenge to Rochester's Sanctuary City laws and policies because they are preempted by federal immigration laws. *See generally* ECF No. 1. Both Defendants and Proposed Intervenors seek to defend those laws and policies, claiming they

---

[2] The United States does not contest the timeliness of Proposed Intervenors' Motion.

are not preempted. ECF No. 6, Answer, ¶¶ 49-50; ECF No. 8-1, Memorandum in Support of Motion for Judgment on the Pleadings at 7-23; ECF No. 10 at 15. Therefore, as to the limited common questions of law at play between Defendants and Proposed Intervenors in this litigation, Defendants adequately represent the interests of Proposed Intervenors, making intervention unnecessary.

According to Proposed Intervenors, intervention is warranted because the City's *motivations* for defending the Sanctuary City laws and policies differ from theirs, and they allege that the consequences of losing those laws and policies also differ. ECF No. 10 at 23-24. For example, Proposed Intervenors contend that the City will be focused on defending its "governmental interest in maintaining control over their municipal employees and promoting public safety generally" whereas Proposed Intervenors seek to intervene in order to protect the religious liberty, equal protection, and due process rights of the communities they serve. *Id.* at 23. Moreover, Proposed Intervenors allege that, in the absence of the Sanctuary City policies, the City will not be forced to make difficult decisions with respect to the community, unlike Proposed Intervenors, who "will have to determine when a situation is sufficiently grave to warrant calling RPD and potentially subjecting their [] clients, congregants, or staff to the risk of encountering immigration authorities, and assess the measures necessary for their organizations and ministries to reach fearful immigrant populations." *Id.* at 24. Finally, Proposed Intervenors contend that the City will not make all of the legal arguments Proposed Intervenors would, as evidenced by the differing litigation strategies taken since the litigation commenced. *Id.* at 24.

Proposed Intervenors' arguments are insufficient to warrant permissive intervention. *Kearns v. Cuomo*, which involved a preemption challenge to certain portions of New York's Green Light law filed by the Erie County Clerk, is illustrative. No. 1:19-cv-902-EAW, 2019 U.S. Dist.

LEXIS 175384, at *1-3 (W.D.N.Y. Oct. 9, 2019). In *Kearns*, the Rural and Migrant Ministry, New York Immigration Coalition, Hispanic Federation, and certain individuals sought permissive intervention in order to ensure the Green Light Law was vigorously defended. *Id.* at *5. A court in this District denied the motion, holding that the proposed intervenors' interests would be adequately represented by the defendants where "the Defendants have displayed a resolve to vigorously defend this lawsuit and the Green Light Law." *Id.* at *16-17. Moreover, the court rejected the proposed intervenors' concerns that the defendants' interests in defending the law might differ from their interests as intervenors where Second Circuit precedent instructs "that differing motives will not establish inadequate representation where, as here, the ultimate objective is the same." *Id.* at *18 (citing *Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 98 (2d Cir. 1990), *Nat. Res. Def. Council, Inc. v. New York State Dep't of Env't Conservation*, 834 F.2d 60, 61-62 (2d Cir. 1987)). Notably, the court acknowledged that permissive intervention was inappropriate given "that the resolution of the pending motions will be driven by a legal analysis and application of the law—as opposed to the policy considerations advanced by the … proposed intervenors in their motion papers." *Id.* at *19.

The same is true here. It is undisputed that the City Defendants and Proposed Intervenors seek to vigorously defend the Sanctuary City laws and policies. "A putative intervenor does not have an interest not adequately represented by a party to a lawsuit simply because it has a motive to litigate that is different from the motive of an existing party." *Nat. Res. Def. Council, Inc.*, 834 F.2d at 61-62. Here, Proposed Intervenors do not argue that the City has not "demonstrated sufficient motivation to litigate vigorously and to present all colorable contentions" in defense of the policies. *Id.* at 62. Diverging motivations for defending the policies in light of the nature of Proposed Intervenors' work in the community do not justify permissive intervention. *Citizens*

*Against Casino Gambling in Erie Cnty. v. Hogen*, 704 F. Supp. 2d 269, 286 (W.D.N.Y. 2010) (denying permissive intervention where proposed intervenors and defendants had the same objective).

There is significant overlap between the Proposed Intervenors' Proposed Motion to Dismiss and Defendants' Motion for Judgment on the Pleadings. *Compare* ECF No. 10 *with* ECF No. 8-1. Indeed, both motions argue that Rochester's policies are not conflict preempted or expressly preempted and are presumptively valid, ECF No. 11-6 at 6-21; ECF No. 8-1 at 7-23, the policies do not discriminate against the Federal Government, ECF No. 11-6 at 22-24; ECF No. 8-1 at 24-25, the policies do not regulate the Federal Government, ECF No. 11-6 at 24-25; ECF No. 8-1 at 25, and argue that the United States is attempting to unlawfully commandeer the City to enforce the immigration laws in violation of the Tenth Amendment. ECF No. 11-6 at 13-17, 21-22, 24; ECF No. 8-1 at 13-15, 21-23. The fact that Proposed Intervenors seek to file a motion to dismiss for failure to state a claim rather than a motion for judgment on the pleadings has no bearing on the analysis here, particularly when Proposed Intervenors concede that the standard of review for both motions is the same. ECF No. 10 at 6. Neither the Intervention Motion nor the Proposed Motion to Dismiss substantively enhance Defendants' arguments regarding these common questions of law. Proposed Intervenors have not established that the City Defendants will not adequately defend their interests on the common questions of law at issue in this case, and permissive intervention should be denied accordingly.

## II.  Intervention Should Be Denied Because the Proposed Intervenors Seek to Expand the Scope of the Litigation with Collateral Interests and Issues.

The Proposed Intervenors also assert intervention is necessary because they have certain interests in the enforcement of the sanctuary city laws and policies including "religious liberty," "allocation of organizational resources," "reliance on local police for protection" and "structuring

their organizational programs and ministries." ECF 10 at 16, 18. The Proposed Intervenors allege that such "interests" differ from those of the City of Rochester and thus are not adequately represented. *Id.* at 22-23. But such alleged interests, and the associated factual questions regarding religious beliefs, organizational resources, and structure, are distinct from the legal question of whether the City of Rochester's sanctuary city laws and policies are preempted by federal law. Indeed, the Proposed Intervenors do not suggest that they have any particular perspective on potentially relevant considerations, such as the scope of the sanctuary laws and policies as construed by the City of Rochester or the effects of those laws and policies on the federal government's immigration enforcement efforts.

Any attempt to explore extraneous questions regarding their programs and funding through this litigation will only expand the scope and complexity of the litigation and cause undue delay. Courts in this Circuit have denied permissive intervention in such circumstances. *City of N.Y.,* 179 F.R.D. at 381 (denying intervention where claimed interests were "broadly related" to the subject matter of the lawsuit but were nonetheless "extraneous to the issues before the court"); *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972) (affirming denial of permissive intervention where "the complicating effect of the additional issues and the additional parties outweigh[ed] any advantage of a single disposition of the common issues"); *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa Steamship Co.*, No. 04 Civ. 4309, 2005 U.S. Dist. LEXIS 2735 *31 (S.D.N.Y. Feb. 22, 2005) (denying motion where proposed intervenor had an interest in the suit "[a]t a macro level" but presented "decidedly different" claims). Furthermore, to the extent the Proposed Intervenors reference "religious liberty" because they plan to bring a First Amendment claim, such a claim is outside the scope of the litigation and would only complicate and delay matters. *See City of Syracuse v. Bureau of Alcohol, Tobacco, Firearms, and*

*Explosives*, No. 1:20-cv-6885, 2021 U.S. Dist. LEXIS 102 at * 14-15 (S.D.N.Y. Jan. 2, 2021) (denying intervention where proposed intervenor's "submissions suggest that they seek to steer this litigation toward a Second Amendment challenge" which was outside the scope of the claims). Intervention should be denied here as well.

The Proposed Intervenors also claim that their clients will fear the potential for immigration enforcement actions should the Rochester Sanctuary City laws and policies be invalidated, and they speculate that such fear could affect their programs in various ways. ECF 10 at 18-20. The Proposed Intervenors spend pages of their brief criticizing recent immigration enforcement efforts with overwrought descriptions and citations to news articles in other jurisdictions, but those are not relevant considerations to intervention or the legal claims or defenses in this case. *See id.* at 9-11. Aliens in the United States without authorization do not have a protectable interest in being free from immigration enforcement. And what may or may not be happening in other cases or other parts of the country has absolutely no bearing on whether federal law preempts the City of Rochester's sanctuary laws and policies.

The Proposed Intervenors may argue that they do not intend to expand the scope of the case to include new (counter)claims, defenses, or relief. But if that were true, they would not have spent nearly nine pages of argument, in addition to declarations, articulating their interests, how those interests differ from the City of Rochester, and why those interests are not adequately protected by the City of Rochester in this litigation. *See id.* at 16-24. Their intent might have been clearer had they submitted "a pleading that sets out the claim or defense for which intervention is sought" as required by Fed. R. Civ. P. 24(c). However, the Proposed Intervenors chose not to submit that pleading, instead arguing that the Second Circuit permits "flexibility" with the requirements of that rule. *See* ECF 10 at 12 n. 9. The purpose of Fed. R. Civ. P. 24(c) is to enable

the court to assess the scope of the proposed intervenor's claims or defenses for purposes of the intervention analysis. *High Farms*, No. 16-cv-736, 2021 U.S. Dist. LEXIS 56730 at *27-29. It is particularly valuable for deciding permissive intervention. *See id.* The Proposed Intervenors' deliberate decision to forego a pleading, combined with the extraneous interests they present in their motion, obscures the claims and defenses they intend to assert and is fatal to their motion to intervene. *Id.* at *28-29 (denying intervention in part because proposed intervenor's "failure to state plainly and clearly her proposed claim or defense was a clear choice, which serves to obfuscate her position"); *see also Bano v. Union Carbide Corp.*, 2005 U.S. Dist. LEXIS 32595, at *48 (S.D.N.Y. Aug. 12, 2005) ("Intervenors' non-compliance with Rule 24(c) here is not a mere technicality, but is fatal to the motion.") (collecting cases denying intervention motions for failure to comply with Rule 24(c)).

Accordingly, the Proposed Intervenors' alleged interests in the litigation are outside the scope of this litigation and will cause unnecessary delay and complication, and for this additional reason, the motion to intervene should be denied.

### III.  Intervention Should Be Denied Because the Proposed Intervenors Will Unduly Delay the Litigation

The district court must consider whether allowing the proposed intervention will cause undue delay.  Fed. R. Civ. P. 24(b)(3). Here, it will.

As explained in Section II *supra*, should the Proposed Intervenors seek to pursue their collateral interests in this litigation, it will complicate the litigation and unduly delay resolution of the discrete, primarily legal issues at hand.

Further, allowing these organizations to intervene may cause other, similar organizations to seek to intervention too, "open[ing] the floodgates to other requests for permissive intervention by similarly interested parties." *See Kearns*, 2019 U.S. Dist. LEXIS 175384 at *18.

Moreover, Proposed Intervenors' actions to date demonstrate that their intervention will unduly delay the litigation. On June 17, 2025, Proposed Intervenors filed a joint motion with Defendants to delay the briefing on Defendants' motion for judgment on the pleadings while the Court decides the intervention motion. *See* ECF No. 20. The joint motion argued that Defendants' motion for judgment on the pleadings should be decided in conjunction with Proposed Intervenors' motion to dismiss to promote judicial economy in light of the common legal questions presented in the motions and the same standards of review governing them. *Id.* at 1. The joint motion also suggested that delaying the briefing in this matter would be prudent in order to await the disposition of other lawsuits in which the United States is challenging the sanctuary policies in other jurisdictions. *Id.* at 2. On July 2, 2025, Plaintiff opposed that motion, explaining that delay is unwarranted where the United States is prepared to litigate the matter and is preparing to file a cross-motion for judgment on the pleadings in conjunction with its opposition to Defendants' motion. ECF No. 29 at 5. Moreover, a delay in briefing the substantive motions filed by *parties* to this lawsuit will only delay the resolution of this matter where the United States seeks to enjoin the City of Rochester's facially invalid local laws and policies. *Id.* Indeed, "[c]oncerns about undue delay … resulting from permissive intervention are acute where the Government … is a party to the underlying action." *S.E.C. v. Bear, Stearns & Co. Inc.*, No. 03 CIV.2937 WHP, 2003 U.S. Dist. LEXIS 14611, at *8-9 (S.D.N.Y. Aug. 25, 2003) (internal citations omitted). Those laws and policies are causing harm to federal immigration enforcement efforts today, and each day that further proceedings are delayed by Proposed Intervenors' litigation tactics.

Additionally, as discussed *supra* in Section I, Proposed Intervenors' motion to dismiss largely tracks the City Defendants' motion for judgment on the pleadings. *Compare* ECF No. 10 *with* ECF No. 8-1. Proposed Intervenors contend that their "proposed motion to dismiss presents

an opportunity to resolve this case at the earliest possible stage—conserving this Court's and the parties' resources." ECF No. 10 at 16. But Defendants' motion for judgment on the pleadings and Plaintiff's forthcoming cross-motion will do just that, under the same legal standard that would be applied to the proposed motion to dismiss. Allowing this additional, likely duplicative briefing on the same subject and under the same legal standard is not an efficient use of this Court's and the parties' resources, and will only delay this Court's resolution of the matter. This Court should deny the request to intervene and further delay this litigation.

## CONCLUSION

Wherefore, the United States requests that this Court deny the motion for permissive intervention.

DATED: July 8, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

ALESSANDRA FASO
Acting Assistant Director

By: */s/ Alexandra McTague*
ALEXANDRA MCTAGUE
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel. 202-718-0483
Alexandra.mctague2@usdoj.gov
*Attorneys for the United States*