UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

             Plaintiff,

    v.

THE CITY OF ROCHESTER; MALIK D. EVANS, Mayor of Rochester, in his Official Capacity; ROCHESTER CITY COUNCIL; MIGUEL A. MELENDEZ, JR., President of the Rochester City Council, in his Official Capacity,

             Defendants.

---

No. 6:25-cv-06226-FPG-MJP


**OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.      Constitutional and Statutory Framework ................................................2

    II.     The Challenged Sanctuary Law and Policies............................................5

           A.      Resolution 2017-5, "Resolution Affirming that Rochester is
                  a Sanctuary City" ...........................................................................5

           B.      Policies Implementing the Sanctuary City Law............................5

LEGAL STANDARD............................................................................................................7

ARGUMENT.......................................................................................................................7

    I.      The City of Rochester's Sanctuary Law and Policies Are Preempted by Federal
          Immigration Laws ........................................................................................7

           A.      8 U.S.C. §§ 1373 and 1644 Expressly Preempt the City of Rochester's
                  Sanctuary Law and Policies ..........................................................7

                  1.      The Second Circuit Has Already Held that Sections 1373 and 1644
                        are Valid Preemption Provisions .....................................8

                  2.      Rochester's Proposed Construction of §§ 1373 and 1644 is Overly
                        Narrow and Contrary to the Plain Text .........................10

                    3.      Rochester's Laws and Policies Restrict Information Sharing In
                        Violation of §§ 1373 and 1644.......................................12

            B.      The City of Rochester's Sanctuary Law and Policies are Conflict
                  Preempted ......................................................................................16

            C.      The City of Rochester's Sanctuary City Law and Policies Violate
                  Principles of Intergovernmental Immunity Where They Unlawfully
                  Discriminate Against and Regulate the Federal Government...................21

    II.     Rochester's Rule 11 Challenge Fails ................................................25

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arizona v. United States*,
567 U.S. 387 (2012).................................................................................... *passim*

*Bank of New York v. First Millennium, Inc.*,
607 F.3d 905 (2d Cir. 2010)................................................................................ 7

*Berger v. State of New York*,
388 U.S. 41 (1967)............................................................................................ 24

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001).......................................................................................... 20

*Buono v. Tyco Fire Prods., LP*,
78 F.4th 490 (2d Cir. 2023) ............................................................................. 12

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011).......................................................................................... 16

*City of New York v. F.C.C.*,
486 U.S. 57 (1988)............................................................................................ 19

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999)....................................................................... *passim*

*Davis v. Elmira Sav. Bank*,
161 U.S. 275 (1896)............................................................................. 16, 18, 19

*Demore v. Kim*,
538 U.S. 510 (2003).......................................................................................... 17

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018).......................................................................................... 11

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ....................................................................... 24, 25

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952)............................................................................................ 2

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ........................................................................................... 4, 16

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) ............................................................................................ 21

*Knox v. Brnovich*,
  907 F.3d 1167 (9th Cir. 2018) ........................................................................... 22

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ............................................................................................ 11

*Mayo v. United States*,
  319 U.S. 441 (1943) ............................................................................................ 23

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ........................................................................................ 14, 23

*McHenry Cnty. v Raoul*,
  44 F.4th 581 (7th Cir. 2022) .............................................................................. 25

*McNally v. Port Auth. (In re WTC Disaster Site)*,
  414 F.3d 352 (2d Cir. 2005) ............................................................................... 12

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) .............................................................................................. 7

*Murphy v. National Collegiate Athletic Association*,
  584 U.S. 453 (2018) .............................................................................................. 8

*National Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018) .......................................................................................... 11

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010) ....................................................................... 4, 11, 20

*New York v. U.S. Dep't of Justice*,
  951 F.3d 84 (2d Cir. 2020) ........................................................................ *passim*

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ............................................................................................ 17

*North Dakota v. United States*,
  495 U.S. 423 (1990) .................................................................................... 2, 3, 22

*Pac. Cap. Bank, N.A. v. Connecticut*,
  542 F.3d 341 (2d Cir. 2008) ................................................................. 18

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) ..................................................................... 23

*Perez v. Campbell*,
  402 U.S. 637 (1971) ............................................................................. 20

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016) ............................................................................. 12

*Roberts v. Babkiewicz*,
  582 F.3d 418 (2d Cir. 2009) ................................................................... 7

*South Carolina v. Baker*,
  485 U.S. 505 (1988) ............................................................................... 4

*Ting v. AT & T*,
  319 F.3d 1126 (9th Cir. 2003) .............................................................. 20

*Truax v. Raich*,
  239 U.S. 33 (1915) ............................................................................... 17

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ............................................................ 20

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ................................................................ 22

*United States v. City of Arcata*,
  629 F.3d 986 (9th Cir. 2010) ................................................................ 24

*United States v. Ferrara*,
  847 F. Supp. 964 (D.D.C. 1993) ........................................................... 23

*United States v. King Cnty., Washington*,
  122 F.4th 740 (9th Cir. 2024) ........................................................ 23, 25

*United States v. Locke*,
  529 U.S. 89 (2000) ............................................................................... 20

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ............................................................... 20

*United States v. Washington*,
  596 U.S. 832 (2022)......................................................................................... 21

*Washington v. United States*,
  460 U.S. 536 (1983)................................................................................... 21, 22

Statutes

6 U.S.C. § 482(b)(2).............................................................................................. 2

8 U.S.C. § 1101................................................................................................... 2

8 U.S.C § 1101(a)(15)........................................................................................... 9

8 U.S.C. § 1103(a)(3)........................................................................................... 19

8 U.S.C. § 1182............................................................................................. 2, 22

8 U.S.C. § 1188................................................................................................... 9

8 U.S.C. §§ 1225–29a..................................................................................... 2, 22

8 U.S.C. § 1226(a)............................................................................................... 24

8 U.S.C. § 1226(c)............................................................................................... 18

8 U.S.C § 1226(c)(4)........................................................................................... 17

8 U.S.C. § 1226(d)(1)(A)....................................................................................... 3

8 U.S.C. § 1226(d)(1)(B)....................................................................................... 3

8 U.S.C. § 1226(f)............................................................................................... 17

8 U.S.C. § 1231............................................................................................. 2, 22

8 U.S.C. § 1231(a).......................................................................................... 3, 19

8 U.S.C. § 1231(a)(1)(B)(iii)................................................................................. 19

8 U.S.C. § 1231(a)(4)........................................................................................... 19

8 U.S.C. § 1305................................................................................................... 12

8 U.S.C. § 1357(d)............................................................................................... 19

8 U.S.C. § 1357(g)(10)......................................................................................... 16

8 U.S.C. § 1357(g)(10)(B) ................................................................................................ 3

8 U.S.C. § 1373 ................................................................................... 3, 7, 14, 23

8 U.S.C. § 1373(a) ................................................................................... 7, 11, 16

8 U.S.C. § 1373(b) ...................................................................................... 4, 16

8 U.S.C. § 1373(c) ................................................................................... 3, 4, 11

8 U.S.C. § 1644 ....................................................................................... 3, 7, 11

Rules

Fed. R. Civ. P. 5(d)(C)(3) ............................................................................... 25

Fed. R. Civ. P. 11 ............................................................................................ 25

Fed. R. Civ. P. 12(c) ......................................................................................... 7

Regulations

8 C.F.R. § 287.7(a) ........................................................................................ 19

Other Authorities

U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017) .................................................. 17, 24

## INTRODUCTION

Cities may not frustrate federal programs with which they disagree, *City of New York v. United States,* 179 F.3d 29, 35 (2d. Cir. 1999), yet that is exactly what the City of Rochester has done through its Sanctuary City laws and policies. Enacted in 2017 in response and resistance to "potential changes in federal immigration enforcement practices and priorities" (Resolution 2017-5, ECF No. 1-2 at 1), the laws and policies chill communication with federal authorities by restricting information collection and disclosure, requiring approval for contact with federal authorities which are granted in only limited circumstances, refusing to honor immigration detainers, and imposing consequences on those who voluntarily cooperate with federal authorities. These policies go beyond merely declining to engage in immigration enforcement and instead serve to frustrate immigration enforcement programs enshrined in federal law.

There is no dispute that the Rochester Sanctuary City law and policies, including Resolution 2017-5, General Order 502, and Training Bulletin P-75-17, remain in force today—Rochester admits as much. ECF No. 6, Answer ¶¶ 27, 34. There is also no dispute that the scope of those policies is evident from the documents themselves—Rochester admits that too. *Id.* ¶¶ 36, 37, 40-43. There is no dispute that police officers who fail to comply with the sanctuary policies of General Order 502 can be subject to sanction—that too is admitted. *Id.* ¶¶ 47. And there is no dispute that sanctions, including additional training for alleged noncompliance with the policies, happened as recently as March or April of this year, as Rochester admits. Compl. ¶ 46; Answer ¶ 46. The material facts are not in dispute and show that Rochester's Sanctuary City laws and policies were developed to frustrate federal immigration enforcement and are doing just that today.

Our system of government contemplates two sovereigns—federal and state. But when a conflict between the two arises, the "Constitution, and the Laws of the United States … shall be

the supreme Law of the Land." Const. Art. VI, cl. 2. Here, the United States, through the Immigration and Nationality Act ("INA") regulates aliens within its borders, provides enforcement authority, and requires that state and local officials be permitted to voluntarily cooperate with that enforcement authority. The City of Rochester seeks to frustrate that federal program through its Sanctuary City laws and policies, contrary to the Supremacy Clause and the doctrines of federal preemption and intergovernmental immunity, by obstructing immigration enforcement, discriminating against immigration enforcement agencies, and regulating the federal government's immigration-related actions. Those laws and policies must be invalidated.

## BACKGROUND

### I.    Constitutional and Statutory Framework

The United States Constitution entrusts the power to "establish an uniform Rule of Naturalization," to Congress, U.S. Const., art. I § 8, cl. 4, thereby providing the federal government with "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has executed this mandate through the INA, 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)). *See id.* at 396. This body of law confers upon the federal government the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). This authority stems from the federal government's "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395. Based on these enumerated constitutional and sovereign powers, the federal government has broad authority to establish immigration laws, the execution of which States cannot obstruct or take discriminatory actions against. *See id.* at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990)

(plurality); *id.* at 444–47 (Scalia, J., concurring).

While "[t]he federal power to determine immigration policy is well settled," "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 395, 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York*, 179 F.3d at 35. Congress, through the INA, contemplated this framework of cooperation. For example, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). And state and local officials may "cooperate with the [federal government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

Congress acknowledged the need for information-sharing across and within governments when it enacted 8 U.S.C. §§ 1373 and 1644. *See New York v. U.S. Dep't of Justice*, 951 F.3d 84, 97 (2d Cir. 2020). With these provisions, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *Id.* (citations omitted). Section 1373 requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction." 8 U.S.C. § 1373(c). It also provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending

to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see id.* § 1373(b). Similarly, § 1644 provides that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [federal government] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, it "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York v. U.S. Dep't of Justice*, 951 F.3d at 112; *see City of New York*, 179 F.3d at 35 (rejecting a facial commandeering challenge to 8 U.S.C. § 1373). "A commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *New York v. U.S. Dep't of Justice*, 951 F.3d at 113.

Although certain rights are reserved to the States, under the Supremacy Clause, federal law is the "supreme Law of the Land" U.S. Const. art. VI, cl. 2, and "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). A state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

Thus, it is a well-settled concept underpinning our system of government that state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35.

## II.    The Challenged Sanctuary Law and Policies

### A.    Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City"

In February 2017, the City passed Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City," ("Resolution"), which was unanimously adopted by the City Council and remains in force today. *See* Resolution 2017-5 at 4; *see also* Answer, ¶ 20. The stated impetus for the Resolution was "changes in federal immigration enforcement practices and priorities." Resolution 2017-5 at 3; *see also id.* at 1. To that end, the Resolution creates "a policy that *assures* immigrants and refugees that they can contact the police and other City agencies *without fear of adverse immigration consequences*." *Id.* p. 3 (emphasis added).

Resolution 2017-5 prohibits City officials, including law enforcement officers, from participating in federal civil immigration enforcement and limits cooperation with federal immigration enforcement. *See generally id.* It expressly prohibits the use of city funds or personnel "to enforce <u>or to assist in the enforcement of</u> Federal immigration policies" "except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." *Id.* ¶ 5 (emphasis in original). Resolution 2017-5 also prohibits police and city personnel from inquiring about immigration status or requesting proof of immigration status unless required by law or needed for a criminal investigation. *Id.* ¶¶ 3, 4. Resolution 2017-5 also directs the Mayor and city officials to "implement policies that further the City's role as a Sanctuary City to ensure compliance with" the Resolution's "objectives." *Id.* ¶ 2.

### B.    Policies Implementing the Sanctuary City Law

To implement Resolution 2017-5, on March 23, 2017, the Rochester Police Department issued General Order 502 and Training Bulletin No. P-75-17, which remain in effect today. *See*

ECF Nos. 1-3, 1-4; Answer ¶ 34. The scope of these documents can be determined from their text.[1] Answer ¶¶ 35, 36, 40-43.

General Order 502 prohibits local cooperation with federal immigration enforcement and furthers Rochester's sanctuary city policies through limitations on information gathering, use, and disclosure to federal authorities; limitations on cooperation provided to federal immigration authorities; and refusal to comply with federal detainers. *See generally* Gen. Order 502 § V ("Sanctuary City Procedures"). The General Order restricts disclosures to federal immigration authorities in § V.E.2 ("If provided immigration documents for identification purposes, members will not contact CBP, ICE, or other federal immigration authorities regarding the person unless necessary to investigate criminal activity" and subject to further approval requirements in § V.F.). It also expressly prohibits cooperation in federal civil immigration enforcement activities, stating that "Members will **not** detain or turn over to CBP or ICE a person named in a civil immigration detainer, and will **not** assist CBP or ICE in taking such persons into custody." *Id.* (G)(2) (emphases in original). The General Order requires officers to report any violations of it to their immediate supervisor, and supervisors are instructed to discipline officers who commit violations. *Id.* § (VII)(A)-(B). Provisions of the General Order are described in more detail, *infra.*

In conjunction with General Order 502, the Rochester Police Department issued Training Bulletin No. P-75-17, which explained that Resolution 2017-5 "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." ECF 1-4, Training Bulletin No. P-75-17 at 1.

The Bulletin explained that "[i]n order to implement the Sanctuary City Resolution and

---

[1] Rather than admit allegations regarding General Order 502 and the Training Bulletin, the City of Rochester repeatedly denied the allegations in its Answer and "direct[ed] the Court to the complete and accurate text of" those documents. Answer ¶¶ 36, 37, 40-43.

ensure compliance, we are renaming and reissuing G.O. 502 with substantial updates." *Id.* at 1. For example, the Bulletin states, "Members will *not* detain or turn over to CBP or ICE a person named in a ***civil immigration detainer***, and ***will not assist*** CBP or ICE in taking such persons into custody." *Id.* at 2 (emphasis original). The Bulletin is described in more detail *infra*.

## LEGAL STANDARD

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is reviewed under the same standard as a 12(b)(6) motion to dismiss. *See Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "To survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (internal citation omitted). In ruling on a 12(c) motion, a court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009). When the parties cross-move for judgment on the pleadings and there are no material facts in dispute, the court can enter judgment. *See City of New York*, 179 F.3d at 33.

## ARGUMENT

I.    **The City of Rochester's Sanctuary Law and Policies Are Preempted by Federal Immigration Laws.**

      A.    **8 U.S.C. §§ 1373 and 1644 Expressly Preempt the City of Rochester's Sanctuary Law and Policies.**

As noted, § 1373(a) contains expressly preemptive language that State and local governments may not prohibit or restrict the sharing of "information regarding the citizenship or immigration status" with federal immigration officials. 8 U.S.C. § 1373(a); *see also* 8 U.S.C. § 1644 (similar). Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Sections 1373 and 1644 are valid preemption statutes that expressly preempt and invalidate

Rochester's Resolution No. 2017-5, General Order 502, and Training Bulletin No. P-75-17.

> **1.    The Second Circuit Has Already Held that Sections 1373 and 1644 are Valid Preemption Provisions.**

The Second Circuit has already found that §§ 1373 and 1644 are valid preemption provisions. In *City of New York v. United States*, the Second Circuit rejected New York City's facial challenge to §§ 1373 and 1644, finding instead that they were valid preemption provisions and also holding that they preempted New York City's Executive Order 124, which restricted City employees' ability to "transmit information respecting any alien to federal immigration authorities." 179 F.3d at 36-37. The Second Circuit rejected the City's Tenth Amendment challenge to those provisions because "the City's sovereignty argument asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *Id.* at 35.

More recently, in *New York v. U.S. Dep't of Justice*, the Second Circuit reversed the district court's holding that § 1373 was facially invalid under the Tenth Amendment. 951 F.3d at 112-14. It rejected the district court's conclusion that § 1373 could not survive a commandeering challenge after *Murphy v. National Collegiate Athletic Association,* 584 U.S. 453 (2018). *Id.* at 112-13. The Second Circuit explained that in *Murphy*, "there was no question that, but for the challenged federal law, the States' police power allowed them to decide whether to permit sports gambling within their borders" but observed that such a conclusion "is not so obvious in the immigration context where it is the federal government that holds 'broad,' and 'preeminent' power." *Id.* at 113 (internal citations omitted). The Second Circuit then conducted an as-applied analysis and held that § 1373 was a valid condition in the context of federal grantmaking. *Id.*

Despite this Second Circuit precedent, Rochester argues that § 1373 does not regulate

private actors and thus cannot survive a Tenth Amendment challenge after *Murphy*, citing out-of-circuit caselaw. ECF No. 8-1 ("Br.") 13-14. However, *City of New York* has not been overruled and still controls, as the Second Circuit reiterated in *New York v. Dep't of Justice*, 951 F.3d at 112 n.26. Under that precedent, §§ 1373 and 1644 are valid preemption statutes. *City of New York*, 179 F.3d at 35. Rochester cannot avoid Second Circuit precedent by citing out-of-circuit decisions.

Furthermore, in *New York v. U.S. Dep't of Justice* the Second Circuit rejected the *very position* advanced by Rochester:

> [I]nsofar as the district court concluded that the statute could claim no preemptive effect because it confers a purported federal right to transmit information only on government entities and officials, not on private persons, its focus may have been too narrow ... § 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons.

*New York v. U.S. Dep't of Justice*, 951 F.3d at 114 n.27 (quotations/citations omitted). Rochester ignores the Second Circuit's guidance entirely. But under *New York v. Dep't of Justice*, the question is whether the INA as a whole regulates private actors—aliens—and not whether §§ 1373 and 1644, when read narrowly, do so. There can be no dispute that the INA, which specifies who may enter and on what conditions, regulates private actors. *See, e.g.,* 8 U.S.C § 1101(a)(15) (classes of nonimmigrants who may seek to enter temporarily); *id.* § 1153 (classes of immigrants); *id.* § 1183 (inadmissible aliens); 8 U.S.C. § 1188 (temporary agricultural workers). Sections 1373 and 1644 relate to information sharing to facilitate immigration policy and are thus just one part of the overall statutory scheme. Under *City of New York* and *New York v. U.S. Dep't of Justice*, those sections are valid preemption statutes, foreclosing Rochester's argument to the contrary.

Rochester's challenge fails for another reason: a court must identify what power is reserved to the States to enact laws or policies "prohibiting their officials and agencies from engaging in even voluntary communications about citizenship and immigration status with federal authorities."

*New York v. U.S. Dep't of Justice*, 951 F.3d at 113. The Second Circuit explained that "[a] court undertaking that inquiry would have to recognize, as the Supreme Court has, that '[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *Id.* at 114 (quoting *Arizona*, 567 U.S. at 411). Indeed, the Supreme Court discussed information sharing provisions of the INA in *Arizona* and concluded that the federal scheme left room for a State policy *requiring* information sharing. *Id.* But, the Second Circuit observed that "[t]he same conclusion may not be so easy to reach … with respect to a State policy *prohibiting* information sharing." *Id.* Rochester has not explained how the power it seeks—prohibiting information sharing—is reserved to the States. At most, Rochester argues that it has an interest in record keeping and ensuring that its officers do not report erroneous information to federal immigration authorities. Br. 18. But the General Order goes far beyond mere record keeping or promoting accuracy in shared information. It prohibits information sharing.

The federal government's power over immigration is broad, it has an interest in information sharing across government entities to facilitate immigration policy, and the INA, including §§ 1373 and 1644, do not leave room for the States to prohibit that voluntary cooperation. Nor is it the case, as Rochester argues, that the United States seeks to interpret §§ 1373 and 1644 broadly against "any local government rules whatsoever regarding their officials' communications with immigration authorities." Br. 13. Here, the United States challenges particular Rochester policies that explicitly prohibit and restrict sharing the very information Congress said State and local governments cannot prohibit or restrict.

>   **2.    Rochester's Proposed Construction of §§ 1373 and 1644 is Overly Narrow and Contrary to the Plain Text.**

Rochester argues, again based on out of circuit caselaw, that its laws and policies are not preempted by §§ 1373 and 1644 because those provisions should be construed narrowly to prevent

restrictions on sharing of actual federal immigration status only, and Rochester does not possess such information. Br. 16-18. Rochester's argument is at odds with the plain text of the statutes.

When analyzing the issue of preemption, courts look to the intent of Congress, which is often expressed explicitly on the face of the statute, or through the law's scope, structure, and context. *New York SMSA Ltd.*, 612 F.3d at 104. The plain text of both §§ 1373 and 1644 shows that Congress intended to preempt any other law or policy that sought to restrict sharing of "*information regarding* the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1644 (similar). Statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018). By limiting the statutes to immigration status only, Rochester ignores this broadening effect and instead reads out the term "information regarding" altogether. That is improper. *National Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018) ("As this Court has noted time and time again, the Court is obliged to give effect, if possible, to every word Congress used.") (quotations/citations omitted). Moreover, when Congress meant the narrower "immigration status" in § 1373, it used it. Section 1373(c) obligates federal immigration authorities to respond to inquiries "seeking to verify or ascertain the citizenship or immigration status of any individual…." 8 U.S.C. § 1373(c). "[W]hen Congress includes particular language in one section of a statute but omits it in another[,] ... this Court presumes that Congress intended a difference in meaning." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018) (quotations/citations omitted). By including "information regarding" in § 1373(a), Congress intended something more than immigration status alone.

That is consistent with the legislative history of those sections which shows that "Section 1373 was enacted in 1996, when Congress took notice that certain states and localities were

restricting their officials' cooperation with federal immigration authorities" and "in enacting § 1373, as in enacting § 1644, Congress sought 'to give State and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens,' notwithstanding any local laws to the contrary." *New York v. U.S. Dep't of Justice*, 951 F.3d at 96-97 (quoting H.R. Rep. No. 104-725, at 383 (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. at 2771)). *See McNally v. Port Auth. (In re WTC Disaster Site)*, 414 F.3d 352, 376 (2d Cir. 2005) (using legislative history to confirm scope of express preemption clause).

Here, "information regarding citizenship or immigration status" includes the actual immigration status as well as other relevant information such as that contained on a travel or identification document which would tend to identify the individual and where they are from, and may show when and how they were admitted into the United States and for how long, which could indicate whether alien has overstayed a visa. Similarly, "information regarding…" includes contact information such as current address, because aliens must "notify the Attorney General in writing of each change of address and new address within ten days from the date of such change," 8 U.S.C. § 1305, or potentially face mandatory detention and removal. *See id.* § 1306. Such information concerns the "presence, whereabouts, or activities" of the aliens. *See McNally*, 414 F.3d at 376.

### 3. Rochester's Laws and Policies Restrict Information Sharing In Violation of §§ 1373 and 1644.

Sections 1373 and 1644, as properly construed, expressly preempt the City of Rochester's Sanctuary City laws and policies because those laws and policies place prohibitions and restrictions on information sharing with federal immigration authorities.[2]

In Resolution 2017-5, which was prompted by concerns of federal immigration

---

[2] To the extent Rochester invokes the presumption of validity, that presumption does not apply in the express preemption context. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023).

enforcement efforts, the City, through the Mayor and City Council, set forth specific objectives including that "the City shall not use its funds or personnel to enforce or to assist in the enforcement of Federal immigration policies[;]" the police department "shall not engage in certain activities solely for the purpose of enforcing federal immigration laws" including that "[t]he Police Department shall not …inquir[e] about the immigration status of an individual, … unless necessary to investigate criminal activity[;]" and "City personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits" unless required for the benefits, required by law, or to investigate criminal activity. Resolution 2017-5 at 3. The Resolution directed that "the Mayor and the City administration implement policies that further the City's role as a Sanctuary City to ensure compliance with the objectives herein"—i.e., prohibiting efforts to enforce or assist in enforcing Federal immigration laws and policies and providing "assur[ance]" to immigrants and refugees that contact with City personnel will not result in "adverse immigration consequences." *Id.*

Rochester argues that Resolution 2017-5 is lawful because on its face it pays homage to federal law (Br. 14-15), but that position cannot be squared with the Resolution's stated objectives that Rochester should not "assist" in the enforcement of "Federal immigration policies" and should "assure" aliens that contact with the City will not result in "adverse immigration consequences." Resolution 2017-5 at 3. Moreover, in 2017, Rochester conceded that "the resolution will, among other things, *regulate and in some cases restrict* our interaction with [CBP and ICE]." Training Bulletin at 1. A purported "savings clause" cannot insulate the Resolution from federal preemption because Rochester pursues policies under that Resolution "that undermine federal law." *Arizona*, 567 U.S. at 416. Rochester has no power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested

13

in the general government." *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819).

Rochester tries to describe General Order 502 narrowly—claiming it pertains to situations where an alien may voluntarily provide immigration documents in response to a request for identification in the context of an arrest, traffic stop, investigative detention, or for issuing an appearance ticket (Br. 15)—but that ignores provisions that prohibit and restrict information sharing, as well as the overall effect of the General Order. The "Sanctuary City Provisions" of General Order 502 restrict information gathering, stating that RPD members "will not inquire about the immigration status of an individual, … unless there is a specific and articulable need to do so to investigate criminal activity" and will not "inquire about or request proof of immigration status or citizenship when providing any police services or benefits" unless certain narrow restrictions are met. Gen. Order 502, §§ V.B., V.C. The General Order states that even if immigration documents are volunteered, members "may accept and review them" only if they were provided in response to a request for proof of identity during a traffic stop or investigative detention and for the purpose of issuing an appearance ticket or setting pre-arraignment bail. *Id.* § V.E.1. Outside of those limited circumstances, RPD may not review immigration documents provided on a voluntary basis. Furthermore, the General Order *prohibits* RPD members who received immigration documents for identification from contacting "CBP, ICE or other federal immigration authorities regarding the person unless necessary to investigate criminal activity[.]" *Id.* § V.E.2. Thus, if an RPD officer makes a routine traffic stop, requests identification, and receives an immigration document in response, that officer *cannot* contact immigration authorities about that person. That is in flat contravention of §§ 1373 and 1644. *City of New York*, 179 F.3d at 35.

The General Order also restricts or prohibits when and how RPD may interact with federal immigration authorities. First, "[a]ny contact or requests for assistance to CBP or ICE, or requests

from CBP or ICE for RPD assistance, must be authorized by Captain or above during business hours, or the Staff Duty Officer (SDO) during non-business hours." Gen. Order 502 § V.F.1. The need for explicit authorization is similar to the restriction in New York City's Executive Order 124, which required employees to refer all immigration-related concerns to an individual who would then decide what to do with them. *City of New York*, 179 F.3d at 31 n.1. The Second Circuit found the restriction violated §§ 1373 and 1644 because "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs." *Id.* at 35; *see also id.* at 37. The General Order is even more restrictive than New York City's because here "[a]ll such contacts or requests require a specific and articulable need for a criminal investigation, or must be otherwise permitted under § V.G of this Order." Gen. Order 502 § V.F.2. The scenarios in § V.G. all require probable cause of a federal criminal violation. *See id.*; *see also id.* at I.I (defining judicial warrant).

Finally, the General Order contains provisions for members of RPD to report on one another and face discipline for violations of the General Order. *Id.* § VII. Thus, not only are members of RPD prohibited from requesting information, viewing information, or sharing information with federal immigration enforcement, but they can be reported on by their colleagues for violating those directives and subject to training, counseling, or discipline. *See* Answer ¶ 47.

The Training Bulletin underscores the problems with General Order 502. It explained that "to implement the Sanctuary City Resolution and ensure compliance, we are renaming and reissuing G.O. 502 with substantial updates." Training Bulletin P-75-17 at 1. It then summarizes some provisions of the General Order regarding inquiring about immigration status and receiving approval to contact immigration authorities if required for a criminal investigation. *Id.* at 1-3.

To be clear, the federal government does not seek to conscript the City into immigration

enforcement efforts. Rochester's arguments to that effect seek to turn the Tenth Amendment into a "sword" to protect passive resistance that frustrates federal programs. *City of New York*, 179 F.3d at 35. Rochester cannot unilaterally decide to prohibit local officials' voluntary communication with federal immigration officials. The Resolution, General Order, and Training Bulleting are expressly preempted by §§ 1373 and 1644 and therefore invalid.

### B. The City of Rochester's Sanctuary Law and Policies are Conflict Preempted.

Rochester's Sanctuary City law and policies are conflict preempted because they pose "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," specifically, the operation of the immigration laws. *Hines*, 312 U.S. at 67. A state law or policy is conflict preempted and invalid if it "frustrates the purpose of the national legislation or impairs the efficiency of the[] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Hines*, 312 U.S. at 68 ("[T]he power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.").

Congress, through the INA, "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (internal citation omitted). To ensure the successful implementation of those laws, Congress anticipated coordination between federal, state, and local officials. *See*, *e.g.*, 8 U.S.C. §§ 1373(a), 1373(b), 1644, 1357(g)(10); *see also City of New York*, 179 F.3d at 35 ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems"). To that end, Congress

enacted §§ 1373 and 1644. *See New York v. U.S. Dep't of Justice*, 951 F.3d at 97.

As part of its broad authority "[t]o establish [a] uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, Congress "specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396; *see also Truax v. Raich*, 239 U.S. 33, 42 (1915). Section 1227(a) defines the classes of deportable aliens, and § 1226(a) authorizes the government to arrest and detain an alien using an administrative warrant pending a decision on removability. *See* U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017). Congress also included mandatory detention provisions when it amended the INA to address the "concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Demore v. Kim*, 538 U.S. 510, 513 (2003). Section 1226(c) requires the mandatory detention of aliens who are inadmissible or deportable for having committed certain offenses without the opportunity for release, including, for example, crimes involving moral turpitude, controlled substance offenses, aggravated felonies, and certain firearms offenses. *See Nielsen v. Preap*, 586 U.S. 392, 398 (2019); *but see* 8 U.S.C § 1226(c)(4) (containing exceptions for release). In 2025, Congress expanded the list of criminal activity triggering mandatory detention to include "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" Laken Riley Act, S. 5, 119th Cong. (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)(ii)). Through this legislation, Congress authorized states to sue the federal government for failure to detain an alien subject to mandatory detention if the alien harms the state or its residents. 8 U.S.C. § 1226(f).

As explained, Rochester's Sanctuary City law and policies impede the federal government's execution and enforcement of the immigration laws by forbidding City personnel

from inquiring about immigration status or assisting in the enforcement of federal immigration policies, and prohibiting RPD from communicating with ICE and CBP about anyone encountered in the course of their law enforcement activities, with limited exceptions. *See* Resolution 2017-5 at 3; Gen. Order 502 §§ (V)(E)(2), (V)(F). Rochester limits the use of personnel, prohibits information gathering, and prohibits communications with ICE or CBP except in narrow circumstances and with supervisor approval. *See* Resolution 2017-5 at 3, Gen. Order 502 §§ (V)(E)(2), (V)(F)(1)-(2). Such constraint on communication with federal immigration officials acts as an obstacle to immigration enforcement because it cuts off critical information channels for ICE and CBP contemplated by Congress in §§ 1373 and 1644 to execute their congressional mandate. Though Rochester contends that "these provisions do not prevent the communication of immigration status information as authorized by §§ 1373 and 1644" (Br. 20) that statement is contrary to the General Order. *See, e.g.*, General Order § V.E.2, V.F.2. Furthermore, "compliance with the [Sanctuary City laws and policies] would frustrate the purposes of the federal scheme." *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008). Rochester's avowed purpose is to impede the federal government's ability to apprehend individuals unlawfully present, in violation of the immigration law and conflict with the spirit of this framework. *See Davis*, 161 U.S. at 284. These policies impermissibly stand as an obstacle to the enforcement of the immigration laws as enacted by Congress. *See Arizona*, 567 U.S. at 406.

Moreover, the policies expressly prohibit Rochester police from complying with civil immigration detainers. Gen. Order 502 § (G)(2); *see also* Training Bulletin No. P-75-17 at 2.[3] Federal law allows aliens to serve their sentences for state crimes prior to deportation. *See* 8 U.S.C.

---

[3] The General Order permits cooperation with CBP and ICE in the event of a warrant supported by probable cause, or if there is probable cause to believe the alien committed a federal crime. Gen. Order 502 § (V)(G)(1). But the policies themselves impede federal officials' ability to obtain information necessary to obtain a judicial warrant in the first place. *See id.* §§ (V)(E)(2), (V)(F).

§§ 1226(c), 1231(a)(1)(B)(iii), (a)(4). "[A] State's incarceration of an alien requires DHS to delay acting on its own statutory obligations to arrest, detain, and remove certain aliens until the State releases the alien," in which case, "coordination between the State and DHS is not only appropriate, but necessary, to allow the federal agency effectively to resume its obligations when the State has achieved its penal ones." *New York v. U.S. Dep't of Justice*, 951 F.3d at 121. Should an alien be in the custody of another law enforcement agency, DHS may issue an immigration detainer to advise that agency that DHS seeks custody upon the alien's release "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer serves as "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Rochester's refusal to comply with detainers frustrates the enforcement of the immigration laws by requiring federal officers to independently locate and apprehend aliens after their release from local custody, and must do so before the individual commits another crime or flees the jurisdiction. These policies, which Rochester claims "are public safety and crime prevention policies," (Br. 8) actually pose a danger to the community. Such blatant disregard for federal immigration enforcement efforts hampers federal officers' ability to expeditiously apprehend individuals who are in violation of the immigration laws, to the detriment of the system Congress designed and to the detriment of the local community. *See City of New York v. F.C.C.*, 486 U.S. 57, 64 (1988); *see also Davis*, 161 U.S. at 283 (state laws cannot "impair[] the efficiency of … the federal government" in the "discharge [of] the[ir] duties"). The challenged law and policies are therefore invalid where they are conflict preempted by federal immigration law.

Rochester also contends that its laws and policies are presumed valid as "public safety and

crime prevention policies, as well as policies of equal access." Br. 8. A presumption against preemption applies with respect to certain areas where states have historically exercised their police powers, *New York SMSA Ltd.*, 612 F.3d at 104. It does *not* apply "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 91 (2000); *see also Ting v. AT & T*, 319 F.3d 1126, 1136 (9th Cir. 2003). Rochester's policies are not entitled to the presumption because they have the effect of impeding immigration activities, which are "inherently federal in character," *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001); *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (declining to apply the presumption "because immigration is an area traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (similar).

Characterizing the policies as "public safety and crime prevention policies" does not change the analysis. The Supreme Court has rejected the contention "that state law may frustrate the operation of federal as long as the state legislature in passing its law had some purpose in mind other than one of frustration," because "such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply … articulating some state interest or policy— other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Perez v. Campbell*, 402 U.S. 637, 651-52 (1971). Thus, despite Rochester's claim that its Sanctuary City laws and policies serve public safety, prevent crime, and ensure equal access, it remains the case that they frustrate federal immigration policy, as they are explicitly intended to do. *See supra* pp. 16-19; *see also* Compl. ¶¶ 5-6; Answer ¶ 35; Resolution 2017-5 at 3. Such laws and policies, "which frustrate[] the full effectiveness of federal law [are] rendered invalid by the Supremacy Clause." *Perez*, 402 U.S. at 652.

Rochester also contends that its policies are entitled to deference because they further a

larger statutory scheme, specifically, The City of Rochester Code Chapter 63, which "enshrines the City's long tradition of tolerance and openness as a community," the goal of which "is to ensure equal access to City services by all persons within the City limits." Br. 10-11. But these arguments fail for the same reason. Regardless of the stated goal of the policy, when its practical effect hinders an area traditionally regulated by the federal government, it is preempted by federal law. *See Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979). That is particularly true here, as Resolution 2017-5 states that it was passed in response to federal immigration policies. Resolution 2017-5 at 3.

  **C. The City of Rochester's Sanctuary City Law and Policies Violate Principles of Intergovernmental Immunity Where They Unlawfully Discriminate Against and Regulate the Federal Government.**

  Rochester's Sanctuary City law and policies violate the intergovernmental immunity doctrine because they unlawfully discriminate against and unlawfully regulate the federal government. *United States v. Washington*, 596 U.S. 832, 838-39 (2022).

  A state law or policy discriminates against the federal government if it "singl[es] out the federal government for unfavorable treatment," *id.* at 839, and "treats someone else better than it treats them," *Washington v. United States*, 460 U.S. 536, 544–45 (1983). Rochester's Sanctuary City law and policies do just that.

  The Resolution again sets the stage by prohibiting funds or personnel from assisting in the enforcement of immigration policies, prohibiting City personnel and police from inquiring into immigration status, and calling for the implementation of policies consistent with these principles. Resolution 2017-5 at 3. General Order 502 provides that "[m]embers will not be assigned to a CBP or ICE task force," Gen. Order 502  § (III)(C), while implying elsewhere that Rochester police officers are involved in other law enforcement task forces. *See id.* § (V) (exempting officers assigned to other law enforcement task forces from the policy); *id.* § (V)(F) (referencing

participation in the Greater Rochester Area Narcotics Enforcement Team); *see also* Training Bulletin P-75-17 at 3. Moreover, Rochester police are not permitted to provide ICE and CBP access to individuals in their custody or allow ICE and CBP to use police facilities to interview suspects unless "the person is named in a judicial warrant or federal criminal arrest warrant; or when there is probable cause to believe the person has committed a federal crime." Gen. Order 502 § (V)(G). And Rochester police are prohibited from complying with detainers. *Id.* § (V)(G)(2).

The "Sanctuary City Procedures" of General Order 502 notably "do not apply to members assigned to a federal law enforcement task force," indicating that Rochester police are not prohibited from sharing information regarding immigration status with agencies other than ICE or CBP or from allowing access to detainees to other law enforcement agencies. *Id.* § (V). These provisions, on their face, treat ICE and CBP less favorably than other law enforcement agencies and discriminatorily burden the United States in carrying out its immigration enforcement functions. *See North Dakota*, 495 U.S. at 438. They interfere with the government's ability to comply with the congressional *mandate* to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. And they do not "merely reference[] or … single[] out federal activities in an … innocuous manner." *Cf. United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019). Instead, they go beyond "incidental effects in an area of federal interest," *Knox v. Brnovich*, 907 F.3d 1167, 1177 (9th Cir. 2018), and impose "a specialized burden on federal activity," obstructing ICE and CBP's ability to enforce the immigration laws. *California*, 921 F.3d at 882.

Rochester argues that the United States cannot succeed on its intergovernmental immunity claim because Rochester is merely declining to participate in federal immigration enforcement, and again contends that any ruling to the contrary would run afoul of the anti-commandeering

principles of the Tenth Amendment. Br. 24-25. In other words, Rochester alleges that its discrimination against the federal government is Constitutionally protected. That is wrong. The Tenth Amendment's prohibition on anticommandeering does not bestow upon the States license to discriminate against the federal government. "The purpose of the Tenth Amendment is to limit Congress from usurping power that was reserved to the states." *Padavan v. United States*, 82 F.3d 23, 29 (2d Cir. 1996). When a state or locality engages in unlawful discrimination to the detriment of the federal government, it cannot use the Tenth Amendment as a shield. There is no threat of unconstitutional commandeering when federal immigration authorities access information collected by Rochester police or access aliens upon their release from Rochester police custody. *See, e.g.*, *United States v. King Cnty., Washington*, 122 F.4th 740, 758 (9th Cir. 2024) (requiring "access to county property consistent with the intergovernmental immunity doctrine does not" violate the Tenth Amendment just as "ICE us[ing] county highways to transport immigration detainees from one place to another just because the county owns its highways" would not).

Rochester's Sanctuary City law and policies similarly violate intergovernmental immunity principles where they have the effect of unlawfully regulating the federal government. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch*, 17 U.S. at 436. Accordingly, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (internal citation omitted).

The challenged laws and policies improperly regulate the federal government by blocking access to information about the individuals encountered by Rochester police even though Congress has expressly contemplated information sharing between local and federal governments under 8

U.S.C. §§ 1373 and 1644. *See* Gen. Order 502 § (V)(E)(2). Moreover, the policies improperly block federal immigration officers' access to detainees unless they have a judicial or criminal warrant despite the fact that Congress has authorized such officers to use detainers and administrative warrants for those purposes under 8 U.S.C. § 1226(a). *See id.* § (V)(G). The policies also prohibit compliance with immigration detainers, *id.* § (V)(G)(2); Training Bulletin P-75-17 at 2, when the INA expressly states that "[o]n a warrant issued by [federal immigration authorities], an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Congress has authorized administrative warrants by federal officers in the discharge of their duties as related to detention and removal. *See Arizona*, 567 U.S. at 407–08 (discussing administrative warrants).

Through these policies, federal officials must "entirely transform [their] approach to detention in the" city by securing a criminal or judicial warrant (which involve heightened[4] standards) or by pursuing the alien and staging an arrest with little to no information about the individual. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022). The Constitution prohibits cities from impeding federal operations in such a way. *See United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."). Rochester's Sanctuary City law and policies effectuate precisely the type of regulation that runs afoul of the intergovernmental immunity doctrine by "impermissibly overrid[ing] the federal government's decision, pursuant to discretion conferred by Congress," as to how to execute its mandate to detain and remove aliens present in violation of the immigration laws. *Geo Grp., Inc.*, 50 F.4th at 750-51.

---

[4] Administrative warrants issue on probable cause that the individual is subject to removal. U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017). A criminal judicial warrant issues on probable cause that a crime has been committed. *See Berger v. State of New York*, 388 U.S. 41, 55 (1967).

Rochester counters that its "Policies bind the Council, the Mayor, and City personnel including officers of the RPD, and no one else." Br. 24. In support of this contention, they cite *McHenry Cnty. v Raoul*, 44 F.4th 581, 593 (7th Cir. 2022). However, since the Seventh's Circuit's decision in that case, courts have recognized that laws can regulate the federal government even though, as here, they appear to regulate others. *See, e.g., Geo Grp., Inc.*, 50 F.4th at 759-60 (state statute disallowing the use of private contractors to run detention facilities within the state unlawfully regulated the federal government in violation of the intergovernmental immunity doctrine); *King Cnty., Washington*, 122 F.4th at 756-57 (county order preventing contractors who leased space from the county's airport from servicing ICE unlawfully regulated the federal government).

## II.    Rochester's Rule 11 Challenge Fails.

Rochester complains that the Complaint is unsigned "by hand or electronically" and argues it must be stricken pursuant to Fed. R. Civ. P. 11. Br. 23. That is wrong. The Complaint was electronically signed because it was filed via the court's ECF system using the ECF login information of an attorney on the signature block. *See* Compl.; Fed. R. Civ. P. 5(d)(C)(3) ("A filing made through a person's electronic-filing account and authorized by that person, together with that person's name on a signature block, constitutes the person's signature."). For the avoidance of doubt, the United States Department of Justice, including all attorneys identified on the Complaint signature block, stand by the Complaint.

## CONCLUSION

Wherefore the United States asks that this Court deny Defendants' Motion, grant the government's Cross-Motion for Judgment on the Pleadings, and hold Resolution 2017-5, General Order 502, and Training Bulletin P-75-17 void and unenforceable.

DATED: July 8, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

ALEXANDRA MCTAGUE
Senior Litigation Counsel

By: */s/ Alessandra Faso*
ALESSANDRA FASO
Acting Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel. 202-305-9855
alessandra.faso@usdoj.gov

*Attorneys for the United States*