IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br>v.<br><br>THE CITY OF ROCHESTER, *et al.*,<br><br>    *Defendants*. | Case No. 6:25-cv-06226-FPG-MJP<br>Judge Frank Paul Geraci, Jr. |

**PROPOSED BRIEF OF *AMICUS CURAIE* IMMIGRATION REFORM LAW INSTITUTE IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Mitchell P. Snyder
PO Box 147
Clarence, NY 14031
716-901-1931
MitchPaulSnyder@gmail.com


Attorneys for *Amicus Curiae*
Immigration Law Reform Institute

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. Pro 7.1 and Local R. 7.1(b), *amicus curiae* the Immigration Reform Law Institute ("IRLI") is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. IRLI has no parent corporation. It does not issue stock. Neither it nor anyone in leadership or with decision-making authority has any financial interest in the outcome of the case or otherwise has any involvement that would bear on the Court's decision on whether or not to recuse itself.

# INTEREST OF *AMICUS CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

# SUMMARY OF THE ARGUMENT

Rochester's sanctuary policies impede and interfere with federal immigration law enforcement and were designed to do just that. By creating an obstacle to congressional purposes, the policies violate the Supremacy Clause of the U.S. Constitution. Rochester's policies prohibit state and local officers from sharing the release dates of aliens, and their personal information, with U.S. Immigration and Customs Enforcement ("ICE"), and forbid such officers to transfer custody of aliens to ICE. In these prohibitions, Rochester compels local officers who would cooperate with federal immigration enforcement to refrain from cooperating.

This choking-off of cooperation that would otherwise take place is an obstacle both to the federal-state cooperation that Congress sought to facilitate and to immigration law enforcement itself. Indeed, by making Rochester a "sanctuary jurisdiction," where illegal aliens and criminal aliens can expect less effective federal immigration law enforcement than in other cities, Rochester's policies function as a magnet for illegal aliens, thus frustrating Congress's declared purpose of achieving operational control of the border.

---

[1] No counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has funded its preparation or submission.

Rochester's sanctuary policies are also conflict preempted in another way: because they command local officials to commit the federal crime of harboring, they make it impossible for officers to obey both City and federal law. Rochester's introduction of this logical conflict between local and federal law is a textbook violation of the Supremacy Clause.

**ARGUMENT**

**I.     ROCHESTER'S SANCTUARY POLICIES ARE OBSTACLE PREEMPTED.**

The City of Rochester enacted its first sanctuary policy in 1986. While the text of the resolution is unavailable today, the City's original resolution was described as a "purely symbolic resolution" that sent a message to the then Immigration and Naturalization Service (now ICE). *See*, Teresa A. Parsons, *Rochester Supports Sanctuary*, THE CATHOLIC COURIER-JOURNAL (June 5, 1986), p. 3.[2] *See also*, *Rochester Council Approves Measure on Alien Sanctuary*, THE NEW YORK TIMES (May 28, 1986).[3]

On February 21, 2017, the City "reaffirmed" its sanctuary policy, reiterating its commitment not to collect immigration-related information from aliens and to refuse to cooperate with federal immigration officials in the conduct of their duties. *See broadly*, City of Rochester, NY, Resolution No. 2017-5 (Feb. 21, 2017).[4] Among other things, the Resolution, which substantially amended the 1986 Resolution, prohibits the Rochester Police Department from "inquiring about the immigration status of an individual," prohibits city personnel from inquiring about or requesting "proof of immigration status or citizenship when providing services

---

[2] Available at http://lib.catholiccourier.com/1986-courier-journal/courier-journal-1986%20-%200379.pdf.
[3] Available at https://www.nytimes.com/1986/05/28/nyregion/rochester-council-approves-measure-on-alien-sanctuary.html.
[4] Available at https://www.cityofrochester.gov/sites/default/files/migrated/WorkArea-DownloadAsset.aspx-id-21474854309.pdf. Transmitting information and Resolution found starting at p. 68 of the document (p. 74 in the PDF). Page number citations will be to the internal document pagination, not to the pdf pagination.

or benefits," and bans the City from using "its funds or personnel to enforce or assist in the enforcement of Federal immigration policies. . ." *Id*. at p. 70.

Roughly a month after the City adopted the new sanctuary policy, the Police Department issued a General Order on the topic of "Equitable Policing," which barred officers from inquiring "about the immigration status of an individual" when investigating criminal offenses or "providing any police services or benefits." City of Rochester, NY, Police Department, General Order 502 (March 23, 2017), p. 4.[5] The Order also prohibits law enforcement from requesting "immigration documents," but may "accept and review them if voluntarily offered by a person in response to a request for proof of identity." *Id*. Should an individual voluntarily provides the information, though, officers are not allowed to "contact CBP, ICE, or other federal immigration authorities regarding the person." *Id.* at p. 5.

Cooperation with federal immigration authorities is significantly curtailed, too. Such cooperation may only occur if CBP or ICE provides local officials with a judicial warrant or federal criminal arrest warrant. *Id*. at p. 6. The limitation on cooperation without a judicial warrant includes detention, turning over, or accessing a person in custody for an interview by immigration officials. *Id*. Violations of the General Order will result in corrective measures and may be based either on the complaints of other officers or from citizens. *Id*. at p. 8.

Simultaneously with the Police Department's General Order, the Department revised its Training Bulletin. City of Rochester, NY, Police Department Training Bulletin P-75-17 (March 23, 2017).[6] The Bulletin affirmed the Police Department's intent to "restrict [its] interaction with [CBP] and [ICE]." *Id*. at p.1. The Bulletin clarified aspects of General Order 502, including that

---

[5] Available at https://data-rpdny.opendata.arcgis.com/documents/4e6c12a2590f42d6beea9164f9326964/explore.

[6] Available at https://data-rpdny.opendata.arcgis.com/documents/541a09c509754cd1ba36b7d365bae4cb/explore.

officers "will *not* detain or turn over to CBP a person named in a *civil immigration detainer*," and that they "*will not request immigration documents*." *Id*. at p. 2 (emphasis original). The Bulletin also clarifies General Order 585, stating that it is Department policy "to not ask persons who are detained or arrested about their citizenship or immigration status." *Id*. at p. 3. This brief, hereafter, will refer to the 1986 and 2017 ordinances and the Police Department's General Order and Training Bulletin collectively as Rochester's "sanctuary policies."

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress has the power to preempt state and local laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Oneok, Inc. v. Learjet, Inc*., 575 U.S. 373, 376-377 (2015), *citing California v. ARC America Corp.*, 490 U.S. 93 (1989). *See also*, *Coalition for Competitive Electricity v. Zibelman*, 906 F.3d 41, 49 (2nd Cir. 2018) (reciting standards for field and conflict preemption). Conflict preemption can occur in one of two ways: where either "compliance with both state and federal law is impossible" or "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok,* 575 U.S. at 377. The Second Circuit has held that the second kind of conflict preemption—obstacle preemption—occurs when there is interference "with the method by which the federal statute was designed to reach [its] goal." *Coalition for Competitive Electricity*, 906 F.3d at 55 (internal citations omitted).

When a state law or local ordinance conflicts with federal law, or the purposes for which

4

Congress enacted federal law, the state or local law must yield. "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), *quoted in Hines v. Davidowitz*, 312 U.S. 52, 67 n.20 (1941). *See also*, *Jackson v. Roberts (In re Jackson)*, 972 F.3d 25, 34 (2nd Cir. 2020).

The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. As pointed out by the First Circuit when opining on *Hines*, "[p]reemption will be more easily found where states legislate in areas traditionally reserved to the federal government, and in particular where state laws touch on foreign affairs." *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 73 (1st Cir. 1999).[7]

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

---

[7] Policies dealing with aliens not only invoke the Uniform Rule of Naturalization Clause of the Constitution but are also "interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952).

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

By design, Rochester's sanctuary policies frustrate the Immigration and Nationality Act ("INA") in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal, state, and local cooperation Congress intended to foster in that enforcement. As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. IIRIRA, Pub. L. 104-208, 110 Stat. 3009 (1996). The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), *quoted in City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative effort among local, state, and federal law enforcement in the enforcement of immigration law.

A review of additional federal immigration provisions further underscores this intent. Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (1996) ("PRWORA"). Entitled "Communication between State and local government agencies and Immigration and

Naturalization Service," section 434 of this law, now codified at 8 U.S.C. § 1644, is nearly identical to § 1373. *Id.* This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing Section 434: to bar *any* restriction on local police in their communications with ICE, including about the *whereabouts* of illegal aliens, which obviously includes the time of their release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.
>
> The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), *quoted in City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to

7

"cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

The City's policies of not asking for or collecting information regarding immigration status – enacted for the purpose of preventing the Police Department from complying with §§ 1373 and 1644 – frustrate the purpose for which Congress enacted the law and are preempted. Indeed,, by design, Rochester's sanctuary policies keep ICE in the dark about aliens' release dates and home and work addresses, sharply increasing the difficulty ICE has in accomplishing the congressional purposes of locating removable aliens and taking them into custody. Furthermore, because the policies, by their terms and purposes, mandate noncooperation with federal enforcement of immigration laws, they thwart the congressional purpose of fostering such cooperation.

In addition, the policies undermine Congress's objective of obtaining "operational control" of the border, defined as "the prevention of all unlawful entries into the United States," not just by terrorists but by all illegal aliens. Secure Fence Act of 2006 § 2(b), Pub. L. No. 109-367, 120 Stat. 2638, 2638–39. By making Rochester a "sanctuary jurisdiction," where illegal aliens who reach it can expect protection from federal immigration law enforcement, the policies function as a magnet to illegal immigration itself, thus frustrating Congress's goal of operational control of the border.

By thus standing as an obstacle to all of these central purposes of the INA, Rochester's policies plainly violate the Supremacy Clause.

## II. ROCHESTER'S SANCTUARY POLICIES MAKE OBEYING BOTH FEDERAL AND STATE LAW AN IMPOSSIBILITY.

An additional, equally plain basis for the government's broad claim of conflict preemption, Compl. ¶¶ 3-6, 58-72, is the argument that Rochester's sanctuary policies are conflict preempted because they command officials to commit the federal crime of harboring.

What are generally referred to as the "anti-harboring" provisions of the INA—located at Title II, Chapter 8, § 274 and codified at 8 U.S.C. § 1324—read in pertinent part:

> **Bringing in and Harboring Certain Aliens**
>
> **(a) Criminal penalties.—**
>
> (1) (A) Any person who—
> …
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> …
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

9

By preventing local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, Rochester's policies compel local law enforcement to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE requests the release date of an alien from a local jail, and local authorities refuse to give that information to it, as mandated by Rochester's policies, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection" either in the jail (a "building") or outside the jail (a "place"), depending on the alien's location at any given moment. Also, if ICE requests the home address of a released alien, and local officials refuse to give it that information, as mandated by Rochester's policies, they are "conceal[ing]" the alien "in a[] building" at any time the alien is at that address. Or, if ICE agents arrive at a local jail to assume custody of an alien, and local authorities, as mandated by the policies, both refuse them entry and do not transfer custody outside of the jail, the local officials are "harbor[ing]" the alien "in . . . a[] building" while the alien remains in the jail, "harbor[ing]" the alien "in . . . a[] place" if they bring the alien outside the jail and there refuse to transfer custody, or concealing the alien "in a[] place" if they deliberately slip the alien out of the jail in a way that evades the agents' notice. Even if local law enforcement claims that receiving a Form I-247A (INS Immigration Detainer Notice of Action form notifying local law enforcement of an alien's removability)[8] from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence.

---

[8] Sample form available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

Accordingly, Rochester's sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and state law an impossibility, and they are, therefore, conflict preempted. *E.g., Oneok,* 575 U.S. at 377; *Coalition for Competitive Electricity*, 906 F.3d at 55.

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Judgment on the Pleadings should be denied.

Dated: July 22, 2025　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　/s/ Mitchell P. Snyder
　　　　　　　　　　　　　　　　　　　　　　Mitchell P. Snyder
　　　　　　　　　　　　　　　　　　　　　　PO Box 147
　　　　　　　　　　　　　　　　　　　　　　Clarence, NY 14031
　　　　　　　　　　　　　　　　　　　　　　716-901-1931
　　　　　　　　　　　　　　　　　　　　　　MitchPaulSnyder@gmail.com


　　　　　　　　　　　　　　　　　　　　　　Counsel for *Amicus Curiae*
　　　　　　　　　　　　　　　　　　　　　　Immigration Reform Law Institute