UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

                *Plaintiff*,

       v.

THE CITY OF ROCHESTER; MALIK D.
EVANS, Mayor of Rochester, in His Official
Capacity; ROCHESTER CITY COUNCIL;
MIGUEL A. MELENDEZ, JR., President of the
Rochester City Council, in His Official
Capacity,

                *Defendants*.

Case No. 25-cv-06226

---

**BRIEF FOR STATE OF NEW YORK AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS' MOTION, AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION,
FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION AND INTERESTS OF AMICUS ..................................................... 1

ARGUMENT ...................................................................................................................... 4

I.    Federalism Ensures That State and Local Governments Can Make Independent
      Decisions About Use of Their Law Enforcement Resources, So Long as Those
      Decisions Are Not Inconsistent with Federal or State Law. ........................................ 4

II.   Rochester's Law Limiting Local Officials' Participation in Immigration
      Enforcement Is Consistent with Federal and State Law. ............................................ 8

      A.   Rochester's Law Is Not Preempted by Federal Law. ............................................ 8

      B.   Both New York State and Federal Law Substantially Constrain Local
           Law Enforcement Participation in Civil Immigration Enforcement. ..................... 10

III.  Rochester's Law Is Supported by a Strong Governmental Interest
      in Maintaining Public Safety and Community Welfare. ................................................ 15

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Arizona v. United States*,
    567 U.S. 387 (2012)......................................................................................4, 7, 9-10, 12-13

*Buono v. Tyco Fire Prods., LP*,
    78 F.4th 490 (2d Cir. 2023) ........................................................................................9

*City & Cnty. of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ......................................................................8

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999)..........................................................................................8

*Colorado v. U.S. Department of Just.*,
    455 F. Supp. 3d 1034 (D. Colo. 2020)......................................................................8

*Creedle v. Miami-Dade Cnty.*,
    349 F. Supp. 3d 1276 (S.D. Fla. 2018) ...................................................................14

*Davila v. Northern Reg'l Joint Police Bd.*,
    370 F. Supp. 3d 498 (W.D. Pa. 2019)......................................................................14

*DeCanas v. Bica*,
    424 U.S. 351 (1976)..................................................................................................5, 7

*Doe v. U.S. Immigration & Customs Enf't*,
    490 F. Supp. 3d 672 (S.D.N.Y. 2020)........................................................................7

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)....................................................................................................6

*Jimenez v. City of Cohoes Police Dep't*,
    No. 23-955, 2024 WL 1551149 (2d Cir. Apr. 10, 2024) ........................................13

*Kansas v. Garcia*,
    589 U.S. 191 (2020)..................................................................................................10

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ...................................................................................14

*Metropolitan Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)....................................................................................................5

**Cases**                                                                      **Page(s)**

*Mountain View Coach Lines, Inc. v. Storms,*
    102 A.D.2d 663 (2d Dep't 1984) ........................................................................11

*Murphy v. National Collegiate Athletic Ass'n,*
    584 U.S. 453 (2018)...........................................................................................8

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)...........................................................................................4

*New York Pet Welfare Ass'n v. City of New York,*
    850 F.3d 79 (2d Cir. 2017)...............................................................................6

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995)...........................................................................................6

*New York State Telecomms. Ass'n v. James,*
    101 F.4th 135 (2d Cir.) .....................................................................................6

*New York v. U.S. Department of Justice,*
    951 F.3d 84 (2d Cir. 2020)...............................................................................8

*Nwauzor v. GEO Grp., Inc.,*
    127 F.4th 750 (9th Cir. 2025) ..........................................................................7

*Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.,*
    8 F.4th 176 (3d Cir. 2021) ...............................................................................8

*Ochoa v. Campbell,*
    266 F. Supp. 3d 1237 (E.D. Wash. 2017) ......................................................14

*Oregon v. Trump,*
    406 F. Supp. 3d 940 (D. Or. 2019) .................................................................8

*Orellana v. County of Suffolk,*
    No. 17-cv-4267, 2025 WL 481723 (E.D.N.Y. Jan. 2, 2025)...........................11, 14

*People ex rel. Wells v. DeMarco,*
    168 A.D.3d 31 (2d Dep't 2018) ................................................................. 10-13

*People v Johnson,*
    66 N.Y.2d 398 (1985) .....................................................................................12

**Cases**                                                              **Page(s)**

*People v. P.J. Video,*
    68 N.Y.2d 296 (1986) ........................................................................................12

*People v. Scott,*
    79 N.Y.2d 474 (1992) ........................................................................................12

*People v. Shakur,*
    215 A.D.2d 184 (1st Dep't 1995) ......................................................................11

*Phelps v. Phelps,*
    128 A.D.3d 1545 (4th Dep't 2015) ....................................................................11

*Plyler v. Doe,*
    457 U.S. 202 (1982) ............................................................................................5

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................................................6, 10

*Santos v. Frederick Cnty. Bd. of Comm'rs,*
    725 F.3d 451 (4th Cir. 2013) ............................................................................14

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of Camden,*
    465 U.S. 208 (1984) ............................................................................................5

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ..........................................................................7

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ..............................................................................6

*United States v. Illinois,*
    No. 25-cv-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) ..........................8

*United States v. Lopez,*
    514 U.S. 549 (1995) ............................................................................................5

*United States v. Morrison,*
    529 U.S. 598 (2000) ............................................................................................5

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ..............................................................................7

**Cases**                                                                                                  **Page(s)**

*Younger v. Harris*,
    401 U.S. 37 (1971).............................................................................................4

**Statutes**

8 U.S.C. § 1357................................................................................................... 12-13

Criminal Procedure Law § 1.20 .............................................................................11

**Regulations**

8 C.F.R.
    § 241.2..............................................................................................................12
    § 287.5..............................................................................................................12

**Miscellaneous Authorities**

Alexandra Sirota & Lissette Guerrero, Budget & Tax Ctr., N.C. Ctr. for Just., *Local
    Communities Face High Costs of Federal Immigration Enforcement* (Apr. 2019),
    https://www.ncjustice.org/wp-content/uploads/2019/04/BTC-REPORT_Cost-of-
    Immigration-Enforcement.pdf ..........................................................................18

Daniel E. Martínez et al., *Providing Sanctuary or Fostering Crime? A Review of the
    Research on "Sanctuary Cities" and Crime*, 12 Socio. Compass e12547 (Jan. 2018)...........17

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino
    Migrants: Wage Theft and Robbery*, 52 Socio. Q. 593 (2011) ................................16

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration
    Enforcement and a Poor Substitute for Real Reform*,
    20 Lewis & Clark L. Rev. 165 (2016) .................................................................18

Letter from Off. of N.Y. State Att'y Gen. (Apr. 8, 2020),
    https://ag.ny.gov/sites/default/files/francis-sj-dearcolleague-letter.pdf.....................1

Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore
    President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017),
    https://www.nydailynews.com/2017/02/23/nypd-commissioner-reminds-cops-to-
    ignore-president-trumps-immigrant-deportation-orders/ .......................................15

**Miscellaneous Authorities**                                                    **Page(s)**

Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/nyregion/police-fear-trump-immigration-orders-may-handcuff-effort-to-fight-gangs.html ...................................................................15

Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 102743 (Aug. 2022) ............................................................................................................17

Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970 (2016) ..................................................................................................................16

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013), http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ......................................................................................................15

Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and the Laws* (2017), https://ag.ny.gov/sites/default/files/setting_the_record_straight.pdf ...........................14, 16, 18

Off. of N.Y. State Att'y Gen., *Guidance Concerning Local Authority Participation in Immigration Enforcement and Model Sanctuary Provisions* (2017 & Supps. 2017-2018), https://ag.ny.gov/sites/default/files/sanctuary_guidance_and_supplements.pdf ...........1

Off. of N.Y. State Att'y Gen., *Immigration Enforcement: Guidance Concerning Local Authorities' Participation in Immigration Enforcement and Model Provisions* (2025), https://ag.ny.gov/police-departments-law-enforcement/immigration-enforcement ..................1

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947 (2015) ...................................................................................................18

Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013), https://www.washingtonpost.com/local/for-immigrant-women-domestic-violence-creates-a-double-shadow/2013/12/02/5626b85e-55e6-11e3-8304-caf30787c0a9_story.html ......................................................................16

Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 Colum. L. Rev. 837 (2019) ...................................................................................................18

**Miscellaneous Authorities**                                                                    **Page(s)**

The President's Task Force on 21st Century Policing, Final Report (2015),
https://www.ojp.gov/ncjrs/virtual-library/abstracts/final-report-presidents-task-force-21st-century-policing ...........................................................................................16

Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, 44 Pol. Behav. 1359 (2022) ............................................................................17

Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigration Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Socio. Rev. 154 (2021).....................................17

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (2015).................................................................................................18

Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017),
https://www.latimes.com/local/california/la-me-0129-lopez-beck-immigration-20170127-story.html..........................................................................................15

Tom K. Wong, Ctr. For Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017),
https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy ...................................................17

## INTRODUCTION AND INTERESTS OF AMICUS

The State of New York submits this amicus curiae brief in support of the City of Rochester defendants' motion for judgment on the pleadings, and in opposition to plaintiff the United States' cross-motion for judgment on the pleadings, in this suit by the United States challenging the city's law limiting local officials' participation in federal immigration enforcement. This Court should grant judgment in favor of defendants as to plaintiff's Supremacy Clause claims because the challenged Rochester city law is wholly consistent with federal law.

The State has a longstanding interest in, and considerable experience with, issues related to the participation of state and local officials in federal immigration enforcement. In 2017 and again in 2025, the New York State Attorney General provided extensive guidance to local officials in New York on the subject, highlighting the ways in which laws and policies limiting participation in civil immigration enforcement can enhance public safety and trust within communities.[1] The resolution of Rochester's elected representatives, and the implementing order and training bulletin, challenged in this case (referred to collectively here as Rochester's "law") are consistent with the Attorney General's guidance. Specifically, Rochester's law requires that, subject to federal and state law, (1) local police officers shall not take certain actions "solely for the purpose of enforcing federal immigration laws," and shall not "stop, question, interrogate, investigate, or arrest" individuals based solely on their immigration status; (2) city officials shall not inquire about

---

[1] *See* Off. of N.Y. State Att'y Gen., *Immigration Enforcement: Guidance Concerning Local Authorities' Participation in Immigration Enforcement and Model Provisions* (2025); Off. of N.Y. State Att'y Gen., *Guidance Concerning Local Authority Participation in Immigration Enforcement and Model Sanctuary Provisions* (2017 & Supps. 2017-2018). The original 2017 guidance was also supplemented later that year, in 2018, and in 2020. *See* Off. of N.Y. State Att'y Gen., *Guidance Concerning Local Authority Participation, supra*; Letter from Off. of N.Y. State Att'y Gen. (Apr. 8, 2020). (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on July 29, 2025.)

immigration status except as required by law or necessary to investigate criminal activity; and (3) city funds and officials shall not be used to enforce federal immigration policies except as required by law.[2] Rochester's law does not prohibit city officials from communications with federal immigration authorities regarding individuals' immigration status, or interfere with criminal immigration enforcement.[3]

This amicus brief draws on the State's experience to make three points in support of defendants' motion for judgment on the pleadings, and in opposition to plaintiff's cross-motion. *First*, federalism principles require that Rochester be permitted to determine, and through local laws implement, the best method of protecting public safety and community welfare, so long as the local laws are not inconsistent with federal or state law. Here, Rochester's elected representatives' decision to limit city officials' participation in immigration enforcement in order to best protect their local community is a quintessential exercise of the police power that federalism and the Tenth Amendment reserve to States and their localities. And there is a strong presumption against federal preemption of local laws governing local officials' exercise of that police power, like Rochester's local law at issue here.

*Second*, Rochester's law limiting local officials' participation in immigration enforcement is consistent with state and federal law. Defendants lay out in detail in their motion papers the reasons Rochester's law is not preempted by federal immigration law and does not unlawfully discriminate against or regulate the federal government. As defendants explain, Rochester's law

---

[2] *See* City of Rochester Resolution No. 2017-5 (Feb. 21, 2017), ECF No. 1-2, at 4; *see also* City of Rochester Police Dep't General Order No. 502 (Mar. 23, 2017), ECF No. 1-3, at 4-8 (similar); City of Rochester Police Dep't, Training Bulletin P-75-17 (Mar. 23, 2017), ECF No. 1-4, at 2-3 (similar).

[3] *See* Resolution No. 2017-5, ECF No. 1-2, at 3.

governs only city officials' own actions and does not restrict the communications with federal immigration authorities that must be permitted under the federal law on which plaintiff relies. Because the State agrees with those arguments (which alone require judgment for defendants), it does not belabor them here. Instead, the State explains that Rochester's law is not only consistent with federal immigration law, but also tailored to ensure that Rochester officials comply with other state and federal law that substantially constrains local law enforcement participation in immigration enforcement. New York state law generally permits state and local law enforcement to arrest and detain only for *criminal* violations—not civil immigration violations. And the Fourth Amendment prohibits unreasonable seizures, which could include civil immigration arrests that violate state law. Rochester's law protects the city from liability for such unlawful arrests.

*Third*, Rochester's law is supported by strong governmental interests. As both the experience of state and local law enforcement and ample social science evidence confirm, by limiting local officials' participation in immigration enforcement, Rochester's law allows its residents to report crimes, serve as witnesses, obtain healthcare, and otherwise interact with local officials without fear that doing so may result in adverse immigration consequences for themselves or loved ones. In this way, the law promotes both public safety and public health for all. At the same time, laws like Rochester's ensure that limited local resources are directed to advancing local public safety priorities, such as prevention of violent crime.

## ARGUMENT

I.  **FEDERALISM ENSURES THAT STATE AND LOCAL GOVERNMENTS CAN MAKE INDEPENDENT DECISIONS ABOUT USE OF THEIR LAW ENFORCEMENT RESOURCES, SO LONG AS THOSE DECISIONS ARE NOT INCONSISTENT WITH FEDERAL OR STATE LAW.**

Federalism is a fundamental principle of the United States Constitution, which recognizes that both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). "Our Federalism" recognizes "that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways," and therefore requires "sensitivity to the legitimate interests of both State and National Governments," and a "National Government, anxious though it may be to vindicate and protect federal rights and federal interests," that must "do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44-45 (1971).

"[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quotation marks omitted). Federalism implements the Framers' vision that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed," "more local and more accountable than a distant federal bureaucracy." *Id.* (citing The Federalist No. 45, at 293 (James Madison)). Power diffused to state and local governments "also serves as a check on the power of the Federal Government: By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* (quotation marks omitted).

Most fundamentally, federalism reserves to the States and their localities the "police power," that is, power over the day-to-day public safety and well-being of people within their

jurisdiction. "The Constitution . . . withhold[s] from Congress a plenary police power," *United States v. Lopez*, 514 U.S. 549, 566 (1995), and, under the Tenth Amendment, the Constitution reserves such power, not delegated to the United States, to the States and the people. "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quotation marks omitted). And the States in turn may delegate aspects of the police power to local governments, which are merely "political subdivision[s] of the State from which [their] authority derives." *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor of Camden*, 465 U.S. 208, 215 (1984).

While the federal government maintains authority over naturalization of noncitizens, and of their entry and removal across the nation's borders, the police power reserved to States and their localities includes authority over "essentially local problems" affecting individuals within their borders, including undocumented individuals and other noncitizens. *DeCanas v. Bica*, 424 U.S. 351, 355-57 (1976); *see, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 215 (1982). There is "no better example" of such a local problem over which the States and their localities retain police power "than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). And suppression of crime and vindication of victims is the principal purpose of the Rochester law challenged here—which is expressly intended to "enhance public safety and neighborhood conditions for all," by assuring immigrant communities "that they can contact the police and other City agencies without fear of adverse immigration consequences." Resolution No. 2017-5, ECF No. 1-2, at 4.

State and local governments also retain control of their own officers in our federal system. The Tenth Amendment prohibits Congress from conscripting state and local officers and resources

to assist with federal regulatory schemes, such as immigration enforcement. *See Printz v. United States*, 521 U.S. 898, 935 (1997). Thus, a "quintessential police power" retained by state and local governments is the "ability to regulate [their] internal law enforcement activities," including in connection with immigration matters. *United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) (rejecting federal preemption challenge to state law governing state and local law enforcement participation in civil immigration enforcement).

While, under the Constitution's Supremacy Clause, Congress has the power to preempt state and local laws that conflict with federal law, there is a strong presumption against preemption. *See, e.g.*, *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). And that presumption "is especially strong" with respect to state and local laws that implicate a State's traditional police powers. *See New York Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017). "Courts 'start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress.'" *New York State Telecomms. Ass'n v. James*, 101 F.4th 135, 148 (2d Cir.) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)), *cert. denied*, 145 S. Ct. 984 (2024), *reh'g denied*, 145 S. Ct. 1229 (2025). And courts do so because federal legislation affecting "areas traditionally regulated by the States" "is an extraordinary power in a federalist system . . . that we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Here, Rochester's challenged law governs quintessential matters of local police power: how city officials can best protect public safety and community welfare in their city. Rochester's elected representatives have decided, based on local experience, applicable state and federal law (see *infra* at 10-14), and powerful empirical evidence (see *infra* at 15-19), that the city should limit local officials' role in federal civil immigration enforcement, in order to best promote public safety

and community welfare. Plaintiff errs in contending (Opp'n & Mem. in Support, ECF No. 33, at 26-27) that the presumption against preemption should not apply to Rochester's law, merely because the law relates to an area of federal concern, i.e., immigration. Where, as here, "'the text of the [challenged] law[] regulate[s] for the health and safety of the people'" of the city or State, the presumption applies even if the law "'certainly ha[s] effects in the area of immigration.'" *See Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 768 (9th Cir. 2025) (quoting *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016)). Thus, both the Supreme Court and other courts, including in this circuit, have regularly applied the presumption in addressing preemption challenges to a variety of state and local laws related to immigration. *See, e.g., Arizona*, 567 U.S. at 400; *DeCanas*, 424 U.S. at 357-58 (applying presumption to reject preemption challenge to state law governing employment of undocumented workers); *Nwauzor*, 127 F.4th at 768 (applying presumption to reject preemption challenge to state law governing wage provided to immigrants working in immigration detention facility); *Doe v. U.S. Immigration & Customs Enf't*, 490 F. Supp. 3d 672, 692-93 (S.D.N.Y. 2020) (applying presumption to reject preemption challenge to state law prohibiting immigration arrests in courthouses).[4]

---

[4] The only cases cited by plaintiff (ECF No. 33, at 27) that declined to apply the presumption to immigration-related state laws directly regulated unauthorized presence in the United States in a manner Rochester's law plainly does not. *See United States v. South Carolina*, 720 F.3d 518, 529-30 (4th Cir. 2013) (state law effectively criminalizing unauthorized presence was preempted); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (similar).

## II.    ROCHESTER'S LAW LIMITING LOCAL OFFICIALS' PARTICIPATION IN IMMIGRATION ENFORCEMENT IS CONSISTENT WITH FEDERAL AND STATE LAW.

### A.    Rochester's Law Is Not Preempted by Federal Law.

For the reasons explained in detail in defendants' motion papers, plaintiff has not come close to meeting its burden to allege facts showing that Rochester's law is clearly preempted.[5] *See* Defs.' Mem. of Law, ECF No. 8-1, at 12-28; *see also* Proposed Intervenors' Mem. of Law, ECF No. 11-6, at 13-29. Plaintiff relies on two specific federal laws for the preemption claim, 8 U.S.C. §§ 1373 and 1644 (*see* ECF No. 1, ¶¶ 58-64), but those laws cannot be valid preemptive provisions because they do not regulate conduct of private actors; they regulate only sharing of information between government officials. And "every form of preemption is based on a federal law that regulates the conduct of private actors"—not government officials. *See Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018).[6]

Because §§ 1373 and 1644 are not preemption provisions at all, they plainly are not express preemption provisions, and plaintiff's express preemption claim fails. As a case on which plaintiff

---

[5] Defendants are also correct that Rochester's law does not unlawfully regulate or discriminate against the federal government; it merely regulates the conduct of Rochester's own officials, without singling out the federal government for less favorable treatment than anyone else. *See* ECF No. 8-1, at 29-30; *see also* ECF No. 11-6, at 29-32.

[6] The cases on which plaintiff relies (ECF No. 33, at 8-10) are not to the contrary. *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), predated *Murphy*. And both that case and *New York v. U.S. Department of Justice*, 951 F.3d 84 (2d Cir. 2020), addressed only Tenth Amendment and Guarantee Clause claims; they did not make any preemption holdings. *See* 951 F.3d at 114 n.27 ("we need not conclusively decide the preemptive effect of § 1373"); *City of New York*, 179 F.3d at 33. Moreover, the courts that have decided the issue have consistently held that §§ 1373 and 1644 do not have preemptive effect under *Murphy. See Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.*, 8 F.4th 176, 182 (3d Cir. 2021); *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *13-17 (N.D. Ill. July 25, 2025); *Colorado v. U.S. Department of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019), *aff'd in part & vacated in part on other grounds*, *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018), *aff'd in part & vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020).

relies (*see* ECF No. 33, at 12 n.2) makes clear, "an express-preemption clause . . . expressly directs that state law be ousted if certain conditions are satisfied," *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 496 (2d Cir. 2023) (quotation marks omitted) (discussing statutory provision labeled "Preemption," expressly providing that state law "is preempted" under defined conditions). Sections 1373 and 1644 do nothing of the sort.

Moreover, Rochester's law does not pose any conflict with § 1373 or 1644, because those federal laws prohibit only restrictions on sharing of information regarding individuals' immigration status, which are nowhere to be found in Rochester's law. Rochester's law restricts gratuitous *collection* of immigration-status information; the law does not restrict city officials from *sharing* immigration-status information. *See* Resolution No. 2017-5, ECF No. 1-2, at 3-4 (city officials generally "shall not inquire" about immigration status, but may "communicat[e] with federal immigration agencies" regarding same). Accordingly, Rochester's law expressly underscores that it does not conflict with § 1373 (which is nearly identical to § 1644, the only other federal law on which plaintiff relies). *See id.* at 3. And insofar as plaintiff nevertheless contends, based on cherry-picked language, that Rochester's law might restrict information sharing in conflict with §§ 1373 and 1644 (*see* ECF No. 33, at 13-15), there is, at best for plaintiff's argument, substantial "uncertainty about what [Rochester's] law means and how it will be enforced," *Arizona*, 567 U.S. at 415. Such uncertainty makes it "inappropriate to assume" a conflict—particularly in light of the rule that laws should be construed to avoid constitutional doubt. *Id.*

Plaintiff likewise errs in contending that Rochester's law is impliedly preempted because it may "frustrate" or "impede" the federal government's immigration enforcement efforts, for instance, "by requiring federal officers to independently locate and apprehend aliens" (i.e., to do their own jobs). ECF No. 33, at 24, 26. The Supreme Court has made clear that the mere

"possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). That is because "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the . . . law enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2) (holding immigration-related state law not preempted). Moreover, any "frustration" that the federal government may face from being unable to commandeer local officials into doing the federal government's work is not an injury that gives rise to preemption; rather, it is a necessary consequence of federalism. *See, e.g.*, *Printz*, 521 U.S. at 935.

**B.    Both New York State and Federal Law Substantially Constrain Local Law Enforcement Participation in Civil Immigration Enforcement.**

Rochester's law is not only consistent with federal immigration law, but also is carefully tailored to ensure that city officials comply with the law—both state and federal—that constrains state and local officials' authority to participate in civil immigration enforcement.

"As a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 567 U.S. at 407. And, under New York state law, state and local officials do not have authority to make arrests or detain individuals for *civil* immigration violations, even at the request of federal immigration authorities issuing immigration "detainers" and administrative warrants to the state or local official.[7] The Appellate Division, Second Department, has explicitly held that state and local officials lack such authority. *See Wells*, 168 A.D.3d at 42-43. And where, as here, the Court of Appeals has not addressed an issue and only one appellate department has

---

[7] An immigration detainer is a request from federal immigration officials to state or local officials, asking the state or local officials to maintain custody of an individual after the date on which the individual otherwise would be released under state law, so that the federal immigration officials can assume custody. *See People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 41 (2d Dep't 2018).

reached the issue, that department's decision is the law of New York, binding on trial courts throughout the State. *See, e.g.*, *Phelps v. Phelps*, 128 A.D.3d 1545, 1547 (4th Dep't 2015); *People v. Shakur*, 215 A.D.2d 184, 185 (1st Dep't 1995); *Mountain View Coach Lines, Inc. v. Storms*, 102 A.D.2d 663, 664 (2d Dep't 1984). In addition, a federal district court has agreed with the Appellate Division's interpretation of New York law. *See Orellana v. County of Suffolk*, No. 17-cv-4267, 2025 WL 481723, at *11-13 (E.D.N.Y. Jan. 2, 2025), *appeal dismissed*, No. 25-321 (2d Cir. June 16, 2025).

As the New York courts have explained, the New York Criminal Procedure Law (CPL) permits state and local officials to execute only judicially issued warrants to arrest, and makes no mention of any federal administrative or immigration warrants. *See Wells*, 168 A.D.3d at 42. And the CPL permits warrantless arrests only if an officer has reasonable cause to believe that the arrestee has committed a crime or offense: that is, has violated a law that allows for a sentence of imprisonment or a fine. *See id.* at 43-44 (citing CPL § 140.10; Penal Law § 10.00(1), (6)); *see also* CPL § 1.20 (incorporating Penal Law § 10.00 definitions into CPL). Federal immigration detainers and the administrative warrants that ordinarily accompany them, however, are civil in nature and do not specify any crime or offense. Thus, standing alone, those documents do not give state or local officials grounds to arrest the subject of the detainer. *See Wells*, 168 A.D.3d at 43-44. Further, no common-law police power permits New York law enforcement officials to make arrests based only on an immigration detainer and accompanying administrative warrant. The New York legislature has "codified the traditional common-law varieties of arrests" and, consequently, "New

York courts have consistently looked to statutory law in determining arrest authority." *Id.* at 54 (citing *People v. Williams*, 4 N.Y.3d 535, 538 (2005)); *see id.* at 44-46.[8]

Moreover, federal law does not authorize New York law enforcement officers to make arrests that New York law prohibits. *See id.* at 47-51. The federal Immigration and Nationality Act (INA) confers civil immigration enforcement authority on federal—not state and local—officers. *See, e.g.*, *Arizona*, 567 U.S. at 408-09. For example, it provides that "an officer or employee of" the U.S. Department of Homeland Security may execute warrants under regulations promulgated by the Secretary of the Department. 8 U.S.C. § 1357(a). Consistent with that assignment of responsibility, the INA's implementing regulations nowhere mention state or local officials as being among the categories of officials who are authorized by those regulations to execute immigration arrest warrants. *See* 8 C.F.R. § 287.5(e)(3)(i); *see also id.* § 241.2(b).

Although plaintiff's complaint (ECF No. 1, ¶ 23) notes that 8 U.S.C. § 1357(g) authorizes state and local authorities to "cooperate" with federal officials in civil immigration enforcement, that provision permits state and local officials to carry out functions of federal immigration officers only in certain limited circumstances. And as relevant here, those circumstances are limited to instances where the carrying out of such functions by state and local officials is "consistent with

─────────────────

[8] There is also a substantial risk that civil immigration arrests by state and local officials would violate the New York Constitution unless conducted pursuant to a judicially issued warrant. Article I, § 12 of the State Constitution provides broader protection than the Fourth Amendment of the U.S. Constitution. *See, e.g.*, *People v. Scott*, 79 N.Y.2d 474, 496-97 (1992); *People v. P.J. Video*, 68 N.Y.2d 296, 304 (1986). For instance, the New York Court of Appeals has interpreted the State Constitution to express a strong preference for warrants made by "detached and neutral" judges, "over those based upon the hurried judgment of law enforcement officers"—particularly where, as here, the stakes are high. *People v Johnson*, 66 N.Y.2d 398, 406 (1985) (quotation marks omitted)); *see Scott*, 79 N.Y.2d at 501. An administrative immigration warrant accompanying an ICE detainer lacks any judicial oversight even though it may result in the weighty consequence of removal from the United States; thus, an arrest based solely on such a warrant may well violate the State Constitution.

State and local law," and where the state or local jurisdiction has a written agreement with the Secretary of Homeland Security—which Rochester undisputedly does not have here. *See* 8 U.S.C. § 1357(g)(1). So, by its plain terms, § 1357(g) contemplates that state and local officers will act within the bounds of state and local law—which in New York prohibits them from making civil immigration arrests. *See Wells*, 168 A.3d at 49-50.

While § 1357(g)(10)(B) permits States and their localities "to cooperate with the [Secretary of Homeland Security] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States" without a written agreement, nothing in the text or context of § 1357(g)(10) indicates that it *requires* state and local governments to do anything—much less to act in contravention of state law. Section 1357(g)(10)(B) is not reasonably interpreted to "confer 'authority on State and local officers to make arrests pursuant to civil immigration detainers, where none otherwise exists' under state law." *Wells*, 168 A.3d at 51 (quoting *Lunn v. Commonwealth*, 477 Mass. 517, 535 (2017)). Rather, § 1357(g)(10) merely clarifies that a State or locality need not enter into a § 1357(g) written agreement if in an exercise of its existing, lawful police powers, it wishes to cooperate with federal immigration enforcement by, for instance, "participat[ing] in a joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities," *Arizona*, 567 U.S. at 410.

Moreover, because neither state nor federal law confers on Rochester officials the authority to arrest or detain on the basis of civil immigration detainers and administrative warrants alone, such actions may violate the Fourth Amendment of the U.S. Constitution. Although the Second Circuit has not yet addressed the question, *see Jimenez v. City of Cohoes Police Dep't*, No. 23-955, 2024 WL 1551149, at *2 (2d Cir. Apr. 10, 2024), a number of courts, including a federal

13

district court in New York, *see Orellana*, 2025 WL 481723, at *13-15, have held that state or local officials may violate the Fourth Amendment by arresting or detaining individuals on the basis of purported civil immigration violations alone.[9] In addition, at least one federal appeals court has held that local officials may be liable for monetary damages for holding individuals for civil immigration violations. *See Santos*, 725 F.3d at 464-66, 470. Accordingly, several local officials have paid substantial settlements or judgments to individuals who alleged that they were arrested or held unlawfully for purported immigration violations.[10]

Rochester's law prohibiting its officials from taking certain actions, including stopping or arresting, "solely for the purpose of enforcing federal immigration laws,"[11] therefore ensures that its officials do not violate state or federal law by acting in excess of their lawful authority. At the same time, Rochester's law ensures that such actions do not subject the city to liability, monetary or otherwise.

---

[9] *See, e.g.*, *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 464-65 (4th Cir. 2013) (local law enforcement officials violate Fourth Amendment by arresting "solely based on known or suspected civil immigration violations"); *Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012) (similar); *Creedle v. Miami-Dade Cnty.*, 349 F. Supp. 3d 1276, 1304 (S.D. Fla. 2018) ("[n]umerous courts" agree); *Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1258 (E.D. Wash. 2017) ("[c]ourts around the country" agree); *Davila v. Northern Reg'l Joint Police Bd.*, 370 F. Supp. 3d 498, 547 (W.D. Pa. 2019) ("courts across the country" agree).

[10] *See* Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight on Local Involvement in Federal Civil Immigration Enforcement: The Facts and the Laws* 9 (2017) (listing several examples).

[11] Resolution No. 2017-5, ECF No. 1-2, at 4 (resolution); *see also* General Order 502, ECF No. 1-3, at 4-5, 7 (implementing resolution in police general order); Training Bulletin P-75-17, ECF 1-4, at 3 (same in police training bulletin).

### III.    ROCHESTER'S LAW IS SUPPORTED BY A STRONG GOVERNMENTAL INTEREST IN MAINTAINING PUBLIC SAFETY AND COMMUNITY WELFARE.

In limiting local officials' participation in immigration enforcement, Rochester's law allows individuals to report crimes, serve as witnesses, and otherwise interact with law enforcement without fear that doing so may result in adverse immigration consequences like deportation for themselves or loved ones. Rochester's approach is strongly supported by empirical evidence and the experience of local law enforcement nationwide. In one study, half of immigrants and more than two-thirds of undocumented individuals reported they were less likely to report or offer information about crimes to local police for fear that officers would inquire about their or others' immigration status.[12] That result is highly problematic because, as one New York county police commissioner explained, "[w]e solve crimes based on people coming to us. It's that simple. If people think they're going to get deported every time they speak to a police officer, it's not helpful."[13] For that reason, as a New York City police commissioner elaborated, "[i]t is critical that everyone who comes into contact with the [police], regardless of their immigration status, be able to identify themselves or seek assistance without hesitation, anxiety or fear."[14] If they cannot do so, "you create a shadow population" that "become[s] prey for human predators who extort them or abuse them because they know they won't contact the police."[15] Indeed, local police leaders agree that "[t]he reluctance of folks to come forward . . . is a much greater public safety

---

[12] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013).

[13] Liz Robbins, *Police Fear Trump Immigration Orders May Handcuff Effort to Fight Gangs*, N.Y. Times (Feb. 22, 2017).

[14] Leonard Greene & Rocco Parascandola, *NYPD Commissioner Reminds Cops to Ignore President Trump's Immigrant Deportation Orders*, N.Y. Daily News (Feb. 23, 2017).

[15] Steve Lopez, *LAPD Chief Beck Explains Why He Doesn't Want His Officers to Be Immigration Cops*, L.A. Times (Jan. 28, 2017).

problem than having people here who may be undocumented but are not committing other crimes," because "[c]riminals thrive in neighborhoods where people don't trust the police."[16] Thus, the President's Task Force on 21st Century Policing, which brought together experts nationwide to identify best practices in contemporary policing, recommended "decoupling" civil immigration enforcement from routine local policing—just as Rochester has attempted to do.[17]

Ample social science research confirms that local law enforcement involvement in civil immigration enforcement harms public safety, and that, conversely, laws like Rochester's benefit public safety. Studies have repeatedly indicated that greater involvement of local law enforcement in immigration enforcement makes immigrant communities less likely to interact with police,[18] and more likely to become victims of crime or other exploitation.[19] A comparative study of juris-dictions with and without policies limiting local law enforcement involvement in civil immigration enforcement found that Latino victims had significantly higher probabilities of reporting violent crime victimization to law enforcement where such limiting policies were in place. In fact, the study found that more than 90,000 additional incidents of violent crime would have been reported

---

[16] Pamela Constable, *For Immigrant Women, Domestic Violence Creates a Double Shadow*, Wash. Post (Dec. 2, 2013); *see also* Off. of N.Y. State Att'y Gen. et al., *Setting the Record Straight*, *supra*, at 14-17 (collecting similar commentary from additional law enforcement leaders).

[17] The President's Task Force on 21st Century Policing, Final Report 18 (2015).

[18] *See, e.g.*, Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. Ethnic & Migration Stud. 970, 971 (2016).

[19] *See, e.g.*, Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Socio. Q. 593, 610 (2011) (labor exploitation and theft increases when migrant workers fear that interaction with police may result in deportation).

to police during the study period if such policies were in place nationally.[20] Another study reached a similar conclusion, finding that crime reporting in 2017 declined significantly compared to 2016 in areas with higher Hispanic population shares because of fears of increased immigration enforcement, but that counties with policies like Rochester's limiting local law enforcement involvement in immigration enforcement did not demonstrate the same levels of decreased crime reporting as counties without such policies. The study also ruled out decrease in crime commission as a cause of the decrease in crime reporting.[21] And that result is consistent with studies that have found no evidence that policies like Rochester's are associated with higher crime commission. On the contrary, studies have found that the "spiral of trust" created by such policies reduces crime,[22] and that jurisdictions with such policies have lower crime rates than other jurisdictions.[23]

Other research has concluded that immigrant community members often refrain from seeking vital local services other than law enforcement assistance—including healthcare services—

---

[20] Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigration Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 Am. Socio. Rev. 154, 170 (2021).

[21] *See* Reva Dhingra et al., *Immigration Policies and Access to the Justice System: The Effect of Enforcement Escalations on Undocumented Immigrants and Their Communities*, 44 Pol. Behav. 1359, 1361 (2022).

[22] Daniel E. Martínez et al., *Providing Sanctuary or Fostering Crime? A Review of the Research on "Sanctuary Cities" and Crime*, 12 Socio. Compass e12547, at 7-10 (Jan. 2018) (surveying the literature); *see, e.g.*, Marta Ascherio, *Do Sanctuary Policies Increase Crime? Contrary Evidence from a County-Level Investigation in the United States*, 106 Soc. Sci. Research 102743 (Aug. 2022) (finding policies that limit local law enforcement involvement in civil immigration enforcement associated with decreased property and violent crime).

[23] *See, e.g.*, Tom K. Wong, Ctr. For Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017).

when they fear that the relevant local officials could report them to immigration authorities.[24] The consequences can be dire: in one disturbing incident, a child died when his parents delayed seeking medical treatment because they feared that hospital officials might report them to immigration authorities.[25] And as communicable diseases like COVID-19 illustrate well, refusal of anyone in the community to seek medical help can harm everyone by amplifying the disease's spread.

At the same time, imposition of federal immigration priorities on already strained local officials can detract from local needs, in law enforcement and otherwise. Rochester's police chief at the time of the enactment of the resolution challenged here, a forty-year law enforcement veteran, explained that the resolution was intended to avoid diverting scarce resources and time away from the community's public-safety priorities, like reducing gun violence.[26] Requiring state and local officials to carry out tasks to support federal immigration enforcement would effectively impose an unfunded mandate on them.[27] And the costs are substantial. For instance, studies have found that requiring local law enforcement to honor federal immigration detainer requests alone cost tens of millions of dollars annually in each of several States, and redirected local resources away from important public safety initiatives.[28] Moreover, these costs come on top of the potential

---

[24] *See, e.g.*, Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. Minor. Health 947, 964 (2015); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (2015).

[25] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

[26] Off. of N.Y. State Att'y Gen. et al*., Setting the Record Straight*, *supra*, at 13.

[27] *See* Pratheepan Gulasekaram et al., *Anti-Sanctuary and Immigration Localism*, 119 Colum. L. Rev. 837, 865-66 & n.169 (2019).

[28] *See* Alexandra Sirota & Lissette Guerrero, Budget & Tax Ctr., N.C. Ctr. for Just., <u>*Local Communities Face High Costs of Federal Immigration Enforcement*</u> 4-5 (Apr. 2019).

liability that the States and localities face from settlements and judgments in cases alleging that immigration-related arrests and detentions were unlawful, as discussed above. See *supra* at 14 & n.10.

Rochester has acted lawfully—and, indeed, wisely—in directing scarce local resources to its public safety priorities, rather than providing uncompensated support for the federal government's civil immigration enforcement that would harm community trust and thus public safety.

## CONCLUSION

This Court should grant the city defendants' motion for judgment on the pleadings and deny plaintiff's cross-motion for judgment on the pleadings.

Dated:    New York, New York
          July 30, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*

By:   */s/ Philip J. Levitz*
PHILIP J. LEVITZ
*Senior Assistant Solicitor General*

28 Liberty Street
New York, New York 10005
(212) 416-6325
philip.levitz@ag.ny.gov

19