## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

               Plaintiff,

v.

THE CITY OF ROCHESTER;
MALIK D. EVANS, Mayor of Rochester, in his
Official Capacity; ROCHESTER CITY
COUNCIL; MIGUEL A. MELENDEZ, JR.,
President of the Rochester City Council, in his
Official Capacity,

               Defendants.

Case No. 6:25-cv-06226 (FPG-MJP)

**BRIEF OF *AMICI CURIAE* IBERO-AMERICAN ACTION LEAGUE, WESTERN NEW YORK COALITION OF FARMWORKER SERVING AGENCIES, THIRD PRESBYTERIAN CHURCH, AND NEW HOPE FREE METHODIST CHURCH IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION

Amy Belsher
Gabriella Larios
Ifeyinwa Chikezie
Perry Grossman
125 Broad Street, 19th Floor
New York, New York 10004
T: 212-607-3320
abelsher@nyclu.org
glarios@nyclu.org
ichikezie@nyclu.org
pgrossman@nyclu.org

Dated: July 30, 2025
     New York, New York

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

INTERESTS OF *AMICI CURIAE* ........................................................................................ 2

FACTUAL BACKGROUND .................................................................................................. 3

    I.      ROCHESTER DECLARES ITSELF A SANCTUARY CITY ................................... 3

    II.     THE TRUMP ADMINISTRATION'S CAMPAIGN AGAINST "SANCTUARY JURISDICTIONS." ........................................................................................................ 4

ARGUMENT ........................................................................................................................... 6

    I.      ROCHESTER'S SANCTUARY POLICIES ARE NOT PREEMPTED. ................... 6

        A.     Rochester's Sanctuary Policies Are Presumptively Valid. ..................................... 6

        B.     Rochester's Sanctuary Policies Are Not Conflict Preempted. ............................... 8

        C.     Rochester's Sanctuary Policies Are Not Expressly Preempted by Section 1373. 14

    II.     THE SANCTUARY POLICIES DO NOT DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT ...................................................................................... 19

    III.    THE SANCTUARY POLICIES DO NOT DIRECTLY REGULATE THE FEDERAL GOVERNMENT ...................................................................................... 21

CONCLUSION ....................................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Cases**................................................................................................................Page(s)

*Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025).......................5

*Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008)................................15, 17

*Arizona v. United States*, 567 U.S. 387 (2012)...............................................................7, 8, 14, 16

*Bond v. United States*, 572 U.S. 844 (2014) ...........................................................................18

*City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) ........................................5

*City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020)................12, 15, 19

*City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025), *opinion clarified*, No. 25-CV-01350, 2025 WL 1358492 (N.D. Cal. May 9, 2025)..................................................................................................................5

*City of Chelsea v. Trump*, No. 1:25-CV-10442 (D. Mass. Feb. 23, 2025) ...................................5

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)............................................................5

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018), *aff'd and remanded*, 957 F.3d 772 (7th Cir. 2020) ..............................................................................................12, 18

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018).........................................................7

*City of El Cenizo , Texas v. Texas*, 890 F.3d 164 (5th Cir. 2018)..............................................12

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999).................................................10

*City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019).........................5

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ...............................12, 15

*Colorado v. United States Dep't of Justice*, 455 F. Supp. 3d 1034 (D. Colo. 2020)....................15

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)........................................12

*Doe v. Noem*, No. 1:25-CV-10495, 2025 WL 1099950 (D. Mass. Apr. 14, 2025) ......................5

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988)..................................................................................................................18

*Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ...............................................................12, 13

*G.F.F. v. Trump*, No. 25-CV-2886, 2025 WL 1301052 (S.D.N.Y. May 6, 2025) .........................5

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................................18

*Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535 (W.D.N.Y. 2018) ...............................6, 17

*J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450 (S.D. Tex. May 1, 2025) .........................5

*Kelley v. Johnson*, 425 U.S. 238 (1976) ........................................................................................7

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) .................................................................15

*Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112 (2d Cir. 2018) ....................................................8

*Mayo v. United States*, 319 U.S. 441 (1943) ...............................................................................21

*McHenry Cnty.v. Raoul*, 44 F.4th 581 (7th Cir. 2022) .................................................................20

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) .....................................14, 15, 19

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) ..............................................................................................................................6

*New York v. United States*, 505 U.S. 144 (1992) ...............................................................11, 14, 20

*North Dakota v. United States*, 495 U.S. 423 (1990) .............................................................19, 21

*Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of N.J.*, 8 F.4th 176 (3d Cir. 2021) ...........15

*Oregon v. Trump*, 406 F. Supp. 3d 940 (D. Or. 2019) ..................................................................15

*Orellana v. Cnty. of Suffolk*, No. 17-CV-4267, 2025 WL 481723 (E.D.N.Y. Jan. 2, 2025), *appeal filed*, No. 25-321 (2d Cir.) ...................................................................................12, 13

*Ozturk v. Hyde*, No. 25-1019, 2025 WL 1318154 (2d Cir. May 7, 2025) ......................................5

*People ex rel. Wells v. DeMarco*, 168 A.D.3d 31 (2018) ...................................................12, 13, 14

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ..........................................................................8, 15

*Printz v. United States*, 521 U.S. 898 (1997) .........................................................................11, 12, 20

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982) .....................................................................17

*Richmond Boro Gun Club, Inc. v. City of New York*, 896 F. Supp. 276 (E.D.N.Y. 1995), *aff'd*, 97 F.3d 681 (2d Cir. 1996) ..............................................................................................7

*State of New York v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020) .....................................................5

*State v. Dep't. of Just.*, 951 F.3d 84 (2d Cir. 2020) ...................................................................15

*United Farm Workers v. Noem*, No. 1:25-CV-00246, 2025 WL 1235525 (E.D. Cal. Apr. 29, 2025) ...................................................................................................................................5

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018)...............................20

*United States v. California*, 921 F.3d 865 (9th Cir. 2019)..................................... *passim*

*United States v. Colorado*, No. 1:25-CV-01391 (D. Colo. May 2, 2025) .........................5

*United States v. Cnty. of Fresno*, 429 U.S. 452 (1977)....................................................19

*United States v. Illinois*, No. 1:25-CV-1285, 2025 WL 2098688 (N.D. Ill. Feb. 6, 2025)........5, 16

*United States v. New Jersey*, No. 20-CV-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) .......5, 20

*United States v. New York*, No. 1:25-CV-0205 (N.D.N.Y. Feb. 12, 2025) ..........................5

*United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879 (N.D. Ill. 2022) ...........................13

*United States v. Washington*, 596 U.S. 832 (2022) ..............................................19, 20

*U.S. of Am., Pl., v. State of Illinois, et al., Defendants.*, No. 25 CV 1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025).......................................................................................................10

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)...................................................9

*Washington v. United States*, 460 U.S. 536 (1983) .........................................................19

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ........................................................................17

**Statutes, Rules and Regulations**

8 C.F.R. § 287.7 .................................................................................................................13

8 U.S.C. § 1257(g)(1) .......................................................................................................12

8 U.S.C. § 1357(g)(9) .........................................................................................................9

8 U.S.C. § 1373(a) .............................................................................................................15

8 U.S.C. § 1360..................................................................................................................15

8 U.S.C. § 1367(a)(2).........................................................................................................15

City of Rochester Resolution No. 2017-5........................................................3, 4, 7, 10

City of Rochester Resolution No. 86-29.............................................................................3

U.S. Const. amend. X ........................................................................................................11

**Other Authorities**

Kyle Cheney, *Trump's immigration 'shock and awe' is losing in the court of law*, Politico
    (May 2, 2025), available at https://www.politico.com/news/2025/05/02/trump-
    immigration-court-losses-00324683 .................................................................................5

## INTRODUCTION

Thousands of people rely on Rochester's decades-old sanctuary policies to live safely and thrive in their communities. Plaintiff seeks to cast aside those protections and force Rochester's Police Department ("RPD") to aid in its efforts to carry out mass deportations. The Trump Administration is waging a nationwide campaign against localities that have decided to opt out of federal immigration enforcement and instead focus municipal resources on ensuring the safety of their communities, including the immigrants who live there. Rochester became one such target after it publicly criticized the conscription of its police officers to arrest and detain Rochesterians for civil immigration violations. In retaliation, and in alignment with its nationwide campaign against sanctuary jurisdictions, Plaintiff filed the instant, baseless lawsuit against the City.

*Amici curiae*—civic organizations and churches that serve and congregate with immigrant communities—submit this brief in support of Defendants' Rule 12(c) motion for judgment on the pleadings, ECF No. 8, and to provide further insight into the critical role Rochester's sanctuary policies play. Plaintiff's claims all lack merit. First, Plaintiff claims that Rochester's sanctuary policies are expressly and impliedly preempted by provisions of the Immigration and Nationality Act ("INA"), but the complaint fails to identify any provision in the INA that conflicts with the sanctuary policies. Second, Plaintiff claims that the sanctuary policies unlawfully discriminate against the federal government, yet the policies do not target the federal government for less favorable treatment than any other entity. Finally, Plaintiff claims that the sanctuary policies unlawfully regulate the federal government. But the challenged policies directly regulate only the *municipality's* actions, not any actions of the federal government.

Accordingly, the Court should grant Defendants' Rule 12(c) motion and dismiss all of Plaintiff's claims against them, as a matter of law.

1

## INTERESTS OF *AMICI CURIAE*

Ibero-American Action League ("Ibero") is a Rochester-based dual-language, multi-service agency that uplifts, empowers, and advocates for Latinos and the underserved, including immigrants. Ibero has been a conduit for building trust relationships between RPD and Rochester residents and regularly partners with RPD on events and programs. If the sanctuary policies are enjoined, Ibero would have to curtail or end many of these partnerships because it could not guarantee that RPD's participation would not result in immigration consequences for attendees and their families. The sanctuary policies enable Ibero to build bridges between the City and the communities it serves and have been critical in differentiating RPD from federal immigration officials, about whom the community has negative associations.

Western New York Coalition of Farmworker Serving Agencies ("WNY Coalition") is a Rochester-based nonprofit whose mission is to promote justice, dignity and equity for migrants and farmworkers through advocacy, education, outreach and direct services in collaboration among partners. WNY Coalition works closely with survivors of trafficking, and invalidating the sanctuary policies would limit its ability to connect clients to RPD to investigate trafficking. Trafficking survivors would not feel safe speaking with RPD because they would no longer see RPD as a trusted partner. WNY Coalition's clients are increasingly afraid due to the Trump Administration's lawless immigration enforcement, which has already negatively affected the way WNY Coalition operates and hurt its ability to reach particularly vulnerable people.

Third Presbyterian Church is an open, accessible, and accepting faith community that has been part of Rochester's tradition of welcoming immigrants and refugees since the 1970s. As a Matthew 25 Church, Third Presbyterian practices its religion by ensuring that all people, regardless of immigration status, feel safe and welcome at its worship services and ministries. Rochester's sanctuary policies assure congregants that they can freely participate in Third Presbyterian's

2

programs and services in spaces where RPD and city officials may be present without having their religious activities inhibited by wrongful and intimidating immigration enforcement.

New Hope Free Methodist Church is a Rochester-based church that is part of the Free Methodist Church of North America. It has been working with immigrants and refugees for nearly 20 years, and today, refugees are a large and dynamic part of New Hope's worshipping community. Through its ministries and its worship services, New Hope embodies its fundamental religious conviction to welcome and love the stranger. Rochester's sanctuary policies are a vital part of New Hope's ability to put that conviction into practice. Without the sanctuary policies, New Hope would have to change its practices and move its ministries and events to private spaces due to the increased risk of lawless and terrifying immigration enforcement tactics in public.

## FACTUAL BACKGROUND

### I.    ROCHESTER DECLARES ITSELF A SANCTUARY CITY.

The City of Rochester first declared itself a "sanctuary city" decades ago in order to "maintain and further human rights for its citizens and for all who come within its borders." City of Rochester Resolution No. 2017-5 (the "Resolution") at 69 (citing City of Rochester Resolution No. 86-29). In 2017, the City passed a Resolution to "reaffirm the City of Rochester's commitment that it is one community; that is welcoming and inclusive of all, is united and strengthened by [its] diversity and committed to upholding and protecting the civil and human rights of all individuals that come within its borders, including immigrants and refugees." *Id*. at 70.

Consistent with these commitments, the Resolution contains three main substantive provisions. First, RPD "shall not engage in certain activities solely for the purpose of enforcing federal immigration laws, including not inquiring about the immigration status of an individual . . . unless necessary to investigate criminal activity . . . and shall not stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship

3

status." *Id.* at 70 Second, Rochester "personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits, except where the receipt of such services or benefits are contingent upon one's immigration or citizenship status or where inquiries are otherwise lawfully required by federal, state, or local laws, or where such information is needed for a criminal investigation." *Id.* And third, the City "shall not use its funds or personnel to enforce or to assist in the enforcement of Federal immigration policies or participate in any program requiring registration of individuals on the basis of religion, race, gender, gender identity or expression, sexual orientation, ethnicity, or national origin, except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." *Id.* (emphasis omitted).

Critically, the Resolution is clear that its implementation is "subject to Federal, state and local laws" and the United States and New York State Constitutions. *Id.* at 70. So while the Resolution "does not require local governments to collect such information or to engage in immigration enforcement," it "does not prohibit City employees from communications with federal immigration agencies regarding citizenship or immigration status." *Id.* at 69. RPD has implemented the Resolution through the issuance of two pieces of guidance: General Order 502 ("General Order") and Training Bulletin No. P-75-17 ("Training Bulletin"). *See* ECF 8-1 at 3–5 (describing provisions of General Order and Training Bulletin).

## II.    THE TRUMP ADMINISTRATION'S CAMPAIGN AGAINST "SANCTUARY JURISDICTIONS."

The Trump Administration has explicitly and consistently expressed anti-immigrant rhetoric and policies. Both this term and last, the Trump Administration has attempted to conscript state and local government officials nationwide in this effort, including through withholding

funding and, as here, through litigation.[1] Since January 2025, it has engaged in a campaign of mass

deportations using increasingly reckless and unlawful tactics.[2] One federal court has accordingly

cautioned that the Trump Administration is on "a path of perfect lawlessness," *Abrego Garcia v.

Noem*, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025), and federal courts across

the country have enjoined many of its unlawful immigration actions.[3]

      Here, Rochester drew the administration's attention, precipitating this lawsuit, by publicly

enforcing its sanctuary policies after RPD officers assisted federal immigration officers in the

arrest of a family. Compl. ¶¶ 44-45. The complaint acknowledges that city policy permits RPD to

provide assistance where federal officers have a judicial warrant or probable cause of criminal

activity, *id*. ¶¶ 6, 40, but the complaint does not allege that either circumstance was present here

or that Rochester officials otherwise interfered with a federal enforcement action. Nor does the

complaint point to any conflict between the sanctuary policies and the information sharing required

---

[1] *See, e.g.*, *State of New York v. Dep't of Just*., 951 F.3d 84 (2d Cir. 2020); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020); *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019); *United States v. California*, 921 F.3d 865 (9th Cir. 2019); *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350, 2025 WL 1186310, at *1 (N.D. Cal. Apr. 24, 2025), *opinion clarified*, No. 25-CV-01350, 2025 WL 1358492 (N.D. Cal. May 9, 2025) (preliminarily enjoining application of Executive Orders directing withdrawal of "all federal funding from 'sanctuary jurisdictions'"); *United States v. New York*, No. 1:25-CV-0205 (N.D.N.Y. Feb. 12, 2025); *United States v. Illinois*, No. 1:25-CV-1285 (N.D. Ill. Feb. 6, 2025); *United States v. Colorado*, No. 1:25-CV-01391 (D. Colo. May 2, 2025); *City of Chelsea v. Trump*, No. 1:25-CV-10442 (D. Mass. Feb. 23, 2025); *United States v. New Jersey*, No. 20-CV-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021).

[2] Kyle Cheney, *Trump's immigration 'shock and awe' is losing in the court of law*, Politico (May 2, 2025), available at https://www.politico.com/news/2025/05/02/trump-immigration-court-losses-00324683.

[3] *See, e.g.*, *G.F.F. v. Trump*, No. 25-CV-2886, 2025 WL 1301052 (S.D.N.Y. May 6, 2025); *Ozturk v. Hyde*, No. 25-1019, 2025 WL 1318154 (2d Cir. May 7, 2025); *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1257450 (S.D. Tex. May 1, 2025); *Doe v. Noem*, No. 1:25-CV-10495, 2025 WL 1099950 (D. Mass. Apr. 14, 2025); *United Farm Workers v. Noem*, No. 1:25-CV-00246, 2025 WL 1235525 (E.D. Cal. Apr. 29, 2025).

by federal law. To the contrary, the plain text of the policies, which are documents integral to the complaint, require compliance with all applicable federal laws.

## ARGUMENT

Each of the complaint's three claims are legally defective. First, Rochester's sanctuary policies are a presumptively valid regulation of city resources that are consistent with the INA and do not obstruct federal civil immigration enforcement efforts. Second, the sanctuary policies do not unlawfully single out the federal government for less favorable treatment than other entities. Finally, the sanctuary policies do not regulate the federal government. Plaintiff's position that Rochester must deploy city resources to assist in civil immigration enforcement would violate the Tenth Amendment's prohibition on commandeering and would compel the RPD to engage in activities that violate the Fourth Amendment to the U.S. Constitution and New York law.

## I.    ROCHESTER'S SANCTUARY POLICIES ARE NOT PREEMPTED.

Rochester's sanctuary policies are presumptively valid because they implicate the core of traditional local police powers. Parties asserting preemption "must meet the heavy burden of showing that the conflict between the federal and state laws is so direct and positive that the two . . . cannot be reconciled or consistently stand together." *Holve v. McCormick & Co., Inc.*, 334 F. Supp. 3d 535, 554 (W.D.N.Y. 2018) (citations and quotations omitted). Because Plaintiff cannot meet this "heavy burden," its preemption claims must be dismissed.

### A.    Rochester's Sanctuary Policies Are Presumptively Valid.

Courts have long recognized a presumption against preemption. *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*., 514 U.S. 645, 654 (1995) ("[W]e . . . address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law."). This presumption is "especially strong in areas where states traditionally

wield police powers." *Id*. "[C]ourts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation and internal quotation marks omitted).

Rochester's sanctuary policies are presumptively valid because they regulate the City's public safety resources—a matter squarely within local government's traditional police powers. *See Richmond Boro Gun Club, Inc. v. City of New York*, 896 F. Supp. 276, 282 (E.D.N.Y. 1995), *aff'd*, 97 F.3d 681 (2d Cir. 1996) ("The promotion of public safety is 'unquestionably at the core' of a municipality's police power. Legislation enacted pursuant to this power is entitled to a strong presumption of validity.") (citing *Kelley v. Johnson*, 425 U.S. 238, 247 (1976)). As in cities with similar laws, Rochester's sanctuary policies reflect a longstanding judgment by local officials that absent those policies, Rochesterians, particularly vulnerable immigrant communities, will be less likely to seek out critical city resources when needed. *See* City of Rochester Resolution No. 2017-5 (express purpose of sanctuary policies is to enable all city residents to access city services without fear of adverse immigration consequences); *see*, *e.g.*, *City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018) (fear that contacting local police "will bring the scrutiny of the federal immigration authorities to their home" may deter noncitizens from "contacting local police to report crimes as a witness or a victim"). Accordingly, Rochester's decision to further its public safety goals by building trust between City officials, including the police, and immigrant communities is entitled to a strong presumption of validity.

As explained in the subsequent discussion, Plaintiff cannot overcome the presumption.

**B.**     **Rochester's Sanctuary Policies Are Not Conflict Preempted.**

      **i.**     **Rochester's Sanctuary Policies Do Not Conflict With Federal Immigration Laws.**

Plaintiff alleges that Rochester's sanctuary policies are conflict preempted because they "stand as an obstacle to federal immigration laws by limiting information sharing, cooperation, access, and the types of warrants honored." Compl. ¶ 62. Under the doctrine of conflict preemption, state laws are preempted where they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Federal courts require a "strong showing of a conflict to overcome the presumption that state and local regulation can constitutionally coexist with federal regulation." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 642 (2011) (cleaned up). Conflict preemption exists only if the conflict between a federal statute and local law "is a sharp one" and "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (citations and quotations omitted). Rochester's sanctuary policies impose no such conflict.

As an initial matter, federal immigration law does not—and cannot—obligate Rochester to provide the type of assistance Plaintiff seeks here.[4] Plaintiff attempts to manufacture a conflict with Rochester's sanctuary policies in numerous provisions of the INA. Compl. ¶¶ 50-51. However, the cited provisions of the INA delineate only the obligations of *federal*, not local, agents within the federal immigration system. *See, e.g.*, Compl. ¶¶ 20, 50.

---

[4] The fact that none of the statutory provisions at issue here are valid preemption provisions to the extent they regulate state, not private, actors, *see infra* I(C)(i), presents an independent basis for finding that Rochester's sanctuary policies are not preempted.

And, as the INA plainly states, the participation of state and local governments in federal immigration enforcement is *voluntary*. *See*, *e.g.*, 8 U.S.C. § 1357(g)(9) (authorizing the federal government to enter agreements with state and local authorities to assist with immigration arrests and detention and explicitly stating that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General").[5] Indeed, in rejecting analogous preemption challenges, circuit courts across the country have recognized that local governments can voluntarily choose to assist federal authorities with federal immigration enforcement activities, but are not required to do so. *See*, *e.g.*, *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.").

In short, nothing in the INA requires Rochester to participate in federal immigration enforcement activities. In assessing preemption claims, courts have a "duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019). Here, Congress wrote that local participation is voluntary.

In any event, no provision of Rochester's sanctuary policies poses an obstacle to federal immigration enforcement. The complaint is vague as to where any purported conflict exists, failing to specify which portion of Rochester's sanctuary policies pose obstacles to any specific provisions of the INA. Compl. ¶ 51 (asserting the policies conflict with "this framework"). It alleges in conclusory fashion that "[t]he challenged law and policies directly conflict" with federal

---

[5] This provision is illustrative for another reason. It plainly states that cooperation with ICE is only authorized only "to the extent consistent with state law and local law." The type of cooperation demanded by ICE here—including the arrest of people for civil immigration violations—violates long-standing New York State precedent holding local law enforcement lack such authority, *see infra* I(B)(2).

immigration enforcement. *See id*. ¶¶ 50-51, 62. Although federal immigration enforcement efforts may be aided if the RPD decided to dedicate its resources to those ends, "refusing to help" cannot be equated with "impeding." *California*, 921 F.3d at 888 (recognizing that "refusing to help" "federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort" and "is not the same as impeding"). Moreover, Rochester has not "forbid[den] all voluntary cooperation" with federal immigration authorities. Compl. ¶ 26 (citing *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999)). The sanctuary policies contain multiple provisions permitting appropriate inquiry into immigration status and cooperation with federal officials. *See, e.g*., Resolution No. 2017-5, at 70; General Order 502(V)(F); (V)(E)(2).

In sum, Rochester's sanctuary policies are not conflict preempted because the INA does not obligate local governments to participate in federal immigration enforcement and because the sanctuary policies merely reflect a choice as to whether to deploy city resources to assist in the enforcement of civil immigration law. Treating the City's decision "to refrain" from participation as an obstacle would create an implied mandate to participate. *California*, 921 F.3d at 890-91; *see also U.S. of Am., Pl., v. State of Illinois, et al., Defendants.*, No. 25 CV 1285, 2025 WL 2098688, at \*24 (N.D. Ill. July 25, 2025) ("Extending conflict or obstacle preemption to the Sanctuary Policies . . . would transform a statutory provision giving States 'the right of refusal' into a provision requiring state action." (cleaned up)). But such a mandate cannot be implied both because it flies in the face of the plain language of the INA and because, as discussed below, the Tenth and Fourth Amendments forbid it. *Id.* at 890.

### ii. The INA Cannot Be Construed to Compel Rochester to Participate in Federal Civil Immigration Enforcement.

Plaintiff's conflict preemption theory fails for the separate reason that its interpretation of the INA cannot be squared with the Tenth and Fourth Amendments. At bottom, the federal

government seeks to commandeer Rochester's officers and employees to interrogate people about their immigration status, expend time and resources maintaining and sharing such information, and participate in warrantless civil immigration arrests. This Court should find the anticommandeering doctrine protects the City's decision that its residents are safer and their rights more likely to be respected when Rochester police officers work with immigrant communities, not participate in the federal government's increasingly lawless efforts to tear them apart.

Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Under the anticommandeering principle derived from the Tenth Amendment, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Thus, the Supreme Court has specifically held that Congress cannot require the "forced participation" of local governments in a federal law enforcement regime. *Id.* at 918 (striking down a federal statute that required local law enforcement officers to conduct background checks on gun purchasers in accord with federal law). "[S]uch commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* at 935.

Plaintiff's interpretation of the INA amounts to precisely the type of "forced participation" in a federal enforcement regime struck down in *Printz*. If Rochester is required to permit its officers to aid in federal civil immigration enforcement, they are subject, as they were March 24, to conscription into ICE's efforts to interrogate and detain Rochester's residents. Such conscription denies Rochester the opportunity to "decline to administer [a] federal program," *New York v. United States*, 505 U.S. 144, 177 (1992), while forcing the city "to absorb the financial burden of implementing a federal regulatory program," *Printz*, 521 U.S. at 930. These actions would in effect

11

allow the federal government "to impress into its service—and at no cost to itself—the police officers of the 50 States." *Id.* at 922. This is constitutionally impermissible.

Courts across the country have held similar attempts to force local participation in federal immigration enforcement inconsistent with the Tenth Amendment.[6] Moreover, while it may be true that "Congress has made an explicit policy choice that [] removals can be effectuated by *civil* arrest warrants for immigration enforcement," Compl. ¶ 6, the INA says nothing about the scope of the authority of local law enforcement to make such arrests, *see Orellana v. Cnty. of Suffolk*, No. 17-CV-4267, 2025 WL 481723, at *12 (E.D.N.Y. Jan. 2, 2025) ("[T]he suggestion that . . . all detainers issued to local law enforcement officials [are] enforceable *regardless* of whether the state itself allows such enforcement would potentially run afoul of the Tenth Amendment of the United States Constitution."), *appeal filed*, No. 25-321 (2d Cir.); *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 45-46 (2018) (stating that New York statutory law defines the full scope of local law enforcement's lawful arrest authority); *see also* 8 U.S.C. § 1257(g)(1) (noting deputization authority is only to the extent consistent with State and local law"). And local law enforcement in New York State have no authority to make arrests for civil immigration enforcement.

Plaintiff faults the RPD for failing to execute administrative warrants and immigration detainers on its behalf. Compl. ¶ 57. An administrative warrant is not a criminal warrant signed by

---

[6] *See California*, 921 F.3d at 890 (holding that "the choice of a state to refrain from participation" in federal civil immigration enforcement activities "cannot be invalid . . . where it retains the right of refusal"); *accord City of El Cenizo, Texas v Texas*, 890 F.3d 164, 178 (5th Cir. 2018); *Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329 (E.D. Pa. 2018); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951 (N.D. Cal. 2018), *aff'd in part, vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020).; *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018), *aff'd and remanded*, 957 F.3d 772 (7th Cir. 2020); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017).

a judge; rather, it is a civil immigration document issued by a federal agency. *See Wells*, 168 A.D.3d at 527-28 (describing "[a]dministrative warrant"). And an "immigration detainer" is a "request"[7] from an immigration agent asking local law enforcement to "maintain custody" of an individual or advise the Department of Homeland Security ("DHS") prior to the individual's release so that DHS can "assume custody" for civil immigration enforcement. 8 C.F.R. § 287.7(a), (d). These documents need not be (and often are not) based on any individualized determination of probable cause that a crime has been committed.

For these reasons, New York law forbids local police officers from effectuating civil immigration arrests. *See Wells*, 168 A.D.3d at 53. The authority of local law enforcement in New York is limited to arrests supported by probable cause of a criminal violation. Accordingly, Rochester's sanctuary policies limit "civil immigration enforcement" while permitting cooperation with federal immigration enforcement relating to criminal matters. Any detention by RPD officers for civil immigration enforcement purposes alone violates the Fourth Amendment. *Orellana*, 2025 WL 481723, at *12 (holding that Suffolk County violated Fourth Amendment by continuing to detain plaintiffs solely on the basis of immigration detainers). Yet Plaintiff seeks to compel

---

[7] A decision not to honor detainer requests cannot be a basis for preemption for another fundamental reason: they are *requests*. *Galarza*, 745 F.3d at 645 (noting a detainer "does not compel state or local [law enforcement agencies] to detain suspected aliens subject to removal pending release to immigration officials," and local law enforcement is "free to disregard" it); *see also California*, 921 F.3d at 887 ("an administrative warrant issued by federal authorities" does not "*compel*[] any action by a state or local official"); *United States v. Valdez-Hurtado*, 638 F. Supp. 3d 879, 890 (N.D. Ill. 2022) ("This Court agrees with *Galarza*, and the federal courts that have cited it, in concluding that ICE detainers are mere requests.") (discussing cases).

Rochester's law enforcement to effectuate such arrests and unlawfully expand the scope of local law enforcement authority under state law.[8]

The incident that precipitated this lawsuit is illustrative. On March 24, federal officers summoned multiple RPD officers away from their regular duties to provide the federal officers with "assistance." Compl. ¶ 44. In providing assistance to federal immigration authorities absent a judicial warrant or probable cause of a criminal offense—and the complaint alleges neither—the RPD officers exceeded their authority under state law, and unlawfully arrested a family in violation of the Fourth Amendment. Thus, Plaintiff's position that Rochester must permit RPD officials to honor ICE detainer requests and assist in civil immigration arrests is equivalent to directing the city to violate the Fourth Amendment and state law. Proper application of the anticommandeering doctrine here upholds Rochester's sanctuary policies against such federal overreach.

C.    **Rochester's Sanctuary Policies Are Not Expressly Preempted by Section 1373.**

i.    **Section 1373 Is Not a Valid Preemption Provision.**

As a threshold matter, Rochester's sanctuary policies cannot be expressly preempted by Section 1373 because that statute is directed at states and local governments—not private actors—and therefore is not a valid preemption provision. For a federal law to have preemptive effect, it "must be . . . read as one that regulates private actors" because "the Constitution confers upon

---

[8] Rochester's sanctuary policies do not prohibit the RPD from effectuating "lawful warrantless arrest[s] for [] federal crimes." General Order V(G)(1)(b). Nor do they prevent the RPD from detaining and turning over to CBP or ICE individuals "named in a judicial warrant or federal criminal arrest warrant." *Id.* (V)(G)(1)(a). Thus, the only set of actions that Plaintiff could be seeking to compel is RPD's effectuation of arrests for immigration offenses, which are civil in nature. *Wells*, 168 A.D.3d at 41, 43; *see Arizona*, 567 U.S. at 407.

Congress the power to regulate individuals, not States."[9] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up) (citation and internal quotation omitted). Accordingly, multiple courts have held that the plain language of Section 1373 "is a clear prohibition on *state* action" and cannot be read to regulate private actors as *Murphy* requires for pre-emption. *Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of N.J.*, 8 F.4th 176, 181-82 (3d Cir. 2021).[10] This Court should join the majority view and find Section 1373's inapplicability to private actors is "fatal" to Plaintiff's preemption claims.[11] *Id.* at 182.

### ii. Rochester's Sanctuary Policies Are Consistent with Section 1373.

Even if Section 1373 is a valid preemption statute, Rochester's sanctuary policies are not expressly preempted by that statute because they are consistent with its terms. Express preemption arises when "express language in a congressional enactment" so requires it. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001); *see also Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (express preemption exists when "a federal statute expressly directs that state law be ousted"). "In the context of express pre-emption," courts "read federal statutes whenever possible not to pre-empt state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 641 (2011).

---

[9] This requirement is a corollary to the anticommandeering doctrine, because "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166 (collecting cases); *see also Murphy* 584 U.S. at 474 (finding no express preemption where statute impermissibly commandeered state legislatures by telling them what they "may and may not do").

[10] *Accord City of Philadelphia*, 309 F. Supp. 3d at 329; *Colorado v. United States Dep't of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *San Francisco*, 349 F. Supp. 3d at 950.

[11] In a case analyzing the constitutionality of Section 1373 as applied to states and localities seeking federal grant funding, the Second Circuit noted that it "need not conclusively decide the preemptive effect of § 1373" while discussing in dicta the district court's preemption ruling. *State v. Dept. of Just.*, 951 F.3d 84, 112, 114 n.27 (2d Cir. 2020).

Rochester's sanctuary policies are consistent with Section 1373—they do not restrict or prohibit the maintenance or sharing of "information regarding [] citizenship or immigration status." 8 U.S.C. § 1373(a). Courts have construed Section 1373 narrowly, holding that it only captures sharing the type of information expressly listed in the statute.[12] *See*, *e.g.*, *California*, 921 F.3d at 892 (Section 1373 extends only to information regarding an individual's immigration status); *see also Illinois,* No. 25 CV 1285, 2025 WL 2098688, at *10 (collecting cases and noting that "without exception," other federal courts addressing analogous challenges "ha[ve] rejected the United States's capacious reading of § 1373").

Plaintiff alleges that Section V of the General Order "explicitly limit[s] officers' ability to . . . provide information to federal immigration authorities regarding citizenship or immigration status." Compl. ¶ 36. But Section V states only that if "provided immigration documents for identification purposes, [RPD officers] will not contact CBP, ICE, or other federal immigration authorities regarding the person unless necessary to investigate criminal activity." General Order V(E)(2). Section V says nothing about "citizenship or immigration status." Unsurprisingly, the complaint does not allege RPD officers are qualified to determine immigration status from "immigration documents," but rather acknowledges that immigration status is governed by an "'extensive and complex' statutory scheme" and its enforcement is a federal executive responsibility. Compl. ¶ 20 (citing *Arizona*, 567 U.S. at 395). It is appropriate for Rochester to

---

[12] Where Congress has sought to encompass broader swaths of immigration-related information, it has used more expansive language to do so. *See*, *e.g.*, 8 U.S.C. §§ 1360 and 1367(a)(2) (forbidding certain federal officials from disclosing "any information which relates to a[] [noncitizen] who is the beneficiary" of certain federal programs). Had Congress intended a more expansive reading of the information encompassed in Section 1373, it would have said so.

direct its officers not to expend resources calling federal officials to report whatever assumptions they might make from the incomplete information discerned from any such documents.

Moreover, Section V must be read alongside the General Order's requirement that all RPD members "are subject to and will comply with . . . all applicable Federal . . . laws." General Order III(B). Thus, to the extent Section 1373 is a valid preemption provision constitutionally applied here (which it is not), Section V must be read as permitting officers to share whatever information about immigration status they obtain.

Beyond Section V, the complaint gestures vaguely at other provisions in Rochester's sanctuary policies, but does not and cannot argue that these sections expressly restrict the sharing of individual's immigration status with federal immigration authorities. *See* Compl. ¶¶ 29-33, 35-43. Moreover, the complaint does not plausibly allege that the City of Rochester even possesses information concerning immigration status. Nor is the "potential" for restricting or prohibiting the sharing of information related to immigration status sufficient to overcome the presumption against preemption. *Holve*, 334 F. Supp. 3d at 554; *see also Rice v. Norman Williams Co*., 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of [a] state statute."). Because the text of Section 1373 does not direct that Rochester's sanctuary policies "be ousted," *Air Tranp. Ass'n of Am., Inc.*, 520 F.3d at 220, they do not expressly preempt those policies.

### iii.   Plaintiff's Interpretation of Section 1373 Would Violate the Tenth Amendment and Should Be Avoided.

As discussed, because Section 1373 applies only to sharing immigration status, it does not conflict with Rochester's sanctuary laws. However, if there were any ambiguity, the doctrine of constitutional avoidance requires this Court to reject the government's expansive reading.

The doctrine of constitutional avoidance instructs that "when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (internal citations and quotations omitted). "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988); *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 860 (2014) (rejecting broad interpretation of federal statute in favor of a plausible narrower interpretation to avoid an interpretation "that intrudes on the police power of the States").

Plaintiff's expansive interpretation of Section 1373 raises serious constitutional concerns because it strikes at decision-making "of the most fundamental sort," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), to state sovereignty—Rochester's "ability to control its officers and employees." *Sessions*, 321 F. Supp. 3d at 869-70. By the complaint's terms, Section 1373 can be read to bar policies restricting not just the sharing of immigration and citizenship status, but that might have some "potential" effect on sharing such information including policies that bear on the gathering and maintenance of such information and policies that bear on cooperation and have nothing to do with information sharing. *See* Compl. ¶ 38; *see, e.g.*, General Order V(F)(1) (instructing that "[a]ny contact or requests for assistance to CBP or ICE, or requests from CBP or ICE for RPD assistance, must be authorized by Captain or above . . . or the Staff Duty Officer (SDO)"). Plaintiff's assertion that a conflict exists amounts to an argument that line level RPD officers *must* collect information irrelevant to their work and share it without any supervisory

oversight to the federal government. The Tenth Amendment does not permit the federal government to make such personnel decisions for Rochester. Such an imposition on Rochester's ability to regulate its municipal resources amounts to commandeering in violation of the Tenth Amendment. In order not to "needlessly confront" this constitutional problem, the Court should reject Plaintiff's argument. *Edward J. DeBartolo Corp.*, 485 U.S. at 575.

Construed as a broad prohibition against state and local governments from being able to adopt *any* rules touching on their employees' communications of immigration status information to federal officials, Section 1373 violates the Tenth Amendment's anti-commandeering principles as articulated in *Murphy*. *See, e.g.*, *San Francisco*, 349 F. Supp. 3d at 949-53.

## II.    THE SANCTUARY POLICIES DO NOT DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT.

The doctrine of intergovernmental immunity "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up) (citing *United States v. Cnty. of Fresno*, 429 U.S. 452, 460 (1977)). "The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 437–38 (1990) (plurality). State laws discriminate against the federal government when they "single it out" for "less favorable treatment." *Washington*, 596 U.S. at 839 (cleaned up). State laws do not discriminate against the federal government unless they "treat[] someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 537 (1983) (holding that state law did not discriminate against the federal government where it did not single out federal employees for discriminatory treatment).

Rochester's sanctuary policies do not single out the federal government for less favorable treatment than other entities. In fact, Rochester's sanctuary policies do not single out the federal

government at all. The challenged policies only mention federal entities while discussing how municipal entities may interact with them. *See*, *e.g.*, General Order V(D)(1) ("[RPD] [m]embers will not request nor utilize CBP or ICE personnel to assist with language translation unless there is a situation involving an imminent threat to life or safety."). The government points to no provision which targets federal entities for differential treatment. Nor could it. Rochester's sanctuary policies do not identify any entity receiving more favorable treatment than the federal government. Moreover, as mentioned *supra* I(B)(i), Rochester's sanctuary policies do not obstruct the federal government. Thus, the principle undergirding this doctrine—that "the States may not directly obstruct the activities of the Federal Government"—further counsels in favor of finding that no permissible discrimination is present here.

For these reasons, courts have uniformly rejected this argument in related challenges. *See, e.g., McHenry Cnty. v. Raoul*, 44 F.4th 581, 593–94 (7th Cir. 2022) (explaining sanctuary law did "not discriminate against the federal government," in that it did not "single[] out" the federal government "for less favorable treatment" than some other entity) (quoting *Washington*, 596 U.S. at 838); *New Jersey*, 2021 WL 252270, at *14 (dismissing intergovernmental immunity challenge to similar New Jersey measure because it did not "treat[] any similarly situated parties better than the federal government"); *United States v. California*, 314 F. Supp. 3d 1077, 1111 (E.D. Cal. 2018).

Finally, the Tenth Amendment supports the argument that no impermissible discrimination is present here. Applying the intergovernmental immunity doctrine to invalidate the sanctuary policies would prevent Rochester from "declin[ing] to administer [a] federal program," *New York*, 505 U.S. at 177, and instead force the city to participate in federal civil immigration enforcement. *See California*, 921 F.3d at 891 ("A finding that [the law] violates the doctrine of

intergovernmental immunity would imply that California *cannot* choose to . . . refus[e] to assist [federal] enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule."). Such compulsion is "incompatible with our constitutional system of dual sovereignty," *Printz*, 521 U.S. at 935, and violates the anti-commandeering doctrine.

### III.     THE SANCTUARY POLICIES DO NOT DIRECTLY REGULATE THE FEDERAL GOVERNMENT.

The doctrine of intergovernmental immunity also instructs that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). "A state regulation is invalid only if it regulates the United States directly." *North Dakota*, 495 U.S. at 435. The doctrine "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881.

Rochester's sanctuary policies do not "regulate the United States directly" because they do not regulate the United States at all. The sanctuary policies regulate whether, when, and how city actors will interact with the federal civil immigration enforcement regime. These policies and regulations do not impose any obligation upon nor directly speak to the roles and responsibilities of federal immigration enforcement authorities but only impose obligations upon municipal actors. The policies' mere references to federal immigration entities while describing the deployment of municipal resources does constitute the impermissible regulation of the federal government. *See supra* I(B); *California*, 921 F.3d at 881. And similar to Plaintiff's claims about preemption and discrimination, accepting the government's attempt to invalidate Rochester's sanctuary policies on the basis of impermissible governmental regulation runs afoul of the Tenth Amendment. Rochester's sanctuary policies do not violate the doctrine of intergovernmental immunity.

## CONCLUSION

For these reasons, the Court should grant Defendants' Rule 12(c) motion for judgment on the pleadings and dismiss all of Plaintiff's claims against them, as a matter of law, and deny Plaintiff's cross-motion.

Dated: July 30, 2025                        Respectfully Submitted,
       New York, New York

*/s/ Amy Belsher*
Amy Belsher
Gabriella Larios
Ifeyinwa Chikezie
Perry Grossman
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
T: 212-607-3320
abelsher@nyclu.org
glarios@nyclu.org
ichikezie@nyclu.org
pgrossman@nyclu.org