UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE UNITED STATES OF AMERICA,

                    Plaintiff,                          **Case No. 25-cv-06226**

             v.

THE CITY OF ROCHESTER; MALIK D.
EVANS, Mayor of Rochester, in his Official
Capacity; ROCHESTER CITY COUNCIL;
MIGUEL A. MELENDEZ, JR., President of the
Rochester City Council, in his Official Capacity,

                  Defendants.

_____

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S CROSS-
MOTION FOR JUDGMENT ON THE PLEADINGS AND REPLY IN
FURTHER SUPPORT OF CITY DEFENDANTS' MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

## <u>TABLE OF CONTENTS</u>

Table of Contents ...................................................................................................i

Table of Authorities ............................................................................................. ii

Introduction .......................................................................................................1

Argument ...........................................................................................................2

    I.      The Rochester Policies Are Not Preempted By Federal Law ...............................2

        a.   The Rochester Policies Are Presumed Not to be Preempted...........................3

        b.   The Rochester Policies Are Not Expressly Preempted ...................................6

             i.   Sections 1373 and 1644 Are Not Valid Preemption Provisions ..........7

             ii.   The Federal Government Interprets Section 1373 Too Broadly ........12

            iii.   The Rochester Policies Do Not Run Afoul of Section 1373...............16

        c.   The Rochester Policies Are Not Conflict Preempted....................................18

        d.   The Tenth Amendment Protects the Rochester Policies ...............................22

    II.     The Federal Government's Intergovernmental Immunity Claim Fails ................23

Conclusion........................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Arizona v United States*, 567 U.S. 387 (2012)......................................................................passim

*Ashcroft v Iqbal*, 556 U.S. 662 (2009) ........................................................................................16

*AT & T Mobility, LLC v Concepcion*, 563 U.S. 333 (2002)........................................................12

*Barnhart v Sigmon Coal Co.*, 534 U.S. 438 (2002)....................................................................13

*Buono v Tyco Fire Prods., LP*, 78 F.4th 490 (2023) ...................................................................5

*Chamber of Com. of U.S. v Whiting*, 563 U.S. 582 (2011) ...................................................passim

*City and County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020) .................................13

*City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022)...........................11, 13

*City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) ..............11, 23

*City of Chicago v Sessions*, 888 F.2d 272 (7th Cir. 2018) ......................................................4, 21

*City of Chicago v. Sessions* (*City of Chicago I*), 321 F. Supp. 3d 855 (N.D. Ill. 2018) ..............11

*City of El Cenzio v Texas*, 890 F.3d 164 (5th Cir. 2018) ...........................................................21

*City of New York v United States*, 179 F.3d 29 (2d Cir. 1999)............................................passim

*City of Philadelphia v. Att'y Gen. of United States,* 916 F.3d 276 (3d Cir. 2019) .....................13

*City of Philadelphia v Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ...........................4, 11, 13

*Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034 (D. Colo. 2020)...............11, 23

*County of Ocean v Grewal*, 475 F. Supp.3d 355 (D.N.J. 2020) .................................7, 13, 14, 21

*Davis v Elmira Sav. Bank*, 161 U.S. 275 (1896) ........................................................................19

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)..........................................15

*Fedorenko v United States*, 449 U.S. 490 (1981) .......................................................................20

*Hines v Davidowitz*, 312 U.S. 52 (1941) ...............................................................................10, 18

*Holve v McCormick & Co., Inc.*, 334 F. Supp.3d (W.D.N.Y. 2018)............................................6

*Jones v Rath Packing Co.*, 430 U.S. 519 (1977) ........................................................................18

*Kansas v Garcia*, 589 U.S. 191 (2020) ................................................................4, 20

*Lamar, Archer & Cofrin, LLP v Appling*, 584 U.S. 709 (2018)..................................13

*Madeira v Affordable Hous. Found., Inc.*, 469 F.3d 219 (2d Cir. 2006) ................17, 18

*Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112 (2d Cir. 2018) .................................19

*McHenry Cnty. v Raoul*, 44 F.4th 581 (7th Cir. 2022).................................................25

*Medtronic, Inc. v Lohr*, 518 U.S. 470 (1996) ...............................................................2

*Murphy v Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)...........................passim

*Natl. Shooting Sports Found., Inc. v James*, 2025 WL 1901082, at *5 (2d Cir July 10, 2025) ...11

*N.Y. Pet Welfare Ass'n, Inc. v City of New York*, 850 F.3d 79 (2d Cir. 2017) .................6, 10, 18

*New York State Conf. of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 U.S. 645 (1995)...................................................................................... 2, 6, 14

*New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135 (2d Cir. 2024)............................3

*New York v Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020) ....................................7, 9, 10

*New York v United States*, 505 U.S. 144 (1992)...................................................2, 6, 8,

*NFIB v Sebelius*, 567 U.S. 519 (2012) ..........................................................................8

*North Dakota v United States*, 495 U.S. 423 (1990) ...................................................23

*Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.*, 8 F.4th 176 (3d Cir. 2021) ..........11, 23

*Oregon v. Trump*, 406 F. Supp. 3d 940 (D. Or. 2019) ..........................................11, 23

*Perez v Campbell*, 402 U.S. 637 (1971)........................................................................4

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)............................................................19

*Printz v United States*, 521 U.S. 898 (1997) .......................................................passim

*Puerto Rico v Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016) ..................................5

*Sebelius v Cloer*, 569 U.S. 369 (2013)......................................................................17

*States v Lopez*, 514 U.S. 549 (1995).............................................................................4

*Steel Institute of New York v City of New York*, 716 F.3d 31 (2d Cir. 2013) .................2

*Stratton v Wallace*, 2016 WL 3552147 (W.D.N.Y. Apr. 5, 2016) .............................18

*U.S. v Morrison*, 529 US 598 (2000) ...............................................................................3, 4, 11

*United States v. California (California II)*, 921 F.3d 865 (9th Cir. 2019) ...........................passim

*United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688 (N.D. Ill. July 25, 2025) .......passim

*United States v King County*, 122 F.4th 740, 758 (9th Cir. 2024) ...............................................24

*United States v Lopez*, 514 U.S. 549, 566 (1995) ......................................................................3

*United States v New Jersey*, 2021 WL 252270 (D.N.J. Jan. 26, 2021) .......................................25

*United States v Salerno*, 481 U.S. 739, 745 (1987) .................................................................7-8

*Virginia Uranium, Inc. v Warren*, 587 U.S. 761 (2019) ..............................................................2

*Washington v United States*, 460 U.S 536 (1983) ....................................................................24

*Wyeth v Levine*, 555 U.S. 555 (2009)........................................................................................6

## Statutes

8 C.F.R § 287.7 .........................................................................................................................21

8 U.S.C. § 1357(g)(9).............................................................................................................5, 21

INA § 1373 .......................................................................................................................passim

INA § 1644 .......................................................................................................................passim

U.S. Const. Art. I .......................................................................................................................2

U.S. Const. Art. VI, cl. 2 .............................................................................................................5

U.S. Const. Art. X.......................................................................................................................2

## INTRODUCTION

The City of Rochester's Sanctuary City policies were enacted to further one of the core responsibilities of local government: the safety of its residents.  The City of Rochester ("the City") exercised its fundamental police power to keep its residents safe when it enacted Council Resolution No. 2017-5 ("the Resolution"), General Order 502 ("the General Order"), and Training Bulletin P-75-17 ("the Bulletin"; collectively, "the Rochester Policies"). The Rochester Policies empower the Rochester Police Department ("RPD") to fight crime and violence by maintaining open and active communications with City residents who happen to be immigrants or refugees.  Our community members must trust the police who work for them; trust that critical information related to crimes will not be used against them; trust that police will investigate crimes and hold perpetrators responsible regardless of the nationality or immigration status of the victim.  The City of Rochester's Sanctuary City policies enable us to build this trust within our community.

When immigrants and refugees are too scared to contact RPD because they fear deportation, then RPD's already difficult job of fighting crime only becomes more challenging because RPD is deprived of critical information and cooperation it would otherwise receive from immigrants and refugees or their families. More importantly, the residents of our City are less safe.  The Rochester Policies chart a lawful path pursuant to basic principles of federalism rooted in the United States Constitution – City personnel and resources do not engage in immigration enforcement. That exercise of the City's police power is entitled to a strong presumption against preemption. Moreover, a valid preemption provision only exists where Congress enacts a law which imposes restrictions or confers rights on *private actors*, and a State or local law confers rights or imposes restrictions that conflict with the federal law.

1

## ARGUMENT

## I.  THE ROCHESTER POLICIES ARE NOT PREEMPTED BY FEDERAL LAW

The federal government's preemption arguments ignore the basic tenets of federalism. The Constitution enumerates limited powers to Congress (*compare* U.S. Const. art. I *with* U.S. Const. Amend. X). Because of this dual allocation of sovereignty, preemption of a state law must follow directly from the Constitution itself or a valid federal law, rather than "some brooding federal interest." *Virginia Uranium, Inc. v Warren*, 587 U.S. 761, 767 (2019); *see also Chamber of Com. of U.S. v Whiting*, 563 U.S. 582, 607 (2011) (preemption analysis does not justify a freewheeling judicial inquiry whether a State law is "in tension with federal objectives").

The Constitution provides that Congress may regulate individuals, not States. *See New York v United States*, 505 U.S. 144, 163-166 (1992).[1] Consequently, federal laws only have preemptive effect when they regulate private individuals, and federal laws that purport to regulate states have no preclusive effect. *See Murphy v Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). The federal government's contentions in this case variously ignore, contort, or outright violate these principles.

Preemption analysis begins with the presumption that Congress "does not intend to preempt state law." *New York State Conf. of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). That presumption is especially strong "when states and localities 'exercise their police powers to protect the health and safety of their citizens.'" *Steel Institute of New York v City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) (quoting *Medtronic, Inc. v Lohr*, 518 U.S. 470, 475 (1996) (cleaned up)). "[C]ourts should assume that the historic police powers

---

[1] This prohibition against Congressional regulation of states extends to state officials and political subdivisions (*see Printz v United States*, 521 U.S. 898, 935 (1997)) – as such, 'state' and 'local' laws are referenced interchangeably in connection with principles of preemption throughout this brief.

of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v United States*, 567 U.S. 387, 400 (2012).

There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, *than the suppression of violent crime and vindication of its victims.*"  *U.S. v Morrison*, 529 US 598, 618 (2000) (emphasis added). The presumption against preemption of the Rochester Policies may only be overcome if Congress had "clear and manifest" intent to preempt. *New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135, 148 (2d Cir. 2024) (citations omitted).

### a.  The Rochester Policies are presumed not to be preempted

As the City has demonstrated, the Rochester Policies serve a valuable public safety purpose. *See* ECF 8-1 (City Mem.) at 14-15.[2]  The Rochester Policies are a "police power" exercise because they are public safety measures which enhance the safety and wellbeing of people within the City by allowing individuals to report crimes and provide information to the RPD without fear that they might be detained or deported as a result of their interaction with RPD. *United States v Lopez*, 514 U.S. 549, 566 (1995) (observing that the Constitution withholds from the federal government a "plenary police power").

The Second Circuit has observed that "[t]he obtaining of pertinent information, which is essential to the performance of a wide variety of state and local government functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved." *City of New York v United States*, 179 F.3d 29, 36 (2d Cir. 1999)[3]. Likewise, other courts have

---

[2] References to docketed items use the ECF pagination, rather than the underlying document pagination.
[3] As an amicus sets forth in additional detail, empirical evidence supports the Second Circuit's observation, as well as the City's choice to enact the Rochester Policies – and to absent itself from the federal government's immigration enforcement efforts – because public safety is demonstrably eroded when immigrants or undocumented individuals are fearful of contacting police. *See* ECF 46 (NY AG Mem.) at 23-27. Where such fear exists, the police are less able to promote public safety.

recognized that fear among immigrants that contact of any kind with government officials "will bring the scrutiny of federal immigration authorities to their home" might deter them from reporting crime. *City of Chicago v Sessions*, 888 F.2d 272, 280 (7th Cir. 2018); *see City of Philadelphia v Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018) (same). The City policy is to ensure equal access to its crime reporting and law enforcement services so that public safety is safeguarded, crime is suppressed, and victims receive redress. Such measures are quintessential police power exercises. *See Morrison*, 529 US at 618.

The Rochester policies are entitled to a strong presumption of validity which the federal government has failed to overcome. The federal government contends that the Rochester Policies are – in effect – immigration policies because they "have the effect of impeding [federal] immigration activities" and therefore are not entitled to a presumption of validity. ECF 32-1 at 26-27. But this line of argument is foreclosed by Supreme Court precedent. In holding an immigration-related state law was not preempted, the Court stated that "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States'" rather than elevating the enforcement priorities of federal officials. *Kansas v Garcia*, 589 U.S. 191, 212 (2020) (quoting U.S. Const. art. VI, cl. 2).

Moreover, the Rochester Policies are plainly not immigration regulations. *See generally* ECF 1-2 (Resolution); ECF 1-3 (General Order); ECF 1-4 (Bulletin). The Rochester Policies explicitly regulate City personnel and govern the use of City resources. *Id.* The federal government's analogy to state laws which seek to frustrate federal law by articulating a sham state purpose is misplaced. *See* ECF 32-1 at 26-27, citing *Perez v Campbell*, 402 U.S. 637, 651-652 (1971) (invalidating state attempt to create carve out to federal bankruptcy law). As is set

forth below in greater detail, the Rochester Policies are not expressly preempted by federal law (*see infra* I(b)), nor do they create an obstacle to federal law (*see infra* I(c)). And the federal government blatantly misrepresents the plain language of the Rochester Policies by arguing that their "avowed purpose" is to frustrate federal immigration enforcement. ECF 32-1 at 25.

Rather, as is set forth in greater detail below (*see infra* I(d)), the Rochester Policies articulate the City's constitutionally protected decision not to participate in immigration enforcement. The federal government fails to appreciate that the City is empowered by the Tenth Amendment to determine whether it will – or will not – engage with the "framework of cooperation" erected by the INA. ECF 32-1 at 3.  Irrespective of whether Congress "anticipated" that the City might participate in immigration enforcement (ECF 32-1 at 16), the City is entitled to decline that participation. The plain text of the INA confirms that state and local government participation in federal immigration enforcement is entirely voluntary. *See for example* 8 U.S.C. § 1357(g)(9) (authorizing localities to enter agreements to assist with immigration enforcement and stating that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection"); *see also* ECF 32-1 at 9 (acknowledging that any state or local cooperation with immigration enforcement is provided on a voluntary basis).

The federal government further seeks to undermine the presumption against preemption that the Rochester Policies enjoy by arguing – incorrectly – that the presumption only applies in the context of conflict preemption analysis. *See* ECF 32-1 at FN 2. The cases cited in support of this erroneous proposition do not support that conclusion (*see Puerto Rico v Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (noting power of Congress to enact express preemption provisions); *Buono v Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2023) (same)), and Supreme

Court precedent is explicit that the presumption against preemption applies in both express

preemption and conflict preemption analyses. *See Arizona*, 567 U.S. at 399-400; *Wyeth v Levine*,

555 U.S. 555, 566 n.3 (2009). The City cannot be cut off from that presumption.

Mere frustration on the part of federal officials arising from the City's decision not to

engage in immigration enforcement cannot form the basis for preemption; the federal

government's quarrel in this case is with federalism itself. *See Murphy*, 584 U.S. at 470 (setting

forth principles of "dual sovereignty"); *Printz*, 521 at 935; *New York*, 505 U.S. at 166.

### b. The Rochester Policies are not expressly preempted

The preemption inquiry begins with the presumption against preemption where, as here,

states exercise their historical police powers. *See New York State Conf. of Blue Cross & Blue*

*Shield Plans New York State Conf. of Blue Cross & Blue Shield Plans*, 514 US at 655. With that

assumption in hand, the inquiry turns to Congressional intent and moves on, as necessary, from

questions of statutory interpretation to an examination of the structure and purpose of the overall

act. *Id.* The plain wording of the purported preemptive statute is the starting place. *See Whiting*,

563 U.S. at 594.

To overcome the presumption against preemption, the party asserting preemption must

meet the "heavy burden of showing that the conflict between the federal and state laws is so

direct and positive that the two . . . cannot be reconciled or consistently stand together." *Holve v*

*McCormick & Co., Inc.*, 334 F. Supp.3d (W.D.N.Y. 2018) (quoting *N.Y. Pet Welfare Ass'n, Inc.*

*v City of New York*, 850 F.3d 79, 86 (2d Cir. 2017)).

The federal government contends that 8 U.S.C. §§ 1373 and 1644 expressly preempt state

and local law by commanding state and local governments that they "may not prohibit or restrict

the sharing of 'information regarding the citizenship or immigration status' with immigration

officials." ECF 32-1 at 14 (quoting § 1373(a) and citing § 1644). Before moving on to the

statutory interpretation exercise, the federal government begins with the mistaken assertion that

these are valid preemption statutes.

### i. Sections 1373 and 1644 are not valid preemption provisions

Contrary to the federal government's contentions, the Second Circuit has not held that §

1373[4] is a valid preemption provision. To the extent that certain Second Circuit dicta casts doubt

on the City's Tenth Amendment-protected sovereign right to decline participation in federal

immigration enforcement, the Second Circuit later confirmed that proposition was superseded by

the Supreme Court in *Murphy*. This Court must be guided by Supreme Court precedent on the

question whether § 1373 is a valid preemption provision. And the existing persuasive authority

exclusively concludes that § 1373 is devoid of preemptive effect.

The federal government contends that two Second Circuit cases support its erroneous

contentions. *See* ECF 32-1 at 15-17 (citing *New York v Dep't of Justice*, 951 F.3d 84, 112-114

(2d Cir. 2020) (hereinafter, *State of New York*); *City of New York v United States*, 179 F.3d 29,

36-37 (2d Cir. 1999) (hereinafter, *City of New York*)). Neither case provides the purported rule of

decision that § 1373 is a valid preemption provision.

*City of New York* concerned a facial challenge by the City of New York to the

constitutionality of § 1373 under the Tenth Amendment. As with the federal government's

burden in this case, the City of New York took on "the most difficult challenge to mount

successfully" because it needed to demonstrate that there was "no set of circumstances" under

which § 1373 would be valid. *City of New York*, 179 F.3d at 33 (quoting *United States v Salerno*,

---

[4] The federal government treats sections 1373 and 1644 as equivalent (*see* ECF 32-1 at 18) and the City
has done so as well. The two provisions contain nearly identical language. *See e.g. County of Ocean v
Grewal*, 475 F. Supp.3d 355, 371 (D.N.J. 2020) (treating sections 1373 and 1644 as equivalent).

481 U.S. 739, 745 (1987)). In rejecting the City of New York's challenge to § 1373, the Second Circuit held that mere "passive resistance to federal programs" did not amount to commandeering under the Tenth Amendment and that, therefore, the statute validly preempted a conflicting City law. *City of New York* at 35. For two profound reasons, this Court is not bound by that reasoning.

First, the Supreme Court – contrary to the federal government's contentions – has affirmatively blessed that very form of passive non-participation. *See e.g. NFIB v Sebelius*, 567 U.S. 519, 579 (2012) (observing state sovereignty requires they enjoy the "simple expedient of not yielding" when they do not want to adopt federal policies as their own); *Printz*, 521 U.S. 925 (federal government may not compel states to implement federal regulatory programs). Similarly, the balancing exercise that the *City of New York* court engaged in (*see* 179 F.3d at 35 (assessing relative weight of federal versus state priorities on the Tenth Amendment challenge and suggesting that states owe the federal government some level of cooperation)) had already been disavowed by the Supreme Court (*See Printz*, 521 U.S. at 532 (rejecting such a "comparative assessment")). On a preemption challenge brought by the United States, such as this one, the *City of New York* court's lack of charity toward "passive resistance to federal programs" also raises anti-commandeering concerns. 179 F.3d at 35; *see e.g. New York*, 504 U.S. at 178 (anti-commandeering applies regardless of the strength of the federal interest at play); *see also infra* at I(d) (discussing anti-commandeering)

As such, *City of New York* employed defective reasoning. And that reasoning has since been superseded by Supreme Court precedent, as the Second Circuit recognized.

The fundamental distinction that *City of New York* rests upon – between federal prohibitions on state-created restrictions and federal laws which "affirmatively conscript[] states,

localities or their employees into the federal government's service" (*City of New York*, 179 F.3d at 35) – was recently and explicitly rejected by the Supreme Court. In *Murphy*, the Supreme Court set aside the distinction between affirmative obligations and proscriptions. *See* 584 U.S. at 474-475. Between federal compulsions on states and federal prohibitions on state action, the Supreme Court stated that the "distinction is empty." *Id.* at 475. Because, in either case, "[i]t is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. *A more direct affront to state sovereignty is not easy to imagine*." *Id.* at 474 (emphasis added). And the Second Circuit has since acknowledged that *Murphy* "clarified that prohibitions as well as mandates can manifest impermissible commandeering." *State of New York*, 951 F.3d at 113.

Consequently, *City of New York* outdated analysis does not provide a rule of decision that § 1373 is a valid preemption provision. And neither does *State of New York*, in which the Second Circuit expressly stated that it did not "conclusively decide the preemptive effect of § 1373." 951 F.3d at 114 n.27. The Second Circuit went on – in dicta – to discuss critically the district court's preemption ruling, but ultimately decided the case narrowly under a unique analysis of the federal government's spending power. *Id*. The spending power is not implicated in this suit and, consequently, *State of New York* is of only limited utility.

The arguments that the federal government builds out from its mistaken reading of Second Circuit precedent should likewise be disregarded.

In particular, the contention that "the question is whether the INA as a whole regulates private actors" is mistaken and at least one court has specifically rejected it. ECF 32-1 at 16. Were courts to accept this approach, "Congress could smuggle unconstitutional commands to States into specific provisions of a broader statute, and then rely on separate provisions for cover,

even as its directives generate all the concerns associated with anticommandeering." *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *15 (N.D. Ill. July 25, 2025) (citing *Murphy* 584 U.S. at 470-474). At best, this a misapplication of the conflict preemption analysis whereby the overall structure and history of a Congressional act may be considered in determining whether a state law "stands as an obstacle to the accomplishment of the full purposes and objectives of federal law." *N.Y. Pet Welfare Ass'n*, 850 F.3d at 86 (quoting *Hines v Davidowitz*, 312 U.S. 52, 67 (1941)).  Under the correct analysis, federal law has preemptive effect only if it "regulates the conduct of private actors, not the States." *See Murphy* 584 U.S. at 479. Any federal law that purports to issue a "direct command to the States" violates the anti-commandeering rule and cannot be used to preempt state laws. *Id*. at 474, 477, 480. And § 1373 plainly regulates state actors. The federal government cannot wave away the import of *Murphy*.

The federal government further seeks to evade this conclusion by suggesting that the City is also required to affirmatively demonstrate that the Rochester Policies are rooted in the traditional police power. *See* ECF 32-1 at 16-17. But this misstates the City's burden in opposing the federal government's preemption challenge. This is not a case in which the City has challenged the constitutionality of a federal law, or the propriety of federally-imposed funding condition – as this contention seems to suggest. *See* ECF 32-1 at 16 (referring mistakenly to "Rochester's challenge"); *see also* ECF No. 32-1 at 8-10 (erroneously referencing "Rochester's challenge" to §§ 1373 and 1644); *Cf. State of New York*, 951 F.3d at 113 (in which New York lodged a facial challenge against § 1373). Rather, this is a case which the federal government initiated alleging that the Rochester Policies are preempted. *See* ECF No. 1 at ¶64 (summing up Count I which alleges preemption).[5] The burden here rests on the federal government alone.

---

[5] Notably, such challenges are disfavored because they run contrary to the fundamental principle of judicial restraint whereby courts "should neither anticipate a question of constitutional law in advance of

However, as is set forth above (*see supra* I), the Rochester Policies are an exercise of the City's "quintessential" police powers to safeguard the public and to regulate the internal affairs of law enforcement. *Morrison*, 529 US at 618. The federal government's allegations to the contrary are wholly conclusory and unsupported. S*ee* ECF No. 1 at ¶¶49-57 (restating preemption allegations without even alleging a negative practical effect of the Rochester Policies on federal immigration enforcement).

The Second Circuit has yet to determine the question whether § 1373 has preemptive effect.  Every other court faced with that decision have held that § 1373 does not have preemptive effect. *See United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *13-17 (N.D. Ill. July 25, 2025); *Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.*, 8 F.4th 176, 182 (3d Cir. 2021); *Colorado v. U.S. Department of Just.*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019), *aff'd in part & vacated in part on other grounds*, *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018), *aff'd in part & vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020); *City of Chicago v. Sessions* (*City of Chicago I*), 321 F. Supp. 3d 855, 868–69, 872 (N.D. Ill. 2018), *aff'd sub nom City of Chicago II*, 961 F.3d 882; *City of Philadelphia*, 309 F. Supp. 3d at 329–331.

The City respectfully submits that this Court should do the same because, as the City has demonstrated, § 1373 impermissibly regulates state actors. *See* ECF 8-1 at 18-19; *see Illinois*, 2025 WL 2098688, at *14 ("[t]he plain text of § 1373 only operates on State and local

---

the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is applied." *Natl. Shooting Sports Found., Inc. v James*, 2025 WL 1901082, at *5 (2d Cir July 10, 2025). Indeed, in the preemption context, it is has been said that "a facial challenge to a statute is the most difficult challenge to mount successfully because the challenger must establish that no set of circumstances exists under which the statute would be valid." *Arizona v U.S.*, 567 U.S. 387, 458 (Alito, J., concurring in part) (internal quotations omitted). Plaintiff fails to meet this burden.

government entities and officials"). The Supreme Court has made it clear that, for a federal statute of have preemptive effect, it must be one that "regulates the conduct of private actors, not the States." *See Murphy* 584 U.S. at 479. Moreover, any federal law that purports to issue a "direct command to the States" violates the anti-commandeering rule and cannot be used to preempt state laws. *Id*. at 474, 477, 480. And § 1373 exclusively commands what states and local governments may or may not do, while it has no application to private actors. The federal government cannot and does not argue the contrary.

Because § 1373 lacks preemptive effect, the federal government's preemption challenge to the Rochester Policies fails.

### ii.  The federal government interprets section 1373 too broadly

Should the Court proceed further, then the federal government's "preemption challenge turns on the scope of § 1373." *See United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *10 (N.D. Ill. July 25, 2025). Where, as here, the language of the statute at issue is "plain and unambiguous with regard to the particular dispute in the case," then the inquiry is at an end. *Barnhart v Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *see AT & T Mobility, LLC v Concepcion*, 563 U.S. 333, 354 (2002). Section 1373 is unambiguous and this Court need not proceed past a simple comparison with the Rochester Policies.

Section 1373 restricts prohibitions on sharing information "regarding" an individual's "citizenship or immigration status," while the Rochester Policies place no restrictions on sharing an individual's "citizenship or immigration status." *See generally* ECF 1-2 (Resolution); *see also* ECF 1-3 (General Order) at 5-6; ECF 1-4 (Bulletin) at 2-3. Given that the plain wording of an express preemption clause "necessarily contains the best evidence of Congress' pre-emptive intent," § 1373 does not interact with the Rochester Policies at all because the Rochester Policies

create no restrictions whatsoever on the sharing of "information regarding the citizenship or immigration status, lawful or unlawful of any individual." *Whiting*, 563 U.S. at 594. The federal government correctly points to the plain text of § 1373 (*see* ECF 32-1 at 18), and the plain text confirms that the Rochester Policies are not preempted.

But the federal government attempts to inject ambiguity into § 1373 nonetheless by arguing that statutory terms, such as "regarding," broaden the statute's subject to include "matters relating to that subject." ECF 32-1 at 18 (quoting *Lamar, Archer & Cofrin, LLP v Appling*, 584 U.S. 709, 717-718 (2018). It also argues that the use of "regarding" in § 1373(a) but its absence from § 1373(c) – which requires the Department of Homeland Security to respond when states or localities seek to verify "the citizenship or immigration status of any individual" – indicates that § 1373(a) therefore encompasses a broader swath of information. ECF 32-1 at 18 ("[b]y including 'information regarding' in § 1373(a), Congress intended *something* more than immigration status alone") (emphasis added).

The Northern District of Illinois recently considered and rejected these very arguments. *See Illinois*, 2025 WL 2098688, at *9-13.[6] The City respectfully submits that this Court should likewise reject the federal government's groundlessly broad reading of § 1373.

The use of "regarding" in § 1373 does not transform that section into one which sweeps in any and all immigration related information – "something more than immigration status alone" in the federal government's troubling formulation – because that would be unreasonable

---

[6] A raft of other courts has also rejected similar attempts to broaden § 1373. *See City & County of San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022); *City and County of San Francisco v. Barr*, 965 F.3d 753, 763 (9th Cir. 2020); *United States v. California (California II)*, 921 F.3d 865, 891-892 (9th Cir. 2019); *County of Ocean*, 475 F. Supp. 3d at 373–76 (collecting cases); *City of Philadelphia v. Sessions,* 309 F. Supp. 3d 289, 331–332 (E.D. Pa. 2018)*, aff'd in part, vacated in part on other grounds sub nom. City of Philadelphia v. Att'y Gen. of United States,* 916 F.3d 276, 291 (3d Cir. 2019).

and the plain language of the statute does not support that reading. *See County of Ocean*, 475 F.Supp.3d 355, 375-376 (rejecting argument that § 1373(c) supports a broad reading of § 1373(a)). The federal government suggests that the use of "regarding" in § 1373 permits this Court to expand that section's plain meaning to include, without limitation, "other relevant information *such as*" identification information, country-of-origin information, date of admission to the United States, duration of admission to the United States, and/or current address information. ECF 32-1 at 19 (emphasis added).

That list tellingly includes discrete items of information, like current address, that do not on their own implicate immigration status – the inclusion of information that does not directly bear on "citizenship or immigration status" is self-defeating. *See Illinois*, 2025 WL 2098688 at *11 (address information itself "says nothing about a person's citizenship or immigration status"). If the federal government's non-exhaustive list of "other relevant information" (ECF 32-1 at 19) can be read into § 1373 by a court then "for all practical purposes pre-emption would never run its course," the federal government does not and cannot establish an outer limit to its overly broad § 1373 reading, and this Court should not accept the implicit invitation to draw such a line. *N.Y. State Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. at 655 (warning against statutory interpretations which render Congress' use of generality into sham limitations which read the presumption against preemption out of the law entirely).

"There is simply nothing in [§ 1373] to suggest that the inclusion of the word 'regarding' requires States and local governments to share personal identifying information and dates of release from detention, as such information does not directly relate to, or regard, an individual's immigration status." *County of Ocean*, 475 F.Supp.3d at 376, n.18 (noting that the overbroad reading of § 1373 would violate the Tenth Amendment).

Even if this Court proceeds on from a plain reading of § 1373, the structure and legislative history of that section likewise foreclose the federal government's broad reading. As noted above, the federal government's structural arguments fail because the purported difference between § 1373(a) and § 1373(c) is specious. *See Illinois*, 2025 WL 2098688 at *12. Indeed, "the fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach as well." *California II*, 921 F.3d at 892.

Also unavailing of the federal governments arguments regarding § 1373 is its legislative history which, as an initial matter, is not the primary guide because Congress's "authoritative statement is the statutory text, not the legislative history." *Whiting*, 563 U.S. at 599 (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)). In any event, the congressional report to which the federal government points suggests that Congress viewed the "presence, whereabouts, or activities of illegal aliens" as a separate category of information from "information regarding the immigration status of an alien" *California II*, 921 F.3d at 892, n.18 (discussing H.R. Rep. No. 104-725, at 383 (1996) (Conf. Report)). So, to the extent legislative history informs an interpretation of § 1373, it counsels against reading into that section the non-exhaustive list of information categories – immigration-adjacent or otherwise – that the federal government identifies in its brief. *See Illinois*, 2025 WL 2098688 at *12.

As the City has demonstrated, the federal government's express preemption arguments advance a strained reading of the Rochester Policies and an over broad interpretation of § 1373, and that broad reading has been routinely rejected by other courts. *See* ECF 8-1 at 19-23. The Rochester Policies do not conflict with § 1373 and the federal government's preemption challenge fails accordingly.

### iii.  The Rochester Policies do not run afoul of section 1373

Even if § 1373 is not deemed an invalid preemption provision, the Rochester Policies are not, as the City has demonstrated, preempted by them. *See* ECF 8-1 at 19-23. Crucially, the Rochester Policies contain no restrictions on sharing of individual's "citizenship or immigration status," rather it creates procedures for RPD members to use if and when they have occasion to review "immigration documents." ECF 1-3 at 5-6. Nothing in the Rochester Policies pertains to an immigrant's legal classification. The Rochester Policies only regulate City official's conduct in respect of information which is distinct from that which § 1373 is concerned with, i.e. "citizenship or immigration status," and the Rochester Policies are therefore not preempted. *See* ECF 1-3 at 5-6 (setting forth procedures for RPD members who are shown "immigration documents"); ECF 1-4 at 2-3 (same).

The federal government suggests that the motivation behind the City's determination not to participate in immigration enforcement is somehow relevant to the express preemption analysis at hand, but there is no support for that suggestion.[7] *See Whiting*, 563 U.S. at 594 (express preemption analyses focus on the plain wording of the express preemption clause). As is discussed more fully below (*infra* I(d)), the City's policy determination in this regard is protected by the Tenth Amendment and the federal government's obvious attempt to pressure the City to abandon its policy choice violates the anti-commandeering rule.

The federal government next proceeds to the mistaken conclusion that an RPD officer who is shown an immigration document necessarily becomes aware of someone's citizenship or

_____

[7] The federal government contends the Rochester Policy's implementing provision directs City personnel to "prohibit[] efforts to enforce . . . Federal immigration laws and policies." ECF 32-1 at 20; *see also* ECF 1 at ¶3 (alleging without factual assertions in support that the City seeks to frustrate federal immigration enforcement). As the City has demonstrated (ECF 8-1 at 15), such allegations are unsupported by the necessary factual assertions and, as such, need not be considered by this Court. *See Illinois*, 2025 WL 2098688 at *22, n.17, n.19 (quoting *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009)).

immigration status. *See* ECF 32-1 at 21. But, whatever tangential relationship an "immigration document" might have with a person's "immigration status," the connection is immaterial to the preemption analysis because – on their face – these terms are distinct. *See Sebelius v Cloer*, 569 U.S. 369, 376 (2013) ("unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning"). No ordinary conception of a "document" places it on all fours with a "status."

 Moreover, the hypothetical formulation that the federal government uses as an illustration demonstrates that the General Order is silent on the question what RPD officers may do specifically in relation citizenship or immigration status information. The federal government speculates that "if an RPD officer makes a routine traffic stop, requests identification, and receives an immigration document in response, that officer *cannot* contact immigration authorities about that person." ECF 32-1 at 21 (emphasis in original). Thus, the federal government's hypothetical application of the Rochester Policies describes an RPD officer who has received an unspecified "immigration document" in response to a request for identification, but does not expressly indicate that the officer has learned anyone's "citizenship or immigration status," the very ambiguity that defeats Plaintiff's argument here. If anything, this hypothetical illustrates a circumstance in which the Rochester Policies do not contravene § 1373.

 "[A]lthough the national power over immigration is undoubtedly supreme," Congress has never "explicitly exercised [that power] to preempt state laws" governing the conduct of police officers who are merely shown immigration documents for the purpose of identification. *Accord Madeira v Affordable Hous. Found., Inc.*, 469 F.3d 219, 240 (2d Cir. 2006) (finding Congress never explicitly preempted state laws allowing for illegal aliens who suffer workplace injuries to recover "compensatory damages" where INA expressly preempted civil "sanctions" against

17

employers of illegal aliens). This Court should reject the federal government's attempt to extend preemptive power to § 1373 as an initial matter but, if it nonetheless determines to do so, it should cabin the preemptive effect of that section to its plain terms. *See Stratton v Wallace*, 2016 WL 3552147, at *5 (W.D.N.Y. Apr. 5, 2016) ("Questions of express preemption focus on the plan wording of a federal statute").

"The best reading of § 1373 (and § 1644 by extension) is that it only pertains to information regarding a person's *legal classification under federal law*." *Illinois*, 2025 WL 2098688 at *13. The Rochester Policies do not restrict City officials from sharing that kind of information. "Consequently, §§ 1373 and 1644 do not expressly preempt them." *Illinois* at *13.

### c.    The Rochester Policies are not conflict preempted

"The conflict standard for preemption is strict," it does not allow for "unwarranted speculations" regarding Congressional intent, and a "clear demonstration of conflict . . . must exist before the mere existence of a federal law may be said to pre-empt state law." *Madeira v Affordable Housing Foundation, Inc.*, 469 F3d 219, 238 (2d Cir. 2006) (quoting *Jones v Rath Packing Co.*, 430 U.S. 519, 544 (1977) (Rehnquist, J. concurring in part and dissenting in part). The "heavy burden" to overcome the presumption against preemption – an especially strong presumption where, as here, the states traditionally wield police powers – falls on the party alleging preemption. *N.Y. Pet Welfare Assoc.*, 850 F.3d at 86-87 (quoting *Hines v Davidowitz*, 312 U.S. 52, 67 (1941). As the City has shown, the federal government's conflict preemption claims fail. ECF 8-1 at 23-28.

Under the doctrine of conflict preemption, state laws are preempted where they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Federal courts require a "strong showing of a

conflict to overcome the presumption that state and local regulation can constitutionally coexist with federal regulation." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 642 (2011) (cleaned up). Conflict preemption exists only if the conflict between a federal statute and local law "is a sharp one" and "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (citations and quotations omitted).

The federal government contends that the Rochester Policies "frustrate[] the purpose" of federal immigration law. ECF 32-1 at 23 (quoting *Davis v Elmira Sav. Bank*, 161 U.S. 275, 283 (1896)). It further contends that Congress "anticipated coordination between federal, state, and local officials" by enacting § 1373. ECF 32-1 at 23-24. The federal government sets forth several of the federal government's powers and duties in connection with immigration and naturalization, including the requirement imposed on federal officials to seek mandatory detention in certain cases. ECF 32-1 at 24. The federal government contends that the Rochester Policies set constraints on communication with federal officials which create an "obstacle to immigration enforcement because it cuts off critical information channels for [federal immigration officials] contemplated by Congress in §§ 1373 and 1644 to execute *their* congressional mandate." ECF 32-1 at 24-25 (emphasis added). It further contends that the Rochester Policies' disregard for "civil immigration detainers" is likewise conflict preempted. ECF 32-1 at 25-26. In particular, the federal government contends that the City's refusal to comply with civil immigration detainers causes "federal officers to independently locate and apprehend aliens after their release from custody." ECF 32-1 at 26. The thrust of the federal government's conflict preemption arguments is that the Rochester Policies make federal immigration officers' jobs more difficult by withholding City assistance.

19

These contentions all fail for the same reason – the INA makes state and local collaboration entirely "permissive, not voluntary." *Illinois*, 2025 WL 2098688 at *23 ("Because the INA give State the option to share information, but does not require it, the Sanctuary Policies do not pose an obstacle"). There is no federal law requiring the City to perform the actions the federal government now seeks to force it to undertake and, were this Court to entertain the attempt to subsume the City's officers into the federal immigration service, it would be prioritizing the "law enforcement priorities or preferences of federal officers" over the laws of the United States. *Kansas*, 589 U.S. at 212. This is not a case of City actions frustrating federal immigration priorities, rather the federal government is plainly recruiting this Court to foist immigration enforcement activities that are explicitly optional under the INA upon the City in contravention of its policy choice. *See* 8 U.S.C. § 1357(g)(9) (state and local governments may voluntarily enter agreements with the Attorney General); 8 C.F.R § 287.7(a) (immigration detainers are a "request" for advice regarding release dates); *see also Arizona*, 567 U.S. at 410 (summarizing INA provisions allowing voluntary cooperation by states); *Illinois*, 2025 WL 2098688, at *23 (state or "assistance is permissible under the INA, not mandatory").

Rather than vindicating federal law, the federal government's attack on the City's "refusal to comply" (ECF 32-1 at 26) with requests that are optional by law, it seeks to read an entirely new requirement into the INA which conflicts with existing INA provisions. *See Fedorenko v United States*, 449 U.S. 490, 513 (1981) ("We are not at liberty to imply a condition which is opposed to the explicit terms of the statute.").

Courts have consistently rejected the very theory of preemption advanced here. In *California II*, the Ninth Circuit reviewed a challenge to a California statute that precluded state officials from honoring civil immigration detainers or from communicating personal information

or release dates to immigration authorities. *See* 921 F.3d at 888; *Cf.* ECF 1-4 at 3 (RPD officers do not honor civil immigration detainers). The Ninth Circuit noted that California's statute made "the jobs of federal immigration authorities more difficult" but that it could not "simply assume that Congress impliedly mandated that state and local governments would act in accordance with" INA provisions permitting voluntary cooperation with immigration authorities. *California II*, 932 F.3d at 888 (quoting *Arizona*, 567 U.S at 406). Although federal immigration authorities' work would be easier if states assisted their efforts, "refusing to help is not the same as impeding." *California II*, 932 F.3d at 888 (quoting *California I*, 314 F.Supp.3d 1077, 1104 (E.D. Cal. 2018). In this case, as with the California statute in *California II*, "invalidating [the Rochester Policies] would *not* prevent obstruction of the federal government's activities, because the INA does not require any particular action on the part of [the City]." 921 F.3d at 889.

The Rochester Policies withhold City assistance with immigration enforcement, which federal immigration officials may find frustrating, but "that frustration is permissible." *California II*, 921 F.3d at 890-891. The District of New Jersey likewise assessed a similar set of state restrictions on cooperation with federal immigration authorities and it also determined that "[m]erely because state law 'inconveniences' the federal government does not render it preempted." *County of Ocean*, 475 F.Supp.3d 355, 382 (D.N.J. 2020).

Still other courts have held that state or local laws withholding assistance with immigration enforcement efforts do not "thwart" or "*impede*" federal immigration authorities. *City of Chicago v Sessions*, 888 F.3d 272, 282 (7th Cir. 2018); *see also City of El Cenzio v Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (upholding ordinances that regulated whether and to what extent local entities would participate with immigration enforcement). The plain text of §§

1373 and 1644, as well as the purpose and structure of the INA, foreclose plaintiff's preemption claim. Count I should be dismissed with prejudice.

### d. The Tenth Amendment protects the Rochester Policies

As the City demonstrated (ECF 8-1 at 26-28), the fundamental structural decision incorporated into the Constitution that Congress should *not* have the power to issue orders directly to the states is expressed in the doctrine of anti-commandeering which recognizes that Congress may regulate private actors but Congress may not issue orders to the governments of the States. *See Murphy*, 584 U.S. at 470-472. Here, if this Court were to extend conflict or obstacle preemption to the Rochester Policies, it would in effect be dictating what the City may or may not do, and how the City may train, supervise or deploy their employees, and would "transform a statutory provision giving States a 'the right of refusal' into a provision requiring state action. *Illinois*, 2025 WL 2098688, at *23 (quoting *California II*, 921 F.3d at 888, quoting *Murphy*, 584 U.S. at 474).[8]

By Constitutional design, local governments "retained 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (J. Madison)). "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v United States*, 521 U.S. 898, 935 (1997). This rule is one of the Constitution's "structural protections of liberty" which promotes a healthy

---

[8] Here it must be emphasized that *State of New York* does not disturb this conclusion because it determined narrowly that § 1373 posed no commandeering concerns in the context of a challenge to conditions placed on federal funding. That court found no Tenth Amendment concerns *only* as applied to the challenged federal funding requirement at issue. *See State of New York*, 951 F.3d at 114-115, n.27, n.28. Here, by contrast, there would be no "legitimate choice whether to accept the federal conditions in exchange for federal funds" and, consequently, profound anti-commandeering concerns are apparent. *Id.* (quoting *NFIB*, 567 U.S. at 578). The instant circumstances are distinct and, as noted above (*see supra* I(b)(i)), the federal government's reliance on *City of New York* and *State of New York* is misplaced.

balance of power between the states and the federal government thereby reducing the risk of tyranny and abuse from either front. *Murphy*, 584 U.S. at 473 (citations omitted).

The Rochester Policies neither "expressly violate" federal law nor create an obstacle to a "clear and manifest" congressional objective. *Arizona*, 567 U.S. at 400. Congress "may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution." *City of New York v United States*, 179 F3d 29, 35 (2d Cir. 1999). Post-*Murphy*, there can be no doubt that §§ 1373 and 1644 impermissibly commandeer state and local legislatures by telling them what they "may or may not do" in violation of the Tenth Amendment, and courts have consistently concluded as much when presented with exactly that question. *Murphy*, 584 U.S. at 474; *see Illinois*, 2025 WL 2098688, at *23-24; *Ocean Cnty. Bd. Of Comms. v Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-182 (3d Cir. 2021); *Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034, 1059 (D. Colo. 2020); *Oregon v Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *City & Cty. of San Francisco v Sessions*, 349 F. Supp 3d 924, 950 (N.D. Cal. 2018). This Court should dismiss the federal government's preemption challenge accordingly.

## II.  THE FEDERAL GOVERNMENT'S INTERGOVERNMENTAL IMMUNITY CLAIMS FAIL

As the City has shown (ECF 8-1 at 29-31), a state or local law is invalid only "if it regulates the United States directly or discriminates against the Federal Government," *North Dakota v United States*, 495 U.S. 423, 435 (1990). Plaintiff's claim that the Rochester Policies violate principles of governmental immunity fails because they do neither.

The plain text of the Rochester Policies fatally undermines plaintiff's intergovernmental immunity claims because the Rochester Policies bind the Council, the Mayor, and City personnel

including officers of the RPD, and no one else. The federal government's contentions underscore the point. *See* ECF 32-1 at 28-29 (parsing the Rochester Policies regulations of City officials). These contentions pivot quickly back to the federal government's obstruction preemption arguments (ECF 32-1 at 29-32), the substance of which is addressed in more detail above. *See supra* I(c). Similarly, the federal government recapitulates its argument that the Rochester Policies prevent "sharing information regarding immigration status" which, as demonstrated above, they do not. *See supra* I(b)(iii).

As the Supreme Court has explained, the federal government is only discriminated against when a state or local law "treats someone else better than it treats [the federal government]." *Washington v United States*, 460 U.S 536, 544-545 (1983). Here, the Rochester policies do not single out for favorable treatment any entity similarly situated to the federal government.[9]

By their plain terms, the Rochester Policies direct City officials in the conduct of their City duties and do not govern any federal actors or entities, consequently the Rochester Policies neither regulate nor discriminate against the federal government. *See McHenry Cnty. v Raoul*, 44 F.4th 581, 593 (7th Cir. 2022). The mere fact that the City's determination – anticipated by the INA – not to participate in immigration enforcement "touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry County*, 44 F.4th at 594, n.7. To determine otherwise would be to violate the anti-commandeering rule and "provide an end-run around the Tenth Amendment." *Illinois*, 2025 WL 2098688, at \*27 (citing *California II*, 921 F.3d at 891;

---

[9] The federal government attempts to diffuse the anti-commandeering concerns it raises by pointing to *United States v King County*, 122 F.4th 740, 758 (9th Cir. 2024), but that case is inapposite. *King County* involved an attempt to bar private parties contracting with federal immigration authorities from municipal facilities, which was an improper attempt to control deportations. *See* 122 F.4th at 756. The Rochester Policies attempt no such invasion of federal prerogatives, rather they absent the City from same entirely.

*McHenry County v. Raoul*, 574 F. Supp. 3d 571, 582 (N.D. Ill. 2021), *aff'd sub nom. McHenry County*, 44 F.4th 581; *United States v New Jersey*, 2021 WL 252270, at *13 (D.N.J. Jan. 26, 2021)); *see also County of Ocean*, 475 F.Supp.3d at 385.

No part of the Rochester Policies regulates the federal government or discriminates against it. Counts II and III should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, City Defendant's motion for judgment on the pleadings should be granted and the federal government's cross-motion for judgment on the pleadings should be denied. City Defendants respectfully request entry of a judgment dismissing all of the federal government's claims against them with prejudice, as a matter of law, and providing for such other and further relief as the Court deems proper.


Dated:  August 20, 2025                          PATRICK BEATH
Rochester, New York                              Corporation Counsel

                               By:    *s/ James "Hal" Kieburtz*
                                        James "Hal" Kieburtz, Esq., Of Counsel
                                        *Attorneys for City Defendants*
                                        30 Church Street, Room 400A
                                        Rochester, NY 14614
                                        Tel.:  (585) 428-6758

To:    Attorneys of Record, via ECF