UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

               Plaintiff,

v.

THE CITY OF ROCHESTER; MALIK D. EVANS, Mayor of Rochester, in his Official Capacity; ROCHESTER CITY COUNCIL; MIGUEL A. MELENDEZ, JR., President of the Rochester City Council, in his Official Capacity,

               Defendants.

No. 6:25-cv-06226-FPG-MJP

**REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS AND RESPONSE TO AMICUS BRIEFING**

---

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .........................................................................................................................1

    I.    Rochester's Law and Policies Are Not Entitled to a Presumption Against Preemption ...................................................................................................1

        A.    The Presumption Does Not Apply to the Express Preemption Analysis .....1

        B.    The Rochester Law and Policies are Designed to Protect Illegal Aliens from Immigration Enforcement ...........................................................................3

    II.    Sections 1373 and 1644 are Valid Preemption Statutes............................................4

    III.    The Government's Reading of § 1373 and § 1644 is Based on the Plain Text of the Statute and is Correct ................................................................................................6

    IV.    Sections 1373 and 1644 Expressly Preempt the Rochester Law and Policies.........8

    V.    The Rochester Law and Policies are Conflict Preempted.........................................9

    VI.    The Rochester Law and Policies Impermissibly Regulate and Discriminate Against the Federal Government..........................................................................................11

    VII.    Response to Certain Points Raised by Amici........................................................12

CONCLUSION...................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................................... 2, 7, 13

*Buono v. Tyco Fire Prods., LP*,
  78 F.4th 490 (2d Cir. 2023) ............................................................................................ 2

*Chamb. of Com. of the U.S. v. Whiting*,
  563 U.S. 582 (2011) ........................................................................................................ 2

*Charles v. Barr*,
  514 F. Supp. 3d 570 (W.D.N.Y. 2021) .......................................................................... 4

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) ......................................................................................... 4, 6

*Cnty. of Ocean v. Grewal*,
  475 F.Supp. 3d 355 (D.N.J. 2020) ............................................................................ 7, 10

*CoreCivic, Inc. v. Governor of New Jersey*,
  145 F.4th 315 (3d Cir. 2025) ........................................................................................ 12

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) .................................................................................................... 3, 4

*Davis v. Elmira Sav. Bank*,
  161 U.S. 275 (1896) ........................................................................................................ 9

*DCC Propane, LLC v. KMT Enters.*, -- F.4th--,
  No. 24-1780, 2025 U.S. App. LEXIS 19633 (2d Cir. Aug. 5, 2025) ............................ 2

*Geo Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ........................................................................................ 12

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .......................................................................................................... 3

*Lamar, Archer & Cofrin, LLP* v. *Appling*,
  584 U. S. 709 (2018) ....................................................................................................... 7

*Murphy v. Nat'l Collegiate Athletic Assoc.*,
  584 U.S. 453 (2018) ........................................................................................................ 5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .................................................................................................. 3, 5

*New York Bankers Ass'n, Inc. v. City of New York*,
  119 F. Supp. 3d 158 (S.D.N.Y. 2015) ......................................................................... 10

*New York SMSA Ltd. v. Town of Clarkston*,
  612 F.3d 97 (2d Cir. 2010) ............................................................................................ 8

*New York v. United States DOJ*,
  951 F.3d 84 (2d Cir. 2020) ............................................................................. 5, 6, 7, 13

*North Dakota v. United States*,
  495 U.S. 423 (1990) .................................................................................................... 12

*Nwauzor v. GEO Grp., Inc.*,
  127 F.4th 750 (9th Cir. 2025) ...................................................................................... 13

*Pac. Cap. Bank, N.A. v. Connecticut*,
  542 F.3d 341 (2d Cir. 2008) ...................................................................................... 9, 11

*Patel v. Garland*,
  596 U.S. 328 (2022) .................................................................................................. 7, 8

*Printz v. United States*,
  521 U.S. 925 (1997) ...................................................................................................... 5

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016) .................................................................................................. 1, 2

*Student Loan Servicing All. v. D.C.*,
  351 F. Supp. 3d 26 (D.D.C. 2018) ............................................................................... 11

*United States v. California* ("*California I*"),
  314 F. Supp. 3d 1077 (E.D. Cal. 2018) ....................................................................... 10

*United States v. California* ("*California II*"),
  921 F.3d 865 (9th Cir. 2019) ..................................................................................... 9, 10

*United States v. Illinois*,
  2025 WL 2098688 (N.D. Ill. July 25, 2025) ................................................................. 8

*United States v. Johnson*,
  117 F.4th 28 (2d Cir. 2024) ........................................................................................... 6

*United States v. Santiago*,
   268 F.3d 151 (2d Cir. 2001) ............................................................................................... 4

*United States v. Washington*,
   596 U.S. 832 (2022) ......................................................................................................... 12

*Vango Media, Inc. v. City of New York*,
   34 F.3d 68 (2d Cir. 1994) ................................................................................................. 10

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................................................... 2

*Young Conservatives of Texas Found. v. Smatresk*,
   73 F.4th 304 (5th Cir. 2023) .............................................................................................. 7

Statutes

8 U.S.C. § 1101(a)(15)(U)(i)(I) ............................................................................................... 14

8 U.S.C. § 1184(p)(1) .............................................................................................................. 14

8 U.S.C. § 1373 .......................................................................................................................... 1

8 U.S.C. § 1373(a) ................................................................................................................ 2, 3

8 U.S.C. § 1623 .......................................................................................................................... 8

8 U.S.C. § 1644 .......................................................................................................................... 3

Other Authorities

*USCIS, Number of Form I-918 Petitions for U Nonimmigrant Status by Fiscal Year, Quarter, and Case Status, Fiscal Years* 2009–2024, available at:
   https://www.uscis.gov/sites/default/files/document/data/i918u_visastatistics_fy2025_q1.xlsx
   (last visited September 17, 2025) .................................................................................... 14

**INTRODUCTION**

Rochester's law and policies are both expressly preempted and preempted because they stand as an obstacle to the enforcement of federal immigration laws. Rochester's arguments to the contrary fail. The Second Circuit has held that 8 U.S.C. §§ 1373 and 1644 are valid preemption provisions, and Rochester's arguments that this Court should ignore that precedent and adopt the reasoning of out-of-circuit courts invites error. The Supreme Court and Second Circuit have held that the presumption against preemption does not apply in the express preemption analysis, and Rochester's reliance on an outlier Third Circuit case also invites error. Likewise, Rochester's proposed narrow reading of the statutes, which ignores Supreme Court precedent again in favor of out-of-circuit decisions, should not be entertained. Beyond express preemption, Rochester's law and policies stand as an obstacle to the Federal immigration enforcement scheme, and Rochester's arguments to the contrary cannot overcome the fact that the City seeks to frustrate federal immigration enforcement through its law and policies. Rochester's law and policies are preempted, invalid, violate principles of intergovernmental immunity, and must be enjoined.

**ARGUMENT**

**I.     Rochester's Law and Policies Are Not Entitled to a Presumption Against Preemption**

   **A.     The Presumption Does Not Apply to the Express Preemption Analysis**

Rochester argues that the federal government advances an "erroneous proposition" that the presumption against preemption does not apply in express preemption cases, (Opp. at 5), but both Supreme Court and Second Circuit precedent support the government's position. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("because the statute 'contains an express preemption clause,' we do not invoke any presumption against preemption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-

1

emptive intent.'") (quoting *Chamb. of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011)); *see also Buono v. Tyco Fire Prods., LP,* 78 F.4th 490, 495 (2d Cir. 2023) ("We 'do not invoke any presumption against pre-emption' when a statute contains an express-preemption clause") (quoting *Franiklin*, 579 U.S. at 125); *DCC Propane, LLC v. KMT Enters.*, -- F.4th--, No. 24-1780, 2025 U.S. App. LEXIS 19633, at *5-6 (2d Cir. Aug. 5, 2025) (same). Those holdings are consistent with the fact that, "the plain wording of [a statute] necessarily contains the best evidence of Congress' preemptive intent." *Buono*, 78 F.4th at 495 (quoting *Whiting*, 563 U.S. at 594).

The cases cited by Defendants do not support their position. Both *Arizona* and *Wyeth* explain that "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act *unless that was the clear and manifest purpose of Congress*," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (emphasis added); *Arizona v. United States*, 567 U.S. 387, 400 (2012). Such a "clear and manifest purpose" can be found in an express preemption provision. *See Wyeth*, 555 U.S. at 574-75 (applying presumption after discussing in detail the fact that Congress chose not to enact an express preemption provision for drugs, as contrasted to medical devices); *Arizona*, 567 U.S. at 399 ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express pre-emption provision.").

Though Defendants believe that they "enjoy" a presumption against preemption, (Opp. at 5), and invoke it over half a dozen times in their brief, they are mistaken. There is no presumption against preemption in the express preemption analysis. 8 U.S.C. § 1373(a) states that "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration agencies] information regarding

2

Case 6:25-cv-06226-FPG-MJP     Document 56     Filed 09/17/25     Page 8 of 20

the citizenship or immigration status, lawful or unlawful, of any individual." *Id.*; *see also* 8 U.S.C. § 1644. The plain language of these statutes evidence Congress's clear expectation that any local laws or policies to the contrary are preempted.

    **B.    The Rochester Law and Policies are Designed to Protect Illegal Aliens from Immigration Enforcement**

The "general power of governing, possessed by the States but not by the Federal Government, is referred to as the 'police power.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535-36 (2012). It encompasses "many of the vital functions of modern government" including "punishing street crime, running public schools, and zoning property for development." *Id.* But it cannot shield those activities that stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Hines v. Davidowitz*, 312 U.S. 52, 67-68 (1941); *see also Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000). It thus cannot extend to shielding illegal aliens from immigration enforcement, which is what Rochester's law and policies seek to do.

Both Rochester and the amici supporting the City avoid quoting the inconvenient text of the law and policies at issue. As explained in the government's opening brief, Rochester implemented Resolution 2017-5 explicitly because of "changes in federal immigration enforcement practices and priorities." Resolution 2017-5 at 3. It created a policy that "*assures immigrants and refugees that they can contact the police and other City agencies without fear of adverse immigration consequences*." *Id.* (emphasis added). The Police Department conceded that the Resolution "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." Training Bulletin No. P-75-17 at 1. Consistent with that admission, and by way of example, General Order 502 states that, "[i]f provided immigration documents for identification purposes,

3

members will not contact CBP, ICE, or other federal immigration authorities regarding the person unless necessary to investigate criminal activity," and even then, such contact is subject to further approval requirements. Gen. Order §§ (V)(E)(2), (V)(F). While Rochester spins the law and policies as having "a valuable public safety purpose," Opp. at 3, the purpose is clear on the face of the law – it is in response to federal immigration enforcement and seeks to "assure" immigrants that they can interact with the City "without fear of adverse immigration consequences." Resolution 2017-5 at 3.

There is no protection from preemption (by presumption or otherwise) when the law and policies at issue are designed to impede and frustrate a federal government program. *See Crosby*, 530 U.S. at 373 n.8 (declining to address presumption against preemption because challenged law stood as an obstacle to the federal program). Moreover, the Tenth Amendment may allow a state to decline to participate in a federal regulatory program, but it does not permit a state to act as an obstacle to it and thus use the Tenth Amendment as a sword rather than a shield. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Rochester cannot shield its law and policies by claiming "police powers" when the law and policies are designed to obstruct and frustrate federal law.

## II.    Sections 1373 and 1644 are Valid Preemption Statutes

This Court is bound to follow Second Circuit precedent unless that precedent is overruled. *Charles v. Barr*, 514 F. Supp. 3d 570, 577 (W.D.N.Y. 2021); *see also United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001). Nonetheless, Defendants suggest this Court ignore binding Second Circuit precedent to render a decision in their favor. Opp. at 8-12. These arguments invite error and fail on the merits.

Defendants first suggest that the Court disregard *City of New York* in view of the Supreme Court's decision in *Printz v. United States*, 521 U.S. 925, 932 (1997). Opp. at 8. *Printz* was decided prior to *City of New York*, and thus this argument should be rejected as an argument that *City of New York* was wrongly decided by the Second Circuit.

Next, Defendants argue that *City of New York* is no longer good law in view of *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012), and *Murphy v. Nat'l Collegiate Athletic Assoc.*, 584 U.S. 453, 470 (2018). Opp. at 8. This argument also fails. *NFIB* has no bearing on the analysis in *City of New York* because it does not relate to preemption of state laws or to the Immigration and Nationality Act ("INA"). *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536-37 (explaining case's focus on Congress's power to regulate commerce and levy taxes). And contrary to Defendants' arguments, *NFIB* does not stand for the proposition that *all* passive resistance is permissible, but rather that a state can forego federal funds if it disagrees with conditions tied to those funds. *Id.* at 579-80.

In *New York v. United States DOJ*, the Second Circuit explicitly refused to overrule *City of New York* in view of *Murphy*, and thus *City of New York* remains binding precedent. *New York v. United States DOJ*, 951 F.3d 84, 113 (2d Cir. 2020). Indeed, while the Second Circuit observed that in *Murphy*, "there was no question that, but for the challenged federal law, the States' police power allowed them to decide whether to permit sports gambling within their borders," it explicitly distinguished "the immigration context where it is the federal government that holds broad and preeminent power," and the INA, which "is Congress's extensive and complex codification of that power." *Id.* (internal quotations/citations omitted). Therefore, Rochester's argument that "[p]ost-*Murphy*, there can be no doubt that §§ 1373 and 1644 impermissibly commandeer state and local

5

legislatures" (Opp. at 23) fails because the Second Circuit explicitly held to the contrary. *New York v. United States DOJ,* 951 F.3d at 113-14.

Defendants also dismiss the government's reliance on portions of *New York v. United States DOJ* that they claim is dicta (Opp. at 9-10), and in doing so fail to provide any substantive response to the government's argument that the Second Circuit has already rejected the very position they advance here. *See* Plaintiff's Cross-Motion at 9-10; *New York v. United States DOJ,* 951 F.3d at 114 n.27. As explained in the government's Cross-Motion, the Second Circuit provided a roadmap to analyze the very arguments Defendants advance, and using that roadmap, Defendants cannot prevail. *See* Plaintiff's Cross-Motion at 9-10.

Defendants encourage this Court to ignore Second Circuit precedent because of contrary reasoning advanced by other courts in other circuits. Opp. at 10-12. It would be error to do so. *See, e.g., United States v. Johnson*, 117 F.4th 28, 41 (2d Cir. 2024) (declining to adopt Fourth Circuit reasoning contrary to Second Circuit precedent). This Court remains "bound by" the Second Circuit's prior decisions in *New York City* and *New York*, and those decisions show that §§ 1373 and 1644 are valid preemption statutes, and that the INA, including those sections, regulates private actors. *See New York v. United States DOJ*, 951 F.3d at 112-14; *City of New York*, 179 F.3d at 36-37.

### III. The Government's Reading of § 1373 and § 1644 is Based on the Plain Text of the Statute and is Correct

Defendants argue that the government's construction of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" as used in § 1373 and § 1644 is too broad, and they seem to suggest it should be limited to only the person's legal classification under the law. Opp. at 12-15, 18. It cannot be reasonably disputed that "the use of 'regarding' in a legal context generally has a broadening effect, ensuring that the scope of a

6

provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 338-39 (2022) (quoting *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U. S. 709, 717 (2018)). In *Patel*, the Supreme Court held that the phrase "any judgment regarding the granting of relief" in § 1252(a)(2)(B)(i) of the INA "encompasses not just 'the granting of relief' but also any judgment *relating to* the granting of relief" which it concluded "plainly includes factual findings." 596 U.S. at 338-39. The government advances a similar argument here: "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" encompasses more than just the citizenship or immigration status *per se*, but also includes related information. *See* Plaintiff's Cross-Motion at 11-12. Indeed, as the Supreme Court has observed, "[c]onsultation between federal and state officials is an important feature of the immigration system" established by the INA. *Arizona*, 567 U.S. at 411; *see also New York v. United States DOJ*, 951 F.3d at 113-14. Consistent with the government's reading of the statute, the Second Circuit has explained that with §§ 1373 and 1644, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York v. United States DOJ*, 951 F.3d at 97.

Defendants rely on a District of New Jersey case which held that "[t]here is simply nothing in [§ 1373] to suggest that the inclusion of the word 'regarding' requires States and local governments to share personal identifying information and dates of release from detention[.]" Opp. at 14 (quoting *Cnty. of Ocean v. Grewal*, 475 F.Supp. 3d 355, 375-76 (D.N.J. 2020)). That court, however, applied the wrong analysis. Sections 1373 and 1644 are not sections that *require* States or local governments to take affirmative steps to share information. Rather, they *prohibit restrictions* on the sharing of information. *Cf. Young Conservatives of Texas Found. v. Smatresk*,

7

73 F.4th 304, 312-13 (5th Cir. 2023) (in preemption case, reversing district court construction of 8 U.S.C. § 1623 because "[u]nlike the statute as written, which is entirely prohibitory and *limits* what can properly be done, the court's rule demands action").

Defendants also rely on *United States v. Illinois* as evidence that other courts have refused to read "regarding" broadly. Opp. at 13-15. But even the *Illinois* decision, which erroneously refused to apply Supreme Court precedent holding that "regarding" has a broadening effect, conceded that § 1373(a) "may have been drafted to sweep in more sources of information needed to verify a person's status." No. 25 CV 1285, 2025 WL 2098688, at *12 (N.D. Ill. July 25, 2025).

Defendants lastly retreat to argue the legislative history does not support the government's reading of the statute. Opp at 15. The government disagrees for the reasons explained in its opening brief, but ultimately the plain language of the statute controls. *New York SMSA Ltd. v. Town of Clarkston*, 612 F.3d 97, 104 (2d Cir. 2010). A plain reading of § 1373 is that it encompasses both citizenship and immigration status, as well as information relating to such status. *See Patel*, 596 U.S. at 338-39.

## IV.  Sections 1373 and 1644 Expressly Preempt the Rochester Law and Policies

Rochester, in its briefing, avoids quoting the law and policies at issue, and for good reason—they are clearly preempted by federal law. Rochester tries instead to argue that its policies relate to the review of "immigration documents" which have at best a "tangential relationship" to "immigration status" but do not show legal status. Opp. at 16-17. Under Rochester's absurd construction, a foreign passport or expired visa has no relation to, and provides no information about, a person's citizenship or immigration status. The government disagrees.

But even under Rochester's own narrow construction of the statutes as "a person's legal classification under the law," its policies are preempted. If, for example, a person volunteered his

8

or her status as an illegal alien to a Rochester police officer, under General Order 502, that officer would still be restricted from conveying that information to ICE. *See, e.g.*, Gen. Order 502 §§ (V)(F); (V)(G). However Rochester tries to spin it, its law and policies plainly restrict information sharing with federal immigration authorities, contrary to §§ 1373 and 1644.

V.      **The Rochester Law and Policies are Conflict Preempted**

Defendants' and their amici's sole rebuttal to the government's conflict preemption arguments centers around the voluntary nature of state cooperation with federal immigration enforcement. Opp. at 20; *see also* ECF 47 at 8-10. But this argument fails because a federal law need not necessarily command action in order for a conflict to exist that triggers preemption. *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351–52 (2d Cir. 2008) ("in order for conflict preemption to apply, the activity that is forbidden by state law need not be required by federal law; it is sufficient that the activity that state law prohibits is federally authorized"). Indeed, Supreme Court precedent instructs that a state or local law or policy that "frustrates the purpose of the national legislation *or* impairs the efficiency of the[] agencies of the federal government to discharge the duties for the performance of which they were created" is conflict preempted. *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (emphasis added). Defendants' law and policies both frustrate the purpose of the federal immigration laws and impair the efficiency of federal immigration agencies to execute their duties to enforce the immigration laws. *See id.* Defendants provide no facts or argument to the contrary.

In support of its argument, Defendants rely on two out-of-circuit cases. The first is *United States v. California* ("*California II*"), where the Ninth Circuit rejected a preemption challenge to a law prohibiting transfer of "individual[s] to immigration authorities unless authorized by a judicial warrant or judicial probable cause determination.'" 921 F.3d 865, 886 (9th Cir. 2019)

9

(quoting Cal. Gov't Code § 7284.6(a)(4)). The Ninth Circuit held that while the statute made "the jobs of federal immigration authorities more difficult," "refusing to help is not the same as impeding." *Id.* at 888 (quoting *United States v. California* ("*California I*"), 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018)). Defendants also cite to *County of Ocean v. Grewal* for a similar proposition: "that the federal government may, without the cooperation of local law enforcement agencies, expend extra efforts and resources to apprehend aliens who are subject to removal, does not create the kind of 'direct' obstacle necessary to trigger conflict preemption." 475 F. Supp. 3d at 382.

Here, again, Defendants avoid addressing the plain text of the challenged provisions because the law and policies, on their face, directly undermine their contentions. Rochester's policies *forbid* communication with federal immigration agencies, with limited exceptions, *see* Gen. Order 502 §§ (V)(E)(2) ("members *will not* contact CBP, ICE, or other federal immigration authorities") (emphasis added), and *prohibit* compliance with civil immigration detainers, *id.* § (G)(2) ("Members will **not** detain or turn over to CBP or ICE a person named in a civil immigration detainer, and will **not** assist CBP or ICE in taking such persons into custody.") (emphasis in original); *see also* Training Bulletin No. P-75-17 at 2. While state and local cooperation with federal immigration enforcement is voluntary, Rochester's policies take that choice away from its personnel. This is a clear example of local policy intentionally frustrating the purpose of the federal immigration scheme. The purpose of the challenged provisions is illustrative. *See Vango Media, Inc. v. City of New York*, 34 F.3d 68, 73 (2d Cir. 1994) (looking to the purpose of the state law and the state law's actual effect in considering whether the law is preempted); *see also New York Bankers Ass'n, Inc. v. City of New York*, 119 F. Supp. 3d 158, 190-91 (S.D.N.Y. 2015). Resolution 2017-5 states that "the New York State Attorney General, *in anticipation of potential changes in*

*federal immigration enforcement practices* and priorities, provided local governments and law enforcement agencies with guidance for improving public safety *by protecting vulnerable immigrant communities*." Resolution 2017-5 at 1 (emphasis added). Despite Defendants' insistence that their policies are exercises of "police power," as discussed above, the aim of the law and policies is to shield individuals from immigration enforcement efforts. Enabling evasion of the immigration laws under the guise of "police powers" does not insulate Rochester from the reality that the purpose and effect of their law and policies impermissibly frustrate the immigration enforcement scheme Congress established. Accordingly, the law and policies are conflict preempted. *See Pac. Cap. Bank, N.A.*, 542 F.3d at 351.

## VI. The Rochester Law and Policies Impermissibly Regulate and Discriminate Against the Federal Government

Defendants insist that their "policies do not single out for favorable treatment any entity similarly situated to the federal government" where the policies exclusively direct city officials. Opp. at 23-24. Instead, Defendants reiterate that the law and policies merely exhibit a choice "anticipated by the INA" to decline to participate in immigration enforcement and argue that the mere fact that this choice incidentally implicates an area traditionally regulated by the federal government does not run afoul of intergovernmental immunity principles because any conclusion to the contrary would violate the Tenth Amendment. *Id.* at 24.

Defendants' arguments fail. First, the City does not meaningfully contest the government's point that laws can impermissibly regulate the federal government where they appear to regulate others. Plaintiff's Cross-Motion at 25. The mere fact that the law and policies purport to regulate only city officials does not change the fact that, in reality, the subject of regulation here necessarily involves federal immigration enforcement. *See*, *e.g.*, *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 73 (D.D.C. 2018) ("Because 'a [state] regulation imposed on one who deals with the

11

Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself,' intergovernmental immunity may apply to state regulation that impacts a" third party) (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990)); *see also CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 327 (3d Cir. 2025) (holding that a state law banning the state, local governments, and private parties from contracting with the federal government for civil immigration detention facilities impermissibly regulated the federal government where it "substantially interferes with federal immigration policy"). The Rochester law and policies, by prohibiting communication between city officials and federal immigration authorities, impermissibly "override the federal government's decision, pursuant to discretion conferred by Congress" to conduct its immigration enforcement operations in Rochester. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750–51 (9th Cir. 2022).

Moreover, Defendants cannot succeed with the contention that the law and policies do not treat the federal government less favorably than others. The General Order, on its face, confirms that Rochester police will not be assigned to immigration-related taskforces, while at the same time, notes that Rochester police participate in other law enforcement taskforces. *Compare* Gen. Order 502 § (III)(C) *with id.* §§ (V), (V)(F); *see also* Training Bulletin P-75-17 at 3. "The law thereby explicitly treats federal workers differently than" other law enforcement entities, thus violating the principles of intergovernmental immunity. *United States v. Washington*, 596 U.S. 832, 839 (2022). Neither Defendants nor the amici respond to this argument and once again, elide the plain text of the challenged provisions where they pose an obstacle to their theory.

### VII. Response to Certain Points Raised by Amici

The government believes most of the points made by amici in support of the City of Rochester are addressed above or are legally irrelevant. However, a few specific points raised by some of the amici merit a separate response.

12

First, the State of New York, relying on a Ninth Circuit case, argues that the presumption against preemption applies when regulating health and safety in the immigration context. *See* ECF 46 at 7. That case concluded that the minimum wage law at issue had only "an incidental effect on immigration" through its application to civil detainees in an immigration detention center operated by a private company. *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 768 (9th Cir. 2025). Here, by contrast, the Supreme Court has recognized the need for information sharing in the immigration context as has the Second Circuit. *Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."); *New York v. United States DOJ*, 951 F.3d at 113-14 (same). Thus, the Rochester law and policies are not "incidental" to immigration issues and the reasoning of *Nwauzor* is inapplicable.

Second, the State of New York argues that Rochester's law and policies "limit local officials' role in federal civil immigration enforcement" and make resource decisions about their police officers and are therefore permissible. *See* ECF 46 at 3, 6. However, Rochester's law and policies go beyond a mere declination to participate in immigration enforcement. As explained in the government's opening brief, Rochester's law and policies limit communications with federal authorities and prohibit cooperation with civil warrants and detainers authorized by Congress after a person is already in Rochester's custody. Plaintiff's Cross Motion at 5-6, 13-15, 18-20. The scope of Rochester's law and policies are apparent from their text, which—notably—the State of New York avoids.

Third, the State of New York argues that Rochester's law and policies comply with *state* law. ECF 46 at 11-12. However, the issue before this Court is not whether Rochester's law and policies comply with state law, but whether they comply with federal law, and as explained, they do not.

13

Finally, both Ibero-American Action League et al. and the amici Cities, Counties, and Elected Officials, argue that Rochester's law and policies are a matter of public safety that are required to build trust so that immigrants will report crimes. *See, e.g.*, ECF 47 at 7, ECF 52-2 (passim). In fact, government data regarding the U-visa program shows that illegal immigrants have been reporting crimes since long before Rochester's sanctuary policies came into being. The U-visa program grants lawful status to eligible individuals who are victims of crime at the federal, state, or local level and who assist law enforcement in the prosecution of the crime, as well as to their qualifying family members. 8 U.S.C. § 1101(a)(15)(U)(i)(I); *id.* § 1184(p)(1). Congress limits the number of available visas each year, but those who file bona fide petitions can receive interim benefits while they wait for a visa to become available. *See* USCIS Policy Manual, Vol. 3, Part C, Ch. 5.4. The U-visa program has received substantial interest since its inception. USCIS has received over 40,000 principal petitions in fiscal year 2024 alone, and tens of thousands in each fiscal year since 2012. *See* USCIS, *Number of Form I-918 Petitions for U Nonimmigrant Status by Fiscal Year, Quarter, and Case Status, Fiscal Years 2009–2024*, available at: https://www.uscis.gov/sites/default/files/document/data/i918u_visastatistics_fy2025_q1.xlsx (last visited September 17, 2025). As of December 2024, there were 409,196 petitions pending. *Id.* Thus, the rationalization that Rochester's law and policies are necessary to promote public safety and well-being because they encourage the reporting of crime rings hollow.

## CONCLUSION

Wherefore, the United States respectfully requests that this Court enter judgment in its favor on all claims and enjoin the Rochester sanctuary city law and policies.

DATED: September 17, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

ALEXANDRA MCTAGUE
Senior Litigation Counsel

By: /s/ Alessandra Faso
ALESSANDRA FASO
Acting Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel. 202-305-9855
alessandra.faso@usdoj.gov

*Attorneys for the United States*