UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

    v.

THE CITY OF ROCHESTER; MALIK D. EVANS, Mayor of Rochester, in his Official Capacity; ROCHESTER CITY COUNCIL; MIGUEL A. MELENDEZ, JR., President of the Rochester City Council, in his Official Capacity,

          Defendants.

No. 6:25-cv-6226-FPG

**AMENDED COMPLAINT**

---

## INTRODUCTION

1. On March 24, 2025, local police officers in Rochester, New York responded to a call for assistance from federal law enforcement officers. To most Americans, that would look like law enforcement at its finest. But not to those leading the City of Rochester. Local political leaders and officials, including Mayor Malik Evans and City Council President Miguel Melendez, criticized the Rochester Police Officers for doing the right thing, because responding to a call for backup and assisting federal law enforcement officers at the scene violated the City's Sanctuary City policies. This is a lawsuit to put an end to those policies.

2. The United States is currently facing a crisis of illegal immigration. *See, e.g.*, Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025). But its efforts to do so are hindered by Sanctuary Cities such as the City of Rochester, who refuse to cooperate or share information, even when requested, with federal immigration authorities.

3.    Rochester's Sanctuary City laws and policies are illegal. Those laws and policies are designed to and in fact do interfere with and discriminate against the Federal Government's enforcement of federal immigration law in violation of the Supremacy Clause of the United States Constitution.

4.    The challenged laws and policies reflect the City of Rochester's intentional effort to obstruct the Federal Government's enforcement of federal immigration law and to impede consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

5.    Rochester officials recently made "crystal clear" the practical upshot of these policies in the aftermath of the March 24, 2025, incident, as evidenced by Mayor Malik Evans' statement that Rochester police officers "do not help or participate in federal immigration activities"—even by responding to a call for assistance by federal immigration enforcement personnel. Rochester First, "Full Press Conference: City policy broken by officers during ICE response" (March 26, 2025), https://www.rochesterfirst.com/video/full-press-conference-city-policy-broken-by-officers-during-ice-response/10573550.

6.    After the filing of this lawsuit, Rochester officials doubled down on their Sanctuary laws and policies. Rather than wait for a decision by the Court, Rochester issued new policies and laws without informing Plaintiff or the Court.  On June 17, 2025, the Police Department issued General Order 125, titled "Mutual Aid." (Exhibit D). That General Order states that all non-emergency calls for assistance must be approved by supervision, and any assistance must "conform

to all RPD General Orders, Rules and Regulations, and other applicable laws. (i.e.: pursuit driving, warrant or immigration enforcement, etc.)." ¶ G.O. 125, ¶ III.D.  Then, on August 27, 2025, the City of Rochester adopted a new City Ordinance, No. 2025-283 "Amending the Municipal Code relating to Rochester as a Sanctuary City for immigrants and for the [LGBTQIA+] community," which amended Chapter 63 of the Municipal code. Exhibit E. On September 4, 2025, the Police Department rescinded the March 23, 2017, GO 502 at issue in this litigation, and replaced it with a revised General Order 502. Exhibit F. The 2025 GO 502 includes all of the prior General Order but also contains detailed instructions for responding to calls for assistance from Department of Homeland Security ("DHS") components Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI"), which differ from the requirements for responding to calls for assistance from other agencies set forth in the Mutual Aid GO.

7.    The challenged laws and policies are designed to deliberately impede federal immigration officers' ability to carry out their responsibilities in those jurisdictions. The laws and policies intentionally obstruct the sharing of information envisioned by Congress, thereby impairing federal detention of removable aliens, including dangerous criminals, as required by federal law; and they refuse assistance unless federal officials procure criminal arrest warrants to take custody of removable aliens, even though Congress has made an explicit policy choice that such removals can be effectuated by *civil* arrest warrants for immigration enforcement.

8.    The Supremacy Clause prohibits the City of Rochester and its officials from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution.

9.     The Supremacy Clause also prohibits the City of Rochester and its officials from singling out the Federal Government for adverse treatment—as the challenged law and policies do—thereby discriminating against the Federal Government. Accordingly, the laws and policies challenged here are invalid and should be enjoined.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

11.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because Defendant the City of Rochester and its defendant officials reside within the Western District of New York and because the Defendants' acts or omissions giving rise to this Complaint arose from events occurring within this judicial district.

12.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

13.     Plaintiff is the United States of America. It regulates immigration under its statutory and constitutional authorities. It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and DHS, along with DHS's component agencies, including ICE/HSI and CBP.

14.     Defendant City of Rochester is a city in the State of New York, Monroe County.

15.     Defendant Malik D. Evans is the Mayor of Rochester and is being sued in his official capacity. He has been Mayor of Rochester since January 2022. Mr. Evans previously served on the Rochester City Council from his election in November 2017 through some time in 2021. Mayor Evans has the power to appoint people to, and fire them from, certain positions within his administration, including the police chief and corporation counsel who serve at the pleasure of

the mayor. The Mayor also has the authority to approve changes to the municipal code, and under the municipal code, to investigate conduct alleged to violate the Rochester's Sanctuary laws and policies.

16.     Defendant Rochester City Council is the governing and legislative body of the City of Rochester. It is responsible for setting the City of Rochester's policy through ordinances and resolutions and for adopting the City's budget. The City Council legislates by passing ordinances which become City laws. The City Council also has the power to amend or remove City laws.

17.     Defendant Miguel A. Melendez, Jr. is President of the Rochester City Council and is being sued in his official capacity. Mr. Melendez was elected president of the City Council in 2022.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

18.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

19.     "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). This authority stems from "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id*. (citations omitted). Based on its enumerated constitutional and

sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to establish immigration laws, the execution of which States cannot obstruct or take discriminatory actions against. *See Arizona*, 567 U.S. at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

20.    Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see, e.g., Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (the United States has the "exclusive[]" control over "any policy toward aliens").

21.    Exercising this function, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.,* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

22.    Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Indeed, New York itself put it well: "The removal of undocumented immigrants is [an] exclusively federal function," and the Federal Government alone decides "not only who may be removed from the United States, but how such individuals should be identified, apprehended, and detained." *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012).

23.    Nonetheless, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from

local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

24.    The immigration laws thus provide for basic principles of cooperation between state and local governments and the Federal Government. For instance, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must also "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). And state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

25.    Naturally, information-sharing across (and within) governments is integral to this system functioning. Section 1373 thus requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction." *Id.* § 1373(c); *see* 6 U.S.C. § 482(b) (requiring information-sharing among federal agencies). By the same token, state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar).

26.    Critically, Congress passed the latter provision to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal

immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see New York*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

27.    In short, under federal immigration laws—and our system of government—state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *New York,* 179 F.3d at 35. Indeed, Congress has affirmatively outlawed any effort to "conceal, harbor, or shield from detection" any "alien in any place[.]" 8 U.S.C. § 1324(a)(1)(A)(iii).

## FACTUAL BACKGROUND

### A.    *The City of Rochester's Sanctuary City Laws*

28.    On May 27, 1986, the City of Rochester established itself as a Sanctuary City when it passed Resolution 86-29. The City of Rochester remains a Sanctuary City today.

29.    In February 2017, the City of Rochester passed Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City," (hereinafter the "Resolution") (Exhibit A) which had been unanimously adopted by the City Council, and which remains in force today. The Resolution as drafted and implemented conflicts with federal law concerning immigration enforcement.

30.    The Resolution prohibits City officials, including law enforcement officers, from participating in federal civil immigration enforcement and limits cooperation with federal immigration enforcement in several ways.

31.     For example, Paragraph 5 of the Resolution bars the City from using "its funds or personnel to enforce or to assist in the enforcement of Federal immigration policies," "except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." Resolution No. 2017-5, ¶ 5.

32.     In addition, the Resolution provides that "[t]he Police Department shall not engage in" various "activities solely for the purpose of enforcing federal immigration laws." *Id.* ¶ 3. In particular, the Resolution bars Rochester police from "inquiring about the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance." *Id.* Rochester police likewise "shall not stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status. *Id.*

33.     In addition, "City personnel shall not inquire about or request proof of immigration status or citizenship when providing services or benefits," unless the services or benefits "are contingent upon one's immigration or citizenship status," or if "inquiries are otherwise lawfully required" or the "information is needed for a criminal investigation." *Id.* ¶ 4.

34.     The Resolution also instructs the Mayor of Rochester and other city officials to "implement policies that further the City's role as a Sanctuary City to ensure compliance with" the Resolution's "objectives." *Id.* ¶ 2.

**B.     *The City of Rochester's Policies Implementing the Sanctuary City Laws***

35.     To implement the Resolution, on March 23, 2017, the Rochester Police Department, through its then-chief, issued General Order 502 (Exhibit B) and Training Bulletin No. P-75-17 (Exhibit C). General Order 502 was subsequently replaced with a revised General Order 502 on September 4, 2025. The revised General Order contains all of the original text of General Order 502, but also adds provisions, as discussed below, and includes a specific reference to the new

Municipal Code section. Upon information and belief, General Order 502 (Sept. 4, 2025) and Training Bulletin P-75-17 remain in force today.

36.    General Order 502 prohibits local cooperation with federal immigration enforcement. It provides that "Members shall not perform the functions of a federal immigration officer or otherwise engage in the enforcement of federal immigration law under 8 U.S.C. § 1357(g) or any other law, regulation, or policy." It singles out CBP and ICE, stating that "Members will not be assigned to a CBP or ICE task force." General Order 502 (III)(C). The General Order suggests elsewhere that officers may be assigned to other federal task forces. *Id.* (V).

37.    Section V of General Order 502 is titled "Sanctuary City Procedures" and provides that, "[i]f provided immigration documents for identification purposes, [officers] will not contact CBP, ICE, or other federal immigration authorities regarding the person unless necessary to investigate criminal activity." General Order 502 (V)(E)(2). Thus, contrary to the assurances of the City Council that the Resolution did not "prohibit City employees from communications with federal immigration agencies regarding citizenship or immigration status," the enactment of the Resolution through General Order 502 explicitly limited officers' ability to cooperate with, or provide information to federal immigration authorities regarding citizenship or immigration status.

38.    The General Order addresses requests for assistance from CBP, ICE, and HSI to the Rochester Police Department, and delineates between exigent circumstances and other circumstances. Previously, there were no restrictions in the General Order on "exigent circumstances" situations involving ICE, CBP, or HSI.  *See* General Order 502 (2017), § (V)(F). The revised General Order contains specific procedures to respond to a call for assistance from ICE, HSI, or CBP in exigent circumstances involving an imminent threat to life or safety, and those procedures are more restrictive than the requirements for such calls from other agencies. *Compare*

10

G.O. 502 § (V)(F)(1) *with* General Order 125 § (III)(A). Furthermore, the revised General Order 502 states that for non-emergency calls for assistance, a supervisor must acknowledge the request, determine whether a response is required, and if so, respond to the scene to ensure compliance by officers with the General Order. G.O. 502 § (F)(2). This too is more restrictive than requirements for calls from other agencies. *See* G.O. 125 § III.B. All other requests for assistance from ICE, CBP, or HSI "must be authorized by [a] Captain or above during business hours, or the Staff Duty Officer (SDO) during non-business hours" and either "require a specific and articulable need for a criminal investigation or fall within the scenarios identified in Section (V)(G), namely the person is named in a judicial warrant or federal criminal arrest warrant, or there is probably cause to believe the person committed a federal crime. General Order 502 (V)(G)(1)(a)-(c). Upon information and belief, these changes to the General Order are in response to the March incident.

39.     By requiring authorization to respond to a request from CBP, HSI, or ICE, the City is restricting, and potentially prohibiting, government officials from sending information to or sharing information with CBP, HSI, and ICE regarding the citizenship or immigration status of individuals.

40.     The Order explicitly bars cooperation in federal civil immigration enforcement activities, stating that "Members will not detain or turn over to CBP or ICE a person named in a civil immigration detainer, and will not assist CBP or ICE in taking such persons into custody solely for a civil immigration detainer" *Id.* (G)(2). It also states that Rochester Police will only provide access to a person in custody or allow the use of Rochester Police facilities to question or interview a person if that person is "named in a judicial warrant or federal criminal arrest warrant; or when there is probable cause to believe the person has committed a federal crime." *Id.* (G)(1)(c).

It requires reporting of all contacts with CBP, HSI, or ICE, though not other federal agencies, and the forwarding of summary reports to the Mayor, to ensure compliance with the General Order.

41.    In conjunction with the initial release of General Order 502 in 2017, the Rochester Police Department issued Training Bulletin No. P-75-17. The Training Bulletin explained that the Resolution "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." Training Bulletin No. P-75-17 at 1.  Upon information and belief, the Training Bulletin has not been replaced and remains in effect today.

42.    The Training Bulletin explained that "[i]n order to implement the Sanctuary City Resolution and ensure compliance, we are renaming and reissuing G.O. 502 with substantial updates." *Id.* at 1. It further explained that minor updates were made to other General Orders and Training Bulletins. *Id.* The Training Bulletin provided an overview of General Order 502, reiterating the information in that General Order. *Id.* at 2-3. By way of example, the Training Bulletin provided that "Members will ***not*** detain or turn over to CBP or ICE a person named in a ***civil immigration detainer***, and ***will not assist*** CBP or ICE in taking such persons into custody." *Id.* at 2 (emphasis original).

43.    The Training Bulletin also provided information about the modifications to other General Orders. For example, in General Order 520, the Prisoner Data Form was modified to remove the field inquiring whether the prisoner was a citizen. *Id.* at 3.

**C.    *Ordinance 2025-283 (August 27, 2025)***

44.    On August 26, 2025, the City Council unanimously passed, and Mayor Malik Evans approved, Ordinance 2025-283, which amended the Rochester City Municipal Code, effective immediately. The Ordinance referenced Sanctuary City Resolutions 86-29 and 2017-5. It stated it

incorporates protections for immigrants in the Sanctuary City resolutions, and was "necessitated by the U.S. President's efforts to implement the mass deportation of Immigrants," which it says "commenced with an Executive Order on January 25, 2025." *See* Ordinance 2025-283, § 63-20 at Legislative Findings.

45.     The Ordinance amended § 63-21 of the Municipal Code to make it unlawful for "the City, and any person under agreement with the City" to "prohibit or discourage Immigrants or their children from seeking opportunities, reporting crimes, or accessing services on the basis of perceived or actual immigration status." § 63-21(A)(1). The section does not contain any limitation on what it means to "discourage" and whether such discouragement may only be through acts on behalf of the City, or whether it extends to an individual's other work or personal interactions outside of the specific agreement with the City. § 63-21(A)(1).

46.     § 63-21(A)(2) makes it unlawful for the Police Department to inquire about immigration status "unless necessary to investigate criminal activity." It also makes it unlawful for the Police Department to "stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status."

47.     § 63-21(A)(3) applies more broadly to all City personnel and makes it unlawful for City personnel to "inquire about or request proof of immigration status or citizenship when providing services or benefits" unless required for receipts of such services or benefits, where lawfully required, or where needed for a criminal investigation.

48.     § 63-21(A)(4) makes it unlawful for the City to use "funds or personnel" to "enforce or assist in the enforcement of Federal immigration policies" or to participate in "any program requiring registration of individuals on the basis of national origin or immigration status" unless required by law.

49.     § 63-11 provides penalties for violations of the chapter, and "any orders and rules issued pursuant" to the chapter, stating that a city officer or employee's commission of an unlawful act shall constitute a basis for discipline including removal. The provision specifically applies to "[a]ny city officer of employee subject to the Mayor's jurisdiction, and any elected City officer or employee subject to the City Council's jurisdiction" and such officers or employees shall be "subject to discipline or removal in the discretion of the appropriate appointing authority and in the manner provided by law."

50.     § 63-11(B) provides that the "Mayor, at their own behest, or upon request of the Council shall investigate any credible allegation that a City agency, official or employee has committed a Violation. At the conclusion of the Investigation, the Mayor or their designee shall present the report of the investigation and its outcome to the Council in executive session" and "the findings and outcome of such investigations shall be made publicly available" to the extent permitted by collective bargaining agreements and law.

**D.    *The March 24, 2025, Incident and its Aftermath***

51.     Indeed, the effects of these Sanctuary City policies were recently on display when federal law enforcement officers requested backup from the Rochester Police Department on March 24, 2025. Rochester Police responded to the federal officers' call for assistance.

52.     In the wake of this incident, Mayor Malik Evans held a press conference in which he reaffirmed his administration's commitment to the City of Rochester's Sanctuary City Policies while criticizing the officers' assistance to federal immigration officers. The Mayor stated that the "policy is crystal clear. City police officers do not help or participate in federal immigration activities." *See* Rochester First, "Full Press Conference: City policy broken by officers during ICE

response" (March 26, 2025), https://www.rochesterfirst.com/video/full-press-conference-city-policy-broken-by-officers-during-ice-response/10573550.

53.     Upon information and belief, the officers involved were removed from road patrol and were required to receive additional training before being permitted to return to full duty. Gino Fanelli, Brian Sharp, WXXI News, "Rochester police likely broke sanctuary policy assisting immigration agents" (March 26, 2025), https://www.wxxinews.org/local-news/2025-03-26/rochester-police-likely-broke-policy-assisting-immigration-agents-with-traffic-stop. Rochester City Councilmember Stanley Martin announced that the officers who responded to the call for backup "need to be fired." *Id.*

54.     Upon information and belief, prior to the enactment of Ordinance 2025-283, police officers who did not comply with Rochester's Sanctuary City directives were subject to disciplinary action.  After enactment of Ordinance 2025-283, police officers and other city employees or officials who engage in conduct deemed "unlawful" under the ordinance are subject to discipline under § 63-11, which may include investigation by the Mayor, public findings, and removal from their position.

55.     Likewise, in the wake of this incident, City Council President Miguel A. Melendez, Jr., reaffirmed the City Council's commitment to Rochester's Sanctuary City Policies. According to news reports, Council President Melendez said the policy would not prevent Rochester police officers from responding for help in a true emergency but that a subsequent review of officers' body camera footage of the incident showed that the incident did not meet the threshold. *See* https://spectrumlocalnews.com/nys/rochester/public-safety/2025/04/03/rochester-city-council-president-clarifies-sanctuary-city-policy-following-controversial-traffic-stop.

56.    Rochester's commitment to its Sanctuary City laws and policies is evidenced by its new Ordinance and policies in the wake of the March incident and this lawsuit, which are even more restrictive than the law and policies previously implemented.

## THE IMPACT OF ROCHESTER'S SANCTUARY CITY POLICIES ON FEDERAL IMMIGRATION ENFORCEMENT

57.    ICE, CBP, and HSI conduct enforcement in Rochester. CBP in particular is responsible for enforcing the immigration laws at international ports of entry, including the Rochester International Airport. Notably, Rochester is also less than 10 miles from Lake Ontario, which straddles the international border between Canada and the United States.

58.    Federal law contemplates that DHS will be able to inspect all applicants for admission, and take all appropriate action against those found to be inadmissible to the United States, even those transferred to state or local custody pending prosecution. 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And, to facilitate coordination between state and local officials and the Federal Government, Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

59.    The challenged provisions of the Rochester laws and policies, set forth in Exhibit G to this Amended Complaint (hereinafter "the Challenged Provisions"), directly conflict with this framework.

60.    Resolution No. 2017-5 and General Order 502 run directly afoul of 8 U.S.C. §§ 1373 and 1644 by forbidding, the Challenged Provisions, Rochester police officers from communicating with ICE, HSI, or CBP regarding information regarding a person's citizenship or

16

immigration status or regarding a detainee, including the detainee's custody status, immigration status, release date, or the like. Likewise, Section 63-21 of the Municipal Code makes it unlawful to inquire about immigration status "unless necessary to investigate criminal activity" or to use City "funds or personnel to enforce or assist in the enforcement of any Federal immigration policies." § 63-21(B)(4). The Municipal Code also subjects persons to discipline for violation of any Orders pursuant to the Code (§ 63-11(A)), which includes General Order 502.

61.     The City of Rochester cannot point to the purported saving clauses in Resolution No. 2017-5 or Ordinance 2025-283 to avoid that reality. The saving clauses allow use of funds or personnel to assist in federal immigration enforcement only "to the extent specifically required by law." *Id.* ¶ 5; *see also* § 63-21(B)(4). But rather than require States and local governments to share and maintain that information, federal law only prohibits restrictions on those activities. Rochester has therefore prohibited the activities that federal law expressly contemplates States will do.

62.     The City of Rochester and its officials have no lawful interest in assisting removable aliens' evasion of federal law enforcement.

63.     Rochester's laws and policies threaten and harm the United States' sovereign interest in the supremacy and enforcement of federal law, specifically the Immigration and Nationality Act. The laws policies also undermine and conflict with federal immigration policy.

64.     The City of Rochester and its officials single out the Federal Government for their disfavored treatment.

65.     The Challenged Provisions of the Rochester laws and policies are an obstacle to the Federal Government's enforcement of the immigration laws and discriminate against federal immigration enforcement, as well as (with respect to the information-sharing and maintenance restrictions) expressly violate 8 U.S.C. § 1373 and § 1644.

66.     In rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE
## (PREEMPTION)

67.     Plaintiff hereby incorporates paragraphs 1 through 66 of the Complaint as if fully stated herein.

68.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

69.     Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Municipal Code 2025-283, as codified in the Municipal Code, constitute and create obstacles to the enforcement of federal immigration law through the Challenged Provisions, including by limiting lawful officer assistance to and information sharing with federal immigration officers.

70.     The Challenged Provisions of Rochester's Sanctuary City laws and policies are expressly preempted by the requirements of 8 U.S.C. §§ 1373 and 1644, requirements that local governments not prohibit or restrict information sharing with federal immigration officials regarding the citizenship or immigration status of any individual.

71.     The Challenged Provisions of Rochester's Sanctuary City laws and policies are also conflict preempted because they "stand[] as an obstacle to the accomplishment and execution." The Challenged Provisions of Rochester's Sanctuary City laws and policies stand as an obstacle

to federal immigration laws by limiting information sharing, cooperation, access, and the types of warrants honored. *Arizona*, 567 U.S. at 406 (citation omitted).

72.     Federal immigration law therefore preempts Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code.

73.     Accordingly, the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, violate the Supremacy Clause, interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government.

<u>**COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE**</u>
<u>**(UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)**</u>

74.     Plaintiff hereby incorporates paragraphs 1 through 66 of the Complaint as if fully stated herein.

75.     Defendants' enforcement of the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, discriminates against the Federal Government.

76.     The Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code single out federal immigration officials, expressly and impliedly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated.

77.     Accordingly, the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, violate the Doctrine of Intergovernmental Immunity and therefore alternatively are invalid on that basis.

**COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**

78.    Plaintiff hereby incorporates paragraphs 1 through 66 of the Complaint as if fully stated herein.

79.    Defendants' enforcement of the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, effects direct regulation of the Federal Government.

80.    By refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions.

81.    Accordingly, the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code effect regulation of the Federal Government and alternatively are invalid on that basis.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

A.    That this Court enter a judgment declaring that the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code violate the Supremacy Clause and are therefore invalid;

B.    That this Court enter a judgment declaring that the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, violate 8 U.S.C. §§ 1373 and 1644 and are therefore invalid;

C.    That this Court preliminarily and permanently enjoin Defendants as well as their successors, agents, and employees, from enforcing in any manner the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance

2025-283 as codified in the Municipal Code, and any substantially similar policies, orders, or laws that may become effective in the future;

D.      That this Court award the United States its costs and fees in this action; and

E.      That this Court award any other relief it deems just and proper.

DATED: December 19, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            DREW C. ENSIGN
                                            Deputy Assistant Attorney General

                                            GLENN M. GIRDHARRY
                                            Acting Deputy Director

                                            ALESSANDRA FASO
                                            Acting Assistant Director

                                            By: */s/ Alexandra McTague*
                                            ALEXANDRA MCTAGUE
                                            Senior Litigation Counsel
                                            United States Department of Justice
                                            Civil Division
                                            Office of Immigration Litigation
                                            P.O. Box 868 Ben Franklin Station
                                            Washington, D.C. 20044
                                            Alexandra.mctague2@usdoj.gov

                                            *Attorneys for the United States*