UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

                                Plaintiff,

      v.

THE CITY OF ROCHESTER, et al.,

                               Defendants.

**Case No. 25-cv-6226**

**Hon. Frank P. Geraci, Jr.**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(b)(6)
MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..................................................................................................3

    I.  The City's Sanctuary Law and Policies ..................................................................3

    II.  Procedural Posture .................................................................................................8

STANDARD OF REVIEW ..................................................................................................8

ARGUMENT .......................................................................................................................10

    I.      The Sanctuary City Law and Policies Are Not Preempted..........................................12

        A.      The Sanctuary City Law and Policies are presumed not to be preempted.............12

        B.      The Sanctuary City Law and Policies do not conflict with the INA .....................15

              i.       The INA makes local participation with civil immigration enforcement entirely voluntary ....................................................................17

              ii.      The United States' reading of the INA would violate the Tenth Amendment's anti-commandeering rule ...................................................19

        C.      The Sanctuary City Law and Policies are not expressly preempted by sections 1373 and 1644 ........................................................................................22

              i.       Section 1373 is an invalid preemption provision which is unconstitutional under the Tenth Amendment ...........................................23

              ii.      Section 1373 is an invalid preemption provision in light of the Supreme Court's holdings in *Murphy* ........................................................26

             iii.      The Sanctuary City Law and Policies are not preempted because they are fully consistent with section 1373 ...............................................27

    II.     The Sanctuary City Law and Policies Do Not Discriminate Against the Federal Government ...........................................................................................................31

    III.    The Sanctuary City Law and Policies Do Not Directly Regulate the Federal Government ...........................................................................................................34

IV.      The United States' Requests for Relief Are Defective ...............................................35

CONCLUSION................................................................................................................................38

**Table of Authorities**

**Cases**

*Absolute Activist Value Master Fund Ltd. v Ficeto*, 677 F.3d 60 (2d Cir. 2012) ............... 9, 33, 34

*Air Transp. Ass'n of Am., Inc. v Cuomo*, 520 F.3d 218 (2d Cir. 2008) ......................................... 27

*Ali v Barr*, 464 F.Supp.3d 549 (S.D.N.Y. 2020) ......................................................................... 37

*Arizona v United States*, 567 U.S. 387 (2012) ..................................................................... passim

*Ashcroft v Iqbal*, 556 U.S. 662 (2009) ............................................................................. 8, 9, 34, 35

*Auto Workers v Wisconsin Bd.*, 351 US 266 (1956) ..................................................................... 14

*Ayotte v Planned Parenthood of N. New England*, 546 U.S. 320 (2006) ..................................... 36

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 9, 34

*Chamber of Commerce v Whiting*, 563 U.S. 582 (2011) ............................................................... 16

*Chavis v. Chappius*, 618 F.3d 162 (2d Cir. 2010) ......................................................................... 9

*Chicago v Barr* (*City of Chicago II*), 961 F.3d 882 (7th Cir. 2020) .............................................. 24

*City & Cty. of San Francisco v Sessions*, 349 F. Supp 3d 924 (N.D. Cal. 2018) ................... 21, 26

*City of Chicago v Barr* (*City of Chicago III*), 513 F.Supp.3d 828 (N.D. Ill. 2021) ..................... 24

*City of Chicago v Sessions*, 888 F.2d 272 (7th Cir. 2018) ............................................................ 13

*City of Chicago v. Sessions*, 321 F.Supp.3d 855 (N.D. Ill. 2018) ................................................ 21

*City of El Cenzio v Texas*, 890 F.3d 164 (5th Cir. 2018) .......................................... 19, 20, 21, 30

*City of New York v United States*, 179 F.3d 29 (2d Cir. 1999) ............................................... 13, 26

*City of Philadelphia v Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ............................. 13, 21, 28

*City of San Francisco v Sessions*, 349 F.Supp.3d 924 (N.D. Cal. 2018) ...................................... 21

*Clark v Martinez*, 543 U.S. 371 (2005) ................................................................................... 25, 36

*Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034 (D. Colo. 2020) ...................... 26

*County of Ocean v Grewal*, 475 F.Supp.3d 355 (D.N.J. 2020), *aff'd*, 8 F.4th 176 (3d Cir. 2021)

.................................................................................................................... 25, 29

*Cty. of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal. 2017) ........................................... 21

*Dalton v Little Rock Family Planning Servs.*, 516 U.S. 474 (1996)................................................ 37

*DeCanas v Bica*, 424 U.S. 351 (1976)................................................................................. 14, 29

*Doe v Midlakes Schools Phelps-Clifton Springs Cent. Sch. Dist.*, 24-cv-6356-FPG, 2025 WL 3673666 (W.D.N.Y. Dec. 18, 2025) ................................................................................. 8, 9

*689 Eatery Corp. v City of New York*, 716 F.Supp3d 88 (S.D.N.Y. 2024) .................................... 36

*Galarza v Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ..................................................................... 21

*Haaland v Brackeen*, 599 U.S. 294 (2023)............................................................................... 38

*Hernandez v United States*, 939 F.3d 191 (2d Cir. 2019)............................................................. 18

*Hillsborough County v Automated Medical Laboratories, Inc.*, 471 US 707 (1985)............. 14, 30

*Holve v McCormick & Co., Inc.*, 334 F. Supp. 3d 535 (W.D.N.Y. 2018)............................... 12, 30

*Jennings v Rodriguez*, 583 U.S. 281 (2018) ............................................................................. 30

*Kansas v Garcia*, 589 U.S. 191 (2020)....................................................................... 16, 19, 22, 25

*Kearns v Cuomo*, 981 F.3d 200 (2d Cir. 2020)........................................................................... 20

*Lorillard Tobacco Co. v Reilly*, 533 U.S. 525 (2001).................................................................. 27

*Marsh v Rosenbloom*, 499 F.3d 165 (2d Cir. 2007)..................................................................... 16

*McHenry Cnty. v Raoul*, 44 F.4th 581 (7th Cir. 2022) ........................................................... 31, 34

*Medtronic, Inc. v Lohr*, 518 U.S. 470 (1996) ............................................................................. 12

*Metropolitan Life Ins. Co. v Massachusetts*, 471 US 724 (1985).................................... 11, 14, 37

*Murphy v National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ...................................... passim

*N.Y. Pet Welfare Ass'n, Inc., v City of New York*, 850 F.3d 79 (2d Cir. 2017) ........................... 12

*N.Y. SMSA Ltd. P'ship v Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010).............................. 15

iv

*National Fed'n of Indep. Bus. v Sebelius*, 567 U.S. 519 (2012) ............................................. 11, 37

*New York State Conf. of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 U.S. 645 (1995) ............................................................................................................... 12

*New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135 (2d Cir. 2024) .............. 13, 16, 31

*New York v U.S.*, 505 U.S. 144 ............................................................................................. 11, 20

*North Dakota v U.S.*, 495 U.S. 423 (1990) ........................................................................... 32, 34

*Nwauzor v GEO Group, Inc.*, 127 F.4th 750 (9th Cir. 2025) ................................................ 14, 30

*Ocean Cnty. Bd. Of Comms. v Attorney Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021) ............................................................................................................... 26

*Oregon v Trump*, 406 F. Supp. 3d 940 (D. Or. 2019) .................................................................. 26

*PLIVA, Inc. v Mensing*, 564 U.S. 604 (2011) ......................................................................... 15, 28

*Plyler v Doe*, 457 U.S. 202 (1982) ......................................................................................... 14, 29

*Printz v United States*, 521 U.S. 898 (1997) .......................................................................... passim

*Reno v Condon*, 528 U.S. 141 (2000) ..................................................................................... 23, 24

*Rice v Norman Williams Co.*, 458 U.S. 654 (1982) ....................................................................... 30

*San Francisco v Barr*, 965 F.3d 753 (9th Cir. 2020) .................................................................... 28

*State of New York v Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020) ................................................ 30

*Steel Institute of New York v City of New York*, 716 F.3d 31 (2d Cir. 2013) ............................... 12

*U.S. S.E.C. v Citygroup Global Mkts., Inc.*, 752 F.3d 285 (2d Cir. 2014) .................................... 35

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v Mayor of Camden*, 465 U.S. 208 (1984) ............................................................................................................... 11, 37

*United States v Coonan*, 143 F.3d 119 (2d Cir. 2025) .................................................................. 36

*United States v County of Fresno*, 429 U.S. 452 (1977) ............................................................... 31

*United States v Illinois*, 796 F.Supp3d 494 (E.D. Ill. 2025) ........................................... 21, 25, 36

*United States v Lopez*, 514 U.S. 549 (1995) .............................................................................. 11

*United States v New York*, 25-cv-0205-AMN-MJK, 2025 WL 3718641 (N.D.N.Y. Dec. 23, 2025 (*Green Light Litigation*) ....................................................................................... 21, 26, 29

*United States v New York*, 25-cv-0744-MAD-PJE, 2025 WL 3205011 (N.D.N.Y. Nov. 17, 2025) (*POCA Litigation*) .................................................................................... 21, 26, 37

*United States v Washington*, 596 U.S. 832 (2022) (*Washington II*) ............................................. 31

*United States v. California*, 921 F.3d 865 (9th Cir. 2019)............................................................. 14

*Warger v Shauers*, 574 U.S. 40 (2014) ........................................................................................ 25

*Washington v United States*, 460 U.S. 536 (1983) .................................................................. 31, 32

**Statutes**
8 C.F.R. 287.7 ......................................................................................................................... 20, 21

8 U.S.C. § 1101............................................................................................................................. 19

8 U.S.C. § 1225............................................................................................................................. 19

8 U.S.C. § 1226............................................................................................................................. 19

8 U.S.C. § 1227............................................................................................................................. 19

8 U.S.C. § 1228............................................................................................................................. 19

8 U.S.C. § 1231............................................................................................................................. 19

8 U.S.C. § 1324............................................................................................................................. 13

8 U.S.C. § 1357...................................................................................................................... 5, 20, 22

8 U.S.C. § 1357(g)(10)(A)-(B))..................................................................................................... 22

8 U.S.C. § 1360............................................................................................................................. 33

8 U.S.C. § 1367............................................................................................................................. 33

8 U.S.C. § 137............................................................................................................................... 13

8 U.S.C. § 1373........................................................................................................................ passim

8 U.S.C. § 1182................................................................................................................ 19

8 U.S.C. §1644........................................................................................................... 13, 20

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 9

Federal Rule of Civil Procedure 8(a)(2) .......................................................................... 9

Rochester City Code § 63-11 ....................................................................................... 4, 5

Rochester City Code § 63-20.................................................................................... 2, 4, 14

Rochester City Code § 63-21 ....................................................................................... 2, 4

Rochester City Code § 63-9 ........................................................................................... 21

**Other Authorities**
The Federalist No. 45.................................................................................................... 11

## PRELIMINARY STATEMENT

The City of Rochester's sanctuary law and policies exist to safeguard the public. By leaving civil immigration enforcement to the federal government alone, these policies assure the community that they can seek City services without fear of adverse immigration consequences. Without that assurance, people in the City might choose to forgo a call to 911, even if they urgently needed the assistance of the Rochester Police Department ("RPD"). Without that assurance to the community, RPD's efforts to suppress crime and vindicate crime victims would be diminished. If RPD does not receive reports of crime, then those crimes may go uninvestigated and unsolved. No one in the City should be denied access to the City's crime-fighting services because they are an immigrant or because they are undocumented.

Participation in federal immigration enforcement would hamper the City's ability to fight crime. Consequently, on August 27, 2025, Malik D. Evans, Mayor of the City of Rochester ("Mayor Evans"), City Council President Miguel A. Melendez, Jr. ("Council President Melendez"), and the Rochester City Council ("City Council") (collectively, with the City, "City Defendants") adopted and approved City Ordinance 2025-283. *See* Declaration of James "Hal" Kieburtz ("Kieburtz Decl."), Ex. 6 ("2025 Ordinance") at 2[1].

The 2025 Ordinance, as relevant, amended chapter 63 of the City Municipal Code ("Code"), which addresses human rights, in order to explicitly protect immigrants from discrimination in, among other things, the provision of City services – "including asylum seekers, refugee resettlers, undocumented individuals, Temporarily Protected Status holders, and all others regardless of status or documentation (collectively, Immigrants)." 2025 Ordinance at 3; *see generally* City Code §§ 63-20 and 63-21.

---

[1] All page citations reference the ECF pagination.

The 2025 Ordinance included by reference the City's previous legislative expressions of support for immigrants, reaffirming the City's official designation as a sanctuary for immigrants since 1986. *See* Kieburtz Decl, Ex. 2 ("2017 Resolution"). The City's singular tradition of support for human rights stretches back well over 200 years to the dawn of the 19th Century when leading Black abolitionists and people escaping slavery, such as the Rev. Thomas James and Frederick Douglass, chose Rochester as their home. The City proudly embraces this history.

The United States, rather than respecting the choice properly made by the City of Rochester, instead seeks to violate the United States' Constitution by coercing City officials into its civil immigration enforcement efforts. The United States has already coerced RPD assistance with its civil immigration enforcement efforts. *See* Kieburtz Decl., Ex. 1 (Amended Complaint, hereinafter "AC") ¶¶1, 51-55. Now the United States seeks, in this very suit, to cement that coercion, alleging that the City's sanctuary policies are preempted under the Supremacy Clause by the Immigration and Nationality Act ("INA").

The federal government's unabashed attempt at such coercion necessarily fails because it proceeds from a fundamentally mistaken view of the law. Congress has passed no law which commands the City to do as the United States would prefer. Rather, the INA places civil immigration enforcement duties on only the federal government. The INA does not prevent laws that opt localities out of immigration enforcement. Quite the opposite, the INA makes participation in civil immigration enforcement efforts entirely voluntary for state and municipal authorities.

The United States' intergovernmental immunity claims also fail. The Sanctuary City Law and Policies do not treat other governmental bodies more favorably the federal government. And

2

the Sanctuary City Law and Policies regulate only City officials, not federal officials. For reasons set forth more fully below, the AC should be dismissed with prejudice.

**STATEMENT OF FACTS**

**I.      The City's Sanctuary Law and Policies**

On May 15, 1986, by Council Resolution 86-29, City Council recognized Rochester as a "City of Sanctuaries." *See* Kieburtz Decl., Ex. 9 ("1986 Resolution") at 2-4. The 1986 "City of Sanctuaries" Resolution recognized that the regulation of immigration is a matter of federal jurisdiction and it is the responsibility of federal officials to implement federal immigration and refugee policy. *Id*. The 1986 Resolution further resolved that the City administration should "direct [City] employees to exclude refugee status as a consideration in their daily activities and routine dealings with the public, with the provisio [sic] that this directive should not be construed as approval to violate any law or encourage interference in law enforcement efforts[.]" *Id.*

On February 21, 2017, City Council enacted the 2017 Resolution which assured immigrants and refugees that they were free to contact RPD or any other City agency without fear of adverse immigration consequences by restricting City officials from participating in civil immigration enforcement. *See* Kieburtz Decl., Ex. 1 ("2017 Resolution") at 2-4; AC at ¶30. The 2017 Resolution barred the use of City funds or personnel to enforce federal immigration policies and barred City officials from inquiring into anyone's immigration status, "except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." AC at ¶¶31-32.

On August 27, 2025, Mayor Evans approved – City Council having passed – the 2025 Ordinance. *See* 2025 Ordinance at 2; AC at ¶6. The 2025 Ordinance, inter alia, amended the City's local law relating to human rights by adding a chapter relative to immigrants. *See* AC at

3

¶¶44-48; City Code §§ 63-11, 63-20 and 63-21 (collectively, "Sanctuary City Law"). The Sanctuary City Law sets forth legislative findings which, inter alia, affirm the 1986 and 2017 Resolutions. *See* City Code § 63-20. City Council's legislative findings also note an enhanced threat to all undocumented immigrants, not just "violent criminal aliens," of detention and deportation. City Code § 63-20(C). The 2025 Ordinance carried the 1986 and 2017 resolutions forward and finally enshrined the City's sanctuary status in law. *See* AC at ¶6, 44; *see generally* 2025 Ordinance; Sanctuary City Law.

The Sanctuary City Law bars the City or any person under agreement with the City from, inter alia, prohibiting or discouraging immigrants from reporting crimes or accessing services. *See* City Code § 63-21(A)(1). The Sanctuary City Law prohibits RPD officers from enforcing immigration laws; RPD officers may not inquire about the immigration status of any individual unless necessary to investigate criminal activity. *See* City Code § 63-21(A)(2)(a); AC at ¶46. RPD officers may not "[s]top, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status." City Code § 63-21(A)(2)(b). No City official may inquire about immigration status unless otherwise required by law. *See* City Code § 63-21(A)(3); AC at ¶47. Broadly, City funds and personnel may not be used to "assist in the enforcement of federal immigration policies." City Code § 63-21(A)(4); *see* AC at ¶48.

The 2025 Ordinance also enacted an enforcement provision into the City's statutory scheme on human rights whereby violations of, inter alia, the Sanctuary City Laws may be investigated by the Mayor at City Council's behest; and violations of the Sanctuary City Laws may be grounds for discipline and removal of City employees. *See* City Code § 63-11 ("Enforcement Provision"); *see also* AC at ¶¶49-50.

4

On September 4, 2025, RPD issued General Order 502 regarding "Equitable Policing." *See* AC at ¶¶35; *see also* Kieburtz Decl., Ex. 4 ("GO 502") at 2-13. GO 502 attaches the 2017 Resolution and references the 2025 Ordinance. *See* GO 502 § II(C)(1). GO 502 provides that RPD officers "shall not perform the functions of a federal immigration officer or otherwise engage in the enforcement of federal immigration law under 8 U.S.C. § 1357(g) or any other law, regulation, or policy." GO 502 § III(C); *see* AC at ¶36. GO 502 prohibits RPD officers from engaging in police activities "solely for the purpose of enforcing federal immigration laws or policies" (GO 502 § V(A)), or from inquiring about "the immigration status of an individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance, unless there is a specific and articulable need to do so to investigate criminal activity." GO 502 § V(B).

However, if provision of a police service is contingent on immigration or citizenship status or the inquiry "is required by federal, state, or local laws," then RPD officers may inquire about or request proof of immigration status of citizenship. GO 502 § V(C). GO 502 permits RPD officers to detain and turn over to federal immigration officials a person named in a judicial warrant or federal criminal arrest warrant. *Id*. § V(G)(1)(a). And it permits RPD officers to assist federal immigration officials in making lawful warrantless arrests for federal crimes. *Id*. § V(G)(1)(b). RPD may likewise grant federal immigration officials access to persons in RPD custody who are named in a judicial warrant, federal criminal arrest warrant, or where there is probable cause to believe the person has committed a federal crime. *Id*. § V(G)(1)(c). But RPD will not honor civil immigration detainers. *Id.* § V(G)(2).

RPD officers will not request to see a person's immigration documents, but they may review immigration documents if a person voluntarily provides them in response to a request for

proof of identity during an arrest, traffic stop, or investigative detention. *See* GO 502 § V(E)(1). "If provided immigration documents for identification purposes, [RPD officers] will not contact [federal immigration officials] regarding the person unless necessary to investigate criminal activity, and in accordance with the procedures set forth in [GO 502 § V(F)]". *Id*. § V(E)(2).

GO 502 § V(F) authorizes RPD officers to respond to calls for backup in exigent circumstances such as those involving an imminent threat to life or safety, "officer-in-trouble" calls, or when responding to a crime in progress. *See* GO 502 § V(F)(1). "When there is a call for assistance that does not involve an imminent threat to life or safety," an RPD supervisor shall acknowledge the request, ascertain whether an RPD response is needed, and respond to the scene to ensure RPD compliance with GO 502 if an RPD response is required. *Id* § V(F)(2). RPD officers must get authorization from an RPD Captain (or higher RPD official) during business hours, or from the staff duty officer ("SDO") during non-business hours, for "[a]ny other contact or request for assistance to" federal immigration officials. *Id*. § V(F)(3). All RPD contacts or requests to contact federal immigration officials "require a specific and articulable need for a criminal investigation, or must be otherwise permitted under § V[(G)] of [GO 502]." *Id*. § V(F)(4).

GO 502 also rescinded a prior General Order, dated March 23, 2017, of the same number. *See* AC at ¶35; GO 502 at 2 (noting it rescinds prior order). The AC devotes much attention to a Training Bulletin which summarized the prior General Order, going so far as to include the Training Bulletin in its prayer for relief. *See* AC at ¶41 ("Upon information and belief, the Training Bulletin has not been replaced and remains in effect today"); *see generally* AC at ¶¶35, 41-43, 69-73, 75-77, 79-81; *see also* Kieburtz Decl., Ex. 3 ("Training Bulletin"). However, the Training Bulletin – by its plain terms – merely summarized *inter alia* the prior General Order

and the 2017 Resolution. *See* Training Bulletin at 3. The General Order was rescinded, consequently the Training Bulletin summarizing it no longer has any force or effect.

Despite the amount of attention devoted to the Training Bulletin – and despite it being mentioned in the AC's prayer for relief – the AC does not actually challenge the Training Bulletin. This seemingly contradictory point can be confirmed by reference to Exhibit G to the AC, which identifies the provisions of the Sanctuary City Law and Policies challenged by the United States.

The AC is clear: it does not challenge the prior – since rescinded – version of the General Order regarding Equitable Policing. *See* Kieburtz Decl., 8 ("Challenged Provisions") at 2, n.1 ("the United States only challenges the new General Order"). This is sensible because GO 502 explicitly rescinded its predecessor in light of the 2025 Ordinance. *See* GO 502 at 2. Exhibit G to the AC further specifies that it challenges the Training Bulletin only "to the extent" that the AC challenges the 2017 version of the General Order and the 2017 Resolution. *See* Challenged Provisions at 7, n.2. And, as noted, "the United States only challenges the new General Order." Challenged Provisions at 2, n.1.

The import of the various internal references and specifications in the AC and Challenged Provisions matrix are as follows:  the United States does not challenge the 2017 General Order or the Training Bulletin. *See generally* Challenged Provisions.

Rather, the United States only challenges the 2025 Ordinance, the 2017 Resolution, and the September 4, 2025 GO 502 (collectively, hereafter "the Sanctuary City Policies"). A plain reading of the AC confirms that the only City laws and policies subject to the United States' Supremacy Clause and intergovernmental immunity challenges are the Sanctuary City Policies and the Sanctuary City Law. *See* AC at ¶3; *see also* AC at ¶¶35, 44-45, 54, and 56 (arguing that

the 2025 Ordinance and GO 502 are inclusive of yet more expansive than the prior versions); ECF 58 at 5 (Decision and Order of the Court noting that intervening passage of 2025 Ordinance "renders the United States' challenge to the 2017 directives moot"). Consequently, hereafter, references to the Sanctuary City Policies exclude the Training Bulletin and the 2017 version of General Order 502.

## II.     Procedural Posture

The United States filed its initial Complaint on April 24, 2025. *See* ECF 1. Thereafter, City Defendants answered (*see* ECF 6) before submitting a motion for judgment on the pleading seeking to dismiss the initial Complaint. *See* ECF 8. The United States submitted a cross-motion for judgment on the pleadings (*see* ECF 32), and the Court also received briefing from amici. *See for example* ECF 55.

In a Decision and Order dated November 13, 2025, this Court dismissed the United States' initial Complaint as moot in light of the 2025 Ordinance, but the Court granted leave to file an amended complaint. *See* ECF 58. The AC was filed on December 19, 2025. City Defendants now move this Court to dismiss the AC pursuant to Rule 12.

## STANDARD OF REVIEW

Defendants may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). A court deciding a motion to dismiss pursuant to Rule 12(b)(6) "must accept as true all of the allegations contained in the complaint." *See Doe v Midlakes Schools Phelps-Clifton Springs Cent. Sch. Dist.*, 24-cv-6356-FPG, 2025 WL 3673666, at *1 (W.D.N.Y. Dec. 18, 2025) (quoting *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009)). Federal Rule of Civil Procedure 8(a)(2) further requires that a complaint contain a "short and plain statement of the claim

8

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "If that statement fails to present 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Rule 12(b)(6)." *Midlakes Schools Phelps-Clifton Springs Cent. Sch. Dist.*, 2025 WL at *1 (quoting *Absolute Activist Value Master Fund Ltd. v Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The plausibility standard requires a complaint to allege "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal* at 678. "[W]ell-pleaded factual allegations" permit a court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

Although the United States' factual allegations set forth in the AC will be assumed true, this tenet is "inapplicable to legal conclusions." *Iqbal* at 678. If a plaintiff "ha[s] not nudged [his or her] claims across the line from conceivable to plausible, [his or her] complaint must be dismissed." *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 570 (2007). Therefore, a complaint fails to state a claim if it supplies only "labels and conclusions," *Twombly*, 550 U.S. at 555, "a formulaic recitation of the elements of a cause of action," *id*., or "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Although a court is "obligated to draw the most favorable inferences that [a plaintiff]'s complaint supports, [it] cannot invent factual allegations that he [or she] has not pled." *Chavis v Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

9

## ARGUMENT

"Federalism, central to the constitutional design, adopts the principal that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v United States*, 567 U.S. 387, 398-399 (2012). The existence of two sovereigns risks possible conflict between the laws of each, and the Supremacy Clause "provides a rule of decision" whereby the conflicted state law is preempted in favor of federal law. *Murphy v National Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).  Preemption may be either express or implied, but either type "work[s] in the same way:  Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477.

Another fundamental structural decision incorporated into the Constitution – that Congress should *not* have the power to issue orders directly to the states – is expressed in the doctrine of anti-commandeering which recognizes that Congress may regulate private actors, however Congress may not issue orders to the governments of the States. *See Murphy*, 584 U.S. at 470-472.  By Constitutional design, local governments "retained 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (J. Madison)). "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v United States*, 521 U.S. 898, 935 (1997). This rule is one of the Constitution's "structural protections of liberty" which promotes a healthy balance of power between the states and the federal government thereby reducing the risk of tyranny and abuse from either. *Murphy*, 584 U.S. at 473 (citations omitted).

10

"[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." *National Fed'n of Indep. Bus. v Sebelius*, 567 U.S. 519, 536 (2012) (quotation marks omitted). The Framers envisioned that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed," which are "more local and more accountable than a distant federal bureaucracy." *Id*. (citing The Federalist No. 45, at 293 (James Madison)). "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of *all* persons." *Metropolitan Life Ins. Co. v Massachusetts*, 471 U.S. 724, 756 (1985) (emphasis added); *see also United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v Mayor of Camden*, 465 U.S. 208, 215 (1984) (local governments, as political subdivisions of States, properly exercise the police power).

"The Constitution . . . withhold[s] from Congress a plenary police power." *United States v Lopez*, 514 U.S. 549, 566 (1995). And the Tenth Amendment shields the City in its exercise of the police power by reserving to the States, or to the people, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X; *see New York v U.S.*, 505 U.S. 144, 156-157 (the Tenth Amendment confirms that the power of the federal government is subject to limits which reserve power to the states, and the Tenth Amendment requires a determination whether an incident of state sovereignty is protected by a limitation on an Article I power).

The United States' central allegation is that provisions in the City's Sanctuary Law and Policies relating to information sharing are expressly preempted by two sections of the INA which prohibit "local government entit[ies] or official[s] from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, [federal

immigration authorities] 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual.'" AC at ¶58 (quoting 8 U.S.C. §§ 1373 and 1644).

More broadly, the United States alleges an "intentional effort [by the City] to obstruct the Federal Government's enforcement of federal immigration law." AC at ¶4; *see also* AC at ¶¶27, 62 (insinuating the City is criminally "harboring certain aliens" in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) by "assisting removable aliens' evasion of federal law enforcement"). The AC alleges that the Sanctuary City Law and Policies "conflict with federal immigration policy." AC at ¶63. The United States' claims are entirely without merit.

## I.    **The Sanctuary City Law and Policies Are Not Preempted**

### A.    **The Sanctuary City Law and Policies are presumed not to be preempted**

The Court's analysis must begin with the presumption that the Sanctuary City Law and Policies are not preempted. *See New York State Conf. of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[W]e . . . address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law"); *see also Holve v McCormick & Co., Inc.*, 334 F. Supp. 3d 535, 554 (W.D.N.Y. 2018) (same). The presumption against preemption is "especially strong in areas where states traditionally wield police powers.*" N.Y. Pet Welfare Ass'n, Inc., v City of New York*, 850 F.3d 79, 86 (2d Cir. 2017); *see also Steel Institute of New York v City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) ("There is a strong presumption against preemption when states and localities 'exercise their police powers to protect the health and safety of their citizens'") (quoting *Medtronic, Inc. v Lohr*, 518 U.S. 470, 475 (1996) (cleaned up)). And the Supreme Court has observed that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.*" U.S. v Morrison*,

529 US 598, 618 (2000). The presumption against preemption of the Sanctuary City Law and Policies may only be overcome if Congress' intent to preempt them is "clear and manifest." *New York State Telecomms. Ass'n, Inc. v James*, 101 F.4th 135, 148 (2d Cir. 2024) (citations omitted).

The primary purpose of the Sanctuary City Law and Policies is to suppress crime and promote public safety. *See* 2017 Resolution at 2 ("A policy that assures immigrants and refugees that they can contact the police and other City agencies without fear of adverse immigration consequences will enhance public safety and neighborhood conditions for all citizens"); 2025 Ordinance at 3 (incorporating 1986 and 2017 Resolutions by reference); GO 502 at § II(C) (incorporating 2017 Resolution and 2025 Ordinance by reference); *see also* City Code §63-20(B) (incorporating 1986 and 2017 Resolutions by reference). The Sanctuary City Law and Policies are a quintessential exercise of the police power because they are public safety measures which ensure RPD is not unnecessarily deprived of the information it needs to fight crime.

The Second Circuit has observed that "[t]he obtaining of pertinent information, which is essential to the performance of a wide variety of state and local government functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved." *City of New York v United States*, 179 F.3d 29, 36 (2d Cir. 1999). Likewise, other courts have recognized that fear among immigrants that contact of any kind with government officials "will bring the scrutiny of federal immigration authorities to their home" might deter them from reporting crime. *City of Chicago v Sessions*, 888 F.2d 272, 280 (7th Cir. 2018); *see City of Philadelphia v Sessions*, 309 F.Supp.3d 289, 297-300 (E.D. Pa. 2018) (same). The City's policy is to ensure equal access to its crime reporting and law enforcement services so that public safety is safeguarded, crime is suppressed, and victims receive redress.

13

Public safety policies are at the center of the traditional police power because States and localities are "the natural guardians of the public against violence . . . [and courts] should not interpret an act of Congress to leave them powerless to avert such emergencies without compelling directions to that effect." *Auto Workers v Wisconsin Bd.*, 351 US 266, 274-275 (1956); *see Metropolitan Life Ins. Co.*, 471 US at 756 (police powers traditionally include legislation as to "the protection of the lives, limbs, health, comfort, and quiet of all persons") (emphasis added).

Moreover, the Sanctuary City Law and Policies "regulate [the City's] internal law enforcement activities" and that also "is a quintessential police power" exercise. *Morrison*, 529 US at 618; *see United States v. California*, 921 F.3d 865, 887 n.11 (9th Cir. 2019) (rejecting federal preemption challenge to state law governing state and local law enforcement participation in civil immigration enforcement). State laws purporting to regulate immigration enforcement have been preempted, *see e.g. Arizona*, 567 U.S. at 400-403, but states and local governments retain broad, inviolable powers to enact and enforce generally applicable laws addressing "essentially local problems" including those affecting undocumented individuals and noncitizens. *DeCanas v Bica*, 424 U.S. 351, 355-357 (1976); *see Plyler v Doe*, 457 U.S. 202, 215 (1982); *see also Hillsborough County v Automated Medical Laboratories, Inc.*, 471 US 707, 719 (1985) ("the regulation of health and safety matters is primarily, and historically, a matter of local concern"); *Nwauzor v GEO Group, Inc.*, 127 F.4th 750, 768 (9th Cir. 2025) (where a state law subject to preemption challenge "regulate[s] for the health and safety of the people" the presumption against preemption applies even if the law "certainly ha[s] effects in the area of immigration") (internal quotation omitted). The United States cannot overcome the presumption against preemption.

14

**B.      The Sanctuary City Law and Policies do not conflict with the INA**

The United States alleges that the "Challenged Provisions of Rochester's Sanctuary City laws and policies stand as an obstacle to federal immigration laws by limiting information sharing, cooperation, access, and the types of warrants honoored." *See* AC at ¶71. *see also* AC at ¶¶2, 4, 19, 59, 65 (Challenged Provisions "directly conflict with" the "framework" established by federal immigration laws). In alleging that the City's refusal to cooperate constitutes obstruction, the AC relies heavily on the INA's expectation of the voluntary cooperation of state and local authorities with civil immigration enforcement efforts. *See* AC at ¶¶2, 4, 23-26. However, the City's sovereign determination not to engage in civil immigration enforcement does not conflict with any portion of the INA, and the United States' insistence on the INA provisions which allow for voluntary municipal participation in those efforts only underlines the point.

Under the doctrine of conflict preemption, "state laws are preempted . . . where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citations and quotations omitted); *see also N.Y. SMSA Ltd. P'ship v Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) ("conflict preemption" applies "where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives"). Federal courts require a "strong showing of a conflict to overcome the presumption that state and local regulation can constitutionally coexist with federal regulation." *PLIVA, Inc. v Mensing*, 564 U.S. 604, 641 (2011).

The burden of establishing conflict preemption "is heavy:  the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power."

15

*James*, 101 F.4th at 155. The basis for preemption must always be "either the Constitution itself or a valid statute enacted by congress" and not "some brooding federal interest." *Kansas v Garcia*, 589 U.S. 191, 202 (2020). Because "it is Congress rather than the courts that pre-empts state law," preemption analysis is not a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce v Whiting*, 563 U.S. 582, 607 (2011). Where, as here, "historic police powers" are exercised, preemption can only occur if "that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400.

There is no federal law requiring the City to perform the actions plaintiff would prefer of the City. *See e.g.* AC at ¶2 (faulting the City for refusing "to cooperate or share information, even when requested, with federal immigration authorities"); AC at ¶4 (alleging "intentional effort [by the City] to obstruct the Federal Government's enforcement of federal immigration law and to impede consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe"). This vagueness is self-defeating.

Plaintiff's conflict preemption claim fails because it does not specify a "valid statute" for preemption. *Garcia*, 589 U.S. at 202; *see* ECF No. 1 at ¶62 (alleging "obstacle to federal immigration laws" in general terms). Moreover, plaintiff's conclusory allegations violate the requirement that "the conflict between state law and federal law must be a sharp one" where, as here, the local authority has exercised its traditional police powers. *Marsh v Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007); *see Garcia*, 589 U.S. at 808 (Thomas, J., concurring) (preemption must rest on statutory text rather than "generalized notions of congressional purposes").

16

i.      **The INA makes local participation with civil immigration enforcement entirely voluntary**

The United States attempts to conjure a conflict by setting forth a laundry list of statutory duties relative to immigration enforcement. *See* AC at ¶21 (citing 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231). But an examination of each of these statutes confirms that none of them places duties or prohibitions on state or local government actors, rather these provisions of the INA only set forth the rights and responsibilities the federal government – or noncitizens individually – relative to immigration enforcement. *Id*.; *see* 8 U.S.C. § 1182 (defining "[i]nadmissible aliens"); 8 U.S.C. § 1225 (inspection of applicants for admission to the U.S. by immigration officers); 8 U.S.C. § 1226 ("[a]pprehension and detention of aliens" by Attorney General); 8 U.S.C. § 1227 (defining "[d]eportable aliens" and "[d]eportation of certain nonimmigrants"); 8 U.S.C. § 1228 (providing for removal of those convicted of certain aggravated felones); 8 U.S.C. § 1231 (process for individuals ordered removed from the U.S.); *see also* 8 U.S.C. § 1101(18) (defining "immigration officer" as an employee of the United States designated by the Attorney General to perform immigration enforcement duties).

The United States does not – because it cannot – point to any statute commanding the City's participation with civil immigration enforcement. The provisions of the INA identified by the United States regulate federal officials while the Sanctuary City Law and Policies regulate City officials, consequently they cannot conflict. [2]

The INA is unambiguous:  state and local participation with civil immigration enforcement is strictly voluntary. *See* 8 U.S.C. § 1357(g) (local officials "may" carry out the

---

[2] As is set forth more fully below in the City's express preemption analysis, 8 U.S.C. §§ 1373 and 1644 – which purport to regulate local officials – are not valid preemption statutes either, nor do the Sanctuary City Law and Policies conflict with them.

17

functions of immigration officers if the state or local authorities enter an agreement with the Attorney General providing for such service). That provision also states "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." 8 U.S.C. § 1357(g)(9).

Plaintiff's overweening focus is on information sharing provisions, but it also challenges the GO 502 prohibition on RPD honoring civil immigration detainers issued pursuant to 8 C.F.R. 287.7. *See* AC at ¶¶7, 40 (noting that GO 502 requires RPD to honor judicial warrants); *see also* GO 502 § V(G)(1)(a) (RPD honors judicial warrants), (b) (RPD assists federal immigration officials in making lawful warrantless arrests for federal crimes), and (c) (RPD provides immigration officials access to persons named in a judicial warrant or federal criminal arrest warrant, or where there is probable cause to believe the person has committed a federal crime). But 8 C.F.R. 287.7 does not require state or local compliance with civil immigration detainers as the plain text of that provision makes clear. It describes detainers as "requests" rather than mandates. 8 C.F.R. 287.7; *see also Hernandez v United States*, 939 F.3d 191, 200 n.11 (2d Cir. 2019) (noting that courts have concluded it is not mandatory to honor civil immigration detainers).

The federal government cannot seriously contend that the Sanctuary City Law and Policies pose an obstacle to the accomplishment of federal immigration policy priorities. Indeed the 2017 and 2025 Resolutions, as well as the Sanctuary City Law, conspicuously accommodate federal law and 8 U.S.C. § 1373 specifically. *See* 2017 Resolution at 3 (noting that City employees are not prohibited from communications with federal immigration agencies regarding "citizenship or immigration status"); *see also* Code § 63-9(C) ("[t]his chapter shall not apply to prohibit conduct that is require by superseding federal or New York State law; nor shall it apply

18

to regulate conduct that is subject to federal or New York State law that preempts local law"). Rather, plaintiff focuses on the GO 502 provisions requiring RPD officers presented with immigration documents for the purposes of identification to refrain from calling immigration authorities in relation to the person providing those documents without command approval. *See generally* AC at ¶¶37, 60.

As noted below, these provisions do not prevent the communication of immigration status information as authorized by §§ 1373 and 1644. But assuming *arguendo* that the Sanctuary City Law and Policies are in tension with federal law – which they are not – the United States has not and cannot identify any "valid statute enacted by Congress" reflecting a "clear and manifest purpose" to conscript the City into assisting with federal immigration enforcement. *Garcia*, 589 U.S. at 202; *Arizona*, 567 U.S. at 400.

### ii. The United States' reading of the INA would violate the Tenth Amendment's anti-commandeering rule

The State of New York and its political subdivisions, like the City, "remain independent and autonomous within their proper sphere of authority." *Printz*, 521 U.S. at 928. City officials therefore cannot be "dragooned . . . into administering federal law." *Id.* As other courts have recognized, federal immigration laws generally "do not suggest the intent—let alone a clear and manifest one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement." *City of El Cenizo v Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (emphasis in original). For example 8 U.S.C. § 1357(g)  permits local cooperation with immigration authorities, but it does not at all require cooperation. *See* 8 U.S.C. § 1357(g).

And, while § 1357(g) allows for states or their political subdivisions to enter into agreements with immigration authorities whereby they will cooperate with federal immigration enforcement, the savings clause in that section "also expressly allows cooperation in immigration

19

enforcement outside those agreements." *City of El Cenizo*, 890 F.3d at 177 (citing 8 U.S.C. § 1357(g)(10)(A), (B)). The natural conclusion of this federal statutory framework is that it "indicates that some state and local regulation of cooperation is permissible." *City of El Cenizo*, 890 F.3d at 178 (citing 8 U.S.C. § 1357(g)(10)(A)-(B)). The City's determination not to participate in federal immigration enforcement "may well frustrate the federal government's immigration enforcement efforts" but "that frustration is permissible" where, as here, the City has the right pursuant to the anti-commandeering rule to refrain from assisting with federal efforts. *California*, 921 F.3d at 890-891.

The view of the INA advanced by the United States would lead to precisely the type of "forced participation" in a federal enforcement regime struck down in *Printz*. But the City has the sovereign power to "decline to administer [a] federal program," *New York v United States*, 505 U.S. 144, 177 (1992); *see Printz* 521 U.S. at 922 (the United States may not "impress into its service . . . the police officers of the 50 States"). And the City cannot be forced "to absorb the financial burden of implementing a federal regulatory program." *Printz*, 521 U.S. at 930. The United States asks this Court to condone what is constitutionally impermissible.

The United States challenges the Enforcement Provision, arguing that it creates an obstacle to enforcement of federal immigration law. *See* AC at ¶60, 69. That challenge fails because where, as here, "a state is allowed to substantively regulate conduct it must be able to impose reasonable penalties to enforce those regulations." *City of El Cenizo*, 890 F.3d 164, 181, n.11 (citing *Whiting*, 563 U.S. at 605-607); *see* Code § 63-11 (imposing reasonable penalties). Likewise, the United States' allegation that the City's actions constitute harboring in violation of 8 U.S.C. 1324 (*see* AC at ¶¶27, 62) fail because it is completely devoid of supporting, well-pled allegations. *See generally Kearns v Cuomo*, 981 F.3d 200, 208-211 (2d Cir. 2020).

Courts across the country have held similar attempts to force local participation in federal immigration enforcement inconsistent with the Tenth Amendment. *See California*, 921 F.3d at 890 (holding that "the choice of a state to refrain from participation" in federal civil immigration enforcement activities "cannot be invalid . . . where it retains the right of refusal"); *accord City of El Cenizo*, 890 F.3d at 178; *Galarza v Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014); *see also United States v New York*, 25-cv-0205-AMN-MJK, 2025 WL 3718641, at *7-8 (N.D.N.Y. Dec. 23, 2025 (*Green Light Litigation*); *United States v New York*, 25-cv-0744-MAD-PJE, 2025 WL 3205011, at *15 (N.D.N.Y. Nov. 17, 2025) (*POCA Litigation*); *United States v Illinois*, 796 F.Supp3d 494, 530-531 (E.D. Ill. 2025); *City of Philadelphia*, 309 F.Supp.3d at 329; *City of San Francisco v Sessions*, 349 F.Supp.3d 924, 951 (N.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F.Supp.3d 855, 872 (N.D. Ill. 2018), *aff'd and remanded*, 957 F.3d 772 (7th Cir. 2020); *Cty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 534 (N.D. Cal. 2017).

The anti-commandeering doctrine prohibits the federal government from compelling states to enact or administer a federal regulatory program, and that rule "holds true no matter how strong the federal interest at play." *POCA Litigation*, 2025 WL 3205011, at *18 (quoting *New York*, 505 U.S. at 178).

Here, the federal government seeks to intrude on the City's exercise of "quintessential" police powers – to safeguard the public and to regulate the internal affairs of law enforcement – on the basis of wholly conclusory and unsupported allegations that the City's exercise of local sovereignty has somehow impacted federal immigration enforcement efforts. *Morrison*, 529 US at 618; *see* AC at ¶¶63 ("Rochester's law and policies *threaten* and harm the United States' sovereign interest in the supremacy and enforcement of federal law, specifically the Immigration and Nationality Act. The laws and policies also undermine and conflict with federal immigration

policy") (emphasis added). However, rather than adopting a policy "*contrary*" to federal immigration law, the City has merely regulated its own officials. *State of New York v Department of Justice*, 951 F.3d 84,114 (2d Cir. 2020) (emphasis in original). Setting aside the plainly mistaken notion that "federal policy" could preempt state law (AC at ¶63), the United States' allegations confirm that it seeks to vindicate nothing more than "some brooding federal interest." *Garcia*, 589 U.S. at 202; *see also Garcia* at 212 ([t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers") (quoting U.S. Const. art. VI, cl. 2).

The Sanctuary City Law and Policies are of no consequence to federal immigration enforcement. Indeed, the only concrete factual allegation offered by the United States – that RPD officers "responded to a call for assistance from federal law enforcement officers" – flatly belies the notion that the Sanctuary City Law and Policies have any negative effect on immigration enforcement whatever. AC at ¶1. Nothing alleged in the AC can plausibly be construed to establish that the Sanctuary City Law or Policies stand as an obstacle to federal immigration law. No federal law preempts the Sanctuary City Law and Policies, and the 10th Amendment rule against commandeering provides an absolute shield against federal interference with the City's exercise of local sovereignty.

The United States' conflict preemption claims fail.

### C.    The Sanctuary City Law and Policies are not expressly preempted by sections 1373 and 1644

The United States contends that "Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual,'[] or from maintaining and

22

exchanging such information with other law enforcement entities" AC at ¶58 (quoting 8 U.S.C. § 1373 (a)); *see also* 8 U.S.C. §§ 1373(b), 1644.[3] It further contends that the Challenged Provisions of the Sanctuary City Law and Policies "directly conflict with this framework," in reference both to § 1373 and other INA provisions. *Id*. at ¶59. The AC alleges that "Rochester has therefore prohibited the activities that federal law expressly contemplates States will do." *Id*. at ¶61.

"The Constitution . . . 'confers upon Congress the power to regulate individuals, not States.'" *Murphy*, 584 U.S. at 477 (quoting *New York*, 505 U.S. at 166). "Under the Tenth Amendment and other provisions of the Constitution, 'the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.'" *California*, 921 F.3d at 888 (quoting *Printz*, 521 U.S. at 925). Section 1373, by its plain terms, seeks to compel the City to implement a federal regulatory program – i.e. civil immigration enforcement – and for that reason it is both unconstitutional and an invalid preemption statute. In any event, the Sanctuary City Law and Policies are consistent with § 1373 and therefore could not be preempted by it.

### i. Section 1373 is an invalid preemption provision which is unconstitutional under the Tenth Amendment

Section 1373 violates the anti-commandeering doctrine and is therefore unconstitutional. Because it is unconstitutional, § 1373 is not a valid preemption statute and the United States' express preemption claim fails.

The Court must begin with "the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v Condon*, 528 U.S. 141, 148 (2000).

---

[3] "Courts have generally held that the relevant provisions in Sections 1373 and 1644 have no meaningful difference and have analyzed them together." *POCA Litigation*, 2025 WL at \*14, n. 8. Given that these provisions are coextensive, the City treats them as such and hereafter all references to "§1373" are inclusive of § 1644 as well.

23

However § 1373 is beyond the limit of that presumption because, "[w]hile Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 151; *see Printz*, 521 U.S. at 935 (striking down statute that required state officials to perform background checks on prospective handgun purchasers).

The Court must ask whether, under *Murphy*, *Reno*, and *Printz*, § 1373 "evenhandedly regulate[s] an activity in which both States and private actors engage," as opposed to strictly local government activities, thereby conscripting those local governments into the implementation of a federal scheme. *Murphy*, 584 U.S. at 475-476. Section 1373 has no application to private actors because it purports to prohibit local government from restricting "government entit[ies] or official[s]" from exchanging "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" with the federal government. Thus, by its plain terms, § 1373 does not evenhandedly regulate government and private actors because it regulates only government entities and has no application to private actors.

"Rather, [§ 1373] mandates that local government employees have the option of furnishing immigration information to the INS while acting in their official, state-sanctioned capacities." *City of Chicago v Sessions* (*City of Chicago I*), 321 F.Supp.3d 855, 868-869 (N.D. Ill. 2018),  *aff'd sub nom City of Chicago v Barr* (*City of Chicago II*), 961 F.3d 882, 888-889 (7th Cir. 2020); *see also City of Chicago II*, 961 F.3d at 898 (finding the *City of Chicago I* anti-commandeering analysis to be "persuasive"); *City of Chicago v Barr* (*City of Chicago III*), 513 F.Supp.3d 828, 832-833 (N.D. Ill. 2021) (withdrawing as unnecessary to afford complete relief the *City of Chicago I* determination that § 1373 is unconstitutional).

24

Section 1373 "doesn't regulate private actors in language or effect." *Illinois*, 796 F.Supp3d at 521. Section 1373 violates the constitution because it seeks to exert direct federal control over local governments through their officials. *See Printz*, 521 U.S. at 931-932 (explicit federal directives to state or local employees are unconstitutional). Section 1373 constrains local rule-making by instructing the City what it may and may not prohibit of its officers, and a "more direct affront to state [or local] sovereignty is not easy to imagine," *Murphy*, 584 U.S. at 474; *see County of Ocean v Grewal*, 475 F.Supp.3d 355, 378 (D.N.J. 2020), *aff'd*, 8 F.4th 176 (3d Cir. 2021) ("any attempt to draw a distinction between federal laws that command state action and those that prohibit state action [are] 'empty'") (quoting *Murphy* at 475). By foreclosing the City's ability to regulate its officials' contacts with federal immigration officials, § 1373 deprives the City of its Tenth Amendment-shielded "critical alternative" not to participate in civil immigration enforcement. *New York*, 505 U.S. at 176.

Section 1373 is not ambiguous. There is no interpretation of § 1373 whereby it applies to private actors because private actors are categorically unable to "prohibit[], or in any way restrict[]" the actions of local government officials. Absent any ambiguity in this regard, the canon of constitutional avoidance does not come into play. *See Clark v Martinez*, 543 U.S. 371, 385 (2005) (canon of avoidance applies where statute is "susceptible of more than one construction" whereby an available reading of statute permits it to stand). Section 1373 is an unambiguous directive to state and local governments, as such "no set of circumstances exists under which [§ 1373] would be valid." *United States v Salerno*, 481 U.S. 739, 745 (1987); *see generally Warger v Shauers*, 574 U.S. 40, 50 (2014).

Consequently, section 1373 is unconstitutional and cannot preempt the Sanctuary City Law and Policies. See *Garcia*, 589 U.S. at 202 ("[F]ederal restrictions or rights that are said to

25

conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.").

### ii.     Section 1373 is an invalid preemption provision in light of the Supreme Court's holdings in *Murphy*

Congress "may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution." *City of New York*, 179 F.3d at 35. Post-*Murphy*, there can be no doubt that § 1373 impermissibly commandeers state and local legislatures by telling them what they "may or may not do" in violation of the 10th Amendment, and courts have consistently concluded as much when presented with exactly that question. *Murphy*, 584 U.S. at 474; *see Ocean Cnty. Bd. Of Comms. v Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-182 (3d Cir. 2021); *Green Light Litigation*, 2025 WL 3718641, at *7; *United States v New Jersey*, 2021 WL 252270, at *10-13 (D.N.J. Jan. 26, 2021); *Colorado v United States Dep't of Justice*, 455 F. Supp 3d 1034, 1059 (D. Colo. 2020); *Oregon v Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *City & Cty. of San Francisco v Sessions*, 349 F. Supp 3d 924, 950 (N.D. Cal. 2018). The United States fails to plausibly allege—because it cannot be alleged—that § 1373 is a valid preemption provision.

The United States will likely respond, as it already has in this case, with an argument that the Second Circuit has upheld the preemptive effect of § 1373. Four days after this Court dismissed the United States' initial complaint, persuasive authority was issued addressing this exact argument and determining that "the United States' contention that the Second Circuit has addressed the preemptive effect of Section 1373 is entirely without merit" because "neither of the cases on which the United States relies concerned preemption." *POCA Litigation*, 25-cv-0744-MAD-PJE, 2025 WL 3205011, at 14 n.9 (N.D.N.Y. Nov. 17, 2025) (D'Agostino, J.) (citing *City of New York,* 179 F.3d at 35; *State of New York*, 951 F.3d at 111-116.

The federal government clearly construes § 1373 as a broad prohibition against any local government rules whatsoever regarding their officials' communications with immigration authorities. *See* AC at ¶¶ 4, 26, 37, 60. However, such a broad construction of these sections violates the 10th Amendment's anti-commandeering principles and no principle of preemption overrides that prohibition. *See Murphy*, 584 U.S at 477 (the Supremacy Clause is not an independent grant of power to Congress); *Illinois*, 796 F.Supp.3d at 519-525 (extensive analysis of § 1373's putative preemptive effect and anti-commandeering concerns therefrom).

The United States acknowledges that the § 1373 does not regulate private actors. *See* AC at ¶70 (alleging that these sections are "requirements that *local governments* not prohibit or restrict information sharing with federal immigration officials regarding the citizenship or immigration status of any individual") (emphasis added). And indeed "there is no way in which [either] provision can be understood as a regulation of private actors." *Murphy*, 584 U.S. at 479-480. Only § 1373 is alleged to expressly preempt the Sanctuary City Law and Policies. *See generally* AC. Bu the United States' allegations and the plain text of § 1373 foreclose that express preemption claim. Consequently, Count One may be dismissed without further consideration of the Rochester Law or Policies themselves.

### iii.    The Sanctuary City Law and Policies are not preempted because they are fully consistent with section 1373

Even if the Court does not agree that § 1373 is unconstitutional and an invalid preemption provision, the United States' express preemption claim still fails because the Sanctuary City Law and Policies are consistent with § 1373. Express preemption arises when "express language in a congressional enactment" so requires it. *Lorillard Tobacco Co. v Reilly*, 533 U.S. 525, 541 (2001); *see also Air Transp. Ass'n of Am., Inc. v Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (express preemption exists when "a federal statute expressly directs that state law

27

be ousted"). "In the context of express pre-emption," courts "read federal statutes whenever possible not to pre-empt state law." *PLIVA, Inc.*, 564 U.S. at 641.

The Sanctuary City Law and Policies do not restrict City personnel from exchanging "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373 (a). The City respectfully submits that this Court should "agree[] with its fellow district courts that the plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is)," *See United States v California*, 314 F.Supp.3d 1077, 1102 (ED Cal 2018), *affd in part, revd in part and remanded*, 921 F3d 865 (9th Cir 2019) (upholding district court determination that § 1373 must be read narrowly). Whatever the scope of § 1373 might be, it does not encompass information regarding a person who provides RPD an "immigration document" in connection with an arrest, traffic stop, investigative detention, or so that RPD can issue an appearance ticket or set pre-arraignment bail." GO 502 § V(E)(1); *see City & Cnty. of San Francisco v Barr*, 965 F.3d 753, 764 (9th Cir. 2020) (upholding local laws that "restrict some information that . . . local officials may share with federal authorities" but do not restrict "information regarding a person's citizenship or immigration status, which is the only information to which § 1373 extends"); *accord City of Philadelphia*, 309 F.Supp.3d at 333, *aff'd in part, vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019).

Where Congress has sought to encompass broader swaths of immigration-related information, it has used more expansive language to do so. *See for example*, 8 U.S.C. § 1360; 8 U.S.C. § 1367(a)(2) (forbidding certain federal officials from disclosing "any information which relates to a[] [noncitizen] who is the beneficiary" of certain federal programs). Had Congress intended a more expansive reading of the information encompassed under § 1373, it would have

28

said so. Nothing in the Sanctuary City Law and Policies restricts sharing information about an individual's immigration status, rather they proscribes the collection of such information.

The United States advances an overly broad reading of § 1373. *See* AC at ¶60 (alleging Sanctuary City Law and Policies "run directly afoul" of § 1373 by restricting RPD from "communicating with ICE, HSI, or CBP regarding information regarding a person's citizenship or immigration status or regarding a detainee, including the detainee's custody status, immigration status, release date, *or the like*") (emphasis added). This Court, like every other court that has addressed this question, should reject that expansive interpretation. *See Green Light Litigation*, 2025 WL 3718641, at *7 (rejecting broad interpretation of § 1373); *Illinois*, 796 F.Supp3d at 516 (concluding that the text, structure, and history do not support "the United States's capacious reading of § 1373 and collecting cases rendering same conclusion); *Grewal*, 475 F. Supp. 3d at 375-376 (rejecting attempt to sweep into the ambit of § 1373 "*any* information, including personal identifying data, concerning an alien in the United States").

The Second Circuit has acknowledged that the broadly preeminent federal power to regulate immigration "does not mean that States [or localities] can never enact laws pertaining to aliens." *See State of New York*, 951 F.3d at 112-114 (discussing *City of New York* in the wake of *Murphy* and *Arizona*) (quotations omitted). Rather, courts must "carefully identify the powers reserved to the States in this area of extensive and complex federal legislation and the effect of their exercise on federal immigration laws and policies." *Id*. The City's "inviolable sovereignty" confers the power to solve for inherently local problems – such as crime and violence – even if that solution touches on immigrants and undocumented people. *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (J. Madison); *see DeCanas*, 424 U.S. at 355-357; *Plyler*,

29

457 U.S. at 215; *Hillsborough County*, 471 U.S. at 719 ("the regulation of health and safety matters is primarily, and historically, a matter of local concern"); *Nwauzor*, 127 F.4th at 768.

Within the federal immigration statutory framework, the authority of local officials to communicate with federal immigration authorities granted by § 1373 – or, in § 1357(g), to cooperate more broadly – clearly establishes that local governments may make regulations either taking advantage of that authority *or* affirmatively declining to take advantage of that authority. *See* AC at ¶26 (asserting Congress intended to give state and local officials "authority" to communicate with federal immigration authorities); 8 U.S.C. § 1373(b) ("additional authority of governmental entities"); *City of El Cenizo*, 890 F.3d at 178; *see also Arizona*, 567 U.S. at 412-413. The City has declined to exercise that authority but, crucially, has not gone the extra step of "*prohibiting* information sharing" as contemplated by § 1373. *State of New York v Dep't of Justice*, 951 F.3d 84, 114 (2d Cir. 2020) (performing anti-commandeering analysis and explicitly not reaching preemption issue).

To the extent the GO 502 regulates City contacts with federal immigration officials, there is at least substantial "uncertainty about what [the City's] law means and how it will be enforced," *Arizona*, 567 U.S. at 415. It is therefore "inappropriate to assume" a conflict given that lack of clarity, particularly in light of the rule that laws should be construed to avoid constitutional doubt. *Id.*; *see also Jennings v Rodriguez*, 583 U.S. 281, 296 (2018) (courts should avoid constitutional questions if possible); *Rice v Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of [a] state statute"); *Holve*, 334 F.Supp.3d at 554 (observing that courts read statutes to not preempt state law "wherever possible").

The Sanctuary City Law and Policies are not implicated by the proper scope of § 1373. There is no "clear and manifest" Congressional intent to preempt the Sanctuary City Law and Policies because they do not regulate sharing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *James*, 101 F.4th at 148. Absent such clarity, the presumption against preemption cannot be overcome.

The United States' express preemption claims fail. Count One must be dismissed pursuant to Rule 12(b)(6).

## II.    The Sanctuary City Law and Policies Do Not Discriminate Against the Federal Government

Count Two of the AC alleges that the Sanctuary Law and Policies "single out federal immigration officials, expressly or impliedly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated." AC at ¶76. In a glaring absence, no mention is made of who exactly those "other law enforcement officials" might be. *Id*.

State laws discriminate against the federal government when they single it out for less favorable treatment. *See Washington v United States*, 460 U.S. 536, 546 (1983). A state law may not "regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v Washington*, 596 U.S. 832, 838 (2022) (*Washington II*) (cleaned up) (citing *United States v County of Fresno*, 429 U.S. 452, 460 (1977)). A state or local law that merely indirectly increases the federal government's costs does not discriminate against it and is not unconstitutional. *See Washington II*, 596 U.S. at 839.

To successfully challenge a law as discriminatory, the United States must identify some actor similarly situated to the federal government that receives more favorable treatment under that law. *See McHenry Cnty. v Raoul*, 44 F.4th 581, 594 (7th Cir. 2022) ("Differential treatment is critical to a discrimination-based intergovernmental immunity claim."); see also *North Dakota*

31

*v U.S.*, 495 U.S. 423, 438 (1990) ("[T]he State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them.") (quoting *Washington*, 460 U.S. at 544. Here, the United States does not allege, nor can it allege, that the City treats any actor more favorably than the federal government because the Sanctuary City Law and Policies do not require City officials to treat federal officials less favorably than any law enforcement agency or government official. *See* AC at ¶76 (conclusory allegation that Sanctuary City Law and Policies "single out federal immigration officials, expressly or impliedly, for unfavorable or uncooperative treatment when other law enforcement officials are not so treated").

The AC underlines the even-handed treatment the City renders to federal immigration officials by attaching RPD General Order 125, which sets forth procedures by which RPD renders "mutual aid" to "the various police and federal law enforcement agencies in Monroe County." Kieburtz Decl., Ex. 5 ("GO 125") §§ I(A), II(A).

GO 125 sets forth *inter alia* that RPD officers "may respond immediately to assist any agency, within or outside the City of Rochester, for back-up that involves an 'officer in trouble' or any other situation involving an imminent danger to officer or public safety." Nothing in GO 502 or any other City law or policy alters the GO 125 officer-in-trouble policy. To put it plainly, if an ICE, CBP, or HSI officer is in trouble and they are in danger, officers of the Rochester Police Department have standing permission to rally to their aid. As to non-emergency requests for assistance, GO 125 sets forth a standard that is *even more restrictive* than the standard applied to immigration officials' requests for assistance. Whereas an RPD officer seeking to respond to an immigration officials' request for assistance must get permission from a Captain (or SDO) (*see* GO 502 § V(F)(3)), an RPD officer seeking to respond to any other law enforcement request for assistance must get permission from an even higher ranking RPD

32

official:  the RPD Deputy Chief of Operations (or SDO). *See* GO 125 § III(B). If anything, City policy treats federal immigration officials more favorably than any other law enforcement.

To the limited extent there is any difference between the request-for-assistance procedures in GO 125 and GO 502, it reflects the City's Tenth Amendment-shielded, sovereign determination not to participate in federal civil immigration enforcement. *Compare* GO 125 § III(B)(1) *with* GO 502 § V(G)(1)(c). There is no authority to justify plaintiff's attempt to invalidate – on intragovernmental immunity grounds – the City's voluntary and constitutionally sound decision not to participate in federal immigration enforcement. *See Murphy*, 584 U.S. at 471. Were that effort to succeed, then many State exercises of those 10th Amendment prerogatives would be vulnerable to attack on intragovernmental immunity grounds. Courts have rejected that theory and this Court should do the same. *See California*, 921 F.3d at 891 (rejecting similar intragovernmental immunity claim by plaintiff because of obvious inconsistency with anti-commandeering rule); *see also Washington*, 460 U.S. at 546 (state law did not discriminate against the federal government where it "merely accommodated" a Constitutional requirement).

The same principle applies here. To the limited extent plaintiff argues that the Sanctuary City Law and Policies can be read to treat federal immigration authorities differently from anyone else, it is wholly the result of a decision not to participate in immigration enforcement that the City was constitutionally entitled to make. More fundamentally, Count Two, like Count Three (*see infra* § III) is manifestly conclusory and not plausibly pleaded. The AC contains only conclusory allegations of discrimination devoid of "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" *Absolute Activist Value Master Fund Ltd*, 677 F.3d at 65; *see* AC at ¶¶3, 9, 18-19, 65, 75-77 (using the term "discrimination" without elaboration). These allegations are "'naked assertions' devoid of 'further factual enhancement'"

33

which fail to plausibly allege discrimination. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Count Two must be dismissed pursuant to Rule 12(b)(6).

**III.    The Sanctuary City Law and Policies Do Not Directly Regulate the Federal Government**

Counts Three re-packages plaintiff's underlying preemption argument. But the plain text of the Sanctuary City Law and Policies fatally undermines plaintiff's unlawful regulation claim because they bind only City personnel and no one else.

By their plain terms, these enactments direct City officials in the conduct of their City duties and do not govern any federal actors or entities. *See Raoul*, 44 F.4th at 593. "A state regulation is invalid only if it regulates the United States directly." *North Dakota*, 495 U.S. at 435. The doctrine "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881. As is set forth in detail above, the Sanctuary City Law and Policies regulate solely personnel and funds of the City of Rochester. No part of the Sanctuary City Law and Policies regulates the federal government.

And Count Three, like Count Two (*see supra* § II) is manifestly conclusory and implausible. The AC contains only conclusory allegations of direct regulation devoid of "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" *Absolute Activist Value Master Fund Ltd*, 677 F.3d at 65; *see* AC at ¶¶66, 79-81 (alleging "direct regulation" without elaboration). To the extent any factual matter is alleged in this area, it misses the mark by a wide margin by simply confirming that the Sanctuary City Law and Policies only regulate the City. *See* AC at ¶66 (alleging that by "rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, the [Sanctuary City Law and Policies] constitute unlawful direct regulation of the Federal

34

Government"). The AC demonstrates clearly that no part of the Sanctuary City Law and Policies regulates the federal government, rather they regulate the City exclusively. County Three is alleged with mere "'naked assertions' devoid of 'further factual enhancement'" which fail to plausibly allege discrimination. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Count Three must be dismissed pursuant to Rule 12(b)(6).

## IV.     The United States' Requests for Relief Are Defective

Even if the Court disagrees with all of the foregoing arguments, the AC still fails because it is not well-pleaded and the relief it seeks violates well-established equity principles.

The United States asks this Court to invalidate substantially all of the Sanctuary City Law and Policies. *See generally* Challenged Provisions. But as this Court observed in dismissing the United States' initial complaint, "it cannot be that the 2017 sanctuary policies should be enjoined or declared unenforceable *in toto*, as several of their provisions are entirely lawful and noncontroversial." ECF 58 at 4, n.3 (citing as an example the provision of the 2017 General Order stating that RPD officers must Comply with the federal and state Constitutions).

Moreover, the United States does not address, nor could it hope to satisfy, the "relevant four-factor test" for permanent injunctive relief. *See* ECF 58 at 4 (citing *U.S. S.E.C. v Citygroup Global Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014). "It remains incumbent upon the United States to, in the first instance, articulate its requested relief with clarity and precision." *Id.* at 4, n.3. It can hardly be said to have done so where it has requested the Court to declare substantially all of the Sanctuary City Law and Policies invalid. *See* AC at ¶B. This Court has flagged the importance of a proposed order in this regard (*see* ECF 58 at 4 (citing Fed. R. Civ. P. 65(d)), but the United States fails to include one "in the first instance" as instructed.

35

Insofar as the United States has lodged a challenge to the Sanctuary City Law and Policies on grounds emanating from the Supremacy Clause, it offers only "non-constitutional grounds for deciding the case" at hand. *689 Eatery Corp. v City of New York*, 716 F.Supp3d 88, 179 (S.D.N.Y. 2024). The United States' claims § 1373 preempts the Sanctuary City Law and Policies but, as set forth *supra* § I(C)(i), § 1373 is unambiguous and not susceptible of more than one construction; it violates the Tenth Amendment rule against commandeering. *See Illinois*, 796 F.Supp.3d at 519-525. That being the case, the "canon of constitutional avoidance" does not come into play. *United States v Coonan*, 143 F.3d 119, 128 (2d Cir. 2025) (quoting *Martinez*, 543 U.S. at 385). Rather, "the constitutional questions presently before the Court cannot be avoided." *Caviezel v Great Neck Pub. Schools*, 739 F.Supp.2d 273, 282 (E.D.N.Y. 2010).

The United States has invoked the Court's "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v Seven Falls Co.*, 515 U.S 277, 286 (1995) (citing 28 U.S.C. 2201(a)). Consequently, the City respectfully submits that the Court should do precisely that by entering an order and judgment which declares 8 U.S.C. §§ 1373 and 1644 invalid as to the United States and City Defendants on grounds that those provisions exceed the Article I powers granted to Congress. Such relief is entirely appropriate where, as here, the United States seeks to vindicate only §§ 1373 and 1644, which solely contain commands to states and local governments that run contrary to Congress' intent in passing the INA. *See Martinez*, 543 U.S. at 381-382 (the canon of avoidance is not meant to subvert Congressional intent); *see also Ayotte v Planned Parenthood of N. New England*, 546 U.S. 320, 328-329 (2006) (stating Supreme Court's preference to sever problematic portions when confronting a constitutional flaw in a statute); *Illinois*, 796 at 530 (the INA reflects Congress' intent to make state participation in civil immigration enforcement voluntary and not mandatory).

36

The United States has also asked this Court to declare substantially all of the Sanctuary City Law and Policies invalid because they "violate the Supremacy Clause" (AC at ¶A) but that is not a proper form of relief because the Supremacy Clause is not an independent grant of power to Congress. *See Murphy*, 584 U.S at 477. A violation of the Supremacy Clause is therefore not an independent basis on which to grant relief.

The United States also requests that City Defendants be permanently enjoined from enforcing the Sanctuary City Law and Policies, "and any substantially similar policies, orders, or laws that may become effective in the future." AC at ¶C. That request is "impermissibly vague" (*Ali v Barr*, 464 F.Supp.3d 549, 560 (S.D.N.Y. 2020) (injunctive relief should be narrowly tailored to fit specific legal violations)), overly broad in "temporal scope" (*Dalton v Little Rock Family Planning Servs.*, 516 U.S. 474, 477 (1996) (rejecting request to enjoin future lawmaking)), and would bind the City's hands from legislating for the health and safety of its residents in blatant violation of the bedrock principles of federalism. *See Sebelius*, 567 U.S. at 536 (Citing Federalist No. 45 and explaining the Framers' vision of dual sovereigns with one being "more local and more accountable than a distant federal bureaucracy"); *see also Metropolitan Life Ins. Co.*, 471 U.S. at 756 (state police power encompasses legislation for the lives, limbs, health, comfort, and quiet of all); *Mayor of Camden*, 465 U.S. at 215 (local governments properly exercise the police power).

"As the [AC] makes abundantly clear, commandeering is the entire purpose of this lawsuit." *POCA Litigation*, 2025 WL 3205011, at *19. However, even absent the Sanctuary City Law and Policies the federal government still could not "impress into its service—and at no cost to itself—the police officers of [the City]." *Printz*, 521 U.S. at 922. So, ultimately, the United States seeks relief which fails the test of redressability because, even if the Sanctuary City Law

and Policies were stricken, the City would remain free to refuse its cooperation with federal civil immigration enforcement. *See Haaland v Brackeen*, 599 U.S. 294 (2023) (redressability, an irreducible minimum requirement of standing, "requires that the court be able to afford relief through the exercise of its power"); *see also California*, 921 F.3d at 889 (quoting *New York*, 505 U.S. at 177). The United States' bid to use the City for its aims will fail.

The City is its own sovereign and it will not be coerced.

## CONCLUSION

As the Supreme Court has observed, "[i]mmigration policy shapes the destiny of the Nation." *Arizona* 567 U.S. at 415. But the refusal to cooperate in civil immigration enforcement is within the City's "residuary and inviolable sovereignty," *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (J. Madison). The Tenth Amendment to United States Constitution shields the City against the United States' coercion into undertaking federal immigration enforcement. For the foregoing reasons, the City respectfully requests entry of an order and judgment (1) declaring 8 U.S.C. §§ 1373 and 1644 invalid as to the United States and City Defendants, (2) dismissing the United States' action in its entirety and with prejudice, and (3) providing for such other and further relief as the Court deems just and proper.

Dated:  January 30, 2026          PATRICK BEATH
Rochester, New York               Corporation Counsel

                        By:    s/ *James "Hal" Kieburtz*
                               James "Hal" Kieburtz, Esq., Of Counsel
                               *Attorneys for Defendants*
                               30 Church Street, Room 400A
                               Rochester, NY 14614
                               Tel.:  (585) 428-6758

To:    Attorneys of Record, via ECF

38