UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA,

                Plaintiff,

     v.

THE CITY OF ROCHESTER; MALIK D. EVANS, Mayor of Rochester, in his Official Capacity; ROCHESTER CITY COUNCIL; MIGUEL A. MELENDEZ, JR., President of the Rochester City Council, in his Official Capacity,

                Defendants.

---

No. 6:25-cv-06226-FPG-MJP

**MEMORANDUM IN SUPPORT OF THE UNITED STATES OF AMERICA'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, AND CROSS-MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.      Constitutional and Statutory Framework ....................................................................2

II.     Factual Background ...................................................................................................5

          A.     Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City" ...................................................................................................5

          B.     2017 Policies Implementing Resolution 2017-5 ......................................5

          C.     The March 2025 Incident .........................................................................6

          D.     § 63-21 of the Municipal Code, as amended by Ordinance 2025-283 ....7

          E.     General Order 502 (2025) .........................................................................8

III.    Procedural History ....................................................................................................9

LEGAL STANDARD ............................................................................................................9

ARGUMENT .........................................................................................................................10

I.      The Challenged Rochester Laws and Policies Are Preempted .................................10

          A.     Congress Expressly Preempted Restrictions on Information-Sharing Like Rochester's and No Presumption Against Preemption Applies ............10

          B.     Rochester's Sanctuary Laws and Policies are both Expressly Preempted and Conflict Preempted .............................................................................15

               1.     The Challenged Provisions of Resolution 2017-5 Are Preempted ............15

               2.     Ordinance 2025-283 is Preempted ...........................................................18

               3.     General Order 502 (2025) is Preempted ...................................................20

                4.     Training Bulletin P-75-17 is Preempted ...................................................23

II.     The Sanctuary Laws and Policies Violate Intergovernmental Immunity .................23

A.      The Sanctuary Laws and Policies Regulate the Federal Government ...................24

B.      The Sanctuary Laws and Policies Discriminate Against Federal
        Authorities.............................................................................................................26

III.    Rochester's Affirmative Defenses Fail.................................................................................28

A.      The Anticommandeering Doctrine Does Not Apply ............................................28

B.      Sections 1373 and 1644 are Constitutional Exercises of Congress's
        Enumerated Immigration Powers and Valid Preemption Provisions ....................30

C.      The Amended Complaint is Adequately Pled.......................................................32

IV.     The United States is Entitled to An Injunction ...................................................................32

CONCLUSION...................................................................................................................................35

# TABLE OF AUTHORITIES

## CASE LAW

*Arizona v. United States*,
   567 U.S. 387 (2012)......................................................................................*passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................... 10, 32

*Berger v. State of New York*,
   388 U.S. 41 (1967)......................................................................................... 26

*Blackie's House of Beef, Inc. v. Castillo*,
   659 F.2d. 1211 (D.C. Cir. 1981)....................................................................... 34

*Buckman Co. v. Pls.' Legal Comm.*,
   531 U.S. 341 (2001)...................................................................................... 14

*Buono v. Tyco Fire Prods., LP*,
   78 F.4th 490 (2d Cir. 2023)............................................................................ 14

*Chamber of Com. of U.S. v. Whiting*,
   563 U.S. 582 (2011).................................................................................. 13, 17

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993).......................................................................................... 11

*City of New York v. United States*,
   179 F.3d 29 (2d. Cir. 1999) .......................................................................*passim*

*CoreCivic, Inc. v. Governor of N.J.*,
   145 F.4th 315 (3d Cir. 2025)......................................................................... 25

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
   62 F.4th 748 (2d Cir. 2023).............................................................................. 9

*Crawford v. Franklin Credit Mgmt.*,
   758 F.3d 473 (2d Cir. 2014) ............................................................................. 9

*Davis v. Elmira Sav. Bank*,
   161 U.S. 275 (1896)............................................................................ 10, 15, 17

*DCC Propane, LLC v. KMT Enters.*,
   147 F.4th 171 (2d Cir. 2025)........................................................................... 14

iii

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ............................................................................................... 32

*English v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ................................................................................................. 10

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ............................................................................................... 28

*Friedman v Connecticut Gen. Life Ins. Co.*,
  877 NE2d 281 (2007) ............................................................................................. 15

*Galper v. JP Morgan Chase Bank, N.A.*,
  802 F.3d 437 (2d Cir. 2015) .................................................................................. 10

*Garland v. Norfolk S. Ry. Co.*,
  1:20-CV-00002 EAW, 2025 U.S. Dist. LEXIS 24636, at *24 (W.D.N.Y. Feb. 11, 2025) .......... 9

*Geo Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .................................................................................. 26

*Gilead Cmty. Servs. v. Town of Cromwell*,
  112 F.4th 93 (2d Cir. 2024) ................................................................................... 32

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ................................................................................................. 2

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................................... 4, 10, 15, 17

*Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*,
  452 U.S. 264 (1981) ............................................................................................... 28

*Knox v. Brnovich*,
  907 F.3d 1167 (9th Cir. 2018) .............................................................................. 27

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) .......................................................................................... 12, 13

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ................................................................................... 33

*Matter of Plastic Surgery Grp., P.C. v. Comptroller of the State of N.Y.*,
  144 N.E.3d 332 (2019) ........................................................................................... 15

*Mayo v. United States*,
319 U.S. 441 (1943)......................................................................................................... 25

*McCulloch* v. *Maryland*,
17 U.S. (4 Wheat.) 316 (1819)................................................................................... 24, 25

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)......................................................................................................... 31

*Murphy v NCAA*,
584 U.S. 453 (2018)................................................................................................. *passim*

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)......................................................................................................... 13

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656, (1993)........................................................................................................ 35

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
491 U.S. 350 (1989)......................................................................................................... 33

*New York v. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) ..................................................................................... *passim*

*New York v. United States*,
505 U.S. 144 (1992)......................................................................................................... 28

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010) ......................................................................................... 4, 10

*Nken v. Holder*,
556 U.S. 418 (2009)......................................................................................................... 33

*North Dakota v. United States*,
495 U.S. 423 (1990)................................................................................................. 2, 3, 24

*Oceanic Navigation Co.* v. *Stranahan*,
214 U.S. 320 (1909)......................................................................................................... 28

*Odebrecht Constr. v. Sec'y, Fla. DOT*,
715 F.3d 1268 (11th Cir. 2013) ...................................................................................... 34

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*,
461 U.S. 190 (1983)......................................................................................................... 10

*Padavan v. United States*,
   82 F.3d 23 (2d Cir. 1996) ..................................................................................... 28

*Perez v. Campbell*,
   402 U.S. 637 (1971) ............................................................................................. 14

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011) ............................................................................................. 11

*Printz v. United States,*
   521 U.S. 918 (1997) ............................................................................................. 30

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   579 U.S. 115 (2016) ............................................................................................. 13

*South Carolina v. Baker*,
   485 U.S. 505 (1988) .......................................................................................... 4, 31

*Ting v. AT & T*,
   319 F.3d 1126 (9th Cir. 2003) ............................................................................. 14

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ...................................................................... 15, 34

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ............................................................................... 33

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ............................................................................... 27

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) .......................................................................... 26, 28

*United States v. Ferrara*,
   847 F. Supp. 964 (D.D.C. 1993) .......................................................................... 25

*United States v. King Cnty., Washington*
   122 F.4th 756 (9th Cir. 2024) .............................................................................. 25

*United States v. Krown*,
   675 F.2d 46 (2d Cir. 1982) .................................................................................. 11

*United States v. Locke*,
   529 U.S. 89 (2000) ............................................................................................... 14

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ................................................................. 33

*United States v. New York*,
2025 U.S. Dist. LEXIS 225875 (N.D.N.Y. Nov. 17, 2025) ....................................... 30

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ................................................................. 14

*United States v. Washington*,
596 U.S. 832 (2022) ..................................................................... 24, 26

*Yamashita v. Scholastic Inc.*,
936 F.3d 98 (2d Cir. 2019) ................................................................. 10

**STATUTES**

6 U.S.C. § 482(b)(2) ........................................................................ 2

8 U.S.C. § 1101 ............................................................................ 2

8 U.S.C. § 1101(a)(15) ..................................................................... 31

8 U.S.C. § 1153 ........................................................................... 31

8 U.S.C. § 1182 ......................................................................... 2, 26

8 U.S.C. § 1183 ........................................................................... 31

8 U.S.C. § 1225-29a ..................................................................... 2, 26

8 U.S.C. § 1226(c) ......................................................................... 3

8 U.S.C. § 1226(c)(3) ..................................................................... 22

8 U.S.C. § 1226(d)(1) ..................................................................... 22

8 U.S.C. § 1226(d)(1)(A) ................................................................... 3

8 U.S.C. § 1231 ........................................................................ 2, 26

8 U.S.C. § 1231(a) ......................................................................... 3

8 U.S.C. § 1231(a)(4)(A) ................................................................... 3

8 U.S.C. § 1306(b) .................................................................................................. 12

8 U.S.C. § 1324a(h)(3)......................................................................................... 12, 31

8 U.S.C. § 1326 ..................................................................................................... 16

8 U.S.C. § 1357(g)(10) ......................................................................................... 17

8 U.S.C. § 1360 ..................................................................................................... 13

8 U.S.C. § 1367(a)(2)............................................................................................ 13

8 U.S.C. § 1373.............................................................................................. *passim*

8 U.S.C. § 1373(a) ............................................................................................ 11, 17

8 U.S.C. § 1373(b) ............................................................................................ 11, 17

8 U.S.C. § 1644.............................................................................................. *passim*

## FEDERAL REGULATIONS

8 C.F.R. § 287.7(a)................................................................................................ 22

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 8.................................................................................................... 32

Fed. R. Civ. P. 56(a) .............................................................................................. 9

## LEGISLATIVE HISTORY

H.R. Rep. No. 104-725 .......................................................................................... 18

S. Rep. No. 104-249............................................................................................... 18

## MISCELLANEOUS

Daniel Finkelstein & WHAM Staff,  *Rochester police officers accused of violating policy by assisting federal agents* (March 26, 2025 at 5:55 PM), Available at https://13wham.com/news/local/rochester-police-officers-accused-of-violating-policy-while-assisting-border-patrol-agents (last visited Feb. 4, 2026) ........................................... 6

Gino Fanelli, Brian Sharp, *Rochester police likely broke sanctuary policy assisting immigration agents* (March 26, 2025 at 5:46 PM), Available at https://www.wxxinews.org/local-news/2025-03-26/rochester-police-likely-broke-policy-assisting-immigration-agents-with-traffic-stop  (last visited Feb. 4, 2026) ...................................................................................... 6

**INTRODUCTION**

Cities may not frustrate federal programs with which they disagree, *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999), yet that is exactly what the City of Rochester has done through its Sanctuary City laws and policies.[1] Rochester[2] proudly disagrees with federal immigration *enforcement* priorities and executive orders issued by the President, going so far as to call them "an enhanced threat to all undocumented immigrants." ECF 66-2 at 4 ("Br."). In response, it enacted its own laws and policies to prohibit and restrict City personnel, particularly police, from conveying information regarding the citizenship or immigration status, lawful or unlawful, of any individual, to the Department of Homeland Security ("DHS"). Rochester claims that its laws and policies are to protect the health and welfare of its citizens and a lawful exercise of the police power, but the effect of those laws is to require federal officials to apprehend aliens in the street and conduct public arrests. Congress recognized the need for information sharing in enacting provisions of the Immigration and Nationality Act (INA), and particularly in 8 U.S.C. §§ 1373 and 1644, which prohibit precisely what Rochester has done, through its sanctuary laws and policies – states and localities may not prohibit, or in any way restrict, the sending to or receiving from DHS information regarding the citizenship or immigration status of any individual.

Federalism, as embodied in the United States Constitution, requires that certain powers belong to the national sovereign, while others are reserved to the states. *Murphy v NCAA*, 584 U.S. 453, 470 (2018). Immigration belongs to the "national sovereign, not the 50 separate States." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Rochester seeks to upset this constitutional order by establishing its own, local approach to immigration, in direct conflict with federal

---

[1] References to Rochester's "Sanctuary laws and policies" refer to Resolution 2017-5 (Am. Compl. Ex. A, ECF 59-1), Ordinance 2025-283 (Am. Compl. Ex E, ECF 59-5), General Order 502 (2025) (Am. Compl. Ex. F, ECF 59-6), and Training Bulletin P-75-1 (Am. Compl. Ex. C, ECF 59-3).
[2] References to "Rochester" as a party encompass all Defendants to this action.

1

immigration law. This it cannot do.

Rochester remains committed to its Sanctuary laws and policies, enacting and revising them even as this lawsuit has remained pending (without alerting Plaintiff or the Court), thus doubling down on its position that it may control immigration policy as it sees fit. The Sanctuary laws and policies cannot stand because they are expressly preempted by federal law, they conflict with federal law, and they violate principles of intergovernmental immunity by discriminating against and regulating federal authorities. The United States is entitled to summary judgment on all claims of its Amended Complaint. The United States is further entitled to a permanent injunction because the Sanctuary laws and policies irreparably harm the United States, there are no adequate remedies at law, and the balance of hardships and public interest weigh in its favor. Accordingly, Defendants' motion to dismiss (ECF 66) also should be denied.

## BACKGROUND

### I.    Constitutional and Statutory Framework

The United States Constitution entrusts the power to "establish an uniform Rule of Naturalization," to Congress, U.S. Const., art. I § 8, cl. 4. That, combined with the federal government's "inherent power as sovereign to control and conduct relations with foreign nations," provides the United States with "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394-95. Congress has executed this mandate through the INA, 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)). *See id.* at 396. This body of law authorizes the federal government to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231; *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). States and localities cannot obstruct or take discriminatory actions against the execution of those laws. *See Arizona*, 567 U.S. at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435

2

(1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

While "[t]he federal power to determine immigration policy is well settled," "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 395, 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York*, 179 F.3d at 35. Congress, through the INA, contemplated this framework of cooperation. For example, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id*. § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). State and local officials may "cooperate with the [federal government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B). And while Congress could have permitted federal authorities to remove criminal defendants at any time, it instead provided that federal authorities "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment" by state or local authorities. *Id.* § 1231(a)(4)(A).

Congress expressly acknowledged the need for information-sharing across and within governments when it enacted 8 U.S.C. §§ 1373 and 1644. *See New York v. Dep't of Justice*, 951 F.3d 84, 97 (2d Cir. 2020). With these provisions, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *Id.* (citations omitted). Section 1373 requires federal officials to "respond to an inquiry" by state or

3

local officials "seeking to verify or ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction," and provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373. Similarly, § 1644 provides that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [federal government] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Accordingly, it "prohibits the federal government from compelling the States to enact or administer a federal regulatory program." *New York*, 951 F.3d at 112; *see City of New York*, 179 F.3d at 35 (rejecting a facial commandeering challenge to 8 U.S.C. § 1373). "A commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *New York*, 951 F.3d at 113.

Although certain rights are reserved to the states, under the Supremacy Clause, federal law is the "supreme Law of the Land" U.S. Const. art. VI, cl. 2, and "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (internal citation omitted). A state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The Supremacy Clause also embodies principles of intergovernmental immunity and thus states and localities may not regulate or discriminate against

4

the federal government. *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

Thus, the Second Circuit has made clear that in our system of government that state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35.

## II.     Factual Background

### A.     Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City"

In February 2017, the City of Rochester unanimously passed Resolution 2017-5, "Resolution Affirming that Rochester is a Sanctuary City" ("Resolution") in response to "changes in federal immigration enforcement practices and priorities." ECF 59-1 at 1, 3, 4. The Resolution creates "a policy that *assures* immigrants and refugees that they can contact the police and other City agencies *without fear of adverse immigration consequences*." *Id.* at 3 (emphasis added). The Resolution prohibits City officials, including law enforcement officers, from participating in or assisting federal civil immigration enforcement or using city funds for that purpose. *See generally id.* It also prohibits police and City personnel from inquiring about immigration status or requesting proof of immigration status unless required by law or needed for a criminal investigation. *Id.* ¶¶ 3, 4. The Resolution also directs the Mayor and city officials to "implement policies that further the City's role as a Sanctuary City to ensure compliance with" the Resolution's "objectives." *Id.* ¶ 2.

### B.     2017 Policies Implementing Resolution 2017-5

The Rochester Police Department ("RPD") issued General Order 502 and Training Bulletin No. P-75-17, in March 2017, pursuant to the Resolution. *See* ECF Nos. 59-2, 59-3; Answer ¶ 34.

General Order 502 (2017) prohibited local cooperation with federal immigration enforcement and included limitations on information gathering, use, and disclosure to federal authorities and cooperation with federal immigration authorities, including a refusal to honor immigration detainers. *See generally* ECF 59-2 §V. The General Order required officers to report

any violations of it to their immediate supervisor, and supervisors were instructed to discipline officers who committed violations. *Id.* § VII.

In conjunction with General Order 502, RPD issued Training Bulletin No. P-75-17, which summarized the General Order and explained that the Resolution "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." ECF 59-3 at 1. The Training Bulletin explained that "[i]n order to implement the Sanctuary City Resolution and ensure compliance, we are renaming and reissuing G.O. 502 with substantial updates." *Id.* at 1. It reconfirmed Rochester's ban on complying with immigration detainers. *Id.* at 2.

## C.    The March 2025 Incident

On March 24, 2025, federal immigration authorities conducted a traffic stop to enforce federal immigration laws in Rochester, and ultimately called Rochester police for backup.[3] Local leaders, including the mayor and city council president, declared that responding RPD officers violated the City's Sanctuary policies. Mayor Evans explained: "Our policy is crystal clear. City police officers do not help or participate in federal immigration activities."[4] The City Council president affirmed, "We have a policy, and we mean it."[5] After the incident, 10 RPD officers were removed from patrol to receive additional training and an internal investigation was initiated.[6]

And they did "mean it." After the filing of this lawsuit, Rochester officials doubled down on their Sanctuary laws and policies. On June 17, 2025, RPD issued General Order 125, titled "Mutual Aid" stating that all non-emergency calls for assistance must be approved by supervision,

---

[3] *See, e.g., https://13wham.com/news/local/rochester-police-officers-accused-of-violating-policy-while-assisting-border-patrol-agents*
[4] *See supra* note 3.
[5] https://www.wxxinews.org/local-news/2025-03-26/rochester-police-likely-broke-policy-assisting-immigration-agents-with-traffic-stop
[6]  *See supra* note 6.

6

and assistance must "conform to all RPD General Orders, Rules and Regulations, and other applicable laws. (i.e.: … warrant or immigration enforcement, etc.)." ECF 59-4, ¶ III.D.

    **D**.       **§ 63-21 of the Municipal Code, as amended by Ordinance 2025-283**

In August 2025, Rochester adopted a new City Ordinance, No. 2025-283 "Amending the Municipal Code relating to Rochester as a Sanctuary City for immigrants and for the [LGBTQIA+] community," which amended Chapter 63, Section 21 of the Municipal Code. The amendment took effect immediately. ECF 59-5 at 2, 9, 10.[7] In "Legislative Findings," the City Council explained that the amendment was "necessitated by the U.S. President's efforts to implement the mass deportation of Immigrants," which it said "commenced with an Executive Order on January 25, 2025." *See id.* at 3-4. Defendants failed to notify Plaintiff or the Court of this development.

Section 63-21 makes it unlawful for "the City, and any person under agreement with the City" to "prohibit or discourage Immigrants or their children from seeking opportunities, reporting crimes, or accessing services on the basis of perceived or actual immigration status." *Id.* at 4 (§ 63-21(A)(1)). There is no limit on what "discourage" means and whether it extends to an individual's other work or personal interactions outside the specific City agreement. *Id.* Nor does it limit or define "any person under agreement with the City," which as this Court noted, could be read to bar any contractor from calling for increased immigration enforcement. *See* ECF 58 at 4 n.2. It could include any county, state, or federal law enforcement agency with an agreement with the City. Indeed, General Order 125, Mutual Aid, states that "[o]ngoing partnerships between local and federal agencies and the RPD shall be documented on signed agreements, with all involved agencies, and shall outline the scope of the partnership." ECF 59-4 at ¶ III.H.

Section 63-21(A)(2) makes it unlawful for RPD to inquire about immigration status "unless

---

[7] Page numbers for the Ordinance refer to the ECF page number printed on the document.

necessary to investigate criminal activity." *Id.* at 4 (§ 63-21(A)(2)). It also makes it unlawful for RPD to "stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status." *Id.* Section 63-21(A)(3) applies more broadly to all City personnel, making it unlawful for them to "inquire about or request proof of immigration status or citizenship when providing services or benefits" subject to narrow exceptions. *Id.* at 4. Section 63-21(A)(4) makes it unlawful for the City to use "funds or personnel" to "enforce or assist in the enforcement of Federal immigration policies" or to participate in any registration program based on immigration status or national origin unless required by law. *Id.*

Section 63-11 provides penalties for violations of the chapter and "any orders and rules issued pursuant" to the chapter including discipline or removal. *Id.* at 9. It applies to "[a]ny city officer or employee subject to the Mayor's jurisdiction, and any elected City officer or employee subject to the City Council's jurisdiction." *Id.* Section 63-11(B) is enforced by the Mayor who "at their own behest, or upon request of the Council *shall investigate* any credible allegation that a City agency, official or employee has committed a Violation," and "[a]t the conclusion of the Investigation, the Mayor or their designee shall present the report of the investigation and its outcome to the Council in executive session" which "shall be made publicly available" to the extent permitted by collective bargaining agreements and law. *Id.* (emphasis added). It also provides the City Council with the power to require the Mayor to initiate an investigation. *Id.*

### E.   General Order 502 (2025)

On September 4, 2025, RPD rescinded the 2017 General Order 502 and replaced it with a revised General Order 502. ECF 59-6. The revised General Order incorporates the 2017 General Order, with additions such as detailed instructions for responding to calls for assistance from DHS ICE, CBP, and Homeland Security Investigations ("HSI").  *Id.* § V.F. Again, Defendants failed to notify Plaintiff or the Court of this development.

8

### III.   Procedural History

The United States filed its Complaint on April 24, 2025, challenging the Resolution, General Order 502 (2017), and Training Bulletin P-75-17. ECF 1. Rochester answered and then moved for judgment on the pleadings. ECF 6, 8. The United States cross-moved for judgment on the pleadings, and briefing completed on September 17, 2025. ECF 32, 51, 56. During that briefing, and unbeknownst to the United States, Rochester issued a new Ordinance, No. 2025-283, and issued a revised General Order 502, rescinding the prior General Order. ECF 59-5, 59-6. Rochester did not notify the United States or the Court of its actions. On November 13, 2026, the Court *sua sponte* dismissed the Complaint as moot, reasoning that could not grant effective relief because any injunction would not include the new Municipal Code section. ECF 58. It granted the United States leave to amend, and the United States filed an Amended Complaint on December 19, 2025. ECF 59. Rochester moved to dismiss the Amended Complaint. ECF 66. The United States now opposes that motion and cross-moves for summary judgment on all claims.

## LEGAL STANDARD

"Summary judgment is required if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (citations/quotations omitted); *see also* Fed. R. Civ. P. 56(a). "The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party." *Garland v. Norfolk S. Ry. Co.*, No. 1:20-CV-00002 EAW, 2025 U.S. Dist. LEXIS 24636, at *24 (W.D.N.Y. Feb. 11, 2025). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 486 (2d Cir. 2014).

On a 12(b)(6) motion to dismiss, the court "accept[s] all of the complaint's factual

9

allegations as true and draw[s] all reasonable inferences in the plaintiffs' favor." *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 103 (2d Cir. 2019). If a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged," then the motion must be denied. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations/citations omitted).

**ARGUMENT**

**I.      The Challenged Rochester Laws and Policies Are Preempted**

Express preemption occurs when Congress, by statute, explicitly supersedes certain state enactments. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983). Federal statutes may expressly preempt state laws by declaring that intent on their face. *Arizona*, 567 U.S. at 399. "Preemption fundamentally is a question of congressional intent and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990) (citations omitted); *see Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015) (similar).

Under conflict preemption principles, "state and local laws that conflict with federal law are 'without effect.'" *New York SMSA Ltd. P'ship*, 612 F.3d at 103 (internal citation omitted). A state or local enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, or if it "frustrates the purpose of the national legislation or impairs the efficiency of the[] agencies of the federal government to discharge the duties for the performance of which they were created," *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896).

**A.      Congress Expressly Preempted Restrictions on Information-Sharing Like Rochester's and No Presumption Against Preemption Applies**

Both §§ 1373(a) and 1644 state that the sections apply "notwithstanding any other

10

provision of Federal, State, or local law." 8 U.S.C. §§ 1373(a), 1644. That statement "clearly signal[s] the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). Such phrases are "commonly interpreted by Courts of Appeals to 'supercede all other laws.'" *Id.* (collecting cases). In the face of such a clause, "courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011) (discussing scope and meaning of notwithstanding clause in the Supremacy Clause).

**1.** Section 1373 provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see id.* § 1373(b). Section 1644 is similar. *Id.* § 1644. The plain meaning of prohibit is "1. *trans.* To forbid (an action or thing) by or as by a command or statute; to interdict." Oxford English Dictionary (2d Ed. 1989). The plain meaning of "restrict" is "1. *trans.* To confine (some person or thing) *to* or *within* certain limits; to limit or bound." *Id.* By using "in any way" to modify "restrict," Congress indicated an intent to encompass a broad range of actions that could restrict the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See United States v. Krown*, 675 F.2d 46, 50 (2d Cir. 1982) (construing statutory use of "in any way" broadly).

Consistent with the plain text of §§ 1373 and 1644, the Second Circuit observed that "'[c]onsultation between federal and state officials is an important feature of the immigration system' established by the INA." *New York*, 951 F.3d at 114 (quoting *Arizona*, 567 U.S. at 411). It also observed that while *Arizona* found that the federal scheme left room for a state policy *requiring* information sharing, "[t]he same conclusion may not be so easy to reach … with respect

11

to a state policy *prohibiting* information sharing." *Id.* (emphasis original). It reached that conclusion even in view of *Murphy*, foreclosing Defendants' argument that *Murphy undermines New York*'s view of §§ 1373 and 1644. *See infra* Section III.A. Under §§ 1373(a) and 1644, state and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *City of New York*, 179 F.3d at 35.

**2.** Similarly, by using the phrase "information regarding the citizenship or immigration status" Congress intended to encompass more than simply the status itself. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (statutory terms like "regarding" or "related to" have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."). Such information includes, e.g., personal identifiers to determine citizenship or immigration status and other information that bears on whether an alien's presence is lawful, including address or employment and release date from state custody (at which point an alien becomes removable). *See* 8 U.S.C. § 1306(b) (must notify government of new address); *id.* § 1305 (mandatory detention and removal); *id.* § 1231(a)(4)(A) (alien removable upon release from custody); *id.* § 1324a(h)(3) (defining aliens not authorized for employment). Section 1644 is in accord with Section 1373. With §§ 1373 and 1644, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted). In every clause of §§ 1373(a) and 1644, Congress indicated its intent that state and local officials shall not be restricted from such information-sharing. *See* 8 U.S.C. §§ 1373, 1644.

Rochester argues that "*information regarding* their citizenship or immigration status" is narrow and limited to "information strictly pertaining to immigration status (i.e. what one's

12

immigration status is)" and that regardless it does not include "immigration document[s]." Br. 28. Rochester's argument is flatly contrary to caselaw that holds that "regarding" is a broadening term, and would render that word surplusage. *Lamar,* 584 U.S. at 717-18; *Nat'l Ass'n of Mfrs. v. Dep't of Def.,* 583 U.S. 109, 128-29 (2018) ("As this Court has noted time and time again, the Court is obliged to give effect, if possible, to every word Congress used." (quotations/citations omitted)). Furthermore, it defies logic that an immigration document, such as a visa or passport, is not "information regarding … citizenship or immigration status" because such documents show, e.g., name and country of origin, and may also show a visa for entry or an entry stamp, or lack thereof. Rochester argues that other sections of the INA, such as §§ 1360 and 1367(a)(2), which describe categories of information differently, somehow show §§ 1373 and 1644 should be read narrowly. Br. 28-29. But those sections are irrelevant. Section 1360 specifies particular information; it does not use a broadly encompassing phrase. Section 1367(a)(2) pertains to "any information which relates to an alien who is a beneficiary" under sections relating to (T) visas for victims of trafficking and (U) visas for victims of certain crimes, and thus supports Plaintiff's reading of §§ 1373 and 1644, because Congress once again used "regarding" to encompass a larger swath of information.

**3.** Lacking textual support, Defendants fall back on two atextual arguments to override the statutes. First, they argue that their laws are entitled to a "presumption against preemption" despite the clear expression of Congress's preemptive intent. Br. 12-14. The Supreme Court has flatly rejected that approach when, as here, "the statute 'contains an express preemption clause,'" stating that "we do not invoke any presumption against preemption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S.* v. *Whiting*, 563 U.S. 582, 594 (2011)). The Second Circuit has repeatedly affirmed the same.

13

*DCC Propane, LLC v. KMT Enters.*, 147 F.4th 171, 174 (2d Cir. 2025); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). Rather than even mention these controlling cases, Rochester's brief reaches back to earlier cases or out-of-circuit precedent, neither of which can control.

Second, Rochester's invocation of the state's "police powers" changes nothing. Br. 16, 21. To begin, Rochester cites nothing to suggest that a "police powers" exception to express preemption survives *Franklin*, *DCC Propane*, or *Buono*. Indeed, to the contrary, the Supreme Court has rejected the notion that a state or local government's characterization of its "purpose" can act as a shield in the preemption analysis because "such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply … articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Perez v. Campbell*, 402 U.S. 637, 651-52 (1971).

Moreover, even as to conflict preemption, the law is clear that no presumption against preemption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 91 (2000); *see also Ting v. AT & T*, 319 F.3d 1126, 1136 (9th Cir. 2003). Immigration is an area that is "inherently federal in character," *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001), and Rochester's laws and policies are, on their face, about the City's disagreement with federal immigration enforcement priorities. *See* Resolution 2017-5, ECF 59-1 at 4 ("whereas" clause stating Resolution responds to "changes in federal immigration enforcement practices and priorities,"); ECF 59-5 at 3, 2025 Ordinance (stating Ordinance was "necessitated by the U.S. President's efforts to implement the mass deportation of Immigrants… [which] commenced with the issuance of an Executive Order on January 20, 2025…"). Thus, there is also no presumption as to the conflict preemption analysis. *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (declining to apply the

14

presumption "because immigration is an area traditionally regulated by the federal government.");

*United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (similar).

**B.    Rochester's Sanctuary Laws and Policies are both Expressly Preempted and Conflict Preempted**

As explained, §§ 1373 and 1644 permit a state or locality to *require* information sharing, *Arizona*, 567 U.S. at 411, but do not leave room for a state or locality to *prohibit* the sharing of information regarding immigration status with federal authorities, *see New York*, 951 F.3d at 114. The United States challenges various Rochester Sanctuary laws and policies regarding information-sharing as expressly preempted. Moreover, those same laws and policies are conflict preempted because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, frustrate the purpose of the national legislation, and impair the efficiency of federal agencies in discharging their duties. *Hines*, 312 U.S. at 67, *Davis*, 161 U.S. at 283. Finally, Rochester's Sanctuary laws and policies are conflict preempted by the INA more broadly because they stand as an obstacle to accomplishing the goals of the statutory scheme and impair the efficiency of federal immigration enforcement. *Id.*

**1.    The Challenged Provisions of Resolution 2017-5 Are Preempted**

The United States challenges Resolution 2017-5 as expressly and conflict preempted. *See* Am. Compl., ECF 59 at ¶¶ 28-34, 67-81; Ex. G, ECF 59-7. Although the United States identifies specific challenged provisions, *see, e.g.,* Ex. G, ECF 59-7, those provisions cannot be considered in isolation; rather the provisions of Resolution 2017-5 must be read as a whole. *Matter of Plastic Surgery Grp., P.C. v. Comptroller of the State of N.Y.*, 144 N.E.3d 332, 337 (2019) ("We are required to 'consider a statute as a whole, reading and construing all [its] parts . . . together to determine legislative intent' (quoting *Friedman v Connecticut Gen. Life Ins. Co.*, 877 N.E.2d 281, 846 (2007)).

15

**a.** The Resolution is expressly preempted. It mandates "a policy that *assures* immigrants and refugees that they can contact the police and other City agencies without fear of adverse immigration consequences…" and it requires the "Mayor and the City administration" "implement policies that…*ensure compliance with the objectives* herein." Resolution 2017-5, at Preamble & ¶ 2 (emphasis added). While it implements certain steps to ensure that aliens are assured of no adverse consequences, such as prohibiting the use of City funds or personnel for immigrant policy enforcement, and restricting the information City personnel may request, *see id.* ¶¶ 3-5, the only way to *assure* immigrants that there will be no adverse immigration consequences is to prohibit information sharing with DHS. As a result, the Resolution cannot be reconciled with the requirements of §§ 1373 (*see* § 1373 (a), (c) (inquiries to/from DHS)), and 1644. If Rochester's personnel learn of immigration status without inquiring about it, because, for example, someone mentions it or it is revealed through a criminal records check[8], the only way to *assure* that there will be no adverse immigration consequences, is to *ensure* that City personnel do not disseminate that information to DHS. To that end, the Resolution expressly prohibits the use of city funds or personnel "to enforce or to assist in the enforcement of Federal immigration policies" "except to the extent specifically required by law and subject to the principles embodied in the Constitutions of the United States and the State of New York." *Id.* ¶ 5. Rochester personnel cannot contact DHS to learn the immigration status of any individual in their custody unless "necessary" to investigate a crime. Resolution ¶3, 4. Were Rochester personnel to communicate with DHS about the immigration status of an alien, they would run afoul of the Resolution's prohibition on assisting in the enforcement of federal immigration policies.

---

[8] This could occur, for example, if police check NCIC and see that an alien has a prior conviction for illegal reentry under 8 U.S.C. § 1326 or has a current final order of removal.

Nor does the savings clause that "[i]t does not prohibit City employees from communications with federal immigration agencies regarding citizenship or immigration status," (ECF 59-1 at page 3 of 4) save the Resolution. For one, as discussed *supra*, §§ 1373 and 1644 are broader than only citizenship or immigration status. Second, a purported "savings clause" cannot insulate the Resolution from federal preemption because, as explained, Rochester pursues policies under that Resolution "that undermine federal law." *Arizona*, 567 U.S. at 416.

**b.** Just as the Resolution is expressly preempted, it is also conflict preempted because there is no way to comply with the Resolution and its express instructions that aliens shall be *assured* of no adverse immigration consequences and that the City shall *ensure* compliance with that objective, while still permitting City personnel to share immigration information freely with DHS. But, if the City *restricts in any way* such information sharing, it obstructs federal implementation of §§ 1373 and 1644, and the INA more broadly. *See, e.g.*, Am. Compl. ¶¶ 21, 24, 27, 36, 58. As a result, Rochester's Resolution is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and federal law stands supreme. *Hines*, 312 U.S. at 67.

The Resolution is conflict preempted for another reason: it "frustrates the purpose of the national legislation or impairs the efficiency of the[] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis*, 161 U.S. at 283. Congress, through the INA, "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S.*, 563 U.S. at 587 (internal citation omitted). To ensure the successful implementation of those laws, Congress anticipated coordination between federal, state, and local officials. *See*, *e.g.*, 8 U.S.C. §§ 1373(a), 1373(b), 1644, 1357(g)(10); *see also City of New York*, 179 F.3d at 35 ("A system of

17

dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems"). Indeed, a House Conference Report explained that the very purpose of the information sharing provisions was to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report for Section 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996). As a result, the Resolution's prohibitions on inquiring about immigration status or assisting in federal immigration enforcement frustrates the very purposes of §§ 1373 and 1644, and the broader INA provisions that rely on such information sharing.

### 2. Ordinance 2025-283 is Preempted

Sections 63-20, 63-21, and 63-11 (as it applies to 63-20 and 63-21) of Ordinance 2025-283 are also expressly and conflict preempted.

**a.** First, the Ordinance sections are preempted for all of the same reasons that Resolution 2017-5 is preempted. That is because § 63-20 explicitly incorporates "the protections" of Resolution 2017-5, which as explained above, including assurances to aliens that no adverse immigration consequences will result, and ensuring compliance with such objectives. ECF 59-5. Similar to the Resolution, it relies on an Executive Order signed by President Trump regarding immigration enforcement, further belying Rochester's arguments that its laws are about state police powers and that such powers should trump federal immigration laws. *Id.* The Ordinance is

18

thus expressly and conflict preempted for the same reasons as the Resolution, discussed above.

**b.** The Ordinance is also expressly preempted on its own terms. Section 63-21 sets forth the specific actions that "shall be unlawful" (ECF 59-5 at 4), and those restrictions are directly contrary to §§ 1373 and 1644. ECF 59-5 at 4 of 10. It prohibits the Police Department from inquiring about immigration status from any source, including DHS, "unless necessary to investigate criminal activity" and equates any such inquiry with "enforcing federal immigration laws." § 63-21(A)(2). Police are prohibited from stopping, questioning, investigating, interrogating, or arresting an individual "based solely on actual or suspected immigration or citizenship status" (a provision that will no doubt invite challenges). Like the Resolution, it restricts requests for proof of immigration status unless required by law or for a criminal investigation (§ 63-21(A)(3)) and prohibits the use of City resources "to assist in the enforcement of Federal immigration policies" (§ 63-21(A)(4)). Section 63-11 provides for discipline for violations of the Ordinance and any orders and rules issued pursuant to it. § 63-11(A). Penalties can be up to and including removal. *Id.* Section 63-11 also gives the Mayor, either on his own initiative or at the behest of the City Council, the ability to investigate "any credible allegation" of a violation. § 63-11(B). By prohibiting inquiries and prohibiting any action that could be considered "assist[ing] in the enforcement of Federal immigration policies," the Ordinance is at odds with the plain terms of §§ 1373 and 1644. It is thus expressly preempted by those sections. Like the Resolution, the Ordinance's purported savings clause in § 63-9(C) does not save it.

**b.** The Ordinance is also conflict preempted by §§ 1373 and 1644 and the broader INA for the same reasons as the Resolution. By prohibiting City personnel from inquiring about immigration status or assisting in federal immigration enforcement, under threat of investigation and penalties up to removal, the Ordinance frustrates the implementation of the INA. It is also

19

conflict preempted for other reasons. First, the Ordinance is extremely broad in scope. It applies to "the City, and any person under agreement with the City" which could include anyone who contracts with the City for any service. The ordinance makes it unlawful for those persons to take certain actions based upon "perceived or actual immigration status" including "discouraging" "Immigrants or their children" from "seeking opportunities." § 63-21(A)(1). Such language is so broad that it could mean that anyone employed by or under contract with the City of Rochester cannot express support for federal immigration enforcement at all. Second, the Ordinance forbids any cooperation or assistance in the enforcement of federal immigration policy, § 63-21(A)(4), but as explained *supra* with respect to the Resolution, the INA reliance on information sharing is plainly frustrated by state and local measures prohibiting such cooperation.

### 3.      General Order 502 (2025) is Preempted

Underscoring the broad scope of the Ordinance and the Resolution discussed above is Rochester's own implementation of them such as in General Order 502 (2025).[9] The Sanctuary provisions of that General Order are expressly and conflict preempted.

The General Order broadly prohibits police: (i) from engaging in any immigration enforcement actions (III.C., V.A.), (ii) from inquiring (from anyone, including DHS) about the immigration status of any person unless "there is a specific and articulable need to do so to investigate criminal activity" or it is otherwise necessary to provide benefits or required by law (V.B, V.C.), (iii) from requesting immigration documents as proof of identity (V.E.), and (iv) from

---

[9] The Revised General Order 502, which rescinded the 2017 version, contains all of the provisions of the 2017 General Order, but also adds provisions. *See* Am. Compl. ¶¶35-40. Thus, the current General Order is evidence of the implementation of both the Resolution and the Ordinance. Further, were Rochester to revert to the prior General Order in an effort to moot the claims yet again, that General Order would be preempted for the same reasons. Moreover, further attempts by Rochester to moot the claims by changing its laws, only to change them back again, would trigger the voluntary-cessation exception to the mootness doctrine.

providing information in immigration documents to CBP, ICE, or other federal immigration authorities" unless "necessary to investigate criminal activity, and in accordance with the procedures [in § V.F.]." Indeed, all contacts with ICE, CBP, or HSI require authorization from "Captain or above during business hours, or the Staff Duty Officer (SDO) during non-business hours" along with "a specific and articulable need for a criminal investigation" or an exception in V.G., which includes that the person is named in a judicial warrant or there is probable cause that a crime has been committed. §§ V.F., V.G.1(c), 2. And to ensure compliance, the General Order requires all contact with CBP, ICE, or HSI to be documented, members of the police department to report on each other for violations, supervisors to initiate discipline for violations, and quarterly reports and review of all such actions by the Police Chief, with reports to the Mayor. § VII.A-C. A Rochester Police Officer thus cannot voluntarily choose to share information pursuant to federal law without facing discipline for doing so. *Id.*

   **a.** Thus, on its face, the General Order both prohibits and restricts Rochester officials from "sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual" in direct conflict with §§ 1373 and 1644. The challenged provisions of the General order are thus expressly preempted by federal law.

   **b.** The General Order is also conflict preempted. Whereas the Resolution and Ordinance more generally forbid assisting federal immigration enforcement, the General Order articulates how far Rochester will go to prevent the use of its personnel in any action related to immigration enforcement. It states that "Members will **not** detain or turn over to CBP, ICE, or HSI a person named in a civil immigration detainer, and will **not** assist CBP, ICE, or HSI in taking such persons into custody solely for a civil immigration detainer." § V.G.2. (emphasis original). Consistent with that section, Rochester confirms in its brief that "RPD will not honor civil immigration detainers."

21

Br. 5. Congress created a system of civil immigration detainers and information sharing so that when a person is in custody and has an immigration detainer, that information may be shared with federal officers for the safety and welfare of all involved. *See* 8 U.S.C. §§ 1226(c)(3), 1373, 1644; *see also* 8 C.F.R. § 287.7(a). Rather than honor that system and share such information with federal authorities, Rochester prohibits any cooperation or information sharing, leaving it to federal authorities to locate such persons and chase them down in the streets to effectuate potentially riskier public arrests. There is no dispute that states and localities have some flexibility in the degree to which they actively assist federal officials in enforcing the immigration laws, but the question in this case is whether the Sanctuary laws and policies are compatible with the federal scheme or whether they obstruct and frustrate it. In exchange for honoring state and local interests in having aliens serve out their sentences of imprisonment, Congress provided federal immigration officials tools to effectuate a quick transfer from state to federal custody and to share the information necessary to do so. *See, e.g.*, 8 U.S.C. § 1226(c)(3); (d)(1). Congress did not intend for states and localities to undermine that system by not only refusing to honor detainers but by refusing to share any information about those subject to the detainers.

Like the Resolution and the Ordinance, the General Order is also conflict preempted because by prohibiting City personnel from inquiring or sharing information about immigration status, the Ordinance frustrates the implementation of the INA. Rochester argues, in passing, that there is uncertainty about what the General Order means or how it will be enforced and thus any conflict is hypothetical. Br. 30. But the General Order is abundantly clear about what officers may or may not do. To the extent Rochester is implying that it may decide not to enforce the General Order's plain terms, such an argument cannot avoid summary judgment here. The March incident shows Rochester was willing to enforce the provisions of General Order 502. The plain terms of

22

the revised General Order forbid information-sharing and other forms of cooperation. And Rochester has doubled own on its Sanctuary laws and policies time and again, even during the pendency of this litigation. It cannot avoid liability by revising or superseding its laws and policies with substantially similar ones and then claiming uncertainty over how they will be implemented. Rochester's intent is clear from its actions, as are the preempted effects of its actions.

### 4. Training Bulletin P-75-17 is Preempted

The Training Bulletin P-75-17 is also expressly and conflict preempted.[10] The Training Bulletin both summarizes the Resolution and General Order and provides evidence of how Rochester interprets and enforces its Sanctuary laws and policies. For example, it concedes that Resolution 2017-5 will "*regulate and in some cases restrict* our interaction with [CBP and ICE]." Training Bulletin P-75-17, ECF 59-3 at 1 (emphasis added). It emphasizes provisions of General Order 502, such as RPD will not ask about immigration status unless required to investigate criminal activity, request immigration documents, or honor detainers. *Id.* at 2. It states that "in non-emergency situations, contact with CBP or ICE must be authorized in advance" and "[a]ll such contacts require a ***specific and articulable need for a criminal investigation***." *Id.* (emphasis original). Because it summarizes and implements the Resolution and the General Order, it is preempted for the same reasons as the Resolution and General Order, explained above.

## II. The Sanctuary Laws and Policies Violate Intergovernmental Immunity

In addition to preemption, the Supremacy Clause also embodies principles of intergovernmental immunity. That doctrine prohibits state and local laws that "*either* regulate the

---

[10] Oddly, Rochester claims that "the AC does not actually challenge the Training Bulletin" which it says "can be confirmed by reference to Exhibit G to the AC." Br. 7. But the Amended Complaint and Exhibit G explicitly challenge the Training Bulletin. *See, e.g.,* Ex. G, p. 7; Am. Compl. ¶¶ 35, 41-43, 69, 72-73, 75-77, 79, 81, Prayer ¶¶ B, C. And Rochester cites no official action rescinding or suspending it to support its new claim that it "no longer has any force or effect." Br. 15.

United States directly *or* discriminate against the Federal Government" or those with whom it deals (*e.g.*, contractors). *United States v. Washington*, 596 U.S. 832, 838 (2022) (citing *North Dakota*, 495 U.S. at 435). In *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court explained that, under the Supremacy Clause, "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id*. at 436. "The Court thus interpreted the Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government." *Washington*, 596 at 838. "A state law discriminates against the Federal Government or its contractors if it single[s them] out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." *Id.* at 839 (internal quotations/citations omitted).

### A.     The Sanctuary Laws and Policies Regulate the Federal Government

Rochester's Ordinance applies to persons "under agreement" with the City and makes it unlawful for such persons to "prohibit or discourage Immigrants or their children from seeking opportunities…or accessing services on the basis of perceived or actual immigration services." § 63-21(A)(1). Rochester's General Order 125, issued in June 2025, states that "Ongoing partnerships between local and federal agencies and the RPD shall be documented on signed agreements, with all involved agencies, and shall outline the scope of the partnership." ECF 59-5 ¶ III.H. By first requiring agreements for ongoing partnerships with local and federal agencies, and then making it unlawful for anyone "under agreement" to prohibit or discourage aliens from seeking opportunities or accessing services, Rochester regulates the federal government because if any federal agency in partnership with it engages in immigration enforcement, they are necessarily violating the Ordinance. Complying with the Ordinance would necessarily impair the federal government's ability to carry out its functions.  Thus, the Ordinance, as applied to federal

agencies under agreement with Rochester, violates principles of intergovernmental immunity. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch*, 17 U.S. at 436; *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) ("federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." (internal citation omitted)). Likewise, if anyone who contracts with Rochester also contracts with the federal government, federal contracts could be impaired. *See King Cnty., Washington*, 122 F.4th at 756-57 (county order preventing contractors who leased space from the county's airport from servicing ICE unlawfully regulated the federal government); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 319, 323-24 (3d Cir. 2025).

The challenged laws and policies also improperly regulate the federal government by blocking access to information about the individuals encountered by RPD even though Congress has expressly contemplated information sharing between local and federal governments under 8 U.S.C. §§ 1373 and 1644. See Gen. Order 502 § (V)(E)(2). The policies also improperly block federal immigration officers' access to detainees unless they have a judicial or criminal warrant because Rochester will not recognize immigration detainers or administrative warrants, despite Congress authorizing those methods. *See id.* § (V)(G), *see also* ECF 59-3 at 2; *Arizona*, 567 U.S. at 407–08 (discussing administrative warrants); § 1226(c)(3). The requirements beyond what Congress authorized regulate federal immigration officials.

Through these policies, federal officials must "entirely transform [their] approach to detention in the" city by securing a criminal or judicial warrant (which require heightened

25

standards[11]) or by pursuing the alien and staging an arrest with little to no information about the individual. *See Geo Grp., Inc. v. Newsom,* 50 F.4th 745, 750 (9th Cir. 2022). The Constitution prohibits cities from impeding federal operations in such a way. *See United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."). Federal authorities have a congressional *mandate* to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. Rochester's Sanctuary laws and policies effectuate precisely the type of regulation that runs afoul of the intergovernmental immunity doctrine by "impermissibly overrid[ing] the federal government's decision, pursuant to discretion conferred by Congress," as to how to execute its mandate to detain and remove aliens present in violation of the immigration laws. *Geo Grp.,* 50 F.4th at 750-51.

> **B.**     **The Sanctuary Laws and Policies Discriminate Against Federal Authorities**

It is well established that a state or local law cannot "discriminate[ ] against the Federal Government" by singling it out for "less favorable treatment." *United States v. Washington*, 596 U.S. at 839 (quotations omitted). Rochester's Sanctuary laws and policies do just that.

All of Rochester's Sanctuary laws and policies discriminate against the federal government because their only application is to federal immigration enforcement, which both the Resolution and Ordinance identify as the impetus for the laws and policies. *See generally* ECF 59-5 at § 63-20; ECF 59-1 at 2, 4. The General Order and Training Bulletin discriminate against the federal government by singling out ICE, HSI, and CBP for unequal treatment. Those policies specifically prohibit certain interactions with ICE and CBP, including participating in an ICE or CBP task force

---

[11] *Compare* U.S. Immigr. & Customs Enf't, Policy No. 10074.2, § 2.4 (Mar. 24, 2017) (probable cause alien is subject to removal) *with Berger v. State of New York*, 388 U.S. 41, 55 (1967) (probable cause a crime has been committed).

(§ III.C.) or using ICE, CBP, or HSI for translation services unless there is an imminent threat to life or safety (V.D.1.), require approval for all non-emergency requests for assistance from CBP, ICE, and HSI outside of a federal task force (V.F.3), limit CBP, ICE, and HSI access to RPD facilities or to a person in RPD custody (V.G.1.c), require reporting of all contacts and requests for assistance with CBP, ICE, or HSI outside of a federal task force (V. H.1), and impose discipline for violations of the General Order (§ VII). These provisions do not "merely reference[] or … single[] out federal activities in an … innocuous manner." *United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019). Instead, they go beyond "incidental effects in an area of federal interest," *Knox v. Brnovich*, 907 F.3d 1167, 1177 (9th Cir. 2018), and impose "a specialized burden on federal activity," obstructing DHS's ability to enforce the immigration laws. *California*, 921 F.3d at 882.

Rochester argues that its laws and policies do not unlawfully discriminate against the federal government because there is no actor treated more favorably than the federal government. Br. 31-32. In support, Rochester argues that its Mutual Aid policy is more favorable to the federal government because requests for assistance from neighboring jurisdictions require a higher level of approval than requests for assistance from ICE or CBP. Br. 32. But that is comparing apples to oranges. A request for assistance from a neighboring department that would take Rochester officers out of the City of Rochester and their area of responsibility is a far different request than a request for assistance *within* City limits, which any request from ICE or CBP would be, because if they were in a neighboring jurisdiction, they would call that jurisdiction. Nor does Rochester's argument address the many ways the General Order singles out and discriminates against federal authorities, described above. Rochester does not, for example, identify a policy that requires reporting of all contacts with other law enforcement agencies or which limits access other law enforcement agencies may have to its facilities or persons in Rochester's custody.

27

Nor is Rochester's argument persuasive that any discrimination is a direct result of its decision not to participate in immigration enforcement. As discussed *infra*, there is a difference between not participating in a federal program and actively frustrating or constraining that program. *See City of Arcata*, 629 F.3d at 991 ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly."). Further, as discussed *infra*, "[t]he purpose of the Tenth Amendment is to limit Congress from usurping power that was reserved to the states," *Padavan v. United States*, 82 F.3d 23, 29 (2d Cir. 1996), and the power to limit information sharing or interfere with other immigration enforcement actions was not so reserved. In short, Rochester does more than passively decline to participate.

**III**.    **Rochester's Affirmative Defenses Fail**

    **A.**    **The Anticommandeering Doctrine Does Not Apply**

Under the Tenth Amendment, "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992) (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981)). But that requires, first, power reserved to the States. As the Second Circuit has explained, "[a] commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States.'" *New York v*, 951 F.3d at 113.  In the context of immigration, "[t]he Government of the United States has broad, undoubted power." *Arizona*, 567 U.S. at 394. "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co.* v. *Stranahan,* 214 U.S. 320, 339 (1909)). The Constitution crafts a delicate balance of power, granting Congress "certain enumerated powers," but leaving "all other legislative power" "for the States." *Murphy v. NCAA,* 584 U.S. 453, 470 (2018). A federal statute within Congress's enumerated powers is the supreme law of the land and

28

state and local statutes must yield. *Id.* Congress does not, however, have the power to issue orders directly to the States or their officials, *id.* at 471, just as states cannot regulate or discriminate against the federal government.

Any anticommandeering analysis must begin with the specific powers reserved to the states. *New York*, 951 F.3d at 113. Here, Rochester appears to assert that the power reserved is the general ability to choose to refrain from participating in federal immigration enforcement. *See, e.g.,* Br. 19-20. But, even though states have some degree of flexibility to decline to participate in immigration enforcement, Rochester's laws and policies go beyond a mere declination, to affirmative obstruction.

Beginning with §§ 1373 and 1644, while they leave room for states or localities to *require* information sharing, as the Supreme Court found in *Arizona*, 567 U.S. at 411, that "[t]he same conclusion may not be so easy to reach … with respect to a State policy *prohibiting* information sharing." *New York*, 951 F.3d at 114. Rochester affirmatively prohibits information sharing. Doing so is more than a mere declination to participate—it is an affirmative policy to obstruct and take an active stance *against* immigration enforcement.  Rochester could, for example, remain silent on information sharing, leaving it to individuals to decide whether to contact DHS. But it did not. The same is true of Rochester's decision not to honor civil immigration detainers. Rochester could honor detainers and provide access to those in custody, or provide their release information, thereby complying with the system created by Congress.

Ultimately, to what extent Rochester may refrain from participating in immigration enforcement is almost irrelevant because no power to restrict or prohibit information sharing was reserved to the states. Indeed, Rochester's reliance on *Printz* is misplaced because there the Court specifically distinguished schemes requiring "only the provisions of information to the Federal

29

Government" as different from "the forced participation of the States' executive in the actual administration of a federal program." *Printz,* 521 U.S. at 918. Nor does Rochester's invocation of police powers save its laws. In *New York*, the Second Circuit explained that in *Murphy*, "there was no question that, but for the challenged federal law, the States' police power allowed them to decide whether to permit sports gambling within their borders," but that such a conclusion "is not so obvious in the immigration context where it is the federal government that holds 'broad,' and 'preeminent' power." *Id.* at 113 (internal citations omitted).

**B.      Sections 1373 and 1644 are Constitutional Exercises of Congress's Enumerated Immigration Powers and Valid Preemption Provisions**

The Second Circuit has already determined, post-Murphy, that §§ 1373 and 1644 are not facially invalid under the Tenth Amendment and remain valid. *See New York*, 951 F.3d at 112-14. That decision is consistent with *City of New York*, in which the Second Circuit rejected New York City's facial challenge to §§ 1373 and 1644 as unconstitutional under the Tenth Amendment, finding instead that they preempted New York City's Executive Order 124, which restricted City employees' ability to "transmit information respecting any alien to federal immigration authorities." 179 F.3d at 36-37. These cases should end the inquiry.[12]

The Second Circuit's decisions make sense in view of preemption law. First, *Murphy* explains that language such as that of the express preemption clause in §§ 1373 and 1644 is not dispositive of who is regulated by the sections. *See Murphy*, 584 U.S. at 478-79 (explaining that Airline Deregulation Act regulated private parties despite clause that "no State or political

---

[12] Rochester argues that *United States v. New York*, 2025 U.S. Dist. LEXIS 225875 (N.D.N.Y. Nov. 17, 2025), calls into question *City of New York* and *New York*. Not so. That court suggested in a footnote that these were Tenth Amendment cases, not preemption cases. *Id.* at *41 n.9. That oversimplifies the cases which rejected the arguments Rochester makes here that §§ 1373 and 1644 do not regulate private parties and violate the Tenth Amendment. Moreover, a district court cannot overrule Second Circuit precedent.

subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision…," citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)).

The Supreme Court's explanation makes sense given that *every* federal law with preemptive effect, including §§ 1373 and 1644, limits the laws a state or locality may enact and thus can have an effect on states and localities. That is the very nature of preemption. *See South Carolina*, 485 U.S. at 514-15 ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect."). Federal laws affecting states and localities do not amount to direct orders to them; more is required, namely directing them to take action on matters left to the states, or coopting them into carrying out a federal regulatory scheme. *See Murphy*, 584 U.S. at 470-73, 477-79.

To determine who is regulated, the Court must look more broadly at both the statutes at issue and their place within the statutory scheme, as the Second Circuit noted in *New York*, when it rejected the *very position* advanced by Rochester:

> [I]nsofar as the district court concluded that the statute could claim no preemptive effect because it confers a purported federal right to transmit information only on government entities and officials, not on private persons, its focus may have been too narrow ... § 1373 is one provision of a larger statute, the INA, which certainly confers rights and places restrictions on large numbers of private persons.

951 F.3d at 114 n.27 (quotations/citations omitted). Thus, the question is whether the INA as a whole regulates private actors—aliens—and not whether §§ 1373 and 1644, when read in isolation, do. There can be no dispute that the INA, which specifies who may enter and on what conditions, regulates private actors. *See, e.g.*, 8 U.S.C. § 1101(a)(15) (classes of nonimmigrants who may seek to enter temporarily); *id.* § 1153 (classes of immigrants); *id.* § 1183 (inadmissible aliens); *id.* § 1324a(h)(3) (unauthorized workers). Sections 1373 and 1644 are just one part of that overall statutory scheme. Lastly, Rochester's reliance on out-of-circuit case law to the contrary is not

31

persuasive because such cases do not relieve this court of its obligation to follow controlling precedent. *Gilead Cmty. Servs. v. Town of Cromwell*, 112 F.4th 93, 98 (2d Cir. 2024).

### C.    The Amended Complaint is Adequately Pled

Rochester argues that the Amended Complaint is insufficiently pled. Br. 33, 35. That is wrong. Rule 8 requires a short and plain statement of the claim showing the plaintiff is entitled to relief, and a demand for the relief sought. Fed. R. Civ. P. 8; *see also Iqbal*, 556 U.S. at 678 (requiring sufficient facts to state a plausible claim). The United States specified its claims and the bases for them (*e.g.,* ECF 59 at ¶¶ 67-81), specified the Rochester laws and regulations challenged (including through an exhibit containing a table of provisions) (*e.g., id.* at ¶¶ 28-66 and Ex. F), set forth facts showing that Rochester enforces its Sanctuary laws and policies to the detriment of the United States (*e.g., id.* at ¶¶ 3-5, 51-56, 63-66), and precisely identified the relief requested (*e.g. id.* at Prayer). Nothing more is required for a Complaint. Rochester also suggests that the United States had to set forth its legal arguments for all injunction factors in the Amended Complaint or attach a "proposed order," but it cites no caselaw in support and the United States is not aware of any. On the contrary, notice-pleading merely requires giving a defendant notice as to *claims* and *forms of relief*, the supporting *arguments* may be developed in briefing.[13]

## IV.    The United States is Entitled to An Injunction

To be entitled to an injunction, a plaintiff must show that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "Harm is irreparable if legal

---

[13] By contrast, Rochester's request for a "declar[ation]" that 8 U.S.C. §§ 1373 and 1644 are "invalid," Br. 38, is inappropriate as the City has filed no claim or counterclaim for such relief.

32

remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). The balance of harms and public interest factors "merge when the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

*First*, the United States has suffered irreparable injury and there is no other remedy at law. Control over immigration is both a sovereign prerogative and an enumerated power of Congress. *Arizona*, 567 U.S. at 394-95. Federalism as embodied in the Constitution requires that certain powers belong to the national sovereign, while others are reserved to the states. *Murphy*, 584 U.S. at 470. Immigration belongs to the "national sovereign, not the 50 separate States" and individual states "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 395, 416. Rochester seeks to upset this constitutional order by establishing its own immigration policy via local laws and policies, which, as explained, conflict with federal law, obstruct the purposes of the INA, impede federal immigration enforcement, and regulate and discriminate against federal government. Rochester's blatant challenge to the Constitutional order causes irreparable harm to the United States. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (irreparable harm may be established by violation of Supremacy Clause); *United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish [injury]"); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (same).

Furthermore, a failure to enjoin these laws will invite other States to enact their own laws, resulting in a patchwork system of laws severely undermining the "integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 402 (internal quotations and citation omitted). *Cf. City of New York*, 179 F.3d at 35 (rejecting City's sovereignty argument as seeking to allow "states and localities to engage in passive resistance that frustrates federal programs."). That is particularly

33

true here because "the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases). The only remedy for such harms is to enjoin the laws; there is no adequate remedy at law.

*Second*, the balance of hardships and public interest tip decidedly in favor of the United States. The public has a strong interest in maintaining our system of federalism and the Constitutional lines drawn between federal and state power, as that is the very bedrock of our system of law and our nation. Rochester's challenged laws and policies undermine the constitutional framework of our nation. For that reason, the public also has no interest in enforcing Rochester's unconstitutional laws and policies. *See, e.g.*, *Odebrecht Constr. v. Sec'y, Fla. DOT*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (similar). The United States' public does, however, have a strong interest in enforcing its own political choices represented through the immigration laws enacted by Congress. *Blackie's House of Beef, Inc.*, 659 F.2d at 1221. Rochester cannot unilaterally undermine such laws through its own enactments; that is not how our federalist system of government works.

### C.     The Scope of the Requested Injunction is Proper

Rochester argues that the request to enjoin the defendants from "enforcing in any manner" the challenged provisions and "any substantially similar policies, orders, or laws that may become effective in the future" is impermissibly vague. Br. 37. To begin, it is odd to raise that objection as to a *complaint* rather than a motion. But in any event, an injunction against substantially similar policies is appropriate here. Rochester has already shown a penchant for issuing or reissuing laws and policies (and failing to alert Plaintiff or this Court when it does so). The scope of the injunction now proposed is necessary to prevent continued, serial litigation caused by Rochester simply

replacing current laws and policies with "new" laws and policies that cause the same harms and contain the same legal defects. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662, (1993) (analyzing similarity of replacement ordinance to challenged ordinance when determining whether case was mooted by new law). An injunction should provide complete relief. Here, given Rochester's actions, relief must reach new laws and policies that are substantially similar in effect and illegality.[14]

## CONCLUSION

For the foregoing reasons, the United States requests that this Court deny Defendants' motion to dismiss the Amended Complaint, enter summary judgment in the United States' favor on all claims, declare the challenged provisions of the Sanctuary laws and policies invalid, and permanently enjoin Rochester, its officers, directors, officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them from enforcing the Sanctuary laws and policies, and any other substantially similar laws and policies.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

GLENN M. GIRDHARRY
Acting Deputy Director

ALESSANDRA FASO
Acting Assistant Director

By: */s/ Alexandra McTague*
ALEXANDRA MCTAGUE

---

[14] Rochester's last-ditch "redressability" argument is misplaced. Br. 45-46. The City has moved to dismiss under Rule 12(b)(6), not (b)(1). And enjoining the Sanctuary laws and policies' prohibitions on cooperation would redress Plaintiff's harms from that obstruction and interference.

Senior Litigation Counsel
U.S. Department of Justice Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, D.C. 20044
Tel. 202-718-0483
Alexandra.mctague2@usdoj.gov

*Attorneys for the United States*