UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

THE CITY OF ROCHESTER, *et al.*,

Defendants.

Case # 25-CV-6226-FPG

DECISION & ORDER

## INTRODUCTION

Plaintiff the United States of America brings this action against Defendants the City of Rochester; Malik Evans, in his official capacity as Mayor of the City of Rochester; the Rochester City Council; and Miguel A. Melendez, Jr., in his official capacity as President of the Rochester City Council. ECF No. 59. Plaintiff alleges that Defendants' Sanctuary City laws and policies violate the Supremacy Clause of the United States Constitution. *See id.* Defendants now move to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6). ECF No. 66. Plaintiff opposes Defendants' motion, ECF No. 79, and moves for summary judgment on all of its claims pursuant to Rule 56, ECF No. 77. For the following reasons, Defendants' motion to dismiss, ECF No. 66, is GRANTED, and Plaintiff's motion for summary judgment, ECF No. 77, is DENIED AS MOOT.

## BACKGROUND

On April 24, 2025, Plaintiff brought the instant action in this Court challenging Defendants' 2017 directives regarding its status as a Sanctuary City. ECF No. 1. Both parties filed motions for judgment on the pleadings. ECF Nos. 8, 32. However, in the meantime, Defendants amended the challenged directives. *See* ECF No. 58 at 5. As such, on November 13, 2025, this Court dismissed Plaintiff's initial complaint as moot, and granted Plaintiff leave to file an amended

complaint. *Id.* at 6. On December 19, 2025, Plaintiff filed its Amended Complaint challenging Defendants' Sanctuary City laws and policies as amended in 2025. ECF No. 59.

The following facts are taken from the Amended Complaint unless otherwise noted. On May 27, 1986, Rochester established itself as a Sanctuary City when it passed Resolution 86-29, and Rochester remains a Sanctuary City to this day. ECF No. 59 ¶ 28. Resolution 86-26 discussed Rochester's long "tradition of support for the vulnerable and dispossessed," and Rochester's wish to "continue supporting its citizens in their efforts to maintain and further human rights for its citizens and for all who come within its borders." Rochester, N.Y., Res. No. 86-29 (1986). Resolution 86-26 states that

> the City Council finds that immigration and refugee policy is a matter of Federal jurisdiction; that Federal employees, not City employees, should be considered responsible for implementation of immigration and refugee policy; and further that the City Council requests the administration to direct[] employees to exclude refugee status as a consideration in their daily activities and routine dealings with the public, with the provisio that this directive should not be construed as approval to violate any law or encourage interference in law enforcement efforts.

*Id.*

Rochester's Sanctuary City policies remained largely unchanged until February 2017 when the Rochester City Council unanimously passed Resolution 2017-5, titled "Resolution Affirming that Rochester is a Sanctuary City," which remains in effect today. *Id.* ¶ 29. Resolution 2017-5 reaffirmed Resolution 86-26, prohibiting "City officials, including law enforcement officers, from participating in federal civil immigration enforcement and limit[ing] cooperation with federal immigration enforcement in several ways." *Id.* ¶ 30. Plaintiff alleges that Resolution 2017-5 impermissibly limits cooperation with federal immigration enforcement because it (1) prevents the City from using "its funds or personnel to enforce or to assist in the enforcement of Federal immigration policies," "except to the extent specifically required by law"; (2) prevents the Rochester Police Department ("RPD") from "inquiring about the immigration status of an

individual, including a crime victim, a witness, or a person who calls or approaches the police seeking assistance"; (3) prevents RPD from stopping, questioning, interrogating, investigating, or arresting "an individual based solely on actual or suspected immigration or citizenship status"; and (4) prevents City personnel from inquiring "about or request[ing] proof of immigration status or citizenship when providing services or benefits" except in limited circumstances. *Id.* ¶¶ 31–33. Resolution 2017-5 also instructs the Mayor and other city officials to implement policies that further the City's role as a Sanctuary City to ensure compliance with the objectives of the Resolution. *Id.* ¶ 34.

In response to Resolution 2017-5, RPD issued General Order 502 and Training Bulletin No. P-75-17. *Id.* ¶ 35. On September 4, 2025, General Order 502 was replaced with a revised General Order 502. *Id.* As amended in 2025, General Order 502 outlines a new protocol for assistance requests from CBP, ICE, and HSI based on whether there are exigent circumstances. *Id.* ¶ 38. Previously, General Order 502 contained no restrictions based on exigent circumstances involving ICE, CPB, or HSI. *Id.* However, when General Order 502 was amended in 2025, specific procedures were added for responding to a "call for assistance from ICE, HSI, or CBP in exigent circumstances involving an imminent threat to life or safety, and those procedures are more restrictive than the requirements for such calls from other agencies." *Id.* Specifically, General Order 502 now requires that "for non-emergency calls for assistance, a supervisor must acknowledge the request, determine whether a response is required, and if so, respond to the scene to ensure compliance by officers with the General Order." *Id.* Plaintiff alleges that this requirement is more restrictive than requirements for calls from other agencies as described in General Order 125. *Id.* As for all other requests for assistance from ICE, CBP, or HSI, General Order 502 provides that they "must be authorized by [a] Captain or above during business hours, or the Staff Duty Officer (SDO) during non-business hours and either require a specific and articulable need for a

criminal investigation or fall within the scenarios identified in Section (V)(G), namely the person is named in a judicial warrant or federal criminal arrest warrant, or there is probabl[e] cause to believe the person committed a federal crime." *Id.* (quotation omitted). Plaintiff alleges that by "requiring authorization to respond to a request from CBP, HSI, or ICE, the City is restricting, and potentially prohibiting, government officials from sending information to or sharing information with CBP, HSI, and ICE regarding the citizenship or immigration status of individuals." *Id.* ¶ 39.

In conjunction with General Order 502 in 2017, RPD issued Training Bulletin No. P-75-17. *Id.* ¶ 41. The Training Bulletin explained that General Order 502 "will, among other things, regulate and in some cases restrict our interaction with Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)." *Id.* The Training Bulletin also provided an overview of General Order 502 and reiterated the information in it. *Id.* ¶ 42. For example, the Training Bulletin explained that RPD "will ***not*** detain or turn over to CBP or ICE a person named in ***a civil immigration detainer***, and ***will not assist*** CBP or ICE in taking such persons into custody." *Id.* (emphasis in original). In addition, the Training Bulletin noted that modifications had been made to other General Orders, such as General Order 520, which modified the Prisoner Data Form to remove the field inquiring whether the prisoner was a citizen. *Id.* ¶ 43.

On August 26, 2025, the Rochester City Council passed, and Mayor Malik Evans approved Ordinance 2025-283, which amended the Rochester City Municipal Code. *Id.* ¶ 44. The Ordinance referenced Sanctuary City Resolutions 86-29 and 2017-5 and stated that it incorporated the protections for immigrants found in the Sanctuary City resolutions. *Id.* The Ordinance amended Municipal Code § 63-21 to make it unlawful for "the City, and any person under agreement with the City" to "prohibit or discourage Immigrants or their children from seeking opportunities, reporting crimes, or accessing services on the basis of perceived or actual immigration status." *Id.* ¶ 45. Plaintiff cites numerous sections of the Municipal Code to support its allegations that it is

unconstitutional. First, it cites to § 63-21(A)(2), which makes it unlawful for RPD to inquire about immigration status "unless necessary to investigate criminal activity" and unlawful for RPD to "stop, question, interrogate, investigate, or arrest an individual based solely on actual or suspected immigration or citizenship status." *Id.* ¶ 46. Second, it cites to § 63-21(A)(3), which applies more broadly to all City personnel and makes it unlawful for City personnel to "inquire about or request proof of immigration status or citizenship when providing services or benefits" unless required for receipt of such services or benefits, where lawfully required, or where needed for a criminal investigation. *Id.* ¶ 47. Third, it cites to § 63-21(A)(4), which makes it unlawful for the City to use "funds or personnel" to "enforce or assist in the enforcement of Federal immigration policies" or to participate in "any program requiring registration of individuals on the basis of national origin or immigration status" unless required by law. *Id.* ¶ 48.

Additionally, Plaintiff takes issue with Municipal Code § 63-11, which provides penalties for violations of the chapter, and "any orders and rules issued pursuant" to the chapter, stating that "a city officer or employee's commission of an unlawful act shall constitute a basis for discipline including removal." *Id.* ¶ 49. The provision specifically applies to "[a]ny city officer o[r] employee subject to the Mayor's jurisdiction, and any elected City officer or employee subject to the City Council's jurisdiction" and provides that such officers or employees shall be "subject to discipline or removal in the discretion of the appropriate appointing authority and in the manner provided by law." *Id.* Further, § 63-11(B) provides that the "Mayor, at their own behest, or upon request of the Council shall investigate any credible allegation that a City agency, official or employee has committed a Violation." *Id.* ¶ 50. "At the conclusion of the Investigation, the Mayor or their designee shall present the report of the investigation and its outcome to the Council in executive session" and "the findings and outcome of such investigations shall be made publicly available to the extent permitted by collective bargaining agreements and law." *Id.* (quotation omitted).

Plaintiff alleges that Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code (collectively the "Sanctuary City laws and policies") "reflect the City of Rochester's intentional effort to obstruct the Federal Government's enforcement of federal immigration law and to impede consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe." *Id.* ¶ 4. Plaintiff states that these policies were on display when federal law enforcement officers requested backup from RPD on March 24, 2025. *Id.* ¶ 51. RPD responded to the call for assistance, but according to Plaintiff, in response, Mayor Malik Evans "held a press conference in which he reaffirmed his administration's commitment to the City of Rochester's Sanctuary City Policies while criticizing the officers' assistance to federal immigration officers." *Id.* ¶¶ 51–52. Plaintiff states that it brought this lawsuit to "put an end to those policies." *Id.* ¶ 1.

In Plaintiff's Amended Complaint, Plaintiff brings three claims against Defendants alleging that Defendants' Sanctuary City laws and policies violate the Supremacy Clause of the United States Constitution because they (1) are both expressly and conflict preempted by 8 U.S.C. §§ 1373 and 1644; (2) unlawfully discriminate against the federal government; and (3) unlawfully regulate the federal government. ECF No. 59. Plaintiff requests as relief that the Court (1) "enter a judgment declaring that the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code violate the Supremacy Clause and are therefore invalid"; (2) "enter a judgment declaring that the Challenged Provisions of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code, violate 8 U.S.C. §§ 1373 and 1644 and are therefore invalid"; (3) "preliminarily and permanently enjoin Defendants as well as their successors, agents, and employees, from enforcing in any manner the Challenged Provisions

of Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283 as codified in the Municipal Code, and any substantially similar policies, orders, or laws that may become effective in the future"; and (4) award Plaintiff its costs and fees in this action. *Id.*

## DISCUSSION

Currently before the Court are Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6), ECF No. 66, and Plaintiff's motion for summary judgment, ECF No. 77, pursuant to Rule 56. The Court discusses each in turn.

### I. Defendants' Motion to Dismiss

#### A. Legal Standard

A complaint will survive a motion to dismiss under Rule 12(b)(6) when it states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief is plausible when the plaintiff pleads sufficient facts that allow the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. In considering the plausibility of a claim, the Court must accept factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). However, the Court need not "accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Id.* (quotation omitted).

#### B. Analysis

Defendants argue that Plaintiff's Amended Complaint must be dismissed because Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code (1) are not preempted by 8 U.S.C. §§ 1373 and 1644; (2) do not unlawfully discriminate against the federal government; and (3) do not unlawfully regulate the federal government. ECF No. 66-2. The Court discusses each argument below.

***1. Preemption***

Count One of Plaintiff's Amended Complaint alleges that Defendants' Sanctuary City laws and policies violate the Supremacy Clause of the Constitution because they are both expressly and conflict preempted by 8 U.S.C. §§ 1373 and 1644. ECF No. 59 ¶¶ 70–71. Under the Supremacy Clause, state and local laws that conflict with federal law are "without effect" and are therefore, preempted by federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quotation omitted); *see* U.S. Const. art. VI, cl. 2. "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quotation omitted).

The Supreme Court has enumerated three relevant principles when considering whether a state or local law is preempted by federal law. *See United States v. New York*, 810 F. Supp. 3d 329, 339 (N.D.N.Y. 2025). "First, given Congress' limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not 'some brooding federal interest.'" *Id.* at 339–40 (quoting *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citation omitted)). "Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States." *Id.* (citing *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 477–78 (2018). "This is so because Congress may only legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their deliberate rejection of a plan that would have allowed Congress to legislate on States." *Id.* (citing *New York v. United States*, 505 U.S. 144, 164–66 (1992). "Third, courts assume that Congress

does not preempt lightly." *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). "Although Congress may legislate in areas traditionally regulated by States, preemption analysis 'assume[s] that the historic police powers of the States' are not superseded unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Arizona v. United States,* 567 U.S. 387, 400 (2012)).

In this case, Plaintiff alleges Defendants' laws and policies are both expressly and conflict preempted by 8 U.S.C. §§ 1373 and 1644. As for 8 U.S.C. § 1373, it states:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

Further, 8 U.S.C. § 1644 states:

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

Defendants make numerous arguments as to why §§ 1373 and 1644 do not expressly or conflict preempt the City of Rochester's Sanctuary City laws and policies. *See* ECF No. 66-2 at 20–39. One of Defendants' arguments is that §§ 1373 and 1644 are not valid preemptive provisions and therefore, Plaintiff's First Count must be dismissed because §§ 1373 and 1644 cannot preempt state or local law. *Id.* at 34. Because the Court agrees that Plaintiff's First Count must be dismissed because §§ 1373 and 1644 are not valid preemptive provisions, the Court will not address Defendants' other arguments.

In *Murphy v. Nat'l Collegiate Athletic Ass'n*, the Supreme Court made clear that for a federal statute to preempt state or local law it must "be best read as one that regulates private actors" rather than government entities. 584 U.S. 453, 477 (2018); *see also Haaland v. Brackeen*, 599 U.S. 255, 284–85 (2023) ("When a federal statute applies on its face to both private and state

actors, a commandeering argument is a heavy lift[.]"). "This pronouncement derives from the Constitution, which 'confers upon Congress the power to regulate individuals, not States.'" *United States v. Illinois*, 796 F. Supp. 3d 494, 520 (N.D. Ill. 2025) (quoting *United States v. New York*, 505 U.S. 144, 166 (1992)). "It also reinforces the anticommandeering doctrine, which preserves dual sovereignty by prohibiting federal command of States as sovereigns (rather than market participants)." *Id.* To determine if a federal law regulates private actors, courts must "look beyond the phrasing employed" and decide whether the law in substance affects the rights of private actors. *Murphy*, 584 U.S. at 478. Where a provision regulates state and local governments, but not private actors, it cannot be a valid preemption provision and therefore, cannot expressly or conflict preempt a state or local law. *See Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 181–82 (3d Cir. 2021) (holding that "regardless of the type of preemption claimed" a federal statute "that does not regulate private actors cannot serve as a basis for preemption.").

Here, the Court concludes that §§ 1373 and 1644 are not preemptive provisions because they do not regulate private actors in language or effect. The plain text of §§ 1373 and 1644 only operates on state and local government entities and officials, prohibiting restrictions on their ability to share certain immigration-related information with the Immigration and Naturalization Service. Because §§ 1373 and 1644 only address information sharing between government actors, they do not create or restrict the rights of any private actor. *See Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 182. Indeed, there is no way to read §§ 1373 or 1644 as regulating anyone other than states and their political subdivisions. Many courts that have considered the issue post-*Murphy* have reached the same conclusion. *See, e.g., Illinois*, 796 F. Supp. 3d at 524–25 (holding that §§ 1373 and 1644 are not valid preemptive provisions, as they regulate "States and local governments, but not private actors"); *Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 182 (holding that plaintiff's express and conflict preemption claims failed because §§ 1373 and 1644 only regulate state action and thus, cannot

serve as a basis for preemption); *United States v. Minnesota*, No. 25-CV-3798, 2026 WL 2085701, at *19 (D. Minn. July 20, 2026) (explaining that §§ 1373 and 1644 cannot serve as a basis for preemption "because neither statute regulates private actors").[1] Therefore, because §§ 1373 and 1644 are not valid preemptive provisions, Plaintiff's preemption claim fails, and Count One is dismissed.

***2. Discrimination Against the Federal Government***

Count Two of Plaintiff's Amended Complaint alleges that Defendants' Sanctuary City laws and policies unlawfully discriminate against the federal government. ECF No. 59 ¶ 75. Specifically, Plaintiff argues that "Resolution No. 2017-5, General Order 502, Training Bulletin No. P-75-17, and Ordinance 2025-283, as codified in the Municipal Code single out federal immigration officials, expressly and impliedly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated." *Id.* ¶ 76. Consequently, Plaintiff argues that these laws and policies violate the doctrine of intergovernmental immunity. *Id.* ¶ 77. Defendants argue that Plaintiff's Second Count must be dismissed because to the extent Plaintiff challenges Resolution No. 2017-5 and Ordinance 2025-283, as codified in the Municipal Code, it has failed to identify a comparator. *See* ECF No. 66-2 at 39. As to General Order 502 and Training Bulletin No. P-75-17, Defendants argue that Count Two must be dismissed because General Order 502 and Training Bulletin No. P-75-17 do not single out the federal government for less favorable treatment. *Id.* at 39–40. The Court discusses each argument in turn.

**a. Resolution No. 2017-5 and Ordinance 2025-283**

Plaintiff argues that Resolution No. 2017-5 and Ordinance 2025-283 discriminate against

[1] Plaintiff argues that post-*Murphy*, the Second Circuit rejected the argument that §§ 1373 and 1644 are not valid preemption provisions in *New York v. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020). ECF No. 79 at 40. However, the Court rejects this argument because in that case, the Second Circuit did not hold that §§ 1373 and 1644 are valid preemption provisions, and instead, merely discussed possible anticommandeering considerations related to §§ 1373 and 1644. *See id.* at 114.

the federal government because their only application is to federal immigration enforcement. ECF No. 79 at 36. In response, Defendants argue that as to these provisions, Plaintiff's claim fails because it has failed to identify a comparator who is treated more favorably than the federal government. ECF No. 66-2 at 39.

"State [and local] law may not discriminate against the federal government by setting it apart for less favorable treatment based on its federal governmental status." *New York*, 810 F. Supp. 3d at 353 (citing *United States v. Washington*, 596 U.S. 832, 839 (2022)). However, "the mere fact that the [state or local law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). Therefore, "[t]he State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *United States v. Washington,* 460 U.S. 536, 544–45 (1983). Consequently, a claim that a state or local government has unlawfully discriminated against the federal government necessarily fails where no comparator that is more favorably treated is identified. *New York*, 810 F. Supp. 3d at 353; *Illinois*, 796 F. Supp. 3d at 533.

Plaintiff's claim as it pertains to Resolution No. 2017-5 and Ordinance 2025-283 only alleges that these provisions discriminate against the federal government because their only application is to federal immigration enforcement. *See* ECF No. 79 at 36. As explained above, to state a claim for discrimination against the federal government, Plaintiff must identify a comparator that is treated more favorably under the law. *See New York*, 810 F. Supp. 3d at 353; *Illinois*, 796 F. Supp. 3d at 533. Here, Plaintiff has identified no such comparator. As such, Plaintiff's claim that Resolution No. 2017-5 and Ordinance 2025-283 unlawfully discriminate against the federal government fails.

**b. General Order 502 and Training Bulletin No. P-75-17**

As for General Order 502 and Training Bulletin No. P-75-17, Plaintiff argues that they "discriminate against the federal government by singling out ICE, HSI, and CBP for unequal treatment." ECF No. 79 at 36. Specifically, Plaintiff takes issue with their (1) prohibition on certain "interactions with ICE and CBP, including participating in an ICE or CBP task force," (2) prohibition on "using ICE, CBP, or HSI for translation services unless there is an imminent threat to life or safety," (3) requirement for "approval for all non-emergency requests for assistance from CBP, ICE, and HSI outside of a federal task force," (4) limitation on "CBP, ICE, and HSI access to RPD facilities or to a person in RPD custody," (5) requirement of "reporting of all contacts and requests for assistance with CBP, ICE, or HSI outside of a federal task force," and (6) imposition of discipline for violations of the General Order. *Id.* at 36–37. In the Amended Complaint, Plaintiff points to General Order 125 as evidence that other law enforcement agencies are treated more favorably than the federal government but does not articulate how any specific provisions of that order support its allegations. *See* ECF No. 59 ¶ 6. Defendants argue that as to these provisions, Plaintiff's claim fails because it has failed to demonstrate that Defendants have singled out the federal government for less favorable treatment. ECF No. 66-2 at 39–40.

To the extent that Plaintiff argues that Defendants have treated the federal government less favorably by prohibiting the use of ICE, CBP, or HSI translation services, limiting CBP's, ICE's, and HSI's access to RPD facilities or those in RPD custody, and imposing discipline for failure to comply with the General Order, Plaintiff has identified no comparator that is treated more favorably. That is, Plaintiff has not alleged that RPD uses another law enforcement agencies' translation services, nor has it alleged that RPD allows other law enforcement agencies access to RPD facilities or those in RPD custody in different circumstances than those in which CBP, ICE, or HSI are allowed, nor does it allege that RPD does not impose discipline for failure to comply

with other General Orders. As explained above, a claim for discrimination against the federal government necessarily fails where no comparator is identified by a plaintiff. *See New York*, 810 F. Supp. 3d at 353. Therefore, as to these specific provisions, the Court concludes that Plaintiff has failed to state a claim of unlawful discrimination because it has failed to identify a comparator.

As for the remaining claims, a claim of discrimination against the federal government must allege that the federal government is being set "apart for less favorable treatment based on its federal governmental status." *Id*. Here, Plaintiff alleges that the federal government is treated less favorably because (1) Rochester does not require reporting of all contacts and requests for assistance from other law enforcement agencies, but requires that for CBP, ICE, or HSI outside of a federal task force; (2) RPD allows officers to be assigned to other federal and state task forces, but not ICE and CBP task forces; and (3) RPD has a different approval process for all non-emergency requests for assistance from CBP, ICE, and HSI outside of a federal task force as opposed to other law enforcement agencies where no such process exists. ECF No. 79 at 37. While Plaintiff argues that these provisions are discriminatory, Plaintiff fails to allege that the purported discrimination is based on Plaintiff's governmental status. *See New York*, 810 F. Supp. 3d at 353. In this case, there may be different requirements for CBP, ICE, and HSI, but amongst the comparator law enforcement agencies that Plaintiff identifies as being more favorably treated than CBP, ICE, and HSI are other federal law enforcement agencies, namely the federal task forces, which are excluded from the provisions. As such, it would be impossible for Plaintiff to allege that the challenged provisions treat the federal government less favorably based on its governmental status because not all federal law enforcement agencies are subject to the purported less favorable treatment.

Further, while the Court agrees that there are differences between how RPD reports contacts with ICE, CBP, and HSI, how RPD approves requests for assistance from ICE, CBP, and

HSI, and RPD's policy related to task force assignments, Plaintiff fails to identify how this differential treatment is less favorable to the federal government. That is, it is unclear to the Court how RPD's internal procedures are detrimental to the federal government absent some sort of allegation that the internal procedures burden the federal government. Specifically, the Amended Complaint fails to allege that these provisions treat the federal government less favorably because it fails to allege that the provisions "impose a burden on the federal government in a way the intergovernmental immunity doctrine considers problematic." *New York*, 810 F. Supp. 3d at 353. "Unlike most discrimination cases in which a state affirmatively levies a tax or cost on the federal government . . . the [challenged provisions] here simply decline to ease the burden of civil immigration enforcement by permitting state and local government agents to assist." *Id.* Such a choice to implement internal procedures that decline to ease the burden of civil immigration enforcement does not impose a burden on the federal government. *See id.* Instead, it simply recognizes the different functions of each governmental body and as such, does not constitute unlawful discrimination. Therefore, the Court concludes that Plaintiff has failed to state a claim as to Count Two, and Count Two is dismissed.

***3. Unlawful Regulation of the Federal Government***

Count Three of Plaintiff's Amended Complaint alleges that Defendants' Sanctuary City laws and policies unlawfully regulate the federal government. ECF No. 59 ¶ 79. Specifically, Plaintiff points to Ordinance 2025-283, which applies to persons "under agreement" with the City of Rochester and makes it unlawful for such persons to "prohibit or discourage Immigrants or their children from seeking opportunities . . . or accessing services on the basis of perceived or actual immigration services." ECF No. 79 at 34 (quoting Municipal Code § 63-21(A)(1)). Additionally, Plaintiff points to General Order 125, which states that "[o]ngoing partnerships between local and federal agencies and the RPD shall be documented on signed agreements, with all involved

agencies, and shall outline the scope of the partnership." *Id.* (quoting ECF No. 59-5 ¶ III.H). Plaintiff therefore argues that "[b]y first requiring agreements for ongoing partnerships with local and federal agencies, and then making it unlawful for anyone 'under agreement' to prohibit or discourage aliens from seeking opportunities or accessing services, Rochester regulates the federal government because if any federal agency in partnership with it engages in immigration enforcement, they are necessarily violating the Ordinance." *Id.* Plaintiff thus concludes that "[c]omplying with the Ordinance would necessarily impair the federal government's ability to carry out its functions" and, as such, applied to federal agencies under agreement with Rochester, it violates principles of intergovernmental immunity. *Id.* at 34–35. Further, Plaintiff argues that if anyone contracts with Rochester and also contracts with the federal government, federal contracts could be impaired. *Id.* at 35.

Additionally, Plaintiff argues that the Sanctuary City laws and policies "improperly regulate the federal government by blocking access to information about the individuals encountered by RPD even though Congress has expressly contemplated information sharing between local and federal governments under 8 U.S.C. §§ 1373 and 1644." *Id*. As a result, Plaintiff argues that the Sanctuary City laws and policies "also improperly block federal immigration officers' access to detainees unless they have a judicial or criminal warrant because Rochester will not recognize immigration detainers or administrative warrants, despite Congress authorizing those methods[,]" which adds "requirements beyond what Congress authorized" thereby regulating federal immigration officials. *Id.* Plaintiff concludes that the Sanctuary City laws and policies are prohibited by the Constitution because "[t]hrough these policies, federal officials must 'entirely transform [their] approach to detention in the' city by securing a criminal or judicial warrant" or "by pursuing the alien and staging an arrest with little to no information about the individual." *Id.* at 35–36 (quoting *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022)).

The intergovernmental immunity doctrine bars states and local governments from directly regulating the federal government. *See McHenry Cnty.*, 44 F.4th at 592. "Direct regulation can take many forms, including taxing the federal government or prohibiting the federal government from taking a particular action." *New York*, 810 F. Supp. 3d at 352. "The crux of the inquiry, however, is whether the state [or local] law directly regulates the federal government." *Id.*; *see also Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) ("[T]he key question is whether state law seeks to improperly 'control' the employee's federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets.'") (quoting *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920)). The Supreme Court has "thoroughly repudiated" the view that "any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota v. United States*, 495 U.S. 423, 434–35 (1990) (citation omitted). Consequently, the intergovernmental immunity doctrine's bar on direct regulation of the federal government is not implicated where a state law does "not forbid the federal government or its contractors from acting," but rather "regulate[s] how state and local officials perform their duties." *Minnesota*, 2026 WL 2085701, at *21.

Defendants argue that Plaintiff's claim fails because "[b]y their plain terms, these enactments direct City officials in the conduct of their City duties and do not govern any federal actors or entities." ECF No. 66-2 at 42. The Court agrees because none of the complained-of laws and policies directly regulate the federal government. As for Plaintiff's arguments about Ordinance 2025-283, the Ordinance only applies to those under agreement with the City of Rochester. Nowhere does it mention the federal government or limit what the federal government may do. To the extent that Plaintiff argues that there may be federal agencies under contract or agreement with the City of Rochester, which are affected by the Ordinance, they fail to identify any such agency.

Nevertheless, even if there were a federal agency under agreement with the City of Rochester, which might be impacted by Ordinance 2025-283, the Ordinance would only indirectly regulate that federal agency because it is under agreement with the City, not because it is a federal agency. As explained above, such indirect regulation does not violate the intergovernmental immunity doctrine. *See New York ex rel. James v. Pennsylvania Higher Educ. Assistance Agency,* No. 19-CV-9155, 2020 WL 2097640, at *8 (S.D.N.Y. May 1, 2020) (explaining that "the burdens imposed on the federal government by a neutral state law" do not violate the intergovernmental immunity doctrine and instead are "'normal incidents of the organization within the same territory of two governments'" (quoting *North Dakota*, 495 U.S. at 435)).

As for Plaintiff's other arguments, the Court notes that it is difficult to discern which specific policies Plaintiff is challenging. In any event, it is of no import which specific provisions Plaintiff is challenging because the intergovernmental immunity doctrine's bar on direct regulation is not implicated where a local law does "not forbid the federal government or its contractors from acting," but rather "regulate[s] how state and local officials perform their duties." *Minnesota*, 2026 WL 2085701, at *21. Here, Rochester's Sanctuary City laws and policies are not a prohibition on or interference with the federal government's role in enforcing immigration policy. Instead, they simply recognize the different functions of each governmental body. Specifically, the Sanctuary City laws and policies only dictate that RPD and other Rochester employees cannot participate in civil immigration enforcement. As such, they do not dictate how the federal government must act and therefore do not violate the intergovernmental immunity doctrine. To the extent that Plaintiff alleges that the Sanctuary City laws and policies may affect the federal government's approach to immigration enforcement, such arguments are insufficient to demonstrate direct regulation. *See Illinois*, 796 F. Supp. 3d at 535 (holding that while laws may "indirectly affect ICE's operations in Illinois, they directly regulate only state and local law enforcement entities" and therefore did

not violate the intergovernmental immunity doctrine). For these reasons, Count Three is dismissed.

### C. Leave to Amend Denied

"Although Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint shall be freely given when justice so requires, it is within the sound discretion of the district court whether to grant or deny leave to amend." *Schvimmer v. Off. of Ct. Admin.*, 857 F. App'x 668, 671 (2d Cir. 2021) (summary order) (cleaned up). Therefore, the Court may deny leave to amend if it determines amendment would be futile or there has been a "repeated failure to cure deficiencies by amendments previously allowed." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016). In this case, the Court concludes that Plaintiff should not be granted leave to amend because Plaintiff has not requested leave to further amend and because Plaintiff has previously been granted an opportunity to amend. *See id.* 28–29. As such, Plaintiff's claims, which have been dismissed for the reasons discussed above, are dismissed with prejudice.

## II. Plaintiff's Motion for Summary Judgment

Because the Court has granted Defendants' motion to dismiss, Plaintiff's motion for summary judgment, ECF No. 77, is denied as moot.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, ECF No. 66, is GRANTED, and Plaintiff's Amended Complaint, ECF No. 59, is DISMISSED WITH PREJUDICE. Additionally, Plaintiff's motion for summary judgment, ECF No. 77, is DENIED AS MOOT. The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: September 1, 2026
Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York